No. 2020-2218

# United States Court of Appeals for the Federal Circuit

BOT M8 LLC,
*Plaintiff-Appellant*,

v.

SONY CORPORATION OF AMERICA, SONY CORPORATION, SONY INTERACTIVE ENTERTAINMENT LLC,
*Defendants-Appellees*.

Appeal from the United States District Court for the Northern District of California in Case No. 3:19-cv-07027-WHA, Judge William H. Alsup

**OPENING BRIEF FOR PLAINTIFF-APPELLANT BOT M8 LLC**

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, California 94025
Telephone: (650) 752-1700

Aaron M. Frankel
Cristina Martinez
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

***COUNSEL FOR PLAINTIFF-APPELLANT BOT M8 LLC***

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 8,078,540

1. A gaming machine, comprising:

(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;

(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and

(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory,

the CPU being configured to:

(a) read out the authentication program from the memory of the board, and then, store the read out authentication program in said another memory of the motherboard;

(b) execute the authentication program stored in said another memory in the process (a), and then, authenticate the game program in the memory of the board, based upon the executed authentication program;

(c) write the game program in the memory of the board, to said another memory of the motherboard, in a case where the game program in the memory of the board is authenticated as a result of the authentication process (b); and

(d) execute the game based upon the game program written to said another memory of the motherboard in the process (c).

**U.S. Patent No. 8,095,990**

1. A gaming machine comprising:

a game action executing device configured to execute a game action;

a loading device including a connection unit configured to be connected to a removable storage medium storing therein gaming information including a mutual authentication program; and

a process device including a readable and rewritable storage unit,

wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device:

the program storage unit configured to store therein an authentication program for authenticating the gaming information stored in the storage medium;

the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

the mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to the mutual authentication program included in the gaming information authenticated by the authentication unit,

the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit, and

the process device includes an action controlling unit configured to control the game action executing device according to the written gaming information so that the game action executing device executes the game action, when the mutual authentication unit has executed the mutual authentication process.

5. A gaming information authentication loading device comprising:

a loading device including therein a connection unit configured to be connected to a removable storage medium storing therein gaming information including a mutual authentication program; and

a process device including a readable and rewritable storage unit,

wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device:

the program storage unit configured to store therein an authentication program for authenticating the gaming information;

the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

the mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to a mutual authentication program included in the gaming information authenticated by the authentication unit, and

the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit.

9. A gaming information loading device configured to load gaming information including a mutual authentication program stored in a removable storage medium from the storage medium to a mother board connected to the gaming information loading device, comprising:

a connection unit configured to be connected to the storage medium;

a program storage unit configured to store therein an authentication program for authenticating the gaming information;

a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

a mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to a mutual authentication program included in the gaming information authenticated by the authentication unit.

**U.S. Patent No. 7,664,988**

1. A gaming device configured to execute a game, the gaming device comprising:

a first memory device for storing a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device for storing a game application program for the game, the second memory device being connected to the mother board; and

a control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein,

wherein the fault inspection program is stored in the first memory device, and the control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started.

4. The gaming device according to claim 1, wherein the first memory device and the mother board are located in the gaming device.

6. A gaming device configured to execute a game, the gaming device comprising:

a first memory device configured to store a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device configured to store a game application program, the second memory device being connected to the mother board and electrically rewritable;

a control device configured to execute a fault inspection program to inspect whether or not a fault occurs in the second memory device and the game application program stored therein;

wherein the fault inspection program is stored in the first memory device, and the control device executes the fault inspection program every time the gaming device is started to operate and completes the execution of the fault inspection program before the game is started, and

wherein when the fault does not occur in the second memory device the game application program is started to execute and when the fault occurs in the second memory device an error is displayed on a display device located on an exterior of the gaming device.

10. A gaming device configured to execute a game, the gaming device comprising:

a first memory device for storing a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device for storing a game application program for the game and a BIOS, the second memory device being connected to the mother board; and

a control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein;

wherein the fault inspection program is stored in the first memory device, and the control device executes the boot program to initialize the BIOS stored in the second memory device before executing the fault inspection program when the gaming device is started to operate, and completes the execution of the fault inspection program before the game is started.

**U.S. Patent No. 8,112,670**

1. A gaming device configured to execute a game, the gaming device comprising:

> a mother board on which a first memory device is provided;
>
> a second memory device configured to store a game application program, the second memory device being connected to the mother board; and
>
> a control device for executing a fault inspection program for the second memory device to inspect whether or not a fault occurs in the second memory device;
>
> wherein the fault inspection program is stored in the first memory device, and the control device completes the execution of the fault inspection program before the game is started.

2. The gaming device according to claim 1, wherein the first memory device stores a boot program executed when the gaming device is started to operate, and

> wherein the control device executes the fault inspection program after the boot program is executed.

3. The gaming device according claim 1, wherein the second memory device is electrically rewritable.

**U.S. Patent No. 7,338,363**

1. A first gaming machine for transmitting/receiving data to/from a server, comprising:

> a specification value setting device for setting at least one specification value as a control condition for game control;
>
> a transmitting device for transmitting data of a game result to the server;
>
> a gaming machine determining device for determining a second gaming machine operated by a co-player;
>
> a total result data receiving device for receiving from the server data of a total game result achieved by the first gaming machine and the second gaming machine based on the data of the game result transmitted by the transmitting device;

a specification value determining device for determining a specification value based on the data of the total game result received by the total result data receiving device; and

a specification value renewing device for renewing to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

8. A server for transmitting/receiving data to/from a first gaming machine operated by a game player and a second gaming machine operated by a co-player, comprising:

a specification value setting device for setting at least one specification value as a control condition for game control with the first gaming machine;

a game result data receiving device for receiving data of a game result transmitted from the first gaming machine and data of a game result transmitted from the second gaming machine;

a game result totalizing device for totalizing the game result of the first gaming machine and the game result of the second gaming machine on the basis of the data of the game result transmitted from the first gaming machine and the data of the game result transmitted from the second gaming machine so as to calculate a total result wherein the data of the game results are received by the game result data receiving device;

a specification value determining device for determining a specification value based on the total result calculated by the game result totalizing device; and

a determined specification value transmitting device for transmitting the specification value determined by the specification value determining device to the first gaming machine and the second gaming machine.

11. A program stored on media for directing a computer of a first gaming machine for transmitting/receiving data to/from a server to perform:

setting at least one specification value as a control condition for game control with the first gaming machine;

transmitting data of a game result to the server;

determining a second gaming machine operated by a co-player;

receiving from the server data of a total result totalizing the game result achieved by the first gaming machine and a game result achieved by the second gaming machine;

determining a specification value based on the data of the total result; and

renewing to replace the set specification value with the determined specification value.

**CERTIFICATE OF INTEREST**

1. The full name of every party represented by me is:

   - Bot M8 LLC

2. The name of the real party in interest represented by me is:

   - Bot M8 LLC

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curia represented by me are listed below:

   - Forward People, LLC

4. The names of all law firms, partners and associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

   - Gregory Proctor and Jeffrey Eng of Kramer Levin Naftalis & Frankel LLP

5. Other than the originating case numbers(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   - *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00726
   - *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00922
   - *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00963
   - *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-01218
   - *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-01288

6. All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and in bankruptcy cases.

   - None.

Dated: November 02, 2020

*/s/ Paul J. Andre*

Paul J. Andre
Lisa Kobialka
James Hannah
Kramer Levin Naftalis & Frankel LLP
990 Marsh Road
Menlo Park, California 94025
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Aaron M. Frankel
Cristina Martinez
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: 212.715.7502
Fax: 212.715.8302
afrankel@kramerlevin.com
cmartinez@kramerlevin.com

*Attorneys for Appellant*
Bot M8 LLC

## TABLE OF CONTENTS

Page(s)

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ON APPEAL ........ 3

STATEMENT OF THE CASE ........ 4

STATEMENT OF THE FACTS ........ 6

A. Universal Entertainment Corporation Invented a Series of Improvements in Gaming Technology ........ 6

B. Sony's PlayStation 4 Infringes Bot M8's Asserted Patents ........ 8

C. Sony Never Challenged the Sufficiency of Bot M8's Original Complaint ........ 10

D. The District Court *Sua Sponte* Required Bot M8 to Provide an Amended Complaint ........ 11

E. The District Court Dismissed Bot M8's First Amended Complaint ........ 14

F. Bot M8 Obtained Permission to Jailbreak and Reverse Engineer the PS4 ........ 15

G. The District Court Denied Bot M8's First Request for Leave to Amend ........ 16

H. The District Court Denied Bot M8's Request for Leave to File a Motion to Reconsider ........ 18

I. The District Court Disregarded Expert Opinion and Factual Issues in Granting Summary Judgment on Claim 1 of the '363 Patent ........ 20

SUMMARY OF THE ARGUMENT ........ 22

ARGUMENT ........................................................................................ 24

I. The District Court Erred in *Sua Sponte* Forcing Bot M8 to Replead, Demanding Far More Proof of All Elements Than the Law Requires ........................................................................................ 24

A. This Court Applies *De Novo* Review to the District Court's Misapplication of Rule 12(b)(6) ........................................ 25

B. The District Court Applied an Incorrect Standard in Reviewing Bot M8's Complaint ........................................ 26

II. The District Court Erred in Dismissing Bot M8's First Amended Complaint, Which Plausibly Alleged Infringement ..................... 29

A. Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '540 Patent ........................................ 30

1. Bot M8's First Amended Complaint Plausibly Alleged that the PS4's Internal Hard Drive is a Board ........................................ 31

2. Bot M8's First Amended Complaint Plausibly Alleged that PS4 Blu-Ray Game Discs are Boards .................. 34

3. Bot M8's First Amended Complaint Plausibly Alleged that the PlayStation Network Servers are Boards ........................................ 36

B. Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '990 Patent ........................................ 38

1. Bot M8's First Amended Complaint Plausibly Alleged That the PS4's Hard drives, Blu-ray Game Discs and PlayStation Network Servers Store a Mutual Authentication Program ........................................ 39

2. Bot M8's First Amended Complaint Plausibly Alleged That the PS4's Flash Memory Chip Stores a Mutual Authentication Program ........................................ 41

C. Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '988 and '670 Patents ........................................ 43

III. The District Court Abused its Discretion by Denying Bot M8's First Motion for Leave to Amend ........ 46

A. This Court Reviews Denial of Leave to Amend for Abuse of Discretion ........ 47

B. The District Court Abused its Discretion by Denying Bot M8's First Motion For Leave to Amend ........ 47

C. The District Court Erroneously Concluded That Bot M8 Could Have Jailbroken the PS4 at Any Time ........ 50

IV. Claim 1 of the '363 Patent is Patent Eligible ........ 54

A. This Court Reviews A Grant of Summary Judgment *De Novo* ........ 55

B. Claim 1 of the '363 Patent is Patent-Eligible at Alice Step 1 ........ 56

C. Claim 1 is Patent Eligible at Step 2 Because it Covers Inventive Concepts ........ 62

D. The District Court Improperly Resolved Disputed Questions of Fact in Granting Summary Judgment ........ 65

CONCLUSION ........ 69

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) ....................67

*Alice Corp. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014).................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) ....................65

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
465 F.3d 946 (9th Cir. 2006) ....................49

*Applied Med. Res. Corp. v. Tyco Healthcare Grp. LP*,
534 F. App'x 972 (Fed. Cir. 2013) ....................55

*Arizona Students' Ass'n v. Arizona Board of Regents*,
824 F.3d 858 (9th Cir. 2016) ....................48

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................23, 25, 27, 32

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ....................64, 65

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, (1955)....................28, 38, 43

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911, 205 L. Ed. 2d 454 (2020).................... *passim*

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp*,
635 F.3d 1373 (Fed. Cir. 2011) ....................68

*Davis v. Pac. Capital Bank, N.A.*,
550 F.3d 915, 916 (9th Cir. 2008) ....................25

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*,
888 F.3d 1256 (Fed. Cir. 2018) ....................................................28, 31, 32

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ..........................................................58, 62

*Finjan, Inc. v. Blue Coat Sys., LLC*,
No. 15-cv-03295-BLF, 2016 WL 7212322
(N.D. Cal. Dec. 13, 2016) ....................................................................57, 59

*Foman v. Davis*,
371 U.S. 178 (1962) ............................................................................47, 48

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
572 U.S. 559 (2014) ............................................................................50, 54

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323, 1339 (Fed. Cir. 2012) ....................................................28

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) .................................................................49

*Juniper Networks, Inc. v. Shipley*,
643 F.3d 1346 (Fed. Cir. 2011) ..............................................................25

*Kimberly-Clark Corp. v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir. 1984) ..............................................................63

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ..........................................................25, 33

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522, 532 (9th Cir. 2008) ..........................................................47

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017) .........................................................*passim*

*Metricolor LLC v. L'Oréal S.A.*,
791 F. App'x 183 (Fed. Cir. 2019) ....................................................25, 47

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018) .........................................................*passim*

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ....................57, 58

*Source Search Techs., LLC v. LendingTree, LLC*,
588 F.3d 1063 (Fed. Cir. 2009) ....................55

*Space Data Corp. v. Alphabet Inc.*,
No. 16-CV-03260-BLF, 2019 WL 415578 (N.D. Cal. Feb. 1, 2019) ....................50

*Synchronoss Techs., Inc. v. Dropbox Inc.*,
No. 16-CV-00119-HSG, 2019 WL 95927 (N.D. Cal. Jan. 3, 2019) ....................50

*Thales Visionix Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017) ....................59

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*,
368 F.3d 1053 (9th Cir. 2004) ....................47

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
No. 2019-1835, 2020 WL 2071951 (Fed. Cir. Apr. 30, 2020) ....................60, 61, 62

**Statutes**

17 U.S.C. § 1201(f) ....................54

17 U.S.C. § 1204 ....................53

17 U.S.C. § 1201(a)(1)(A) ....................53

28 U.S.C. § 1295(a) ....................2

28 U.S.C. §1331 and §1338 ....................2

35 U.S.C. § 101 ....................*passim*

**STATEMENT OF RELATED CASES**

Pursuant to Fed. Cir. Rule 47.5, Appellant Bot M8 LLC ("Bot M8"), states that:

1) Bot M8 has not taken any other appeals from lower courts or bodies.

2) Appellant Bot M8 is a party to the following additional cases, which may be directly affected by the Court's decision in this appeal:

- *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00726;
- *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00922;
- *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-00963;
- *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-01218; and
- *Sony Interactive Entertainment LLC v. Bot M8, LLC*, IPR2020-01288.

**JURISDICTIONAL STATEMENT**

The District Court had jurisdiction over this action under 28 U.S.C. §1331 and §1338 because this action arose under the Patent Act of 35 U.S.C. § 101 *et seq*.

The District Court entered final judgment in favor of Defendants Sony Corporation of America, Sony Corporation, and Sony Interactive Entertainment LLC (together, "Sony") on August 19, 2020. Appx5.

Bot M8 timely filed a notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(2) on August 21, 2020. Appx4497–Appx4499.

This Court has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES ON APPEAL

1.     Whether the District Court erred in requiring Bot M8 to file an amended complaint, after pleadings were already closed, arbitrarily imposing an unsupported heightened pleading standard.

2.     Whether the over 200 pages of detailed infringement analysis and claim charts in Bot M8's First Amended Complaint, addressing all elements of all asserted claims, were sufficient to state a claim for patent infringement.

3.     Whether the District Court abused its discretion by denying Bot M8's first and only motion for leave to amended its complaint as the District Court was requiring it to include additional evidence of infringement that far exceeded the pleading standard.

4.     Whether the District Court erred by granting summary judgment that Claim 1 of the '363 Patent is abstract under 35 U.S.C. § 101, where (a) the claim is directed to a concrete improvement in the way machines function and not well-known, routine, and conventional technology, and (b) the Court resolved genuine material issues of fact.

## STATEMENT OF THE CASE

Bot M8 sued Sony in the United States District Court for the Southern District of New York for infringing six patents, U.S. Patent Nos. 8,078,540 ("the '540 Patent"), 8,095,990 ("the '990 Patent"), 7,664,988 ("the '988 Patent"), 8,112,670 ("the '670 Patent"), 7,338,363 ("the '363 Patent"), and 7,497,777 ("the '777 Patent") (together, the "Asserted Patents").  Appx242–Appx302.  The '777 Patent is not at issue on this appeal and will not be further discussed herein.

After Sony filed an answer, the case was transferred to the United States District Court for the Northern District of California on October 18, 2019, and ultimately assigned to Judge William Alsup (the "District Court").  Appx507–Appx508.  Despite the fact that Sony answered the complaint, waiving any challenge to the pleadings, the District Court *sua sponte* ordered Bot M8 to file an amended complaint, requiring Bot M8 to include proof of infringement in the amended complaint in the form of claim charts and invited Sony to file a motion to dismiss. Appx532–Appx533 at 2:21-3:9.

Bot M8 filed an amended complaint, complying with the District Court's order by including over 300 pages of infringement claim charts, demonstrating Sony's infringement on an element-by-element basis. Appx542–Appx766.  Sony moved to dismiss for failure to state a claim (after having answered the original complaint), and the District Court granted Sony's motion as to the '540, '990, '988

and ‘670 Patents, and denied the motion as to the ‘363 Patent. Appx8–Appx17. The District Court denied Bot M8’s motion for leave to file an amended complaint. Appx20–Appx24. The District Court also denied Bot M8’s motion for reconsideration of the order denying leave to amend. Appx25.

The District Court granted summary judgment that Claim 1 of the ‘363 Patent is directed to ineligible subject matter under 35 U.S.C. § 101. Appx41–Appx42.

Based on the District Court’s rulings, the parties entered into a Joint Stipulation Regarding Case Management and Dismissal, variously dismissing the remaining claims with and without prejudice, with Bot M8 reserving the right to appeal the District Court’s various orders. The District Court so ordered the Stipulation and entered final judgment on August 19, 2020, making the case ripe for appeal. Appx1–Appx5.

Bot M8 timely filed a notice of appeal on August 21, 2020. Appx4497–Appx4499.

## STATEMENT OF THE FACTS

### A.    Universal Entertainment Corporation Invented a Series of Improvements in Gaming Technology

Universal Entertainment Corporation ("UEC") invented a series of improvements in gaming technology, resulting in the Asserted Patents.  UEC, a Japanese gaming conglomerate with a history dating back to 1969, is a leading provider of single and multiplayer videogames used in arcade gaming halls and software for home gaming machines.  Its offerings over the years included games for Sony's PlayStation videogame console, gaming software for personal computers, and electronic wagering machines such as slot machines.  UEC is the successor company to Aruze Corp., which released over two dozen home videogames, including at least a dozen videogames made for various of Sony's PlayStation gaming machines.  Appx3993–Appx3994; Appx3495–Appx3496.

The Asserted Patents cover multiple inventions for improved gaming machines and videogames.  For example, the '540 Patent recognized a need for making video gaming machines flexible enough to accept new programs from removable media, such as CD-ROMs, but also recognized that removable media can carry malicious content or be manipulated or illegally duplicated.  Appx186 at 1:28-51.  To achieve this flexibility without sacrificing security, the '540 Patent claims a separate gaming board to store the game program and an authentication program for

authenticating the gaming content, which adds a layer of protection between the removable media and the motherboard of the gaming machine. Appx188, Appx190 at 5:60-6:32; 10:1-11.

The ‘990 Patent improves gaming machine security, as it requires mutual or “double” authentication to ensure that the authentication program itself has not been compromised. Appx215 at Claims 1, 5.

The ‘670 Patent claims an improved gaming machine that can detect faults in its hardware and software. Appx222–Appx223 at Claim 1. For example, the gaming devices claimed in this patent have a “fault inspection program,” which is responsible for detecting faults, including damage to the memory, and a change or falsification of a game program stored in the memory device. Appx222 at 4:6–9.

The ‘988 Patent covers gaming machines with fault detection components, where the fault inspection program and a boot program are stored in different memory from where a game program is stored. Therefore, if the memory holding the game is altered or damaged, the fault inspection program would not be affected and would still be reliable. Appx175–Appx177 at 1:18-39, Claim 1.

The ‘363 Patent claims gaming machines that implement the inventive concept of aggregating game results across multiple networked machines to change the game conditions for future games, permitting team or group play, and making the games more exciting. The gaming machines of Claim 1 have various

components that (i) locate other players, (ii) set a “specification value,” which is a value that controls game conditions, (iii) transmit game results to a server, (iv) receive total game results which incorporate the game results for the other players, and (v) then set a new specification value based on the total game results that controls conditions for future games. Appx3492–Appx3493 at ¶ 37; Appx79 at Claim 1.

Bot M8 acquired the Asserted Patents from UEC. Appx544–Appx546. The Asserted Patents fit within Bot M8’s mission of developing next-generation gaming technology.

**B. Sony’s PlayStation 4 Infringes Bot M8’s Asserted Patents**

Sony is a consumer electronics company. Its flagship videogame machine is the PlayStation 4 console (“PS4”). Sony sells PS4 consoles and subscriptions to online services permitting customers to participate in multiplayer games over the Internet (the “PlayStation Network”). Appx248–Appx249. Sony also sells games for its PS4. *Id.* For example, Sony sells Uncharted 4: A Thief’s End and Uncharted 4: Lost Legacy (together “Uncharted 4”), which are action-adventure games based on a treasure-hunting theme. Appx3849 at ¶¶ 24, 25. Sony also sells MLB The Show 19 (“MLB 19”), which is a sports simulation videogame where players control baseball characters from today and the past. Appx4031 at 86:19-25.

To prevent piracy, which is a major threat to the profitability of Sony’s PS4 business, Sony relies on a variety of authentication and copyright protection

technologies to prevent unauthorized use of the PS4 and copying of PS4 games. *See, e.g.*, Appx629–Appx643; Appx646–Appx675; Appx678–Appx705; Appx708–Appx721; Appx3192–Appx3194. Sony aggressively litigates against anyone who tries to circumvent these authentication and access control technologies protecting the PS4. Appx3192–Appx3194.

Bot M8 filed a complaint for patent infringement against Sony on August 12, 2019, in the Southern District of New York, asserting that the PS4, Uncharted and MLB 19 (together, "Accused Products") infringe its patents. Appx242–Appx302, *generally*. Bot M8 accused the PS4's authentication and fault detection technology of infringing Bot M8's '540, '990, '670, and '988 Patents and Uncharted and MLB 19 together with a PS4 of infringing Bot M8's '363 Patent, based on their use of the combined results from multiple players' games to change the gaming conditions for future games. Appx252–Appx258, Appx262–Appx267, Appx271–Appx276, Appx280–Appx283, Appx287–Appx289 at ¶¶ 38-49, 62-75, 87-100, 112-119, 132-138. Bot M8 included in its complaint evidence from teardown analysis of the PS4, meaning a physical inspection of the components internal to the PS4 and product testing. *See, e.g.*, Appx262–Appx267 at ¶¶ 63-75.

### C. Sony Never Challenged the Sufficiency of Bot M8's Original Complaint

Bot M8's original complaint detailed the Accused Products' infringement with over forty-nine pages of infringement analysis, setting forth detailed infringement allegations of the Accused Products for at least one claim of each of the asserted patents. On October 3, 2019, Sony answered, waiving any challenge to the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Appx251–Appx300; Appx488. Bot M8 and Sony negotiated a proposed case schedule for discovery to proceed under Bot M8's original complaint, which they submitted in advance of the initial case management conference. Appx509–513.

After the case was transferred in October 2019, Bot M8's original complaint and Sony's answer thereto were transferred and docketed in the Northern District of California. Appx242; Appx488. Thus, Bot M8's same detailed complaint with over 49 pages of infringement analysis continued to control, and neither party sought to file any new pleadings. The parties negotiated a proposed case schedule based on the allegations in the original complaint, which they filed on November 14, 2019. Appx515, Appx518–519. At no time did Sony raise issues with the sufficiency of Bot M8's allegations in the complaint.

### D. The District Court *Sua Sponte* Required Bot M8 to Provide an Amended Complaint

The District Court held an initial case management conference on November 21, 2019. Appx531. At the conference, the District Court *sua sponte* required Bot M8 to file an amended complaint, even though Sony already answered Bot M8's complaint. The District Court further directed Bot M8 that "you have to explain in your complaint every element of ***every claim*** that you say is infringed and/or explain why it can't be done." Appx532–Appx533 at 2:21-3:9 (emphasis added). In doing so, the District Court recognized that it was imposing a heightened pleading standard untethered from the Federal Rules of Civil Procedure and told Bot M8 that if it did not file an amended complaint, "I'm going to let [Sony] bring a Motion To Dismiss and you can test it out in the Federal Circuit." Appx533.[1]

Shortly thereafter, on December 5, 2019, Bot M8 filed a first amended complaint (the "FAC") that the District Court directed it to do. Appx542–Appx766. The FAC was 223 pages long and provided further detailed analyses explaining how each accused product infringes every claim element and identified all the asserted claims. Appx542–Appx766.

[1] The District Court later acknowledged that Sony had "waived" the opportunity to challenge the pleadings by filing an Answer, but it granted Sony a new chance to move to dismiss when it *sua sponte* "directed" Bot M8 to amend the complaint. Appx22.

In addition to its narrative allegations, the FAC included over 300 pages of infringement claim charts that precisely map each accused product element-by-element to every asserted claim.[2] Appx556-Appx626; Appx635-Appx642; Appx652-Appx675; Appx681-Appx705; Appx711-Appx719; Appx727-Appx762. A representative example of such claim-chart style allegations is reproduced below.

| **Claim 1** | |
|---|---|
| 1. A gaming machine, comprising:<br><br>(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;<br><br>(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and<br><br>(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, | Game programs stored on a hard drive or Blu-ray include programming for authenticating the game program. Various error codes can show up on the PlayStation 4 device during execution of the authentication program.<br><br>For example:<br><br>CE-30005-8<br>Error occurred while checking the Hard Disk Drive ("HDD") or Blu-ray/DVD Drive.<br>CE-33191-7<br>Please insert the correct disc into the PlayStation 4 system.<br>NP-32062-3<br>Data on the system may be corrupted<br>CE-35486-6<br>The system cannot read the disc. The disc format may be unsupported, or the disc may be corrupted.<br>E-82000134<br>This product or content is not available for your account's country/region.<br>CE-34544-0<br>The database is likely to be partially corrupted as required information to start the application cannot be found.<br><br>https://www.playstation.com/en-nz/get-help/#!/error-code/ |

Appx638 (showing error codes the PS4 displays if the authentication of the game program fails).

---

[2] There are two pages of claim charts on each page of the FAC. *See, e.g.*, Appx557.

To further comply with the District Court's order, Bot M8 included evidence from teardown studies of the PS4, such as inspecting the internal components and product testing. *See, e.g.*, Appx640.

| Claim 1 | |
|---|---|
| 1. A gaming machine, comprising:<br><br>(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;<br><br>(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and<br><br>(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, | The PlayStation 4 console includes a motherboard. The mother board contains memory that is different from the board and reads and stores the game program during execution by the CPU (see discussion of Claim 1, Element (b): Samsung K4G41325FC-HC03 4Gb (512 MB) GDDR5 RAM (total of 16 x 512 MB = 8GB) memory, and Macronix MX25L25635FMI 256 Mb Serial Flash Memory.<br><br>• Samsung K4G41325FC-HC03 4 Gb (512 MB) GDDR5 RAM (total of 8 x 512 MB = 4 GB)<br>• Macronix MX25L25635FMI 256Mb Serial Flash Memory<br><br>• Samsung K4G41325FC-HC03 4 Gb (512 MB) GDDR5 RAM (total of 8 x 512 MB = 4 GB)<br>• Macronix 25L1006E CMOS Serial Flash Memory |

Appx640 (showing teardown evidence of motherboard different from and connected to the accused memory "board").

Thus, even before fact discovery commenced, Bot M8's FAC detailed infringement on an element-by-element basis for every asserted claim, which included hundreds of pages of claim charts citing to a plethora of public information, such as screen captures, quotations from and citations to Sony's publications, and product testing and teardown inspections of the PS4. Appx542–Appx766, *generally*.

**E. The District Court Dismissed Bot M8's First Amended Complaint**

Despite waiving any objections to the sufficiency of Bot M8's original complaint, Sony accepted the District Court's *sua sponte* invitation and moved to dismiss Bot M8's FAC, arguing that Bot M8's allegations as to each asserted patent failed to prove infringement as to one limitation. Appx1395–Appx1399.

During oral argument on Sony's motion, held January 23, 2020, the District Court faulted Bot M8 for not citing to Sony's source code in the FAC to prove Sony's infringement. Appx1541 ("Why can't you buy one of these products and take whatever code is on there off and analyze it?"). Bot M8 explained that the PS4 source code is not publicly available and the software on the PS4 (which is not source code) is encrypted and protected by Sony's access control technology. Appx1547–Appx1548. Sony had not provided its source code (or any other confidential discovery) to Bot M8 at this early stage of the case. Appx1546. Sony's source code is not included on the Accused Products and cannot be obtained from a teardown analysis of those products. Appx1547–Appx1548; Appx3193.

Sony did not argue in its briefing for its motion to dismiss that Bot M8 should have or even could have obtained its source code. But, at the hearing, Sony followed the District Court's lead and argued for the first time that Bot M8 should have cited software code in its FAC. Appx1539 ("Why don't they reverse-engineer the hard drive, dump the code, and show me 'Here is the authentication program,' right?").

On January 27, 2020, the District Court granted Sony's motion to dismiss as to the '540, '990, '988, and '670 Patents, but denied Sony's motion as to the '363 Patent. Appx10–Appx15. In its dismissal order, the District Court faulted Bot M8 for purportedly failing to provide proof in the form of evidence obtained by reverse engineering the PS4, but permitted Bot M8 to file a motion seeking leave to amend the FAC. Appx9, Appx11, Appx16–Appx17.

### F.    Bot M8 Obtained Permission to Jailbreak and Reverse Engineer the PS4

At a discovery hearing held two days after the District Court issued its MTD Order, Bot M8 for the first time obtained leave from the District Court and from Sony to "jailbreak" the PS4, circumventing its access control technology, and then reverse engineer its software. *See* Appx1557–Appx1568, *generally*.

At that hearing, Bot M8 explained that to prepare the original complaint and FAC it had performed a legal "tear down" of the PS4's components (meaning physical inspection and testing) and relied on publicly available information. Appx1561. Bot M8 further explained that it had not circumvented the encryption and access control technology Sony uses to protect the PS4 because it is illegal to do so and would be "jailbreaking" the PS4 in order to reverse engineer its internal software. Appx1561–Appx1562. Jailbreaking a PS4 involves installing illegal

software created by hackers that disables the access control protections on the PS4, permitting access to the software on its hard drive.

Bot M8 explained that legal "teardown" vendors would not reverse engineer or "jailbreak" the copyrighted and encrypted code on the PS4 without prior authorization because it would violate the Digital Millennium Copyright Act ("DMCA") and other anti-hacking statutes. Appx1561–Appx1562. Sony did not dispute that it was illegal to jailbreak a PS4, and the District Court accepted this representation, without asking for evidence to support this fact. In response, the District Court asked Sony to give Bot M8 permission to "jailbreak" the PS4. Appx1561–Appx1563. Sony agreed, for the first time permitting Bot M8 to disable the access control and encryption protections on the PS4 without running afoul of the DMCA. *Id.*

### G. The District Court Denied Bot M8's First Request for Leave to Amend

Having obtained for the first time permission to jailbreak the PS4, on January 29, 2020, Bot M8 promptly did so and filed a motion for leave to amend its complaint based on this newly obtained evidence two weeks later, on February 13, 2020. Appx1574–Appx1581, *generally*. This was Bot M8's first motion for leave to amend.

Bot M8's motion for leave to amend explained that it was based on the newly obtained evidence from jailbreaking the PS4 and attached a redlined version of the proposed Second Amended Complaint ("SAC") showing how it addressed every challenge to the sufficiency of the complaint raised by the District Court and Sony. Appx2283–Appx2915. Bot M8 also conferred with Sony before seeking leave to amend to ensure that its SAC would address all of Sony's concerns over the sufficiency of the pleadings. Appx1576.

The proposed SAC added new evidence to its infringement claim charts in the form of previously encrypted and copyrighted program files, directories, and source code modules that prove Sony's infringement. *See, e.g.*, Appx1687–Appx1693 (citing program files and source code modules). This new evidence extended the SAC from 223 pages to 370 pages, including hundreds of pages of infringement analysis and evidence. *See generally,* Appx1586–Appx1802, and Appx1803–Appx1958.

Even though Bot M8 filed its motion for leave to amend within two weeks of the MTD Order and shortly after getting permission from the District Court and Sony to disable the access control technology in the PS4, the District Court denied Bot M8's motion for purported lack of diligence. Appx24. The District Court held that Bot M8 should have jailbroken a PS4 and included the evidence of doing so in its

FAC, finding that Bot M8's SAC, filed just nine weeks after the FAC, was too late. *Id*.

Critically, the District Court decided, *sua sponte*, that Bot M8 had no grounds to fear that "reverse engineering, code decryption, and circumvention of security measures were mysteriously prohibited" by "the DMCA or other anti-hacking statutes." Appx23–Appx24 ("there remains no basis for either patent owner's fears or its failure to timely raise them"). The District Court's denial of leave to amend was based on this finding that Bot M8 was free at any time to hack Sony's PS4 and circumvent its access control technology. Yet, Sony did not make this argument in opposing leave to amend (nor could it have) and, during oral argument, the District Court had accepted Bot M8's representations that it could not jailbreak the PS4 without permission. Appx1562–Appx1563. Thus, the District Court decided this dispositive issue without any briefing from the parties and without even indicating that it was an issue the parties should address.

### H. The District Court Denied Bot M8's Request for Leave to File a Motion to Reconsider

Upon receipt of the District Court's April 2, 2020 denial of its motion for leave to amend, Bot M8 requested leave to file a motion for reconsideration. Appx3190–Appx3200. Bot M8's sought an opportunity to provide proof to the District Court that it could not have reverse engineered the PS4 before obtaining

permission to disable the PS4's access control technology in view of the DMCA and other anti-hacking statutes, as well as the Sony customer license agreement which prohibits reverse engineering, neither of which had been addressed in the parties' briefing. Appx3192–Appx3198, *e.g*. at Appx3193.

Bot M8's motion to reconsider also sought to bring to the District Court's attention Sony's history of aggressively enforcing the DMCA, including at least six different cases in California courts alone, where Sony regularly sued people under the DMCA for reverse engineering or "jailbreaking" the PS4, as it was a violation of the DMCA and grounds for other claims against an offender. Appx3193–Appx3194. Bot M8 also cited Sony's end user license agreement for the PS4, which states: "RESTRICTIONS: You may not reverse engineer, decompile or disassemble System Software, create System Software derivative works, or attempt to create System Software source code from its object code.")." Appx3193.

The District Court denied Bot M8's motion for leave to move for reconsideration, holding that "Patent owner's disagreements are understandable, but they do not warrant extraordinary relief." Appx25. Thus, the District Court dismissed with prejudice Bot M8's infringement allegations as to the '540, '670, '988, and '990 Patents.

### I. The District Court Disregarded Expert Opinion and Factual Issues in Granting Summary Judgment on Claim 1 of the '363 Patent

In its Case Management Order, the District Court ordered an early summary judgment procedure for the remaining patents in the case. Appx18–Appx19. Under this procedure, which the District Court coined a patent "shootout," each side was to select one claim on which to file for early summary judgment. *Id*. Both sides selected Claim 1 of the '363 Patent. Bot M8 moved for summary judgment of infringement and Sony moved for summary judgment of non-infringement and patent ineligibility under 35 U.S.C. § 101. *See, generally,* Appx3453–Appx3482, Appx3699–Appx3728.

In opposing Sony's motion, Bot M8 submitted two expert declarations. Appx3991–Appx4011; Appx4012–Appx4022; Appx3483–Appx3516. One expert, Stacy Friedman, is a professional game designer with over twenty years' experience in the gaming industry. He provided a detailed analysis demonstrating that Claim 1 of the '363 Patent is not directed to an abstract idea and covers technology that goes well-beyond gaming machines that were routine or conventional in the field at the time of the invention. Appx3484–Appx3485; Appx4008–Appx4010. Bot M8 also submitted the declaration of Dr. Ian Cullimore, an expert with over thirty-five years' experience in computer science and a former CTO of a gaming company, who likewise demonstrated that Claim 1 of the '363 Patent was not directed to an abstract

idea and that its elements were not well-known, routine, or conventional. Appx4014–Appx4015, Appx4017–Appx4020.

The District Court granted Sony summary judgment on Claim 1 of the '363 Patent, ruling that it was abstract and rejecting the opinions of Bot M8's experts regarding what was "well-known, routine, or conventional in the field at the time of the invention." Appx30, Appx39.

Following the District Court's summary judgment order regarding Claim 1 of the '363 Patent, the parties stipulated to dismiss the remaining issues in the case so the case could be appealed. The District Court entered final judgment and Bot M8 timely appealed. Appx1–Appx5, Appx4497–Appx4499.

## SUMMARY OF THE ARGUMENT

From start to abrupt finish, the District Court managed this case in a manner that is contrary to the spirit and the letter of the Federal Rules of Civil Procedure and to controlling Supreme Court precedent. This appeal seeks reversal of four critical errors.

***First,*** the District Court imposed its own heightened pleading standard completely untethered from the controlling rules and precedent. Sony answered Bot M8's original complaint, which more than satisfied the controlling pleading requirements as it contained detailed allegations of infringement, waiving any challenge under Rule 12(b)(6). The District Court nevertheless *sua sponte* required Bot M8 to file an amended complaint and required proof of infringement on an element-by-element basis and claim charts to be included in the amended complaint. The District Court's imposition of this improper pleading standard was plain legal error and should be reversed.

***Second,*** the District Court doubled down on its legal error by dismissing Bot M8's FAC. The FAC, in alleging patent infringement of all asserted claims, identified the specific Accused Products, provided dozens of pages detailing Sony's infringement of those claims, and included over 300 pages of infringement claim charts that demonstrated how the Accused Products satisfied every element of every asserted claim. The FAC therefore readily provided far more than the requisite

notice to Sony of Bot M8's claims and plausibly alleged infringement. The District Court's dismissal should therefore be reversed. *See, e.g.*, *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (a plaintiff need not plead facts to support every element under *Iqbal* / *Twombly*).

***Third***, the District Court abused its discretion by denying Bot M8's first and only motion to amend the pleadings for purported lack of diligence. After the District Court's dismissal of the FAC, Bot M8 diligently sought and obtained permission from the District Court and from Sony to jailbreak the PS4, circumvent its access control and encryption technology, and thus gain access to its operating system software, as that was what the District Court stated was necessary to sufficiently plead a claim of infringement. Within two weeks of obtaining such leave, Bot M8 moved for leave to amend to incorporate the software-based evidence that the District Court found lacking in the FAC. Remarkably, the District Court denied this motion, finding that Bot M8 was not diligent in seeking to amend. This finding was so contrary to the record, given Bot M8's rapid and diligent efforts to address the District Court's unfounded heightened pleading standard, and so inconsistent with the liberal policy favoring amendment that it cannot be a valid exercise of discretion and must be overturned.

***Fourth,*** the District Court erred in finding Claim 1 of the '363 Patent to be directed to an abstract idea. Claim 1 is directed to a concrete invention for improved

gaming machines that include specific components for transmitting data of game results to a server, locating gaming machines operated by co-players, receiving data of total game results achieved by multiple gaming machines, and setting future game conditions based on the data of the total game results.

The District Court erroneously concluded that this was nothing more than an application of conventional gaming technology. In so finding, the District Court disregarded the detailed and unrebutted opinions of Bot M8's two technical experts. The District Court erred, as a matter of law, in engaging in fact finding and crediting its own view of conventional technology at the time of the invention over qualified experts and in resolving these disputed factual and expert issues in favor of Sony on summary judgment.

Accordingly, the Court should reverse the District Court's Orders granting Sony's motion to dismiss and motion for summary judgment, and denying Bot M8's motion for leave to amend its complaint.

## ARGUMENT

### I. The District Court Erred in *Sua Sponte* Forcing Bot M8 to Replead, Demanding Far More Proof of All Elements Than the Law Requires

The District Court erred in *sua sponte* forcing Bot M8 to replead, because Bot M8's complaint satisfied the controlling pleading requirements of containing sufficient factual matter to "state a claim to relief that is plausible on its face."

*Nalco*, 883 F.3d at 1347; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Bot M8's

original complaint identified the Accused Products and Asserted Patents, and

included dozens of pages of analysis identifying the infringing functionality in the

Accused Products and relating it to the Asserted Patents.  Sony's answer confirmed

that Sony understood the allegations made against it.  The District Court's

erroneous imposition of a heightened pleading standard, which ultimately led to

the dismissal of Bot M8's FAC, should be reversed.

### A.    This Court Applies *De Novo* Review to the District Court's Misapplication of Rule 12(b)(6)

This Court reviews the District Court's application of Rule 12(b)(6) under

the regional circuit law of the Ninth Circuit.  *Juniper Networks, Inc. v. Shipley*, 643

F.3d 1346, 1350 (Fed. Cir. 2011).  "Under Ninth Circuit law, [the Court] review[s]

a district court's dismissal under Rule 12(b)(6) *de novo*."  *Metricolor LLC v.

L'Oréal S.A.*, 791 F. App'x 183, 188 (Fed. Cir. 2019) (citing *Davis v. Pac. Capital

Bank, N.A.*, 550 F.3d 915, 916 (9th Cir. 2008)).  Under this standard, the Court

accepts all factual allegations in Bot M8's complaints as true and construes them in

the light most favorable to Bot M8.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th

Cir. 2005).

### B. The District Court Applied an Incorrect Standard in Reviewing Bot M8's Complaint

The District Court's *sua sponte* demand that Bot M8 file an amended complaint (and subsequent dismissal of the FAC, discussed in Section II of the Argument) should be reversed because Bot M8's complaint far surpassed the minimum threshold to state a claim. Specifically, the complaint identifies the Accused Products, the Asserted Patents, and the basis for infringement. Appx242–Appx302.

For example, for the '540 Patent, Bot M8's complaint identifies the acts of infringement ("making, using, advertising, importing, selling, and offering for sale" the Accused Products), identifies the products at issue (PS4 and PlayStation Network services), identifies the components of the PS4 that satisfy the claim elements (the authentication program, motherboard, internal hard drive or Blu-ray disc storing the game program, etc.), and explains how those components satisfy the authentication and memory storage requirements of the '540 Patent. Appx258–Appx268 at ¶¶ 52-77.

Because the complaint's allegations "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" confirmed by Sony's decision to answer, as opposed to moving to dismiss, the District Court

should not have required Bot M8 to replead, under threat of dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

The District Court's directive to Bot M8 to replead was further error because the District Court imposed an incorrect and indefensible requirement, completely disjointed from this Court's precedent and the Federal Rules of Civil Procedure, that Bot M8 set forth detailed allegations of infringement of every asserted claim, which essentially required proving — not just alleging — infringement at the pleading stage. Specifically, the District Court dictated that Bot M8 must "explain in your complaint every element of every claim that you say is infringed and/or explain why it can't be done," and sought to have claim charts at this early pleading stage. Appx532–Appx 533 at 2:21-3:9. Seeming to recognize that it was making up new law, the District Court dared Bot M8 to "test it out in the Federal Circuit" if it chose not to replead. Appx533.

However, the law regarding stating a claim of infringement does not require Bot M8 to lay out its infringement case of every asserted claim or essentially *prove* infringement. Rather, this Court requires only "that a complaint place the alleged infringer on notice of what activity . . . is being accused of infringement" and "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nalco,* 883 F.3d at 1347; *Iqbal*, 556 U.S. at 678. That was what Bot M8's original complaint did – it put Sony on notice of Bot M8's allegations

of infringement, setting forth specific factual matter to state a plausible claim of patent infringement. Bot M8 did more than what is required, as "[s]pecific facts are not necessary; the [complaint] need only 'give the defendant fair notice of what the . . . claim is and the ground upon which it rests.'" *Disc Disease Sols. Inc. v. VGH Sols., Inc*., 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (1955)).

The District Court cannot be permitted to concoct a heightened pleading standard by fiat and unnecessarily deviate from the law. There is "no requirement for [plaintiff] to 'prove its case at the pleading stage,'" as the District Court erroneously imposed. *Lifetime Indus., Inc. v. Trim-Lok, Inc*., 869 F.3d 1372, 1379 (Fed. Cir. 2017) (quoting *In re Bill of Lading Transmission & Processing Sys. Patent Litig*., 681 F.3d 1323, 1339 (Fed. Cir. 2012)).

There is also no support for the District Court's requirement of proof of infringement on an element-by-element basis. The District Court's demand for claim charts was directly contrary to this Court's holding that a plaintiff need not "plead facts establishing that each element of an asserted claim is met." *Nalco*, 883 F.3d at 1350 (reversing dismissal); *Disc Disease*, 888 F.3d at 1260 (a plaintiff need not plead every element, but must only put the infringer on notice).

In *Nalco*, the patent at issue covered a method for removing elemental mercury from power plant emissions by injecting a solution into the gas to form solid

particles that can be filtered. *Nalco,* 883 F.3d at 1342. The district court repeatedly dismissed the *Nalco* plaintiff's pleadings because it found the accused process differed from the asserted patent in "when" and "how" the solution was injected. *Id*. at 1344. The plaintiff in *Nalco* filed four amended complaints, each time attempting "to address what it believed was the district court's misunderstanding of what" the patent claimed, and explaining that the patent did not restrict when, where, or how the "injecting" step is performed. *Id*. at 1344-46. This Court found the *Nalco* "pleading clearly exceeds the minimum requirements under Rule 12(b)(6), especially as 'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met'" and was sufficient to notify the defendants of the accused activity without demonstrating, or even explaining, how each element is satisfied. *Id*. at 1350. Here, just as in *Nalco*, the District Court failed to take Bot M8's allegations as true and incorrectly required proof of all elements.

## II. The District Court Erred in Dismissing Bot M8's First Amended Complaint, Which Plausibly Alleged Infringement

After compelling Bot M8 to replead and inviting Sony to move to dismiss, the District Court erred in dismissing Bot M8's FAC, which more than plausibly alleged infringement. The FAC gave Sony much more than the required fair "notice of infringing activity," as it contained over 300 pages of claim charts providing an

element-by-element infringement analysis, all supported by citations to evidence. *Lifetime Indus.*, 869 F.3d at 1379 (fair notice is all that is required). Bot M8 addresses the District Court's specific rulings for each patent below.

### A. Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '540 Patent

Bot M8's FAC included detailed factual allegations and supporting evidence showing that the PS4 infringes the '540 Patent and specifically satisfies each element of the asserted claims. Claim 1 of the '540 Patent, which was the focus of the District Court's analysis, is directed to a gaming system which has an authentication program to validate a game program before running it in order to prevent bootlegging and cheating. Appx641. The FAC describes how the PS4 meets all of these elements with fourteen pages of factual allegations, including fifteen pages of claim charts applying the publicly available evidence to the claim elements. Appx629–Appx645.

The District Court's dismissal of the '540 Patent was based on finding an absence of proof that the PS4 has "a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored" (the "Board Limitation"). Appx10–Appx11. In so holding, the District Court disregarded the specific factual allegations in the FAC that the PS4 has three different components that satisfy the Board Limitation.

As shown in the following subsections, the FAC alleges that the following components have a memory and store both a game program and an authentication program, thereby satisfying the Board Limitation: (1) the PS4's internal hard drive; (2) PS4 Blu-ray discs; and (3) PlayStation Network servers (for playing games online). Appx629–Appx645. These specific factual allegations alone provide Sony with the requisite "fair notice" of what Bot M8 accuses of infringement, thereby stating a claim for infringement. *Disc Disease*, 888 F.3d at 1260 (fair notice is all that is required to satisfy the pleading standard).

#### 1. Bot M8's First Amended Complaint Plausibly Alleged that the PS4's Internal Hard Drive is a Board

The FAC alleges that the PS4's internal hard drive is a board that is "configured to store the game programs as well as authentication programs associated with the games" and, therefore, satisfies the Board Limitation. Appx636.

The FAC provides evidence to support this factual allegation with links to Sony's technical support webpages that explain how games may be downloaded to the PS4 hard drive for playing offline, showing that the hard drive "board" stores the game programs. Appx636–Appx637. The FAC further explains, with similar citations to evidence, that the PS4 will not allow these downloaded games to run offline unless the user has set the PS4 to "primary," "otherwise the downloaded games cannot be played because the hard drive includes an authentication program

for verifying that the PS4 is allowed to play the game," showing that the hard drive stores an authentication program. Appx637 (reproduced below).

| Claim 1 | |
|---|---|
| 1. A gaming machine, comprising:<br><br>(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;<br><br>(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and<br><br>(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, | PlayStation 4 requires one to set a PlayStation 4 console as the primary PlayStation 4 if downloaded games on the hard drive are desired to be played offline, otherwise the downloaded games cannot be played because the hard drive includes an authentication program for verifying that the PS4 is allowed to play the game.<br><br>**Activate as Your Primary PS4**<br><br>Activate your PS4™ system as your primary system, using your Sony Entertainment Network account. Activating your system enables these features:<br>• Anyone who uses your primary PS4™ system can use applications you purchase from PlayStation®Store.<br>• Anyone who uses your primary PS4™ system can enjoy the benefits of your PlayStation®Plus subscription.<br>• Your PS4™ system can automatically download content you pre-ordered, or content you've purchased on (PlayStation®App).<br>• You can connect to your PS4™ system via the Internet using Remote Play on another device.<br>• Anyone who uses your primary PS4™ system can use the themes that you purchase from PlayStation®Store.<br><br>• You can activate only one PS4™ system per account.<br>• When you activate a system, other users of the system can use applications and enjoy some of the PlayStation®Plus benefits of your account, even when that user is not logged in.<br>• To enjoy certain PlayStation®Plus benefits, you must subscribe to the service. For details, visit the SIE website for your country or region.<br><br>http://manuals.playstation.net/document/en/ps4/settings/activation.html |

4

*Id.* (discussing evidence of authentication program on PS4 hard drive).

Thus, the FAC plausibly alleges (and provides supporting evidence) that the PS4's internal hard drive is the claimed "board" because it stores both a game program and an authentication program. *Iqbal*, 556 U.S. at 678 (a complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").

The District Court erroneously dismissed the FAC after finding that it was possible that the authentication program could be stored in another memory board,

instead of the internal hard drive. Appx10. A flaw in the District Court's reasoning is that it is not necessary to allege facts from which infringement is the ***only possible inference*** in order to state a claim. Rather, it is sufficient for the allegations to support infringement as a ***reasonable inference***. *Lifetime Indus.*, 869 F.3d at 1376 (holding the inference need not be the ***only*** inference that can be drawn from the facts alleged; it must merely be *a* ***reasonable*** inference). That is the case here because of the above evidence that the internal hard drive contains both the game and authentication programs, as is claimed. An alternative reading of the evidence does not render the allegation implausible. *Id.*

Indeed, the District Court failed to heed the directive that Bot M8's factual allegations are to be deemed true for purposes of opposing Sony motion to dismiss because they go beyond reciting legal elements. *Knievel*, 393 F.3d at 1072 (factual allegations are deemed true and the pleadings are construed in the light most favorable to plaintiff). Bot M8 went beyond simply stating that the PS4 has a "board;" its FAC identified the internal hard drive as a board and provided evidence that both a game program and an authentication program are stored on the hard drive.

Thus, the District Court erred in finding that the FAC fails to state a claim as to the '540 Patent for failure to allege a board satisfying the Board Limitation, and reversal is warranted.

### 2. Bot M8's First Amended Complaint Plausibly Alleged that PS4 Blu-Ray Game Discs are Boards

Bot M8's FAC plausibly alleges that PS4 Blu-ray game discs are a second board that satisfies the Board Limitation, which alone should have precluded dismissal of the '540 Patent.

Specifically, the FAC alleges that the Blu-ray discs, which carry game programs, also contain the BD-Rom Marks authentication program for authenticating Blu-ray game discs.[3] Appx637. The FAC substantiates this allegation by providing evidence regarding the Blu-ray authentication program. *Id.* The FAC further alleges that the game programs stored on the discs "include programming for authenticating the game," and supports that allegation with citations to various error codes that show the PS4 will not run if the authentication program on the disc is not executed properly. Appx637. Therefore, Bot M8 further plausibly alleged that the PS4 satisfies the Board Limitation through its use of Blu-ray game discs.

---

[3] A Blu-ray game disc is a round, plastic disc the same size as a CD or DVD. A user can insert the disc into a PS4 to play the game stored on it.

| **Claim 1** | |
|---|---|
| 1. A gaming machine, comprising:<br><br>(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;<br><br>(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and<br><br>(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, | A PlayStation 4 Blu-ray disc containing game software that is inserted into a PlayStation 4 console is also a board comprising memory for a game program for executing a game on the using the PlayStation 4.<br><br>"The games come on proprietary CD-ROM/XA discs that are read by laser, just like regular CDs." https://electronics.howstuffworks.com/playstation2.htm<br>Consumers can buy various PlayStation 4 game discs from retail store such as Best Buy. https://www.bestbuy.com/site/playstation-4-ps4/playstation-4-ps4-video-games/pcmcat296300050018.c?id=pcmcat296300050018<br><br>The PlayStation 4 includes an authentication program to authenticate the game program on the Blu-ray discs.<br><br>"The ... PlayStation 4 use[s] Blu-ray BD-ROM discs. In addition to any protection provided by the consoles themselves, the BD-ROM format's specification allows for a ROM-Mark which cannot be duplicated by consumer-level recorders. While the BD-ROM format does provide considerable capacity (up to 100 gigabytes per disc with potential revision to provide more), increased consumer bandwidth availability combined with the increased size of games distributed through online channels (approaching 100 gigabytes for some titles) is rendering this point moot. To prevent the consoles themselves being hacked and used as a means to defeat these protections (as happened with the Wii and partially with the PlayStation 3), contemporary consoles employ trusted hardware paths that authenticate the internal hardware and software prior to operation." https://en.wikipedia.org/wiki/Copy_protection<br><br>In computing, **ROM Mark** or **BD-ROM Mark** is a serialization technology designed to guard against mass production piracy or the mass duplication and sale of unauthorized copies of pre-recorded Blu-ray Discs. Only licensed BD-ROM manufacturers have access to the equipment that can make these unique ROM Marks, thus allowing authentic BD-ROM media like movies and music to be identified. The ROM Mark contains the Volume ID required to decrypt content encrypted using AACS." https://en.wikipedia.org/wiki/ROM_Mark<br><br>"Volume IDs are unique identifiers or serial numbers that are stored on pre-recorded discs with special hardware. They cannot be duplicated on consumers' recordable media. The point of this is to prevent simple bit-by-bit copies, since the Volume ID is required (though not sufficient) for decoding content. On Blu-ray discs, the Volume ID is stored in the BD-ROM Mark. To read the Volume ID, a cryptographic certificate (the *Private Host Key*) signed by the AACS LA is required. However, this has been circumvented by modifying the firmware of some HD DVD and Blu-ray drives." https://en.wikipedia.org/wiki/Advanced_Access_Content_System. |

Appx637 (collecting evidence of the Blu-ray disc authentication program).

The District Court erred by making the factual finding that the BD-Rom Marks are "not an executable computer program that itself authenticates the disc," and disregarding this allegation on that basis. Appx11. In so finding, the District Court impermissibly weighed the factual evidence and failed to deem to be true the factual allegations in the FAC regarding the Blu-ray discs. *Nalco*, 883 F.3d at 1350 ("The district court's failure to credit these allegations as true is reversible error.").

This is a second, independent basis upon which to reverse the District Court's dismissal of Bot M8's claim for infringement of the '540 Patent.

### 3.    Bot M8's First Amended Complaint Plausibly Alleged that the PlayStation Network Servers are Boards

As a third alternative "board," the FAC identifies the servers of the PlayStation Network.  The FAC alleges that these servers both store game programs and an authentication program, as recited in the Board Limitation.  This further should have prevented the District Court from dismissing the '540 Patent.

In particular, the FAC alleges that the PlayStation Network servers hold game programs for multiplayer games played over Sony's PlayStation Network. Appx638–Appx639 (*see* excerpt reproduced below).  The FAC further alleges that the PlayStation Network servers store an authentication program.  *Id.*  The FAC provides evidence that the PlayStation Network authentication program is a 2-step verification and cryptography algorithm used when a player starts a game hosted by the network servers.  *Id.*  Deeming these factual allegations to be true, the FAC therefore alleges a third independent basis upon which the PS4 satisfies the Board Limitation of the claims of the '540 Patent.

| **Claim 1** | |
|---|---|
| 1. A gaming machine, comprising:<br><br>(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;<br><br>(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and<br><br>(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, | The PlayStation 4 uses 2-step verification and a Cryptography algorithm as an authentication program for authenticating the game programs when a user attempts to play a PlayStation Network server game.<br><br>"When signing into your account on the network, you will use your password along with a verification code that you will receive on your mobile phone via text. By requiring two forms of identification for sign-in, your account and personal information will be better protected." https://www.playstation.com/en-us/account-security/2-step-verification/<br><br>"The Sony PS4 console encrypts its chat messages with Transport Layer Security (TLS), the suite of **protocols** formerly known as SSL. It uses a modern symmetric cipher (AES256-CBC) and 2048-bit asymmetric (RSA) keys, both of which are still thought to be unbreakable in the foreseeable future." https://www.securityweek.com/paris-attacks-what-kind-encryption-does-playstation-4-use-anyway<br><br>"The TLS protocol aims primarily to provide privacy and data integrity between two or more communicating computer applications. When secured by TLS, connections between a client and a server should have one or more of the following properties. The connection is private because symmetric cryptography is used to encrypt the data transmitted."<br><br>https://en.wikipedia.org/wiki/Transport_Layer_Security#Algorithm |

Appx639 (collecting evidence of PlayStation Network's use of authentication program).

The District Court again erred in weighing the strength of the evidence in support of infringement and finding that "storage on the same server does not mean the game and authentication programs are stored ***together*** on a memory board." Appx11 (emphasis in original). The District Court seems to be positing that the server ***might*** have ***multiple*** memory boards, that separately hold the game and authentication program. *Id.* But alternative inferences do not warrant dismissal. *Lifetime Indus.*, 869 F.3d at 1379 (a reasonable inference need not be the only fair inference that can be drawn from the facts alleged).

Instead, the District Court should have deemed true the FAC's allegation that the server is a memory board and that it holds ***both programs***.  Appx638.  This is more than sufficient under *Twombly* to ward off dismissal by proving "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting infringement.  *Twombly*, 550 U.S. at 556.  Thus, the District Court's dismissal of the '540 Patent should be reversed.

### B.  Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '990 Patent

Bot M8's FAC plausibly alleges that the PS4 infringes the '990 Patent.  Like the '540 Patent, the '990 Patent recites an authentication program for authenticating the game program.  It further recites a "mutual authentication" program for authenticating the authentication program, which must be stored with gaming information, to ensure that the authentication program itself has not been compromised, thereby enabling greater security (the "Mutual Authentication Limitation").  Appx646.  The FAC provides detailed factual allegations showing how the PS4 satisfies all elements of the asserted claims of the '990 Patent.

For the Mutual Authentication Limitation, the FAC alleges four different storage components that store "gaming information including a mutual authentication program," thereby satisfying the Mutual Authentication Limitation:

(1) the PS4's hard drives; (2) Blu-ray game discs; (3) PlayStation Network Servers; and (4) flash memory on the PS4 console. Appx653–Appx654.

The District Court erred by finding that the FAC "fails to allege ***when*** or ***where*** the game program and mutual authentication program are stored ***together***." Appx12 (emphasis original). Imposing its idiosyncratic and unsupported pleading standard, the District Court ignored any factual allegations that were not supported by source-code-level evidence. However, such proof is not required to state a claim. *Nalco*, 883 F.3d at 1350 ("the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met" and a patentee is "not required to provide evidentiary support for its claims at this [pleading] stage of the proceedings").

As set forth below, Bot M8 provided plausible allegations that the PS4 infringes the '990 Patent, including that it satisfies the Mutual Authentication Limitation, and reversal is warranted.

#### 1. Bot M8's First Amended Complaint Plausibly Alleged That the PS4's Hard drives, Blu-ray Game Discs and PlayStation Network Servers Store a Mutual Authentication Program

Bot M8's FAC plausibly alleges that the PS4's hard drives, Blu-ray game discs, and PlayStation Network servers are each a "storage medium" that stores gaming information that includes a mutual authentication program, thereby satisfying the Mutual Authentication Limitation. Appx646–Appx648, Appx653,

Appx663. As with its allegations for the '540 Patent, the FAC provides evidence that these three memory components store information for videogames and contain a mutual authentication program, including evidence of the error messages displayed when the mutual authentication check fails. *Id.* The FAC also alleged and provided evidence of the PS4's use of a "mutual authentication process" to verify authenticity by way of cryptographic algorithms that encrypt communications between the PS4 and PlayStation Network Servers. Appx658–Appx660 (*see* exemplary excerpt reproduced below).

| Claim 1 | |
|---|---|
| 1. A gaming machine comprising:<br><br>a game action executing device configured to execute a game action;<br><br>a loading device including a connection unit configured to be connected to a removable storage medium storing therein gaming information including a mutual authentication program; and<br><br>a process device including a readable and rewritable storage unit,<br><br>wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device:<br><br>the program storage unit configured to store therein an authentication program for authenticating the gaming information stored in the storage medium;<br><br>the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;<br><br>the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and | "When using PlayStation Network at the office or other locations with shared networks, a firewall or other security measures might prevent you from connecting to PlayStation Network."<br>https://manuals.playstation.net/document/en/psvita/psn/firewall.html<br><br>"An **authentication protocol** is a type of computer communications protocol or cryptographic protocol specifically designed for transfer of authentication data between two entities. It allows the receiving entity to authenticate the connecting entity (e.g. Client connecting to a Server) as well as authenticate itself to the connecting entity (Server to a client) by declaring the type of information needed for authentication as well as syntax.[1] It is the most important layer of protection needed for secure communication within computer networks."<br><br>https://en.wikipedia.org/wiki/Authentication_protocol#AAA_architecture_protocols_(Authentication,_Authorization,_Accounting) |

Appx658 (discussing use of mutual authentication in communications between PS4 and PlayStation Network servers).

The District Court dismissed this allegation for the same flawed reasons that it dismissed the '540 Patent. Appx12. Thus, the District Court erred as to these allegations for the same reason discussed in Section I(C)(1) above.[4]

**2. Bot M8's First Amended Complaint Plausibly Alleged That the PS4's Flash Memory Chip Stores a Mutual Authentication Program**

In dismissing the '990 Patent, the District Court further disregarded the FAC's factual allegations that the PS4's flash memory satisfies the Mutual Authentication Limitation. The FAC alleges and provides evidence that the PS4 executes game programs by utilizing "RAM or Flash memory" and that the PS4 loads the games from the hard drives into the flash memory in order to execute them. *See, e.g.*, Appx649, Appx659–Appx661, and Appx646 ("[g]ame programs as well as authentication programs associated with the games are temporarily stored on the memory when executed").

The FAC's allegations as to flash memory are far from conclusory recitations of claim elements. The FAC identifies the specific flash memory chip that it accuses by name and product number. Appx647 (identifying the "Macronix MX25L25635FMI 256Mb Serial Flash Memory chip" as the accused flash

[4] The claim language in the '990 Patent is broader than the '540 Patent, as it only requires a memory that stores some "gaming information," not a board that stores a "game program." *Compare* Appx215 at Claim 1 *with* Appx191-192 at Claim 1.

memory). The FAC further substantiates the allegations regarding the flash memory by citing evidence showing that a user must "dump" the flash memory before playing an unauthorized copy of a videogame, which proves that the flash memory contains a mutual authentication program. Appx660 (*see* example reproduced below). In other words, when the flash memory chip is operating normally, its mutual authentication program detects bootleg videogames, and that program must be disabled by dumping to use an inauthentic copy. Thus, the FAC supports the plausible inference that the PS4 stores the gaming information and mutual authentication program on flash memory together, satisfying the Mutual Authentication Limitation.

| **Claim 1** | |
|---|---|
| the mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to the mutual authentication program included in the gaming information authenticated by the authentication unit,<br><br>the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit, and<br><br>the process device includes an action controlling unit configured to control the game action executing device according to the written gaming information so that the game action executing device executes the game action, when the mutual authentication unit has executed the mutual authentication process. | In order to play pirated games on the PlayStation 4, one must "dump" the PlayStation NOR Chip, which is one of the Flash memory chips. The Flash memory chip stores an authentication program and handles the PlayStation boot up processes. Though because of the mutual authentication which PlayStation 4 implements, just completing this modification will not allow one to play pirated games on a PlayStation. This confirms the use of a stored mutual authentication program.<br><br><br><br>How To Dump The Playstation 4 NOR Chip |

Appx660 (discussing how need to dump flash memory chip to use bootleg game supports location of a mutual authentication program on that chip).

The District Court failed to credit these allegations and stated that because the PS4 contains three different flash memories, Bot M8's allegations that the two programs are both stored in flash memory "hardly leads to the plausible inference that they are stored *together*." Appx12–Appx13 . However, as previously discussed, the District Court may not dismiss Bot M8's reasonable inference simply because it finds that alternative inferences are also reasonable. *Twombly*, 550 U.S. at 556 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable"); *Lifetime Indus.,* 869 F.3d at 1376 (the inference of infringement need not be the *only* inference that can be drawn from the facts alleged to state a claim). As such, the District Court erred by dismissing Bot M8's claims at to the '990 Patent.

### C.     Bot M8's First Amended Complaint Plausibly Alleged Infringement of the '988 and '670 Patents

Bot M8's FAC contains forty-three pages of infringement analysis for the '988 and '670 Patents, with over sixty pages of element-by-element infringement claim charts. The asserted claims from these patents are directed to gaming devices, and recite a "fault inspection program" for identifying faults in a "second memory

device" and a "game program" before the game is started (the "Fault Inspection Limitation"). Appx13.

The District Court acknowledged that Bot M8 "plausibly allege[d] the inspection for both the memory device and the game stored therein." Appx13. The District Court nevertheless dismissed Bot M8's claims for infringement of these two patents after incorrectly finding that its allegations that the fault inspection program is completed before the game is started too closely tracked the claim language to be deemed a plausible factual allegation. Appx13–Appx14 ("the complaint provides no basis to infer the proper timing of the inspection").

The District Court's conclusion is untenable because the FAC includes specific evidence demonstrating that the PS4 includes a fault inspection program that concludes prior to a game starting. It identifies twelve different "error codes" that the PS4 displays upon boot up and prior to the game starting if the fault inspection program detects a problem. Appx680, Appx686-Appx687. These codes and error messages prove and, at a minimum, support a plausible inference that the PS4's fault inspection program can be concluded prior to the start of a game program.



Appx680 (showing screen capture of error screen prior to start of game when fault inspection detects a problem with system storage).

The PlayStation 4 CPU will report various error codes if there is a problem detected while running the fault inspection program to inspect the second memory device:

For example:

CE-30005-8
Error occurred while accessing the Hard Disk Drive ("HDD") or Blu-ray/DVD Drive.
CE-33191-7
Please insert the correct disc into the PlayStation 4 system.
NP-32062-3
Data on the system may be corrupted
CE-35486-6
The system cannot read the disc. The disc format may be unsupported, or the disc may be corrupted.
E-82000134
This product or content is not available for your account's country/region.
CE-34544-0
The database is likely to be partially corrupted as required information to start the application cannot be found.

https://www.playstation.com/en-nz/get-help/#!/error-code/

These error codes indicate a failure of the fault inspection program.

Appx686 (showing various error codes that are displayed when faults are detected).

Many of these error codes make clear that the game *cannot* start until the error is resolved, including one that asks for the correct game disc to be loaded (a prerequisite to starting a game), and another that says "required information to ***start*** the [game] application cannot be found." Appx686 (emphasis added). Thus, at a minimum, it is a reasonable inference that the fault inspection program is completed before the game starts, especially in these instances where the game cannot start until the errors that resulted from the fault inspection program are resolved. *Lifetime Indus.*, 869 F.3d at 1380 (reasonable inferences are drawn in plaintiff's favor).

Therefore, the MTD Order should be reversed as to the '988 and '670 Patents because the FAC plausibly alleges that the PS4 satisfies the Fault Inspection Limitation.

## III.    The District Court Abused its Discretion by Denying Bot M8's First Motion for Leave to Amend

After the District Court dismissed the FAC for purported failure to include sufficient proof of infringement, Bot M8 requested permission from the District Court and Sony to circumvent the encryption and access control protection systems of the PS4 in order to do so without violating the DMCA, other anti-hacking statutes, and Sony's end-user license for the PS4. *See, supra,* Statement of the Facts, § F. Within two weeks of obtaining such permission, Bot M8 filed a motion for leave to amend, its first such motion in this case. *Id.* Bot M8's motion included a proposed

Second Amended Complaint (SAC), with hundreds of pages of claim charts proving infringement through the use of new evidence obtained from jailbreaking and then reverse engineering a PS4.   As set forth below, the District Court abused its discretion in denying Bot M8's motion for leave to amend due to purported lack of diligence.

### A.   This Court Reviews Denial of Leave to Amend for Abuse of Discretion

Under the regional circuit law of the Ninth Circuit, this Court reviews the District Court's denial of Bot M8's motion for leave to amend the complaint for abuse of discretion. *Metricolor*, 791 F. App'x at 188 (citing *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)).

### B.   The District Court Abused its Discretion by Denying Bot M8's First Motion For Leave to Amend

The District Court should have granted Bot M8's motion for leave to amend. It was an abuse of discretion not to do so and to give Sony a free pass for its infringement; a result "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of" pleading deficiencies. *Foman v. Davis*, 371 U.S. 178, 181–82 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."); *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004)

("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

Bot M8 sought leave to amend in view of new evidence uncovered after obtaining permission to jailbreak the PS4 and then deciphering its software. Under Ninth Circuit law and Federal Rule of Civil Procedure 15(a)(2), leave to amend should be given "freely . . . when justice so requires." *Arizona Students' Ass'n v. Arizona Board of Regents*, 824 F.3d 858, 871 (9th Cir. 2016). In view of this permissive standard, leave to amend is granted unless there is "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party[, or] . . . futility of amendment." *Foman*, 371 U.S. at 182.

In its order dismissing-in-part the FAC, the District Court gave Bot M8 until February 13, 2020 to seek leave to amend. Appx16–Appx17. Because Bot M8 complied with that deadline, both Bot M8 and Sony briefed Bot M8's motion for leave to amend under the Rule 15 analysis, with Sony opposing only the basis that Bot M8 purportedly had not stated a claim. Appx2949 ("Bot [M8]'s motion for leave to amend should be denied because the proposed SAC fails to provide factual allegations supporting infringement of key limitations"). Sony did not argue undue delay, bad faith, or prejudice. *Id.*

In its order denying Bot M8's motion for leave to amend, the District Court instead applied Rule 16, based on an incorrect finding that Bot M8 had "ignored"

the original deadline to amend the pleadings.  Appx22.  In the Ninth Circuit, "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).  The District Court's denial was based only on a purported lack of diligence.  Appx20–Appx22, Appx24.  The District Court made no finding of bad faith or dilatory motive, prejudice to Sony, or futility of amendment.  *Id.*

Under the standards of both Rule 15 and Rule 16, the District Court abused its discretion in denying Bot M8's motion because Bot M8 diligently pursued the evidence and leave to amend.  The District Court dismissed Bot M8's FAC on January 27, 2020, citing a purported failure to state a claim due to the absence of proof of infringement by reverse engineering.  *See, e.g.*, Appx10 at 3:24-25; Appx11 at 4:9-11.  Bot M8 filed its motion for leave to amend on February 13, 2020.  During the intervening 16 days, Bot M8 obtained permission from the District Court and from Sony to circumvent the PS4's access control protections, jailbroke a PS4, conducted a detailed reverse engineering analysis of the unlocked PS4, and prepared the proposed SAC, which has hundreds of pages of claim charts proving Sony's infringement.  *Supra*, Statement of the Facts at § F.  This was a remarkably short turn-around time, and reasonable diligence under any standard.  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951–54 (9th Cir. 2006) (diligence measures

the time from when the moving party "knew or should have known the facts and theories raised by the amendment").

In the Ninth Circuit, a plaintiff is often given multiple attempts to plead *after* being informed of pleading deficiencies, and courts do not find a lack of diligence until a plaintiff's delay has spanned multiple months — neither of which apply here. *See, e.g.*, *Space Data Corp. v. Alphabet Inc.*, No. 16-CV-03260-BLF, 2019 WL 415578, *1-*3 (N.D. Cal. Feb. 1, 2019) (granting patentee leave to file a fifth amended complaint, after the deadline to amend pleadings had passed); *see also, Synchronoss Techs., Inc. v. Dropbox Inc.*, No. 16-CV-00119-HSG, 2019 WL 95927, at *2 (N.D. Cal. Jan. 3, 2019) (granting leave after the deadline to amend pleadings had passed because the facts underlying amendment were not previously discoverable).

Thus, the District Court abused its discretion in denying Bot M8's first motion for leave to amend, filed less than three weeks after the District Court dismissed the FAC and within two weeks of obtaining permission to jailbreak the PS4.

### C. The District Court Erroneously Concluded That Bot M8 Could Have Jailbroken the PS4 at Any Time

The District Court's denial of leave to amend was further an abuse of discretion because it is based on erroneous legal and factual conclusions regarding Bot M8's ability to lawfully jailbreak a PS4. *Highmark Inc. v. Allcare Health Mgmt.*

*Sys., Inc.*, 572 U.S. 559, 564 (2014) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."). Specifically, the District Court concluded that Bot M8 was free to jailbreak the PS4 and circumvent its access control system at any time because Bot M8 had not substantiated its claim that it needed permission under the DMCA to do so:

> To the extent patent owner believed it had won an extension of the December 5 deadline to reverse engineer the PlayStation 4, such modification was contingent upon the accuracy of ***patent owner's statement of the law***. Counsel accepts the duty of candor in appearing, and the Court credits many things counsel says without citation — including patent owner's new handwringing regarding the DMCA. But patent owner may not, and may not reasonably believe it could, treble the scope of this case upon no more than its unsubstantiated, on-the-fly remarks at a hearing. Now, with the benefit of the record and full briefing, it becomes clear that there was ***no*** basis in law for patent owner's concern or any contingent relief.
>
> Patent owner has ***never*** cited — and ***does not*** now cite — ***any*** authority, caselaw or otherwise, to support its professed fear of the DMCA or other anti-hacking statutes. Its motion to amend and reply brief rely ***entirely*** upon patent owner's ***own*** verbal representations to the Court that reverse engineering, code decryption, and circumvention of security measures were mysteriously prohibited.

Appx23–Appx24 (emphasis in original).

This is a remarkable claim by the District Court because the District Court never raised a question about this issue. During the hearing in which Bot M8 for the first time obtained permission from the District Court and Sony to jailbreak the PS4,

Bot M8 explained that it needed permission to do so lest it violate the DMCA and other statutes. Neither Sony nor the District Court disputed that representation. Instead, when prodded by the District Court, Sony authorized Bot M8 to proceed to jailbreak the PS4:

> **THE COURT:** Is it okay with you, then, if [give Bot M8] my blessings to have his teardown company do that kind of reverse engineering on the code and the hardware so that I don't have to order you to provide it to him?
>
> **[SONY]:** I think that's fine.
>
> **THE COURT:** All right. So you've got my permission, for whatever good it is, to have your teardown company analyze the code.

Appx1563.

> **THE COURT:** You [Sony] have not objected, and I'm telling [Bot M8] for the sake of getting this moving along that he can do his own reverse engineering and hire people to do it. At least to the extent that I have any authority whatever to give him that blessing, I'm giving it to him now because I want to move this case along.

Appx1565.

At no point did the District Court question or ask for proof of Bot M8's representation that it needed permission to jailbreak the PS4 to unlock it and permit reverse engineering its software, nor did Sony. Thus, when Bot M8 moved for leave to amend, it explained in its motion that it was seeking leave based on newly obtained evidence that it could not have obtained earlier without violating the

DMCA.  There was no need to brief the specific impact of the DMCA because that was never disputed:

> The Court held a discovery hearing on January 29, 2020, where it authorized and directed Bot M8 for the first time to conduct reverse engineering of Sony's products without restriction from various statutes, such as the Digital Millennium Copyright Act (DMCA) and other anti-hacking statutes. At that hearing, Sony confirmed for the first time its consent to Bot M8 conducting this analysis.

Appx1578 (citation omitted).

Notably, in opposing Bot M8's motion, Sony argued that Bot M8 substantively failed to state a claim, but Sony never argued that Bot M8 had not been diligent and never argued that Bot M8 could have disabled the PS4's access control technology without running afoul of the DMCA.  Appx2946–Appx2971.

After the District Court *sua sponte* denied leave to amend for purported lack of diligence, Bot M8 filed a motion for leave to file a motion for reconsideration, which the District Court promptly denied.  In that motion, Bot M8 explained that the DMCA expressly precludes bypassing Sony's access control technology, providing that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A)); Appx3193. The DMCA makes it a criminal act to willfully violate § 1201 "for purposes of commercial advantage or private financial gain." 17 U.S.C. § 1204.  Punishment for violating the DMCA includes "fine[s] of not more than $500,000 or imprison[ment]

for not more than 5 years, or both, for the first offense." *Id.*[5] Bot M8 further demonstrated that reverse engineering is prohibited under Sony's end-user license. Appx3193. Bot M8 also provided the District Court with Sony's history of aggressively litigating against individuals who circumvent the PlayStation's access control protections. Appx3192–Appx3196.

Accordingly, the District Court abused its discretion in denying Bot M8's motion on the basis that Bot M8 was purportedly free to jailbreak the PS4 at any time, a finding based on erroneous legal and factual conclusions. *Highmark*, 572 U.S. at 564.

## IV. Claim 1 of the '363 Patent is Patent Eligible

Claim 1 of the '363 Patent is patent eligible because it is directed to a non-abstract invention for making gaming machines more fun by dynamically reconfiguring the machines based on total results from multiple machines. This concrete invention improves on gaming machines at the time of the invention, which did not aggregate results in this way, and is directed to patent eligible subject matter under both steps of the *Alice* framework. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct.

[5] The DMCA permits reverse engineering "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs," but that exception does not apply to Bot M8's circumvention of the PS4's access control for purposes of proving patent infringement. 17 U.S.C. § 1201(f).

2347 (2014) (providing a two-step framework for determining patent eligibility); Appx4015–Appx4016 at ¶ 13.

The District Court made three critical errors in granting summary judgment that Claim 1 of the '363 Patent is abstract under 35 U.S.C. § 101. At Step 1 of the *Alice* analysis, the District Court overgeneralized the invention, ignoring the specific improvement it provides to computer functionality. The District Court further incorrectly deemed Claim 1 to be directed to conventional technology, failing to appreciate the specific differences between the approach of Claim 1 and then-conventional gaming technology. Finally, the District Court erred in granting summary judgment, thereby resolving genuine material factual disputes.

### A. This Court Reviews A Grant of Summary Judgment *De Novo*

This Court reviews a grant of summary judgment without deference. *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1069 (Fed. Cir. 2009). Under the summary judgment standard of the Ninth Circuit, the Court is to "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Applied Med. Res. Corp. v. Tyco Healthcare Grp. LP*, 534 F. App'x 972, 976 (Fed. Cir. 2013) (quoting *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131–32 (9th Cir. 2003)).

At *Alice* Step one, courts "determine whether the claims at issue are directed to a patent-ineligible concept." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1366 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911, 205 L. Ed. 2d 454 (2020). At *Alice* Step two, courts consider the claim elements both individually and as an ordered combination to determine whether they "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer*, 881 F.3d at 1367.

"Whether a claim element or combination of elements would have been well-understood, routine, and conventional to a skilled artisan in the relevant field at a particular point in time may require "weigh[ing] evidence," "mak[ing] credibility judgments," and addressing "narrow facts that utterly resist generalization." *Berkheimer*, 890 F.3d at 1370. If there is a genuine dispute of material fact as to whether a claim element would have been well-understood, routine, and conventional at the time, as is the case here, "Rule 56 requires that summary judgment be denied." *Id.* at 1371.

### B. Claim 1 of the '363 Patent is Patent-Eligible at *Alice* Step 1

Claim 1 of the '363 Patent is patent eligible under Step 1 of the *Alice* inquiry because it is directed to specific improvements in computer functionality and it recites concrete components to implement those improvements. *Alice*, 134 S. Ct. 2347. Specifically, Claim 1 is about the invention of dynamically reconfiguring the

settings on gaming machines for future games based on total results aggregated from multiple gaming machines. Appx4019 at ¶¶ 26-27. Multiple gaming machines are connected and send game results to a server, the game results are totaled, the gaming machines receive the total game results, and then use them to determine a new "specification value" for modifying future game conditions. *Id.*, ¶ 27.

Thus, Claim 1 is patent eligible because "the claims focus 'on the specific asserted improvement in computer capabilities," making the games more fun by changing the way they are configured," rather than "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Finjan,* 879 F.3d at 1303-05 (finding computer security claim to be patent eligible). And "claim [1] recite[s] more than a mere result . . . . Instead, [it] recit[es] specific steps . . . that accomplish the desired result." *Id.*

Claim 1 of the '363 Patent is further patent-eligible at Step 1 because it recites specific components that accomplish the desired result of keeping consumers more engaged and playing games for longer periods of time. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (claims are not abstract at *Alice* Step 1 if they claim a specific way of achieving a desired result). Here, Claim 1 recites that (1) multiple gaming machines must be connected, (2) they send gaming results to a server, (3) the gaming results are totaled, (4) the gaming machines receive the total game results back from the server, and (5) use them to adjust the specification values

for modifying future game conditions for each machine, thereby enhancing the excitement for each player. Appx4017–Appx 4019; Appx79 at Claim 1.

The invention of these steps accomplished an improvement in gaming machines that was new to the industry, and resulted in higher revenues for game makers or operators through prolonged player engagement and greater excitement. *SAP Am.*, 898 F.3d at 1167 (claiming a specific way to achieve a result is not abstract); Appx4008–Appx 4010 at ¶ 50 (the '363 Patent was novel and unconventional in the gaming industry), ¶¶ 51-53 (no prior gaming system included the functionality of the '363 Patent).

Sony lured the District Court into the trap of over-generalizing the invention to overlook this concrete idea. Sony mischaracterized Claim 1 as directed only to "adding together two numbers … to generate further numbers," a remarkable over-generalization that would apply to just about any software implemented invention, as almost every computer program is based on performing arithmetic operations on numbers to yield further numbers. Appx3705; Appx4019 at ¶ 28.

This Court has recognized that every invention could be described at a high level in a few words, and that when addressing patentability under *Alice*, the Court must be careful not to describe the claims at a high level of abstraction. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (citing *Alice*, 134 S. Ct. at 2354 ("we tread carefully in construing this exclusionary principle [of laws of

nature, natural phenomena, and abstract ideas] lest it swallow all of patent law”)). “We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.” *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346-47 (Fed. Cir. 2017) (citing *Alice*, 134 S. Ct. at 2354). The District Court should have heeded this Court’s guidance and rejected Sony’s attempt to rewrite the invention of Claim 1, which goes far beyond merely adding two numbers to yield a third.

In finding inventions similar to Claim 1 to be patent eligible, this Court rejected the same type of over-generalized argument that Sony advanced and the District Court adopted. For example, in a case involving malware detection software, the defendant characterized a computer security patent as merely flagging suspicious messages, arguing that its steps could be performed with a pencil and paper, and claimed that post offices perform the same task while delivering the mail. *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-cv-03295-BLF, 2016 WL 7212322, at *9 (N.D. Cal. Dec. 13, 2016). Yet the Court still found the patent non-abstract because the claim “does a good deal more” by claiming a real “improvement in computer functionality, rather than the abstract idea of computer security writ large.” *Finjan*, 879 F.3d at 1304-05. Here too, Claim 1 of the ‘363 Patent goes far beyond claiming just the abstract ideas of adding numbers or making games that are fun, and provides a specific way to obtain the desired result.

Proving this point, Claim 1 cannot be satisfied simply through arithmetic or mental processes. Instead, it is applied to the specific, real-world, tangible context of gaming machines, including components such that they are connected by a server, collecting results from the disparate gaming machines, totaling the results and then modifying future games played on the game machines, taking it out of the realm of pure math and into the realm of real-world improvements to the functioning of the computer gaming machines, rendering the claim patent eligible. *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, No. 2019-1835, 2020 WL 2071951, at *3 (Fed. Cir. Apr. 30, 2020) ("We have routinely held software claims patent eligible . . . when they are directed to improvements to the functionality of a computer or network platform itself."). Here, the claimed gaming machines with more functionality are far more fun and entertaining – the result is a real improvement to gaming machines.

Claim 1 is further patent eligible because it is directed to a novel gaming machine that is not based on conventional practices within the pertinent gaming field, as explained by Bot M8's experts. Appx4019–Appx 4020 at ¶ 29; Appx4008–Appx 4009 at ¶ 51. The District Court mischaracterized Claim 1 as covering conventional business practices, such as "offer[ing] a variety of conditions for the same game, e.g., slot machines with different base bets" while noting that "casinos aggregate player results … Their profit margins don't depend

on individual outcomes, but on the aggregate results of all players converging on the odds." Appx39.  In so holding, the District Court lost sight of Claim 1's specific elements.

It has never been a conventional practice in a casino or other gaming location to automatically collect and total results across multiple gaming machines to dynamically change the gaming conditions based on those results, as recited in Claim 1, and the two examples cited by the District Court are inapposite. Appx4008–Appx 4009 at ¶ 51; Appx79 at Claim 1.  Slot machines with different preset base bets are static – the base bet amount does not change in relation to gameplay.  To the contrary, gaming machines in the casino context are highly regulated and require detailed compliance logs every time the settings on a machine are modified.  It would be both contraindicated and possibly illegal for a casino employee to run around from machine to machine trying to observe players, evaluating results of gameplay simultaneously on multiple machines, and then manually changing gaming settings to dynamically make the game harder or easier.  *Id*.  And more importantly, it has never been a conventional practice in casinos to do so.  *Id.*  Thus, in comparing Claim 1 to setting different base bet amounts for slot machines, the District Court engaged in erroneous fact-finding and failed to appreciate the specific scope of Claim 1.

Similarly, the fact that casinos ***financially*** aggregate their wins and losses across all of the tables and gambling machines in a building has nothing to do with Claim 1's invention of collecting game results from multiple networked machines and then using those results to change the game conditions for future games. None of what the Claim 1 covers is a mere computerization of a conventional practice. *Id.*

Thus, the '363 Patent is directed to a non-conventional technological improvement to gaming machines and as such, is patent-eligible at *Alice* Step 1. *Enfish*, 822 F.3d at 1335–36 (a claim is not directed to an abstract idea at Step 1 if it improves the way computers or machines function). Therefore, the District Court erred by finding Claim 1 of the '363 Patent to be directed to an abstract idea.

### C. Claim 1 is Patent Eligible at Step 2 Because it Covers Inventive Concepts

While the District Court's application of *Alice* should have ended with a finding that Claim 1 is patent eligible under Step 1, Claim 1 also recites inventive concepts that further demonstrate that it is eligible under *Alice* Step 2. Claim 1 recites a specific and novel implementation of its concepts, including requirements for the components comprising the gaming machine, the flow of data exchanged between the components, and the way the gaming conditions are modified based on prior results of multiple connected gaming machines. This satisfies Step 2 because

these "claim limitations 'involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer*, 881 F.3d at 1367, quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014). As Bot M8's technical experts explained, there was nothing conventional about collecting individual results from networked gaming machines to alter the playing conditions for future games. Appx4008–Appx4010 ¶¶ 50-55; Appx4020 at ¶¶ 32-33.

Sony's numerous arguments in support of its motion for summary judgment of *non-infringement*, which were all based on Claim 1 having very specific requirements, confirmed as much and directly contradicted both Sony's patent eligibility position that the claim is not concrete and the District Court's findings. Having argued that Claim 1 includes multiple specific limitations for infringement purposes, Sony should have been bound by those arguments for validity purposes. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449 (Fed. Cir. 1984) (claims "must be construed in the identical way for both infringement and validity").

Below are examples of Sony's characterizations of Claim 1 as having specific and particular requirements confirming it is not abstract:

- "Claim 1 requires ***a particular configuration*** in which a gaming machine receives from a server a 'total game result' . . . and then determines a 'specification value' at the 'first gaming machine' based upon this data from the server." Sony Br., 1 (emphasis added).

- "[T]he accused PlayStation 4 games fail to perform the ***specific calculations required by Claim 1 of the '363 Patent***." *Id*., 1 (emphasis added).

- "[T]he number-adding of the invention must be carried out with ***specific communications*** between a ***particular arrangement of gaming machines*** and a server." *Id*., 4 (emphasis added).

- "Claim 1 requires ***specific communications*** between a first gaming machine and a server." *Id*., 7 (emphasis added).

- "Claim 1 requires a ***specific arrangement of components***." Sony Br., 10 (emphasis added).

The District Court further erred in failing to take into account the specific ordered combination of Claim 1's elements in its flawed *Alice* Step 2 analysis. In particular, as Sony itself contends for purposes of non-infringement, Claim 1 recites a sequence where: (1) multiple gaming machines sends game result data to the server, (2) the server receives the data, (3) the game results are totaled, (4) a gaming machine receives the total game results, (5) the gaming machine uses the total game result data to determine a specification value, (6) the specification value is then renewed based on the newly determined specification value, and (7) the specification value is used to change conditions for a future game. Appx79 at Claim 1; Appx3706-3707.

This ordered combination of the elements in Claim 1 is an inventive concept, and it was not found in the conventional art in the gaming machine field at the time of the invention. Appx4010 at ¶ 55; Appx4020 at ¶ 33; *Bascom Global Internet*

*Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (finding inventive concept "in the non-conventional and non-generic arrangement of known, conventional pieces").  The District Court's failure to address the inventive nature of the sequence alone warrants reversal of summary judgment.  *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1302 (Fed. Cir. 2016) (holding courts must consider elements as an ordered combination).

### D.    The District Court Improperly Resolved Disputed Questions of Fact in Granting Summary Judgment

Bot M8's expert testimony, at a minimum, raised a genuine issue of material fact as to whether the ordered elements of Claim 1 of the '363 Patent were well-known, routine, or conventional in the field at the time of the invention which precluded summary judgment.  The District Court's decision was premised on the invention of Claim 1 being supposedly limited to conventional practices.  Appx39.  But that factual contention was far from undisputed.

To the contrary, Bot M8's expert, Mr. Friedman, explained that, at the time the '363 Patent was filed, no other gaming machines in the industry were meeting the requirements of Claim 1 at that time.  Appx4008–Appx4010 at ¶¶ 50-53.  He further explained that the '363 Patent invented the idea of using game results from multiple gaming machines in order to change conditions for future games, and that no other gaming machines were doing so at that time.  *Id.*

Bot M8's other technical expert, Dr. Cullimore, explained that the '363 Patent was an improvement over conventional gaming machines and Claim 1 as an ordered whole was not well-known, routine, or conventional, for the reasons discussed above.  Appx4017–Appx4018, 4019–Appx4020 at ¶¶ 23, 29-33.

The District Court misapplied *Alice* in dismissing Dr. Cullimore's analysis because he testified at his deposition that "the totality" of the claim elements comprise the inventive concept.  Appx40 ("When pushed at deposition, Dr. Cullimore could articulate no specific inventive concept … other than 'the totality'").  This is a critical misunderstanding of patent eligibility.

The Supreme Court and this Court have repeatedly held that a district court *must* specifically consider if the totality of the ordered combination of the elements as whole represents an inventive concept, which is precisely what Dr. Cullimore opined.  "At step two, we 'consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application.'"  *Berkheimer*, 881 F.3d at 1367 (citing *Alice*, 134 S. Ct. at 2355).

The District Court repeated its error in disregarding Mr. Friedman's patent eligibility opinion because he admitted that the individual concepts of (1) connecting multiple machines, (2) aggregating results, and (3) changing game parameters were known.  Appx40.  The salient point of Mr. Friedman's unrebutted analysis was that

it was not conventional (or even known prior to the '363 Patent) to combine all of the elements of Claim 1 to reach the ordered combination of the invention recited in Claim 1. This Court has never held that if the claim elements are individually known they cannot be combined into a patent eligible invention.

Such disputes over "whether a claim element or combination of elements is well-understood, routine and conventional to a [POSITA] is a question of fact." *Berkheimer*, 881 F.3d at 1368 (holding any fact "pertinent to the invalidity conclusion must be proven by clear and convincing evidence") (citation omitted). *Berkheimer* reversed summary judgment on a similar dispute, holding that "the district court erred in concluding there are no underlying factual questions to the § 101 inquiry" and explaining: "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." *Id*. at 1369; *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1128 (Fed. Cir. 2018) (recognizing the "inventive concept" in Step 2 is a question of fact over "[w]hether the claim elements or the claimed combination are well understood, routine, conventional"). That is exactly the case here.

There is substantial evidence that Claim 1 of the '363 Patent represents a real improvement over the prior art in making gaming more fun by allowing the dynamic modification of game conditions based on the combined results of multiple gaming

machines connected by a server, and is not based on conventional practices.  Appx79 at 23:49-59; Appx4008 at ¶ 50; Appx4017 at ¶ 23.  Thus, expert opinion, the intrinsic evidence including the patent specification, and Federal Circuit precedent all demonstrate that the invention of the '363 Patent is patentable.

Sony failed to prove that each of the facts that Bot M8's experts proffered were wrong by clear and convincing evidence, which it needed to do in order to substantiate its claim that Claim 1 is abstract.  *Berkheimer*, 881 F.3d at 1368.  The District Court could not come to such a conclusion on summary judgment where it was required to resolve all factual disputes in Bot M8's favor.  Thus, at a minimum the District Court should have denied Sony's motion under § 101 because questions of material fact preclude summary judgment on this issue.

The District Court erred by discounting this expert evidence, rather than acknowledging that the existence of the dispute makes this issue inappropriate for summary judgment.  *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate.").  As such, this Court should reverse the District Court's grant of summary judgment on the '363 Patent.

## CONCLUSION

For the reasons set forth above, the Court should reverse the District Court's Orders granting Sony's Motion to Dismiss Bot M8's FAC and Motion for Summary Judgment and denying Bot M8's Motion for Leave to Amend its complaint.

Respectfully submitted,

Dated: November 02, 2020

*/s/ Paul J. Andre*

Paul J. Andre
Lisa Kobialka
James Hannah
Kramer Levin Naftalis & Frankel LLP
990 Marsh Road
Menlo Park, CA 94025
Tel: 650.752.1700
Fax: 650.752.1810
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Aaron M. Frankel
Cristina Martinez
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: 212.715.9100
Fax: 212.715.8000
afrankel@kramrelevin.com
cmartinez@kramerlevin.com

*Attorneys for Plaintiff-Appellant*
*Bot M8 LLC*

# ADDENDUM

| Date | Description | Appx No. |
|---|---|---|
| 08/19/2020 | Final Judgment | Appx1 |
| 11/26/2019 | Case Management Scheduling Order | Appx6 |
| 01/27/2020 | Order Granting in Part and Denying in Part Motion to Dismiss | Appx8 |
| 02/13/2020 | Case Management Order Number Two | Appx18 |
| 04/02/2020 | Order Denying Motion to Amend | Appx20 |
| 04/16/2020 | Order Denying Leave to Move for Reconsideration | Appx25 |
| 06/10/2020 | Order re: Motion for Summary Judgment | Appx26 |
| | U.S. Patent No. 7,338,363 (the ’363 Patent) | Appx43 |
| | U.S. Patent No. 7,497,777 (the ’777 Patent) | Appx84 |
| | U.S. Patent No. 7,664,988 (the ’988 Patent) | Appx171 |
| | U.S. Patent No. 8,078,540 (the ’540 Patent) | Appx178 |
| | U.S. Patent No. 8,095,990 (the ’990 Patent) | Appx193 |
| | U.S. Patent No. 8,112,670 (the ’670 Patent) | Appx217 |

PAUL J. ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

AARON FRANKEL (*pro hac vice*)
afrankel@kramerlevin.com
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7793

*Attorneys for Plaintiff*
BOT M8 LLC

Brandon Brown (SBN 266347)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Gregory S. Arovas (*pro hac vice*)
greg.arovas@kirkland.com
KIRKLAND & ELLIS
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

David Rokach (*pro hac vice*)
david.rokach@kirkland.com
KIRKLAND & ELLIS
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendants*
Sony Corporation of America, Sony Corporation and Sony Interactive Entertainment LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BOT M8 LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>SONY CORPORATION OF AMERICA, a New York Corporation; SONY CORPORATION, a Japanese Corporation, and SONY INTERACTIVE ENTERTAINMENT LLC, a California Limited Liability Company,<br><br>Defendants. | Case Number: 3:19-cv-07027-WHA<br><br>**STIPULATION AND ~~[PROPOSED]~~ JUDGMENT IN A CIVIL CASE** |

Plaintiff Bot M8, LLC ("Bot M8") and Defendants Sony Corporation of America, Sony Corporation, and Sony Interactive Entertainment LLC (together, "Sony"), by and through their respective counsel, hereby stipulate as follows:

WHEREAS, the Court dismissed Bot M8's claims for infringement of U.S. Patent Nos. 7,664,988, 8,078,540, 8,095,990, and 8,112,670;

WHEREAS, the Court found Claim 1 of U.S. Patent No. 7,338,363 (the "'363 Patent") to be invalid under 35 U.S.C. § 101 (Dkt. 161, the "'363 Order");

WHEREAS, Bot M8 and Sony entered into a Joint Stipulation Regarding Case Management and Dismissal, where the parties agreed to dismiss the remaining claims and counterclaims in the case (Dkt. No. 166, the "Stipulation") and the Court so-ordered the Stipulation (Dkt. No. 167); and

WHEREAS, the parties agree that the case is ripe for appeal because all pending claims and counterclaims have been resolved as set forth in the Stipulation, with the parties reserving all rights set forth in the Stipulation, including the right to appeal the Court's various orders in this action.

NOW, THEREFORE, Bot M8 and Sony respectfully request that the Court issue a Final Judgment in this matter.[1] The parties submit a proposed Judgement herewith.

**IT IS SO STIPULATED**.

Respectfully submitted,

Dated: August 18, 2020 By: /s/ *Paul Andre*

Paul Andre (SBN 196585)
Lisa Kobialka (SBN 191404)
James Hannah (SBN 237978)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

[1] Sony believes that a further entry of Judgment in this case is unnecessary in view of Dkt. No. 167, but nevertheless joins Bot's request for entry of this Judgment in order to avoid unnecessary disputes and motion practice on this issue.

pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Aaron Frankel (Admitted *Pro Hac Vice*)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
afrankel@kramerlevin.com

*Attorneys for Plaintiff*
Bot M8 LLC

Respectfully submitted,

Dated: August 18, 2020 By: */s/ David Rokach*

Brandon Brown (SBN 266347)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Gregory S. Arovas (*pro hac vice*)
greg.arovas@kirkland.com
KIRKLAND & ELLIS
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

David Rokach (*pro hac vice*)
david.rokach@kirkland.com
KIRKLAND & ELLIS
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendants*
Sony Corporation of America, Sony Corporation and Sony Interactive Entertainment LLC

**ATTESTATION**

I, Paul Andre, am the ECF user whose identification and password are being used in this filing. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all other signatories to this document have concurred in the filing of this document.

*/s/ Paul J. Andre*
Paul J. Andre

3
STIPULATION AND [~~PROPOSED~~] JUDGMENT IN A CIVIL CASE CASE NO.: 3:19-cv-07027-WHA

Appx4

# ~~[PROPOSED]~~ JUDGMENT

The Court enters Judgment in favor of Defendants Sony Corporation of America, Sony Corporation, and Sony Interactive Entertainment LLC and denies all relief sought by Bot M8, LLC. The parties previously entered into a Joint Stipulation Regarding Case Management and Dismissal (Dkt. No. 166), where the parties agreed to dismiss the pending claims and counterclaims in the case while reserving the right to appeal the Court's orders in this action, thereby rendering all issues already decided ripe for appeal.

**IT IS SO ORDERED AND ADJUDGED** that all Court orders in this case are final and that judgment is entered.

Dated: August 19, 2020.

THE HONORABLE WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BOT M8 LLC, a Delaware limited liability company,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, a New York corporation, SONY CORPORATION, a Japanese corporation, and SONY INTERACTIVE ENTERTAINMENT, LLC, a California limited liability company,

Defendants.

_______________________________________/

No. C 19-07027 WHA

**CASE MANAGEMENT ORDER**

After a case management conference, the Court enters the following order pursuant to Rule 16 of the Federal Rules of Civil Procedure ("FRCP") and Civil Local Rule 16-10:

1. Plaintiff will file an amended complaint specifying, element-by-element, its allegations of infringement by **DECEMBER 5, 2019 AT NOON**.

2. By **FEBRUARY 6, 2020**, plaintiff and defendants shall select and exchange one asserted claim — presumably the strongest case for infringement and the strongest case for noninfringement or invalidity, respectively.

3. A further case management conference shall be held on **FEBRUARY 13, 2020 AT 11:00 A.M.**, during which the parties shall present their selected claim. By **FEBRUARY 6, 2020 AT NOON**, the parties shall file the joint case management statement according to Civil L.R. 16-10(d). Pursuant to the amended case management order that will follow the conference, the parties shall file early motions for summary judgment on their

United States District Court
For the Northern District of California

respective claim. The outcome of this exchange and motions may (or may not) warrant an injunction or sanctions, depending upon which side prevails. The potential remedies shall be litigated soon after the early motions for summary judgment are decided (depending, of course, on the outcome). In addition to adjudicating the selected claims on their merits and indicating the relative strengths (or weaknesses) of both sides' positions, this procedure will educate the undersigned judge about the technology at issue. If issues of fact preclude summary judgment, trial on the disputed points will follow soon thereafter. Both sides shall please plan their calendars accordingly.

4. Discovery between the parties begins **NOVEMBER 21, 2019**.

5. The remainder of the patents and claims asserted by plaintiff will remain part of the case. The parties are advised to proceed per the Civil Local Rules and Patent Local Rules.

**IT IS SO ORDERED.**

Dated: November 26, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOT M8 LLC,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, et al.,

Defendants.

No. C 19-07027 WHA

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

**INTRODUCTION**

In this patent infringement suit, defendants move to dismiss the amended complaint. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

Patent owner asserts six patents against defendants: U.S. Patent Nos. 8,078,540 ("the '540 patent"); 8,095,990 ("the '990 patent"); 7,664,988 ("the '988 patent"); 8,112,670 ("the '670 patent"); 7,338,363 ("the '363 patent"); and 7,497,777 ("the '777 patent"). The asserted patents are directed toward casino, arcade, and video games generally (Dkt. No. 79 at 2). The '540, '990, '988, and '670 patents are asserted against the Sony Play Station 4. The '363 patent is asserted against both the Sony PlayStation 4 and three video games: MLB The Show 19; Uncharted 4; and Uncharted: the Lost Legacy (Dkt. No. 75 at 18). And, the '777 patent is asserted against the PlayStation 4 and three games: the two Uncharted games and God of War.

At a November 21 case management conference, plaintiff was directed to file an amended complaint by December 5 specifying "every element of every claim that [patent owner] say[s] is infringed and/or explain why it can't be done [and] if this is a product you can buy on the market and reverse engineer, you have got to do that." Plaintiff obliged, stating "[w]e have torn down the Sony PlayStation" (Dkt. No. 67 at 2–3). On December 5, patent owner timely filed its amended complaint (Dkt. No. 68) and defendants moved to dismiss (Dkt. No. 75). Now, it's showtime.

Unsurprisingly, with six patents in suit and 25-page briefs, the parties' briefs do not expand on the technology at issue, or its alleged impact. Instead, they jump right into the merits of infringement. Defendants challenge a key aspect of the infringement allegations for each patent. Thus, this order does not evaluate the sufficiency of the pleadings in their entirety. Rather, it decides *only* whether patent owner's complaint is deficient on the challenged grounds.

**ANALYSIS**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that defendants are liable for the misconduct alleged. While a court must take all of the factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Ibid.* Of particular importance below, in both *Twombly* and *Iqbal* the Court made plain: allegations merely *consistent* with liability are not enough. 550 U.S. at 556–57; 556 U.S. at 678. Allegations of infringement "without explanation as to the *how* or *why* these products infringe . . . do[] not lead to any inference that plaintiff may be entitled to relief." *PageMelding, Inc. v. ESPN, Inc.*, No. C 11-06263 WHA, 2012 WL 851574, at *2 (N.D. Cal. Mar. 13, 2012).

**1. THE '540 PATENT.**

The '540 patent describes an authentication mechanism for video games. Defendants challenge the sufficiency of the complaint as to the limitations:

- [A] board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored.
- [A] motherboard which is different from the board and connects to the board . . . .

('540 patent, cl. 1). Specifically, defendants argue the complaint fails to sufficiently allege that a game program and authentication program are stored *together* in a memory on a board *other than* the motherboard (Dkt. No. 75 at 6–9). Patent owner offers four responses.

*First*, the complaint alleges that when a PlayStation 4 operates games offline, *i.e.* while not connected to the internet, an authentication program checks if the PlayStation 4 is designated the "primary" station for the user account. Patent owner, in its opposition brief, also points in the complaint to three different "board[s]" with memory that are not the "motherboard" (Dkt. No. 79 at 3–4). But, even accepting the pled program *is* an acceptable "authentication program," the complaint fails to allege *when* or *where* the game program and authentication program are stored *together* on the same memory board. The complaint's allegation that the PlayStation 4 "hard drive includes an authentication program for verifying that the PS4 is allowed to the play the game" is: (1) a conclusion unsupported by the allegations offered, which merely allege an authentication program's existence and not its storage location (Dkt. No. 68, ¶ 80(b)–(d)); and (2) does not mean the game program is also stored on that same hard drive, given the *three* memory boards patent owner notes (Dkt. No. 79 at 3). Moreover, the picture of an alleged hard drive in the complaint (Dkt. No. 68 at ¶ 80(b)) provides no basis to infer *what* is stored on that drive. Despite patent owner proclaiming "we have torn down the Sony PlayStation," the complaint does not allege what programs were found *on the* hard drive or what, if anything, prevented such access.

*Second*, the complaint alleges each Blu-ray game disc includes a "ROM Mark" to confirm the disc is an authentic copy of a game and that "[t]he PlayStation 4 includes an authentication

United States District Court
Northern District of California

program to authenticate the game program on the Blu-ray discs." But alleging the "*PlayStation 4* includes an authentication program" indicates that the program is *not* stored on the Blu-ray disc with the game program. And the complaint describes the ROM Mark as a key, or "Volume ID," required to "decrypt" the disc content, not an executable computer program that itself authenticates the disc (Dkt. Nos. 68 at ¶ 80(e), 79 at 4) (emphasis added).

*Third*, the complaint alleges an authentication program which displays error codes if a game program fails (Dkt. No. 79 at 5, 68 at ¶ 80(f)). But the existence of an authentication program alone does not plausibly indicate the authentication program is stored *together* with the game program. Again, despite patent owner proclaiming the reverse engineerability of the PlayStation 4, the complaint does not explain *what* or *where* programs were found, or what prevented such discovery.

*Fourth*, the complaint alleges the PlayStation Network servers authenticate game programs when users connect. Indeed, it alleges the servers contain both game programs and authentication programs (*ibid.*). But storage on the same server does not mean the game and authentication programs are stored *together* on a memory board. Moreover, the complaint then alleges the authentication program is within the PlayStation 4, not on the server: "[t]he PlayStation 4 uses 2-step verification and a Cryptography algorithm as an authentication program . . ." (Dkt. No. 68 at ¶ 80(i)).

Thus, the complaint fails to plausibly plead the shared location of the game and authentication programs according to claim 1 of the '540 patent. As patent infringement requires the practice of *every* claim limitation, the failure to allege one limitation precludes liability. The claim for infringement of the '540 patent fails.

**2. THE '990 PATENT.**

The '990 patent describes a mutual authentication mechanism for video games. Defendants challenge the limitations:

- [A] removable storage medium storing therein gaming information including a mutual authentication program.
- [T]he mutual authentication unit confirmed to execute a mutual authentication process for the authentication

> program to check that the authentication program is a legitimate program according to the mutual authentication program included in the gaming information authenticated by the authentication unit.

('990 patent, cl. 1, 5, 9). Specifically, defendants contend the complaint fails to allege that the mutual authentication program and game program are stored *together* (Dkt. No. 75 at 10–12). Patent owner offers three responses.

*First*, the complaint alleges the authentication program referenced above regarding the '540 patent is a mutual authentication program (Dkt. No. 79 at 7). But, as noted above, accepting as true that the authentication program suffices, the complaint fails to allege *when* or *where* the game program and mutual authentication program are stored *together*.

*Second*, the complaint alleges the PlayStation 4 "NOR flash memory chip includes authentication functionality, as confirmed by the fact that the NOR chip must be removed in order to play pirated (non-authentic) games" (*ibid.*). But, again as above, taking the NOR chip authentication functionality as sufficient pleading of the mutual authentication program, the complaint does not plead *when* or *where* the mutual authentication program and "gaming information" are stored *together*.

*Third*, the complaint alleges a mutual authentication program facilitates communication between the PlayStation 4 and the PlayStation Network Server (*ibid.*). Patent owner points to the assertion in the complaint that "[t]he game program on the hard drive or disc contains a mutual authentication process . . . ." But allegations that track the claim language that closely are conclusory and require support not found in the substantive allegations (Dkt. Nos. 79 at 8, 68 at ¶ 106(o)). So the allegations still fail to allege *where* or *when* the game program and the mutual authentication program are stored *together*.

Patent owner finally contends the complaint states "evidence that the flash memory contains a mutual authentication program and that the game program is stored in the flash memory when the game is loaded" (Dkt. No. 79 at 8) (citing Dkt. No. 68 at ¶ 106(e), 106(q)). The cited allegations do not support this assertion because they do not address where the game program is stored. Moreover, the complaint appears to indicate there are multiple flash memory chips (Dkt. No. 68 at ¶ 106(e)). So merely alleging the mutual authentication program and the

game program are each stored on flash memory at some point hardly leads to the plausible inference that they are stored *together*. This necessary limitation of the '990 patent not plausibly plead, the claims for infringement of the '990 patent fail.

**3. THE '988 AND '670 PATENTS.**

The '988 and '670 patents describe computer program fault inspection. Defendants challenge the '988 patent limitations:

- [A] control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein.
- [T]he control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started.

('988 patent, cl. 1, 6, 10). Defendants also challenge similar limitations from the '670 patent:

- [A] second memory device configured to store a game application program.
- [A] control device for executing a fault inspection program for the second memory to inspect whether or not a fault occurs in the second memory device.
- [T]he control device completes the execution of the fault inspection program before the game is started.

('670 patent, cl. 1). Specifically, defendants argue the complaint fails to plausibly allege an inspection, completed *before* the game starts, of *both* the second memory device and game program (Dkt. No. 75 at 13–17).

The complaint does plausibly allege the inspection for both the memory device and the game stored therein. Specifically, it alleges the PlayStation 4 reports various error codes, including "Error occurred while accessing the Hard Disk Drive ('HDD') or Blue-ray/DVD Drive" and "The system cannot read the disc" (Dkt. No. 68 at ¶ 128(k)). Given the complaint also alleges games can be stored on the hard drive and on Blu-ray discs (Dkt. No. 68 at ¶ 128(e)–(f)), the inspection of the memory plausibly includes inspection of the game program as well.

United States District Court
Northern District of California

But the complaint provides no basis to infer the proper timing of the inspection. The allegation too closely tracks the claim language to be entitled to the presumption of truth:

| | |
|---|---|
| The PlayStation CPU will execute the fault inspection program when the gaming device is started to operate[] and completed before the game is started (Dkt. No. 68 at ¶ 128(n)). | [T]he control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started ('988 patent, cl. 1). |

No underlying allegations of fact are offered. Thus, the complaint fails to plausibly allege an essential element in the claim for infringement of the '988 and '670 patents.

**4. THE '363 PATENT.**

The '363 patent describes gathering and using game result data from multiple networked gaming devices. Defendants challenge the limitation:

- [A] total result data receiving device for receiving from the server data of a total game result achieved by the first gaming machine and the second gaming machine.
- [D]etermining a specification value based on the data of the total game result received by the total result data receiving device.

('363 patent, cl. 1). Specifically, defendants contend the complaint fails to plausibly allege the receipt of game results from a server (Dkt. No. 75 at 18–19).

The complaint alleges that multiple PlayStation 4 consoles connect via the PlayStation Network server for online multiplayer gaming and specifies the hardware that connects the PlayStation 4 to the network (Dkt. No. 68 at ¶ 48(a)–(f), (m)). For the Uncharted Games, the complaint offers game screenshots: (1) explaining that player game performance is graded; and (2) showing the summary of multiplayer grades (*id.* at ¶ 48(p), (r), (t), (u)). For MLB: The Show 19, the complaint also includes screenshots: (1) explaining player performance ratings; and (2) displaying player ratings and multiplayer game results (Dkt. No. 68 at ¶ 51(s)–(u)). The allegations may be slim (Dkt. No. 81 at 12–13), but the game consoles plainly communicate player performance data across the PlayStation Network server, from which individual consoles receive the game result data.

Defendants also challenge the limitation:

- [T]otaliz[ing] the game result of the first gaming machine and the game result of the second gaming machine on the basis of data of the game result transmitted from the first gaming machine and the data of the game result transmitted from the second gaming machine so as to calculate a total result.
- [R]eceiving data of a game result from the first gaming machine and data of a game result transmitted from the second gaming machine.

('363 patent, cl. 8). Here, defendants argue the complaint fails to plausibly allege the totalization of game data.

The complaint includes screenshots explaining how player performance is evaluated in the Uncharted games, on a graded scale from S to C, and for MLB: The Show 19, with baseball's standard runs-per-inning scorecard (Dkt. No. 68 at ¶ 49(n)–(p), ¶ 52(o)). Such data compilation is a plausible allegation of post-game data totalization. And because defendants challenge the infringement of claim 11 on similar grounds, the motion fails for the same reasons. Defendants' motion to dismiss as to the '363 patent is **DENIED**.

### 5. THE '777 PATENT.

The '777 patent describes the calculation, display, and execution of game characters' order of action. Defendants challenge the limitations:

- [A]n execution order calculation section that calculates an execution order of actions of a plurality of characters in the battle.
- [T]he display control section displays the execution order calculated by the execution order calculation section on the display.
- [W]hen a predetermined combination condition . . . is satisfied, when executing an action of the predetermined ally character, the action execution section also executes an action of the different ally character without following the execution order calculated by the execution order calculation section.

('777 patent, cl. 1, 12). Defendants contend the complaint fails to plausibly plead the PlayStation 4 and video games calculate and display an execution order that is then disregarded if a condition is met (Dkt. No. 75 at 22–24).

United States District Court
Northern District of California

The complaint explains that both the Uncharted games and God of War enable player interaction with non-player allied characters. In Uncharted, these are called "Sidekicks;" in God of War the character is named Atreus. In both games, when a player gives an order to an ally, the order displays on the video screen (Dkt. No. 68 at ¶ 174(n)–(o), ¶ 179(b)–(c), (h)). Defendants argue the execution order must be displayed in advance, *i.e.* for future actions (Dkt. No. 81 at 14). This claim interpretation is appropriate at summary judgment, not at a motion to dismiss.

In each game, the complaint alleges allied characters can deviate from the initial execution order under various circumstances. For example, for the Uncharted games, the complaint shows a screenshot of an allied medic with orders to assist a wounded comrade. But, subjected to enemy gunfire (the predetermined condition), the medic hides behind a wall and shoots back, rather than simply running out and assisting the wounded as initially ordered (Dkt. No. 68 ¶ 174(p)).

In God of War, the complaint offers a screenshot of instructions showing how a player may instruct the ally character Atreus to fire arrows from his bow and how to change Atreus' target (Dkt. No. 179(i)). The trigger, though, is the player's command. Though in the above example an aversion to gunfire may be a predetermined condition, the player's real-time command is not a *predetermined* condition causing a change in execution order. Thus, while the claim for infringement of the '777 patent may proceed against the two Uncharted games, the claim against God of War fails.

**CONCLUSION**

For the above reasons, defendants' motion to dismiss, as to the '363 patent and the '777 patent claim against the Uncharted games, is **DENIED**. The motion, to the remainder of the claims, is **GRANTED**. The claims for infringement of the '540, '990, '988, '670, and (as to God of War only) '777 patents are **DISMISSED**.

Patent owner has already enjoyed its one free amendment under the rules and was given clear directions to plead well, element-by-element. Patent owner does not deserve yet another chance to re-plead. Nevertheless, should patent owner wish to file yet another amended

complaint, it may do so by **FEBRUARY 13 AT NOON** on the condition that it pay all reasonable fees and expenses incurred by defendants in responding to yet another amended complaint. Any such motion must include as an exhibit a redlined version of the proposed amendment that clearly identifies all changes from the amended complaint. This order highlighted certain deficiencies in the amended complaint, but it will not necessarily be enough to add sentences parroting each missing item identified herein. If patent owner moves for leave to file yet another amended complaint, it should be sure to plead its best case and take into account all criticisms made by defendants, including those not reached by this order.

**IT IS SO ORDERED.**

Dated: January 27, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOT M8 LLC, a Delaware limited liability company,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, a New York corporation, SONY CORPORATION, a Japanese corporation, and SONY INTERACTIVE ENTERTAINMENT, LLC, a California limited liability company,

Defendants.

No. C 19-07027 WHA

**CASE MANAGEMENT ORDER NUMBER TWO**

United States District Court
Northern District of California

After a case management conference, the Court enters the following order regarding the patent showdown procedure pursuant to Rule 16 of the Federal Rules of Civil Procedure ("FRCP") and Civil Local Rule 16-10:

1. The parties shall file cross motions for summary judgment on the two claims (one for each party) selected for the patent showdown. The parties are limited to **ONE MOTION EACH REGARDLESS OF THE NUMBER OF ISSUES RAISED**, *e.g.* standing, invalidity, noninfringement, etc. Opening briefs are limited to **25 PAGES** of briefing and **150 PAGES** of declarations and exhibits (not counting the patent itself). The opposition must be limited to **25 PAGES** of briefing and **150 PAGES** of declarations and exhibits. The reply must be limited to **15 PAGES** of briefing and **20 PAGES** of declarations and exhibits. In the

case of voluminous documents and transcripts attached as exhibits, counsel may append only the pages of the document necessary to support the assertions in the briefing and provide reasonable context, along with cover pages sufficient to identify the documents. Any judicially noticed material will count as an exhibit, but counsel may rely on exhibits and declarations already filed on the same motion by the other side without counting them against counsel's limit. All briefing and declarations must be double-spaced with twelve-point font with only occasional single-spaced quotes and footnotes.

2. For many years, the Court conducted a claim construction hearing about mid-way through the fact-discovery period. While this timing gave some guidance to counsel and experts, it had the distinct disadvantage of requiring abstract rulings without the benefit of a more complete record, thus increasing the risk of a claim construction error and a re-trial (and, for that matter, subsequent second appeal). Instead of a stand-alone claim construction hearing, claims will be construed as-needed along with the parties' motions for summary judgment or at trial. Any proposed claim constructions shall be included in the parties' summary judgment briefs — no separate briefs will be accepted. In this way, the Court will better understand the as-applied meaning of terms advanced by counsel as claim constructions.

3. The parties' opening briefs are due **THURSDAY, APRIL 9 AT NOON**.

4. The parties' opposition briefs are due **THURSDAY, APRIL 23 AT NOON**.

5. The parties' reply briefs are due **THURSDAY, APRIL 30 AT NOON**.

6. The motion will be heard on **THURSDAY, MAY 21 AT 8:00 A.M.**

**IT IS SO ORDERED.**

Dated: February 13, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOT M8 LLC,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, et al.,

Defendants.

No. C 19-07027 WHA

**ORDER DENYING MOTION TO AMEND**

## INTRODUCTION

A patent owner seeks leave to amend its complaint again following prior amendment upon transfer to this District. The proposed amendments are nine weeks delayed. Patent owner failing to demonstrate diligence, the motion is **DENIED**.

## STATEMENT

Patent owner, Bot M8 LLC, originally asserted six patents, directed toward casino, arcade, and video games, against defendants Sony Corporation of America, Sony Corporation, and Sony Interactive Entertainment LLC ("Sony"): U.S. Patent Nos. 8,078,540 ("the '540 patent"); 8,095,990 ("the '990 patent"); 7,664,988 ("the '988 patent"); 8,112,670 ("the '670 patent"); 7,338,363 ("the '363 patent"); and 7,497,777 ("the '777 patent"). The prior complaint in this Court asserted the '540, '990, '988, and '670 patents against the Sony PlayStation 4, the '363 patent against both the Sony PlayStation 4 and three video games: MLB The Show 19;

Uncharted 4; and Uncharted: the Lost Legacy; and the ’777 patent against the PlayStation 4 and three games: the two Uncharted games and God of War (Dkt. No. 91). *Bot M8 LLC v. Sony Corp. Am.*, No. C 19-07027 WHA, 2020 WL 418938 (N.D. Cal. Jan. 27, 2020).

At a November 21 case management conference upon transfer from the Southern District of New York, the undersigned directed patent owner to file an amended complaint specifying, element-by-element, how Sony’s products allegedly infringed the asserted patents. Moreover, patent owner was, quite clearly, directed to reverse engineer the PlayStation 4 to support its detailed allegations. Patent owner obliged, proclaiming it *had already done so*, and committed to a December 5 amendment deadline (Dkt. No. 67 at 2–3).

Patent owner filed its timely amended complaint (Dkt. No. 68) then Sony moved to dismiss (Dkt. No. 75). Following a January 23 hearing, a January 27 order dismissed claims for infringement of the ’540, ’990, ’988, ’670, and (as to God of War only) ’777 patents but permitted assertion of the ’363 and (against the Uncharted games) ’777 patents to proceed.

The dismissal order made clear, “[p]atent owner ha[d] already enjoyed its one free amendment under the rules and was given clear directions to plead well, element-by-element. Patent owner d[id] not deserve yet another chance to re-plead.” Nevertheless, the order gave patent owner until February 13 to seek leave to amend (Dkt. No. 91 at 9–10).

Patent owner now seeks leave to amend, relying on an assertion, voiced at a January 29 discovery hearing, that the Digital Millennium Copyright Act (DMCA) and other anti-hacking statutes restrained its earlier reverse engineering efforts (Dkt. No. 122 at 1, 14). Sony opposes. Both parties filed two briefs, Sony’s request for a sur-reply being granted. Given the public health concern due to COVID-19, this motion is appropriate for disposition on the papers.

**ANALYSIS**

The proposed amended complaint is untimely for reasons both parties miss. Sony contends the amendment is governed by Patent Local Rule 3-6’s good cause standard, because amended pleadings at this stage also mean amended infringement contentions. But under the local rules, patent owner’s initial infringement contentions were due December 5, the same date its amended complaint was due. Pat. L.R. 3-1. The Court’s November 21 amended pleading

schedule displaced the default rules. Just as patent owner was directed to replead, Sony was given another chance to move for dismissal — a chance which it initially waived by answering the complaint filed in the Southern District of New York. *See* Rule 12(b). This order is about pleadings, not contentions.

But good cause *is* the standard. Patent owner mistakes this amendment as governed by Rule 15, where leave is "freely give[n] . . . when justice so requires," absent undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Patent owner ignores the December 5 amended pleadings deadline. Where the Court has imposed a deadline, Rule 16(b)(4) permits modification "only for good cause." "The central inquiry under Fed. R. Civ. P. 16(b)(4) is whether the requesting party was diligent in seeking the amendment." *DRK Photo v. McGraw-Hill Glob. Ed. Holds.*, 870 F.3d 978, 989 (9th Cir. 2017). Here, it was not.

Patent owner bases its February 13 proposed amendments in new reverse-engineering of the PlayStation 4. It contends that the DMCA and other anti-hacking statutes prevented it from circumventing the PlayStation 4 security protocols and decrypting the code and asserts that not until January 29 did the Court "authorize[] and direct[] Bot M8 for the first time to conduct reverse engineering of Sony's products without restriction from various statutes." Indeed, patent owner explains the amendments are "based on new evidence Bot M8 was able to obtain only after receiving authorization from the Court to reverse-engineer" (Dkt. No. 110 at 2, 4).

These amendments, due December 5, are nine weeks overdue. At the November 21 case management conference, the Court *directed*: "if this is a product you can buy on the market and reverse engineer, *you have got to do that* . . . [s]o I will give you another chance to plead if you want to try again." Patent owner responded that "[w]e would be happy to put in an Amended Complaint with claim charts. *We have torn down the Sony PlayStation*." When asked how long it needed to amend, patent owner said "[t]wo weeks." So, the Court set a December 5 deadline for amendment to include allegations drawn from reverse engineering of the PlayStation 4 (Dkt. Nos. 60; 67 at 2–3) (emphasis added). If patent owner had concerns about reverse engineering, this was the time to raise them. The clock for diligence started there.

United States District Court
Northern District of California

United States District Court
Northern District of California

For nine weeks, patent owner raised no concerns about its ability to reverse engineer the Play Station 4. It timely filed its amended complaint (Dkt. No. 68) with no concern. Sony moved to dismiss (Dkt. No. 75) and the parties appeared at a January 23 hearing (Dkt. No. 89) — not a word about the DMCA or anti-hacking statutes.

Curiously, *only after* the January 27 order dismissed several claims for relief (Dkt. No. 91), at a January 29 discovery hearing, did patent owner surface any concern that the DMCA and other anti-hacking statutes had hampered its reverse engineering of the PlayStation 4. Taken by surprise, the Court responded by saying that a court order to reverse engineer could supersede any such concerns and granted patent owner "permission, for whatever good it is, to have your teardown company analyze the [PlayStation 4]." The Court had no clue whether such concerns were valid or why they hadn't been raised earlier (Dkt. No. 96 at 6–7).

To be clear: the Court did not *order* new reverse engineering of the PlayStation 4. It merely excused, from some unknown violation of law, what patent owner had said it was *already doing* months earlier. Neither party asked for a modification of the deadline to reverse engineer —*nor did the Court* grant one. So, the December 5 deadline stood.

To the extent patent owner believed it had won an extension of the December 5 deadline to reverse engineer the PlayStation 4, such modification was contingent upon the accuracy of *patent owner's statement of the law*. Counsel accepts the duty of candor in appearing, and the Court credits many things counsel says without citation — including patent owner's new handwringing regarding the DMCA. But patent owner may not, and may not reasonably believe it could, treble the scope of this case upon no more than its unsubstantiated, on-the-fly remarks at a hearing. Now, with the benefit of the record and full briefing, it becomes clear that there was *no* basis in law for patent owner's concern or any contingent relief.

Patent owner has *never* cited — and *does not* now cite — *any* authority, caselaw or otherwise, to support its professed fear of the DMCA or other anti-hacking statutes. Its motion to amend and reply brief rely *entirely* upon patent owner's *own* verbal representations to the Court that reverse engineering, code decryption, and circumvention of security measures were mysteriously prohibited (Dkt. Nos. 110 at 2–4; 122 at 1, 14). Nor does patent owner explain

why it failed to raise these concerns at the November 21 case management conference, where it proclaimed "[w]e have torn down the Sony PlayStation" (Dkt. No. 67 at 3). And atop that, patent owner does not even try to explain that it only learned of the DMCA or other anti-hacking statutes' restrictions on reverse engineering between the November 21 or January 23 hearings and the January 29 hearing. So, there remains no basis for either patent owner's fears or its failure to timely raise them.

Patent owner controlled the timing of this case, decided when to sue, boasted that it had already reverse engineered the PlayStation 4, and committed to the Court's December 5 amendment deadline. Now, only after Sony landed a punch in the first round does patent owner complain "I wasn't ready." Absent *any* authority for its theory of the DMCA, these amendments could have, and *should have*, been included in the December 5 amended complaint. They are nine weeks overdue and, absent diligence, lack good cause.

Finally, the proposed amended allegations regarding the '777 patent are further untimely. The amendments propose to remedy the same failing addressed in the January 27 dismissal order but appear entirely based on public information from the web and in-game screenshots (Dkt. No. 110-4, ¶ 174(a)–(p)). These allegations did not rely on reverse engineering and should have been included in the operative complaint at the November 21 hearing and certainly should have been included in the December 5 amendment. Both unduly delayed and lacking good cause, these amendments rate as untimely.

**CONCLUSION**

Patent owner's motion to amend is **DENIED**. The proposed amendments are untimely. The January 27 order denied Sony's motion to dismiss the claims for infringement of the '363 patent and, as to the Uncharted games, the '777 patent. This case proceeds on these two claims of infringement.

**IT IS SO ORDERED.**

Dated: April 2, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

BOT M8 LLC,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, et al.,

Defendants.

No. C 19-07027 WHA

**ORDER DENYING LEAVE TO MOVE FOR RECONSIDERATION**

Patent owner seeks leave to move for reconsideration of an April 2 order denying leave to reassert several patents previously dismissed. Both parties having been heard (Dkt. Nos. 139, 140), the request is **DENIED**.

"A motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marylyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). A clear error involves "[a] manifest failure by the Court to consider material facts or dispositive legal arguments . . . ." Civ. L.R. 7-9(b)(3). Patent owner's proffered theory of the Digital Millennium Copyright Act crossing paths with patent rights remains unsupported by caselaw, and it offers no binding decision directing a different pleading or amendment standard. And, despite patent owner's reading of the record, the Court still directed *reverse engineering* of the Sony PlayStation 4 at the November 21, 2019, case management conference. Patent owner's disagreements are understandable, but they do not warrant extraordinary relief.

**IT IS SO ORDERED.**

Dated: April 16, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOT M8 LLC,

Plaintiff,

v.

SONY CORPORATION OF AMERICA, et al.,

Defendants.

No. C 19-07027 WHA

**ORDER RE SUMMARY JUDGMENT**

## INTRODUCTION

Dueling summary judgment motions contest a patent's validity under 35 U.S.C. § 101 and its infringement by certain videogame systems. The asserted claim is invalid for reciting an abstract idea, failing to describe a specific technological improvement, and including no further inventive concept. Defendants' motion is **GRANTED IN PART**; the remainder is **DENIED AS MOOT**.

## STATEMENT

Patent owner Bot M8 LLC asserts two patents against Sony Corporation of America, Sony Corporation, and Sony Interactive Entertainment, LLC, U.S. Patent Nos. 7,338,363 and 7,497,777. Only claim 1 of the '363 patent remains relevant here.

The '363 patent purports to disclose an improved gaming machine. Different game players seek different entertainment, so the patent teaches that a "gaming machine [should] be

designed to satisfy different game motives of various game players." For example, games played under the same conditions risk losing player engagement, because they do not "provide[] the game player with a varying sense of anticipation to the game." Thus, "it is desirable to provide a gaming machine with which the specification values are changed by each game player in an enjoyable manner" ('363 patent at 1:32–34, 1:47–48, 1:67–2:2).

So, the '363 patent discloses a game machine wherein the "a game result achieved by a game player and a game result achieved by another game player are totalized and the specification value is changed in accordance with the total result." As a result, "exciting gaming machines which give the game players incentive to play the game can be provided" (*id.* at 2:41–45, 2:54–56).

The '363 patent embodies this invention in an improved slot machine. Simply, two or more of these slots machines connect to a server, transmit and aggregate individual game results, and then update the individual game conditions based on the aggregate result.

> Accordingly, even when the number of medals paid out to one of [the] jointly-played gaming machines is large, the specification values would be reduced (or depreciated) if the number of medals paid out to the other gaming machine is small, so that the next game play must be carried out under a more unfavorable condition than the preceding game play. Conversely, even when the number of medals paid out for one of the jointly-played gaming machines is small, the specification values would be increased (or improved) if the number of medals paid out to the other gaming machine is large, so that the next game play could be carried out under a more favorable condition that the preceding game play.

In one example, the specification explains that two players' aggregate winnings above a certain threshold result in better or more exciting jackpot odds. And, conversely, if the two players lose enough, the jackpot odds diminish (*id.* at 19:64–20:12, 22:8–27).

Of course, the '363 patent claims this principle more broadly than just updating slot machine odds. Rather, it claims a gaming machine which curates conditions based upon prior results. Relevant here, the asserted claim 1 recites:

> A first gaming machine for transmitting and receiving data to and from a server, comprising:
>
> a specification value setting device that sets at least one specification value as a control condition for game control;

> a transmitting device that transmits data of a game result to the server;
>
> a gaming machine determining device that determines a second gaming machine operated by a co-player;
>
> a total result data receiving device that receives from the server data of a total game result achieved by the first gaming machine and the second gaming machine based on the data of the game result transmitted by the transmitting device;
>
> a specification value determining device that determines a specification value based on the data of the total game result received by the total result data receiving device; and
>
> a specification value renewing device that renews to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

Patent owner asserts claim 1 against Sony's PlayStation 4 and three video games: MLB The Show 19; Uncharted 4: A Thief's End; and Uncharted: Lost Legacy, but only moves for summary judgment of infringement against the Uncharted games. In these games, players step into the shoes of swashbuckling treasure hunters, searching exotic locales for long-lost treasure and evading enemies via a combination of wit, physicality, and (most relevant for patent owner's purposes) guns — lots of them. The games' online multiplayer modes pit two teams of five against each other in a variety of exciting gunfights. In the Deathmatch mode, teams simply try to kill each other. In Plunder, they fight for possession of a large idol. Victory in online multiplayer or other challenges unlocks new weapons or weapon upgrades, which players can use to compete more effectively in future multiplayer matches (Dkt. No. 142-4 at 3–5).

Patent owner says these unlockable weapons constitute the games' "specification value[s]" because a player's arsenal directly influences her competitive advantage (or disadvantage) in multiplayer rounds. Players unlock new weapons or weapon improvements by spending Relics, an in-game currency which players earn by accomplishing in-game challenges, winning matches, and advancing through the games' player rankings of Apprentice, Bronze, Silver, Gold, Platinum, and Diamond. Simply, prior individual and team match results drive player access to the weapons and improvements which define the game conditions of future multiplayer rounds (*id.* at 13–16).

United States District Court
Northern District of California

Sony rates patent owner's assertions as a new infringement theory not disclosed in the prior infringement contentions, mandated by Patent Local Rule 3-1. In its opposition and its cross motion for summary judgment, Sony asserts the Uncharted games and MLB (each along with the PlayStation 4 of course) do not infringe claim 1. More important for our present purposes, however, Sony also argues claim 1 recites a patent-ineligible abstract concept without including an inventive concept. This order follows full briefing of both motions and a hearing (held telephonically due to COVID-19).

**ANALYSIS**

Summary judgment is appropriate if there is no genuine dispute of material fact, those facts "that might affect the outcome of the suit." "[T]he substantive law's identification of which facts are critical and which facts are irrelevant . . . governs." A genuine dispute contains "sufficient evidence" such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If "a proper jury question" remains, summary judgment is inappropriate. *See Anderson*, 477 U.S. at 249.

A defendant may only infringe a valid patent. Thus, before addressing infringement, this order must address Sony's challenge to claim 1's subject-matter eligibility. Because this order finds claim 1 ineligible, it does not reach other infringement issues.

**1. PATENTABLE SUBJECT MATTER GENERALLY.**

A patent can cover "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. But 150 years of precedent exclude laws of nature, natural phenomena, and abstract ideas — "the basic tools of scientific and technological work." Tying these up in patents "might tend to impede innovation," thus undermining the constitutional purpose of patents — "[t]o promote" progress. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014); U.S. CONST., art. I, § 8, cl. 8.

To distinguish the abstract from the patentable, the Supreme Court has provided a two-step framework. "First, we determine whether the claims are directed to a 'patent-ineligible concept,' such as an abstract idea. If so, we 'consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.'" *Customedia Techs., LLC v. Dish Net. Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) (quoting *Alice*, 573 U.S. at 217).

Though ultimately a question of law, subject-matter eligibility may include underlying questions of fact, and any extrinsic facts supporting invalidity "must be proven by clear and convincing evidence." But, of course, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry . . . [p]atent eligibility has in many cases been resolved on motions to dismiss or summary judgment." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365, 1368 (Fed. Cir. 2018). The challenged claim and specification remain the primary sources in this dispute, and in appropriate cases a court might "need to only look to the specification" to resolve the matter. *See In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613–14 (Fed. Cir. 2016); *see, e.g., Customedia*, 951 F.3d at 1365–66; *Interval Lic. LLC v. AOL, Inc.*, 896 F.3d 1335, 1346–48 (Fed. Cir. 2018); *Berkheimer*, 881 F.3d at 1369; *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1354–56 (Fed. Cir. 2016).

As will be seen, claim 1 of the '363 patent recites the abstract idea of increasing or decreasing the risk-to-reward ratio, or more broadly the difficulty, of a multiplayer game based upon previous aggregate results. But the claim leaves open *how* to accomplish this, and the specification provides hardly any more direction. Then, though limited to a specific field, "gaming machine[s]," the claim merely recites result-oriented uses of conventional computer devices. At bottom, neither the patent specification, patent owner, or patent owner's experts articulate a technological problem solved by the '363 patent.

**2. *ALICE* STEP ONE: CLAIM 1 RECITES AN ABSTRACT CONCEPT.**

To determine whether a claim recites an abstract idea, we look to "the focus of the claim[] [and its] character as a whole." *Alstom*, 830 F.3d at 1353. "[A] claimed invention must embody a concrete solution to a problem having the specificity required to transform a claim

from one claiming only a result to one claiming a way of achieving it." *Interval*, 896 F.3d at 1343 (quotation omitted). "An improved result, without more stated in the claim" does not "confer eligibility to an otherwise abstract idea. To be patent-eligible, the claim[] must recite a specific means or method that solves a problem in an existing technological process." That bears repeating — the *claim itself* must "sufficiently capture the inventors' asserted technical contribution to the prior art by reciting *how* the solution specifically improves the function of prior art . . . ." *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150–51 (Fed. Cir. 2019) (emphasis added).

Moreover, the invention must be concrete. "Data in its ethereal, non-physical form is simply information that does not fall under any of the categories of eligible subject matter under section 101." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014). Similarly, data collection and analysis remain intangible and abstract. Thus, the Federal Circuit has said that "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *See Alstom*, 830 F.3d at 1354.

Now, a machine, "'consisting of parts, or of certain devices and combination of devices'" historically would be a sufficiently tangible invention. *See Digitech*, 758 F.3d at 1349 (citing *Burr v. Duryee*, 1 Wall. 531 (1863)). But that assumes the machine *is* the invention. *See Alstom*, 830 F.3d at 1353. If it's not, and the claim focuses on an intangible aspect, *Alice* "made clear that the invocation of a computer does not necessarily transform an abstract idea into a patent-eligible invention." *See Customedia*, 951 F.3d at 1362 (citing *Alice*, 573 U.S. at 223). Thus, the recitation of generic "tangible components," described predominantly in "purely functional terms" — *i.e.*, limiting the abstract claim to "a particular environment," does not actually make the claim any less abstract. *TLI*, 823 F.3d at 612–13.

But a court must not oversimplify the invention. "At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract

concept." *Alice,* 573 U.S. at 217 (quote omitted). So, a court should "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).

That warning in mind, this order nonetheless concludes that claim 1 of the '363 patent recites an abstract concept. The specification explains that "it is desirable to provide a gaming machine with which the specification values" — *i.e.* the risk/reward level or difficulty — "are changed by each game player in an enjoyable manner," so the patent offers an improvement whereby "a game result achieved by a game player and a game result achieved by another game player are totalized and the specification value is changed in accordance with the total result." Thus, "exciting gaming machines which give the game players incentive to play the game can be provided" ('363 patent at 1:67–2:2, 2:41–45, 2:54–56).

Simply, the '363 patent teaches a game machine that updates the game conditions based on past results to keep players engaged. That's a result, not a means to achieve it. So, up front it's abstract. Yet more so, because the Federal Circuit has "held that improving a user's experience" remains, "without more," an insufficient technological improvement and, thus, not patentable. *See Customedia*, 951 F.3d at 1365. But, as warned, anything can be abstracted if viewed from a high-enough altitude. To ensure we articulate this claim's focus with adequate specificity, this order delves into claim 1 and the supporting specification to determine whether they explain *how* to achieve the improved user experience. *Interval*, 896 F.3d at 1343; *Koninklijke*, 942 F.3d at 1151. They do not.

Claim 1 itself recites (in relevant part) only:

> a specification value determining device that determines a specification value based on the data of the total game result received by the total result data receiving device; and
>
> a specification value renewing device that renews to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

Future game conditions change based on prior game results — no means recited; no explanation how to accomplish the result.

United States District Court
Northern District of California

Further review of the specification reveals little more. The invention summary explains:

> [T]he specification value may be improved even if the game result of the game player is bad since the game result of the another game player could be good. Accordingly, even if the game result of the game player is not good, the game player may have a sense of anticipation for the game. Furthermore, even if the game result of the game player is good, the specification value may be depreciated since the game result of the another game player could be bad. In order to avoid such a situation, the game players try to make their game results good.

(*id.* at 2:45–54). A little more this time. The game specification value increases if the players perform well and decreases if the players perform poorly. But *how* do the game conditions change based upon results? What conditions change? Based on what variables? And, what are the thresholds for change?

Describing the preferred embodiment, two slot machines connected by a server, the specification later explains that the payout conditions, "the big-hit shift probability" (*i.e.*, the odds of a "great success, big prize win[], or jackpot"), "the payout, and the payout rate," change based upon the two players' total winnings:

> Specifically, if the total of the numbers of payout medals is not less than a predetermined fixed number, the big-hit probability, the payout and the payout rate are increased. On the other hand, if the total of the numbers of payout medals is less than the predetermined fixed number, the big-hit probability, the payout, and the payout rate are reduced so as to be depreciated.

Thus, it continues:

> [E]ven when the number of medals paid out to one of [the] jointly-played gaming machines is large, the specification values would be reduced (or depreciated) if the number of medals paid out to the other gaming machine is small, so that the next game play must be carried out under a more unfavorable condition than the preceding game play. Conversely, even when the number of medals paid out for one of the jointly-played gaming machines is small, the specification values would be increased (or improved) if the number of medals paid out to the other gaming machine is large, so that the next game play could be carried out under a more favorable condition that the preceding game play.

In English, then, it says that if the two slots players win enough (together), greater jackpots become possible. And, if they lose enough, these exciting jackpot opportunities vanish. Figure 7 tabulates the prior results and future parameters (*id.* at 1:35–37, 19:45–20:12, 22:8–27).

Fig. 7

| | SET 1 | | | ⋯ | SET 6 | | |
|---|---|---|---|---|---|---|---|
| TOTAL RESULT | PROBABILITY 1 | PAYOUT 1 | PAYOUT RATE 1 | ⋯ | PROBABILITY 6 | PAYOUT 6 | PAYOUT RATE 6 |
| — | D1000 | E1000 | F11 | ⋯ | D6000 | E6000 | F61 |
| A1~A2 | D1100 | E1100 | F12 | ⋯ | D6100 | E6100 | F62 |
| A2~A3 | D1200 | E1200 | F13 | ⋯ | D6200 | E6200 | F63 |
| A3~A4 | D1300 | E1300 | F14 | ⋯ | D6300 | E6300 | F64 |
| A4~A5 | D1400 | E1400 | F15 | ⋯ | D6400 | E6400 | F65 |
| A5~ | D1500 | E1500 | F16 | ⋯ | D6500 | E6500 | F66 |

That's as far as the specification goes. It partially illuminates the parameters to change, the payout parameters, and the driving variable, the actual prior payout. But the descriptions remain vague and qualitative — greater than, less than, increase, and decrease — and fail to specify any (even if only as an example) threshold values, which trigger changed game parameters.

So, review of the claim and specification — asking what problem claim 1 solves — reveals several articulations of claim focus. Most specific, the patent purports to teach *how* to increase or decrease the odds or difficulty of a gaming machine, here a slot machine, based upon the players' winnings or losses. More generally, the patent says it teaches *how* to increase or decrease game difficulty based on prior results. More broadly yet, the patent still teaches that a game operator *should* increase or decrease the difficulty of a slot machine based upon the players' winnings or losses. And, the broadest (noted above), the patent may simply teach that a game machine should update game conditions based on prior results. None of these warrants patent protection.

At the most specific, claim 1 of the '363 patent doesn't actually teach *how* to increase or decrease the difficulty of a slot machine, or any gaming machine for that matter, based on prior results to keep players engaged. It only instructs a game operator to present new jackpot opportunities if the two slots players win enough and to take away jackpot opportunities if the two lose enough. Well, *how*? How much do the two need to win to increase the specification value and access new opportunities? How much do they need to lose to decrease the

United States District Court
Northern District of California

specification value and close those doors. Claim 1 leaves the operator with no hint of *when* to change the game conditions (assuming any of this slot machine tinkering is legal to begin with). Changing game conditions at the wrong time due to wrong win or loss thresholds might just as easily drive players away. So, the operator remains just as (and perhaps more) likely to lose players' engagement by following claim 1. A claim that doesn't guide the artisan to the result does not "sufficiently capture the inventors' asserted technical contribution to the prior art." *See Koninklijke*, 942 F.3d at 1151.

Even if the '363 patent provided and claimed specific thresholds, this order doubts such guidance would be patent eligible under *Mayo*, where the Supreme Court held invalid as a natural law claims which aided drug efficacy by reciting metabolite thresholds, above which drug dosage should be reduced, and below which it should be increased. Regardless of the time and effort spent surveying patients to determine effective thresholds, the thresholds themselves remained "a consequence of the ways in which [the drug was] metabolized by the body — entirely natural processes. And so a patent that simply describe[d] that relation set[] forth a natural law." *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77 (2012). So too here. The win-threshold, above which winning nickels becomes boring and a slots player needs a new thrill, and the complimentary loss-threshold, below which a slots player slinks back from the nickel slots to the penny slots, remain *human* reactions. Of course, the '363 patent does not provide this much guidance — but the recognition the patent focuses heavily on *natural* human reactions leads to the next conclusion.

The most specific articulations of claim focus failing, we now step back a level. The patent still teaches that a game operator *should* change the difficulty of a slot machine or other game machine based on prior results to keep players engaged (*id.* at 2:41–56). But upon review of the specification (even assuming the novelty of this teaching), it becomes clear this solves a *human* problem, not a technological one. At first, the game entertains the player. Then, it does not. Not because the "prior art" slot machine changes in operation or develops a flaw but because the *player tires* of the recurrent game conditions. A human problem with, historically, a human solution. The player seeking more exciting conditions dismounted the stool in front of

the nickel slot machine and graduated to the dime slots. Or, if the nickel slots proved too emotionally trying, the player returned to the quiet comfort of the penny slots. And, of course, two players pooling their costs and winnings would do the same. So, when the '363 patent simply says game operators *should* curate the game conditions, instead of explaining *how* to do it, the patent does no more than *recognize* a human problem. Thus, the focus remains on improved user enjoyment which, as above, the Federal Circuit rates as an abstract concept. *See Customedia*, 951 F.3d at 1365.

Patent owner proclaims the '363 patent "is directed to specific improvements in computer functionality" specifically by connecting multiple gaming machines, sending results to a server, totaling the result, sending the results back to the gaming machines, and using the results to recalculate game parameters (Dkt. No. 149 at 18). Patent owner's Dr. Ian Cullimore similarly concludes the patent recites a specific technological improvement because:

> [S]pecifically, Claim 1 provides that multiple gaming machines are (1) connected to a server, (2) the gaming machines send game results to the server, (3) the gaming machines receive total game results, and (4) then use them to determine a new specification value for modifying the game conditions.

(Dkt. No. 149-2 at ¶¶ 26–27). But reciting the claim elements along with the conclusion that they recite a specific improvement to the technology does not make it so. A specific solution solves a problem. Yet the patent articulates, for example, no technological difficulty in connecting slot machines to servers, instead admitting that they may be linked by conventional means, "such as a public phone line network, a local area network (LAN), or the like." And, when pressed at deposition, Dr. Cullimore could articulate no specific technological improvement offered by the '363 patent ('363 patent at 9:26–27, 10:34–36; Cullimore Dep. Tr., Dkt. No. 152-3, at 94, 102).

Last, patent owner also rates claim 1 as unconventional because it could not be performed manually. According to patent owner's Dr. Stacy Friedman, "gaming machines in the casino context are highly regulated and require detailed compliance logs every time the settings on a machine are modified." So, manually gathering and aggregating game results and changing game conditions by running from machine to machine on the casino floor would "be both

contraindicated and possibly illegal" (Dkt. No. 149 at 20). This argument goes against patent owner because patent owner again fails to specify a technological obstacle to the practice and instead confirms it to be a legal — *i.e.*, human — one. Such a solution, assuming the '363 patent first disclosed it, remains unpatentable.

In sum, neither the patent, patent owner, nor patent owner's experts articulate a problem present in the prior art or the '363 patent's specific technological solution. So, the recited concept of updating game parameters based on prior results to maintain user enjoyment remains abstract.

**3. *ALICE* STEP TWO: CLAIM 1 OFFERS NO INVENTIVE CONCEPT.**

Having determined claim 1 of the '363 patent recites an abstract concept, eligibility now turns on whether its elements, either individually or as an ordered combination, recite an inventive concept that transforms the abstract concept into a patent-eligible application. *Customedia*, 951 F.3d at 1365–66. "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" Both *Mayo* and *Alice* make "clear that transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words *apply it*.'" And, of course, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 221–23 (quoting *Mayo*, 566 U.S. at 72, 77) (emphasis added).

The Federal Circuit has explained that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs. v. AT&T Mob.*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). But, "the components must involve more than performance of 'well-understood, routine, conventional activit[ies]' previously known to the industry." *TLI*, 823 F.3d at 613 (citing *Alice*, 573 U.S. at 225). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" which may involve extrinsic evidence or testimony. *Berkheimer*, 881 F.3d at 1368. But, of course, though the

United States District Court
Northern District of California

inquiry does not necessarily end with the claim and specification themselves, it certainly begins there.

Taken alone, the elements of claim 1 invoke no more than "generic and functional hardware" to accomplish their abstract tasks. *See Customedia*, 951 F.3d at 1366. Claim 1's "specification value setting device" simply "sets [a] specification value." The "transmitting device" merely "transmits data." The "gaming machine determining device" merely "determines a second gaming machine." The "specification value determining device" merely "determines a specification value" without, as discussed above, contributing any specific means to do so. And, the "specification value renewing device" merely "replace[s] the specification value," again without describing any specific means. Though given special names, each part remains a generic computer part invoked to effect the conventional computer task of gathering, manipulating, transmitting, and using data. This fails to transform the claim. *See Alice*, 573 U.S. 225–26, *TLI*, 823 F.3d at 614; *Alstom*, 830 at 1355.

Even taken as an ordered combination, the elements fail to transform the claimed abstract concept. Patent owner asserts claim 1 captures game components, the flow of data, and modification of conditions based upon prior results in a manner unconventional in the gaming machine industry (Dkt. No. 149 at 22). But, to start, a mere high-level summary of claim 1's elements along with the conclusion that they rate as unconventional does not actually lead to that conclusion. More importantly, though, "limiting [claim 1] to the particular technological environment of [gaming machines] is, without more, insufficient to transform [it] into [a] patent-eligible application[] of the abstract idea at [its] core." *See Alstom*, 830 F.3d at 1354.

Indeed, that was the point of *Alice*. Generic computer parts and functions do not become patentable every time they enter a new field. Put another way, performing standard industry practice on conventionally arranged, generic computer parts — even for the first time in the field — remains unpatentable. *Alice*, 573 U.S. 225–26. The '363 patent may very well be the first time someone put all the recited computer parts into a slot machine. But, as before, the functionally described parts do only conventional computer tasks, gathering, processing, transmitting, and using data. Claim 1 must offer something more.

Putting the generic computer parts aside, then, the remaining concepts articulated in claim 1 rate as conventional. Recall, the '363 patent seeks to "provide a gaming machine with which the specification values are changed by each game player in an enjoyable manner" and in which "a game result achieved by a game player and a game result achieved by another game player are totalized and the specification value is changed in accordance with the total result" ('363 patent at 1:67–2:2, 2:41–45). But all of this remains standard practice. All businesses seek to maintain user enjoyment, and casinos have long offered a variety of conditions for the same game, *e.g.*, slot machines with different base bets. And of course, casinos aggregate player results. Their profit margins don't depend on individual outcomes, but on the aggregate results of all players converging on the odds, which are tipped in the house's favor (*see, e.g.*, Friedman Dep. Tr., Dkt. No. 152-2, at 51:11–23).

Ultimately, the search for an inventive concept still entails a search for both a technological problem or limitation in the prior art and an improvement the claim offers. *See Alice*, 573 U.S. at 225. This search for an improvement necessarily queries *how* the patent achieves its improved result. *Interval*, 896 at 1347; *Alstom*, 830 F.3d at 1355. Yet, as explained above, despite vague and conclusory assertions, neither claim 1, the specification, nor patent owner articulate the technological problem in the prior art or the '363 patent's solution.

So, patent owner turns to two experts' testimony for proof of an inventive concept. Neither offers competent testimony sufficient to forestall summary judgment. Unconventionality is a conclusion drawn from a comparison with the state of the art before and after the patent, with the contribution of the patent comprising the change. *See BASCOM*, 827 F.3d at 1350. Here, though, the experts' bare assertions that the steps recited by claim 1 were unconventional in the field, without specifying the convention and noting the difference, remain unsubstantiated conclusions entitled to no weight. Regardless, deposition testimony negates both declarations.

Patent owner's Dr. Cullimore purports to find specific and novel implementations of the abstract concept articulated in claim 1, "including requirements for the components comprising the gaming machine, the flow of data exchanged between the components, and the way the

gaming conditions are modified based on prior results of multiple connected gaming machines." Dr. Cullimore thus concludes the "claim limitations involve more than performance of conventional practices," explaining that the recited:

> (1) multiple gaming machines send[] game result data to the server, (2) the server receives the data, (3) a total game result is generated, (4) the gaming machines receive the total game results, (5) the gaming machines use the total game result data to determine a specification value, and (6) the gaming machines renew the specification value for the next game based on the newly determined specification value . . .

constitutes "an inventive" ordered combination of elements. As before, a recitation of the claim (or a higher-level recitation) plus a conclusory assertion warrants no weight (Dkt. No. 149-2 at ¶¶ 32–33).

In similar fashion, patent owner's Dr. Friedman asserts that claim 1 "provide[s] a novel way to improve the functionality of gaming machines, making them more fun by aggregating results from multiple gaming machines to automatically and dynamically change the game settings." Dr. Friedman also contends that the recited:

> (1) multiple gaming machines send[] game result data to the server, (2) the server receives the data, (3) the server generates a total game result, (4) the server sends the total game result to a gaming machine, (5) the gaming machine uses the total game result data to determine a specification value, and (6) the specification value is then renewed based on the newly determined specification value . . .

rates as "an inventive concept . . . not found in the conventional art in the gaming machine field at the time of the invention." The state of the art before the '363 patent and the particular inventive concept remain unstated. Again, a recitation of the claim elements plus a bare conclusion deserves no analytical weight (Dkt. No. 149-1 at ¶¶ 50, 55).

On the other hand, the deposition testimony of these experts reveals the frailty of patent owner's argument. When pushed at deposition, Dr. Cullimore could articulate no specific inventive concept in claim 1 of the '363 patent other than "the totality" based on his expert report, already dispensed with as conclusory (Cullimore Dep. Tr. at 110, 112, 133–34, 156–159). Dr. Friedman admitted the video game field knew well how to connect multiple game machines, aggregate results, and change game parameters before the '363 patent (Friedman Dep. Tr. at 91–92). And, Dr. Cullimore effectively admitted that he could not articulate

United States District Court
Northern District of California

anything unconventional about the ’363 patents’ disclosure of changing the game parameters during play (Cullimore Dep. Tr. at 157, 159). In sum, patent owner’s experts fail to offer competent extrinsic evidence sufficient to forestall summary judgment.

In its final expert-related argument, patent owner rates Sony’s Dr. David August as unqualified to testify about gaming, specifically gambling, machines. But this order does not employ Dr. August’s testimony. Here, in the absence of competent extrinsic evidence offered by patent owner, the patent speaks for itself.

Patent owner then complains of alleged inconsistencies in Sony’s noninfringement and invalidity arguments. At first glance, patent owner lacks a leg to stand on — arguing, for example, in its infringement portion that the ’363 patent covers all gaming devices, not just gambling machines, yet heavily rooting its subject-matter eligibility rebuttal in the state of the art for *gambling* machines. Regardless, even accepting the critique, it does not undermine Sony’s position. It remains true that patent claims “must be construed in the identical way for both infringement and validity.” *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449 (Fed. Cir. 1984). So, patent owner must present consistent theories, as its infringement theory depends on its validity theory. *See, e.g.*, *Straight Path IP Grp. v. Cisco Sys.*, 411 F. Supp. 3d 1026, 1034–35 (N.D. Cal. 2019). But a comprehensive patent infringement defense probes *both* the breadth and narrowness of the claims, because both noninfringement and invalidity are complete defenses. Sony may fairly present inconsistent claim interpretations between its invalidity and noninfringement defenses, so long as its theories remain consistent within those two defenses.

Finally, patent owner argues that if claim 1 is patent ineligible then so too are many of Sony’s patents. Life is too short to litigate Sony’s own patents here. If Sony’s patents are invalid for the reasons articulated herein, patent owner is free to cite this order in an appropriate proceeding. For our present purposes, however, two wrongs don’t make a right.

**CONCLUSION**

Claim 1 of U.S. Patent No. 7,338,363 recites an abstract idea without an inventive concept and thus, under *Alice* and its progeny, rates as invalid under 35 U.S.C. § 101. To the extent

above, then, Sony's motion is **GRANTED**. Infringement of an invalid claim being impossible, the remainder of the parties' motions, including the remaining procedural, infringement, and noninfringement arguments, are **DENIED AS MOOT**.

Last, though this order doesn't reach the merits of Sony's argument that patent owner's infringement arguments exceed the bounds of the infringement contentions, this order offers both sides a fair warning: in this district, the Patent Local Rule 3-1 infringement and invalidity contentions set the metes and bounds of the suit. *Apple Inc. v. Samsung Elecs. Co.*, No. C 12-0630 LHK (PSG), 2013 WL 3246094, at *1 (N.D. Cal. June 26, 2013) (Magistrate Judge Paul S. Grewal). This Court adheres to the local rules. Contention amendment requires good cause. Arguments truly outside the scope of the contentions will be stricken.

Looking ahead to the remaining asserted claims, this order reminds the parties that non-expert discovery closes on March 31, 2021. The Court awaits the parties' dispositive motions no later than May 27, 2021. Following a September 8 pre-trial conference, trial will commence at 7:30 a.m. on September 20, 2021 (Dkt. No. 112).

**IT IS SO ORDERED.**

Dated: June 10, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE



US007338363B2

(12) **United States Patent**
**Okada**

(10) **Patent No.: US 7,338,363 B2**
(45) **Date of Patent: Mar. 4, 2008**

(54) **GAMING MACHINE, SERVER, AND PROGRAM**

(75) Inventor: **Kazuo Okada**, Tokyo (JP)

(73) Assignee: **ARUZE Co., Ltd.** (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 595 days.

(21) Appl. No.: **10/686,567**

(22) Filed: **Oct. 17, 2003**

(65) **Prior Publication Data**

US 2004/0147322 A1 Jul. 29, 2004

(30) **Foreign Application Priority Data**

Oct. 18, 2002 (JP) ............................ 2002-304951

(51) **Int. Cl.**
***A63F 9/24*** (2006.01)
***A63B 71/00*** (2006.01)

(52) **U.S. Cl.** .......................................... **463/13**; 463/20

(58) **Field of Classification Search** .................. 463/13, 463/20, 25, 26
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,116,055 A 5/1992 Tracy
5,611,730 A 3/1997 Weiss
6,110,041 A * 8/2000 Walker et al. ................ 463/20
6,254,483 B1 7/2001 Acres
6,257,981 B1 7/2001 Acres et al.
6,319,122 B1 11/2001 Packes, Jr. et al.
6,354,943 B1 3/2002 Miura
2002/0138594 A1* 9/2002 Rowe ......................... 709/219
2002/0183105 A1 12/2002 Cannon et al.
2005/0085300 A1* 4/2005 Johnson ....................... 463/42
2006/0111186 A1* 5/2006 Hattori ........................ 463/40

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 6-134135 | 5/1994 |
| JP | 8-71203 | 3/1996 |
| JP | 11-76581 | 3/1999 |
| JP | 2000-189647 | 7/2000 |
| JP | 2000-227930 | 8/2000 |
| JP | 2000-262702 | 9/2000 |

(Continued)

OTHER PUBLICATIONS

Patent Abstracts of Japan, Publication No. 2001347042, Publication Date: Dec. 18, 2001.

*Primary Examiner*—Robert E. Pezzuto
(74) *Attorney, Agent, or Firm*—Antonelli, Terry, Stout & Kraus, LLP

(57) **ABSTRACT**

A slot machine is provided with specification value setting means for setting at least one specification value as a control condition when game control is carried out, total result data receiving means for receiving from a server the data of the total result of a game result achieved by a first gaming machine and a game result achieved by a second gaming machine, specification value determining means for determining the specification value on the basis of the data of the total result received by the total result data receiving means, and specification value renewing means for renewing the specification value set by the specification value setting means to the specification value determined by the specification value determining means. There is provided a slot machine for renewing the specification value on the basis of the total result of the game results achieved by the first and the second gaming machines.

**27 Claims, 23 Drawing Sheets**



FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2001-198335 | 7/2001 |
| JP | 2001-347042 | 12/2001 |
| JP | 2002-15180 | 1/2002 |
| JP | 2002-282485 | 10/2002 |
| JP | 2002-360911 | 12/2002 |
| JP | 2003-79882 | 3/2003 |
| JP | 2003-190640 | 7/2003 |
| JP | 2003-230739 | 8/2003 |
| JP | 2003-230753 | 8/2003 |
| JP | 2003-230762 | 8/2003 |

* cited by examiner

Fig. 1

Fig. 2



Fig. 3



Fig. 4

100
112
RANDOM NUMBER GENERATOR
CPU
106
ROM
108
RAM
110
102
32
START LEVER
34L、34C、34R
REEL STOP BUTTON
20
1-BET SWITCH
22
2-BET SWITCH
24
MAXIMUM BET SWITCH
72
SETTING SWITCH
36
PAYOUT BUTTON
52
MEDAL COUNTER
54
MEDAL PASS SENSOR
56
TOUCH SENSOR
INTERFACE CIRCUIT GROUP
114
DISPLAY CONTROL DEVICE
30
DISPLAY DEVICE
117
MOTOR CONTROL DEVICE
118
MOTOR DRIVING CIRCUIT
62L
62C
62R
26L
26C
26R
120
REEL ROTATION ANGLE POSITION DETECTING CIRCUIT
122
LAMP DRIVING CIRCUIT
44
ILLUMINATION LAMP
124
SPEAKER DRIVING CIRCUIT
46
SPEAKER
126
HOPPER DRIVING CIRCUIT
128
HOPPER
104



Fig. 5



Fig. 6

80
82
CPU
84
ROM
88
HARD DISC DRIVE
86
RAM
87
90
STATION NUMBER SWITCH
COMMUNICATION INTERFACE CIRCUIT



Fig. 7

| | SET 1 | | | … | SET 6 | | |
|---|---|---|---|---|---|---|---|
| TOTAL RESULT | PROBABILITY 1 | PAYOUT 1 | PAYOUT RATE 1 | … | PROBABILITY 6 | PAYOUT 6 | PAYOUT RATE 6 |
| — | D1000 | E1000 | F11 | … | D6000 | E6000 | F61 |
| A1～A2 | D1100 | E1100 | F12 | … | D6100 | E6100 | F62 |
| A2～A3 | D1200 | E1200 | F13 | … | D6200 | E6200 | F63 |
| A3～A4 | D1300 | E1300 | F14 | … | D6300 | E6300 | F64 |
| A4～A5 | D1400 | E1400 | F15 | … | D6400 | E6400 | F65 |
| A5～ | D1500 | E1500 | F16 | … | D6500 | E6500 | F66 |



Fig. 8
114
30
DISPLAY DEVICE
DRIVING CIRCUIT
218
214
VIDEO RAM
216
IMAGE DATA ROM
206
CPU
208
ROM
210
RAM
212
VDP
204
202
INTERFACE CIRCUIT

U.S. Patent Mar. 4, 2008 Sheet 9 of 23 US 7,338,363 B2

Fig. 9

D1
D2
D3
C1
C2
C3
214
B1
DISPLAY AREA R2
SCREEN IMAGE AREA R1

Appx53

Fig. 10



Fig. 11

30
SELECT GAMING MACHINE
PLEASE INPUT NUMBER OF GAMING MACHINE YOU WANT TO PLAY WITH
00
7
8
9
4
5
6
1
2
3
CORRECT
0
DELETE
RETURN
ENTER
SWITCH SCREEN



Fig. 12



Fig. 13

CONGRATULATIONS !
BIG-HIT SHIFT PROBABILITY
1 / 200
PAYOUT
10
PAYOUT RATE
1.15



Fig. 14

SORRY
BIG-HIT SHIFT PROBABILITY 1 / 500
PAYOUT 2
PAYOUT RATE 0.85



Fig. 15

GAMING MACHINE CONTROL PROCESSING
PLAYER DETECTION PROCESSING
S11
GAME CONTENT CONTROL PROCESSING
S12
SPECIFICATION VALUE RENEWAL PROCESSING
S13
RETURN





Fig. 16
PLAYER DETECTION PROCESSING
S21
REEL MOVED ?
YES
NO
S22
RESET DETECTION TIMER
S23
IS DETECTION TIMER NOT LESS THAN PREDETERMINED VALUE ?
YES
NO
S24
SET PLAYER DETECTION FLAG TO ON
S25
SET PLAYER DETECTION FLAG TO OFF
S26
DETECTION FLAG CHANGED FROM ON TO OFF ?
NO
YES
S29
DETECTION FLAG CHANGED FROM OFF TO ON ?
NO
YES
S27
SPECIFICATION VALUE EVACUATION PROCESSING
S28
SPECIFICATION VALUE INITIALIZATION PROCESSING
S30
NOTIFICATION/ SELECTION SCREEN DISPLAY PROCESSING
S31
SPECIFICATION INITIALIZATION SELECTED ?
NO
YES
S32
SPECIFICATION VALUE SETTING PROCESSING
S33
EVACUATED SPECIFICATION VALUE DELETION PROCESSING
RETURN

Fig. 17

GAME CONTENT CONTROL PROCESSING
S41
MEDAL INSERTED ?
NO
YES
S42
BETTED ?
NO
YES
S43
START LEVER OPERATED ?
NO
YES
GAMING MACHINE DRIVING CONTROL PROCESSING
S44
STOP WINNING COMBINATION IDENTIFICATION PROCESSING
S45
PAYOUT PROCESSING
S46
RETURN



Fig. 18

GAMING MACHINE DRIVING CONTROL PROCESSING
INTERNAL LOTTERY PROCESSING
S51
REEL ROTATION CONTROL PROCESSING
S52
REEL POSITION DETECTION PROCESSING
S53
REEL STOP CONTROL PROCESSING
S54
S55
ALL REELS STOPPED ?
NO
YES
RETURN



Fig. 19

REEL STOP CONTROL PROCESSING
S61
LEFT REEL STOP BUTTON OPERATED ?
NO
YES
S62
LEFT REEL STOP CONTROL
S63
CENTER REEL STOP BUTTON OPERATED ?
NO
YES
S64
CENTER REEL STOP CONTROL
S65
RIGHT REEL STOP BUTTON OPERATED ?
NO
YES
S66
RIGHT REEL STOP CONTROL
RETURN



Fig. 20

SPECIFICATION VALUE RENEWAL PROCESSING
TRANSMIT DATA OF NUMBER OF PAYOUT MEDALS
S71
S72
DATA OF TOTAL RESULT RECEIVED ?
NO
YES
DETERMINE SPECIFICATION VALUES
S73
RENEW SPECIFICATION VALUES
S74
RETURN



Fig. 21

GAMING MACHINE 10A
SERVER
GAMING MACHINE 10B
TRANSMIT DATA OF GAMING MACHINE
S81
RECEIVE DATA OF GAMING MACHINE
S91
TRANSMIT GAMING MACHINE SELECTING NOTIFICATION SIGNAL
S92
RECEIVE GAMING MACHINE SELECTING NOTIFYING SIGNAL
S101
PLAY GAME
S82
S102
PLAY GAME
TRANSMIT DATA OF GAME RESULT
S83
S103
TRANSMIT DATA OF GAME RESULT
TRANSMIT DATA OF GAME RESULT
S93
TOTALIZE GAME RESULTS
S94
TRANSMIT DATA OF TOTAL RESULT
S95
S84
S104
RECEIVE DATA OF TOTAL RESULT
RECEIVE DATA OF TOTAL RESULT
DETERMINE SPECIFICATION VALUES
S85
S105
DETERMINE SPECIFICATION VALUES
RENEW SPECIFICATION VALUES
S86
S106
RENEW SPECIFICATION VALUES
RETURN
RETURN
RETURN



Fig. 22

30
WOULD YOU MIND DELETING SETTINGS OF GAME SPECIFICATION VALUES ?
YES
NO



Fig. 23 A

| TOTAL RESULT | CHANGE |
|---|---|
| A1~A2 | −2 |
| A2~A3 | −1 |
| A3~A4 | ±0 |
| A4~A5 | −1 |
| A5~A6 | +2 |

Fig. 23 B

| SET NUMBER | PROBABILITY | PAYOUT | PAYOUT RATE |
|---|---|---|---|
| 1 | D1000 | E1000 | F10 |
| 2 | D1100 | E1100 | F11 |
| 3 | D1200 | E1200 | F12 |
| 4 | D1300 | E1300 | F13 |
| 5 | D1400 | E1400 | F14 |
| 6 | D1500 | E1500 | F15 |
| 7 | D1600 | E1600 | F16 |
| 8 | D1700 | E1700 | F17 |
| 9 | D1800 | E1800 | F18 |
| 10 | D1900 | E1900 | F19 |

# GAMING MACHINE, SERVER, AND PROGRAM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is based upon and claims the benefit of priority from the prior Japanese Patent Application No. 2002-304951 filed on Oct. 18, 2002, the entire contents of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to a gaming machine, a server, and a program.

## RELATED ART

A player generally plays a game with a gaming machine by inserting a game medium such as a game ball, a medal, or the like into the gaming machine, and a certain amount of game media corresponding to the game result by the player are paid out for return to the game player.

There are various game players who have various game motives. For example, some game players have game motives to mainly enjoy their games for a long time although the amount of game media to be paid out is small (hereinafter referred to as a "low-risk/low-return" motive), and some game players have game motives to mainly aim at profit-return of a large amount of media although they must take the risk (hereinafter referred to as a "high-risk/high-return" motive). Accordingly, it is preferable that the gaming machine be designed to satisfy different game motives of various game players.

In the conventional gaming machines, a big-hit shift probability such as a probability of shifting to big hit (great success, big prize winning, or jackpot), a payout such as the amount of game media to be paid out, and a payout rate such as a ratio of the amount of game media to be paid out to the amount of inserted game media are fixed by the manager or the like at an arcade. Therefore, the big-hit shift probability, the payout, and the payout rate do not vary during each game. Therefore, the game player has to play the game with the fixed big-hit shift probability, payout, and payout rate. In such game, it is hard to say that the gaming machine provides the game player with a varying sense of anticipation to the game, and thus it has been hitherto difficult to provide exquisite services to the game player. The lack of such services is caused by the restriction that the big-hit shift probability, the payout, and the payout rate cannot vary by the game player himself.

Under the foregoing circumstances, in Japanese unexamined patent application publication No. 2001-347042, there is proposed a gaming machine with which plural specification values of the big-hit shift probability and the payout can be varied by the game player himself.

Such gaming machine enables the game player to vary the big-hit shift probability and the payout, however, the gaming machine cannot amuse the game player more than the ordinal gaming machine unless some discernible effect is provided such that the game player actually makes a big hit or the like. This is because the game player could not feel a benefit or fun caused by changes in the specification values if the game player does not play the game under a game condition that a setting-variation effect discernibly appears. Accordingly, it is desirable to provide a gaming machine with which the specification values are changed by each game player in an enjoyable manner.

## SUMMARY OF THE INVENTION

In view of the foregoing situation, according to the present invention, it is an object to provide a gaming machine with at least one specification value based on the total result obtained by totalizing a game result achieved by a first gaming machine and a game result achieved by a second gaming machine.

In view of the above object, the present invention provides the following.

(1) There is provided a first gaming machine for transmitting/receiving data to/from a server, comprising: specification value setting means for setting at least one specification value as a control condition for game control; transmitting means for transmitting data of a game result to the server; gaming machine determining means for determining a second gaming machine; total result data receiving means for receiving from the server data of a total game result achieved by the first gaming machine and the second gaming machine based on the data of the game result transmitted by the transmitting means; specification value determining means for determining the specification value based on the data of the total game result received by the total result data receiving means; and specification value renewing means for renewing the specification value set by the specification value setting means to the specification value determined by the specification value determining means.

(2) The first gaming machine according to (1) is characterized in that the gaming machine determining means determines a plurality of gaming machines including the second gaming machine.

(3) The first gaming machine according to (2) is characterized in that the total result data receiving means receives from the server the data of the total game result and that the total game result is achieved by the plurality of gaming machines including the first and second gaming machines.

According to the invention recited in (1), (2), or (3), a game result achieved by a game player and a game result achieved by another game player are totalized and the specification value is changed in accordance with the total result. Therefore, the specification value may be improved even if the game result of the game player is bad since the game result of the another game player could be good. Accordingly, even if the game result of the game player is not good, the game player may have a sense of anticipation for the game. Furthermore, even if the game result of the game player is good, the specification value may be depreciated since the game result of the another game player could be bad. In order to avoid such a situation, the game players try to make their game results good. Accordingly, exciting gaming machines which give the game players incentive to play the game can be provided.

(4) There is provided a first gaming machine for transmitting/receiving data to/from a second gaming machine, comprising: specification value setting means for setting at least one specification value as a control condition for game control; gaming machine determining means for determining the second gaming machine; receiving means for receiving from the second gaming machine data of a game result achieved by the second gaming machine; game result totalizing means for totalizing a game result achieved by the first gaming machine and the game result achieved by the second gaming machine based on the data of the game result of the

second gaming machine received by the receiving means so as to calculate a total result; specification value determining means for determining the specification value based on the total result calculated by the game result totalizing means; and specification value renewing means for renewing the specification value set by the specification value setting means to the specification value determined by the specification value determining means.

(5) The first gaming machine according to (4) is characterized in that the gaming machine determining means determines a plurality of gaming machines including the second gaming machine and that the first gaming machine transmits and receives data to and from the plurality of gaming machines.

(6) The first gaming machine according to (5) is characterized in that the receiving means receives data of game results achieved by the plurality of gaming machines including the second gaming machine and that the game result totalizing means totalizes a game result achieved by the first gaming machine and the game results achieved by the plurality of gaming machines including the second gaming machines based on the data of the game results of the plurality of gaming machines received by the receiving means so as to calculate the total result.

According to the invention of (4), (5), or (6), a game result of a game player and a game result of another game player are totalized, and the specification value is changed in accordance with the total result. Therefore, the specification value may be improved even if the game result of the game player is bad, since the game result of the another game player is good. Accordingly, even if the game result of the game player is not good, the game player can have a sense of anticipation to the game. Furthermore, even if the game result of the game player is good, the specification value may be depreciated because the game result of the another game player is bad. In order to avoid such situation, the game players try to make their game results good. Accordingly, exciting gaming machines which give the game players incentive to play the game can be provided.

(7) The first gaming machine according to (1) further comprises gaming machine selecting means for selecting the second gaming machine based on an operation by a game player, wherein the gaming machine determining means determines the second gaming machine based on a selection result by the gaming machine selecting means.

A game player himself may wish to select a partner of which game result should be totalized with that of the game player. For example, a game player wishes to totalize his game result with a game result of his friend or a stronger game player to improve his specification value.

According to the invention recited in (7), the game player himself can select a partner of which game result are totalized with that of the game player. Accordingly, the game player can get what he wishes, and a more amusing game can be provided to the game player. Furthermore, according to the present invention, a game player can pretend a good player who may achieve a good game result in spite of the opposite fact so that the another game player selects the game player expecting to improve the specification value. As a result, exciting and thrilling games can be provided.

(8) There is provided a server for transmitting/receiving data to/from a first gaming machine and a second gaming machine, comprising: specification value setting means for setting at least one specification value as a control condition for game control with the first gaming machine; game result data receiving means for receiving data of a game result transmitted from the first gaming machine and data of a game result transmitted from the second gaming machine; game result totalizing means for totalizing the game result of the first gaming machine and the game result of the second gaming machine on the basis of the data of the game result transmitted from the first gaming machine and the data of the game result transmitted from the second gaming machine so as to calculate a total result wherein the data of the game results are received by the game result data receiving means; specification value determining means for determining the specification value based on the total result calculated by the game result totalizing means; and determined specification value transmitting means for transmitting the specification value determined by the specification value determining means to the first gaming machine and the second gaming machine.

(9) The server according to (8) is characterized in that the server transmits and receives data to and from a plurality of gaming machines including the first and second gaming machines.

(10) The server according to (9) is characterized in that the game result data receiving means receives data of game results transmitted from the plurality of gaming machines including the first and second gaming machines.

According to the invention recited in (8), (9), or (10), a game result achieved by a game player and a game result achieved by another game player are totalized, and the total result obtained from the game results is transmitted to each gaming machine. Each gaming machine changes the setting of the specification value based on the total result. Therefore, even if the game result of a game player is bad, the specification value may be increased because the game result of the another game player is good. Accordingly, even if the game result of the game player is not good, the game player can have a sense of anticipation to the game. Furthermore, even if the game result of the game player is good, the specification value may be depreciated because the game result of the another game player could be bad. In order to avoid such situation, the game players try to make their game results good. Accordingly, exciting gaming machines which give the game players incentive to play the game well can be provided.

(11) There is provided a program for directing a computer of a first gaming machine for transmitting/receiving data to/from a server to perform: setting at least one specification value as a control condition for game control with the first gaming machine; transmitting data of a game result to the server; determining a second gaming machine; receiving from the server data of a total result totalizing the game result achieved by the first gaming machine and a game result achieved by the second gaming machine; determining the specification value based on the data of the total result; and renewing the set specification value to the determined specification value.

(12) The program according to (11) is characterized in that the computer of the first gaming machine performs determining at least one gaming machine other than the second gaming machine.

(13) The program according to (12) is characterized in that the computer of the first gaming machine performs receiving from the server data of the total result totalizing a game result achieved by the at least one gaming machine other than the second gaming as well as the game results achieved by the first and second gaming machines.

According to the invention of (11), (12), or (13), the game result of the game player and the game result of the another game player are totalized, and the specification value is changed in accordance with the total result. Accordingly,

even if the game result of the game player is not good, the game player can have a sense of anticipation to the game. Furthermore, even if the game result of the game player is good, the specification value may be depreciated because the game result of the another game player could be bad. In order to avoid such situation, the game players try to make their game results good. Accordingly, exciting gaming machines which give the game players incentive to play the game well can be provided.

(14) The first gaming machine according to (1) is characterized in that the specification value comprises a big-hit shift probability, a payout, a payout rate, or a combination thereof.

(15) There is provided a method of renewing at least one specification value a first gaming machine for transmitting/receiving data to/from a server, comprising: setting a first specification value as a control condition for game control with the first gaming machine; determining a second gaming machine; performing a game; transmitting data of a game result to the server; receiving from the server data of a total result totalizing the game result achieved by the first gaming machine and a game result achieved by the second gaming machine; determining a second specification value based on the data of the total result; and renewing the specification value from the first specification value to the second specification value.

Here, "game result" refers to a result after a game is carried out. The "game result" may contain not only the number of game media which have been paid out, but a combination of symbols after rotation, a result of a sub game carried out on a display device, the number of games having been played, and so on.

Furthermore, "total result" refers to a result obtained by adding or totalizing the game results of plural game players or plural gaming machines.

Other features and advantages of the invention will be apparent from the following description taken in connection with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of a slot machine according to an embodiment of the present invention.

FIG. **2** is a schematic view of a part of a display screen of the slot machine according to the embodiment of the present invention.

FIG. **3** is a perspective view of the slot machine according to the embodiment of the present invention.

FIG. **4** is a block diagram of a circuit of the slot machine according to the embodiment of the present invention.

FIG. **5** is a schematic diagram of a configuration of a server and slot machines being connected to each other in a network.

FIG. **6** is a block diagram of a circuit of the server according to the embodiment of the present invention.

FIG. **7** is a schematic diagram of a specification value determining table of the slot machine according to the embodiment of the present invention.

FIG. **8** is a block diagram of an electrical circuit of a display control device of the slot machine according to the embodiment of the present invention.

FIG. **9** is a schematic diagram of an arrangement of image data in a video RAM of the display control device according to the embodiment of the present invention.

FIG. **10** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **11** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **12** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **13** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **14** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **15** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **16** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **17** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **18** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **19** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **20** is a flowchart of control processing executed with the slot machine according to the embodiment of the present invention.

FIG. **21** is a flowchart of data communications between a server and two slot machines.

FIG. **22** is a schematic diagram of a screen display of the slot machine according to the embodiment of the present invention.

FIG. **23**A is a table for the total result of the slot machine and the variable range of the specification value for the total result according to the embodiment of the present invention.

FIG. **23**B is a table for the setting of the specification value of the slot machine such as a big-hit shift probability, a payout, and a payout rate for each setting of each slot machine according to the embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

According to the present invention, a preferred embodiment will be described hereunder referring to the drawings.

FIG. **1** is a perspective view of a gaming machine according to the embodiment of the present invention. In the following embodiment, a slot machine to which the present invention is applied will be described as a preferable embodiment of the gaming machine according to the present invention.

A housing **12** enclosing an outer periphery of a slot machine **10** comprises a main body **11** and a door **13**. A rectangular display window **14** is provided on the front face of the housing **12** which forms the whole body of the slot machine **10**.

Three kinds of reels **26**L, **26**C, **26**R are freely rotatably provided in the housing **12**, and plural kinds of identification information pictures (i.e., symbols) are drawn on the outer peripheral surface of each reel. Each of the reels **26**L, **26**C, **26**R is provided so as to be visually recognized through the display window **14**. The identification information pictures (i.e., symbols) drawn on the outer peripheral surfaces of the

reels **26**L, **26**C, **26**R are driven downward as the reels are rotated. When the rotation of each of the reels **26**L, **26**C, **26**R is stopped, three identification information pictures (i.e., symbols) drawn on the outer peripheral surface of each reel are visually recognizable through the display window **14**.

A display device **30** is provided at the lower side of the display window **14**. The display device **30** comprises a liquid crystal display, for example. As described later, various images such as notification pictures for game contents, effect pictures for amusing game players, etc. are displayed on the display device **30**.

Furthermore, a touch sensor **56** (see FIG. **4**) is provided on the display device **30** to enable various kinds of operations.

A substantially horizontal seat portion **28** is provided at the lower side of the display device **30**. A medal slot **31** is provided on the right side of the upper face of the seat portion **28**. A medal, a token, or a coin as a game medium may be inserted into the medal slot **31** for playing the game. By way of example, the medal is used in the following description. A 1-BET switch **20** for setting only one medal out of the inserted medals as a betting target for a game by one pushing operation is provided on the left side of the upper face of the seat portion **28**. In addition, a 2-BET switch **22** for setting only two medals out of the inserted medals as a betting target for the game is also provided. Furthermore, a maximum BET switch **24** for setting the permitted maximum number of medals out of the inserted medals as a betting target for the game is provided.

When the 1-BET switch **20** is operated by a game player, only a payline L**1**, which may be a prize-winning line, is set as a activated payline for determination of a game result (hereinafter, the activated payline will be referred to as "activated line"). When two or more medals have been already inserted and also the 2-BET switch **22** is operated by the game player, not only the payline L**1**, but also paylines L**2**A, L**2**B, that is, totally three paylines are set as activated lines.

Furthermore, when three or more medals have been already inserted and also the maximum BET switch **24** is operated by the game player, not only the paylines L**1**, L**2**A, L**2**B, but also paylines **3**A, **3**B, that is, totally five paylines are set as activated lines. However, when the number of residual medals out of the inserted medals is equal to two, only the three paylines L**1**, L**2**A, L**2**B out of the five paylines are activated. When the number of residual medals out of the inserted medals is equal to one, only the payline L**1** out of the five paylines is activated. With respect to the activated paylines, an indication thereof is displayed at a side of the display window **14** and notified to the game player.

A game start allowing state is set when a game player pushes the 1-BET switch **20**, the 2-BET switch **22**, or the maximum BET switch **24**.

As shown in FIG. **1**, a start lever **32** is provided on the left side of the front face of the seat portion **28** so as to be operative by tilting. When the game player tilts the start lever **32**, the three reels **26**L, **26**C, **26**R start to rotate all at once. When the three reels **26**L, **26**C, **26**R are rotated, the identification information pictures (i.e., symbols) drawn on the outer peripheral surface of each of the reels **26**L, **26**C, **26**R are variably displayed.

When the rotational speeds of the three reels **26**L, **26**C, **26**R reach a predetermined speed, the game player is allowed to operate reel stop buttons **34**L, **34**C, **34**R as described later. However, the slot machine **10** may be configured without such stop buttons.

Three reel stop buttons **34**L, **34**C, **34**R which can be pushed are provided at the center on the front face of the seat portion **28**. The reel stop button **34**L is provided to stop the reel **26**L, the reel stop button **34**C is provided to stop the reel **26**C and the reel stop button **34**R is provided to stop the reel **26**R.

A payout button **36** is provided on the left side of the start lever **32**. When the game player pushes the payout button **36**, the inserted medals are paid out from a medal payout opening **38** at the lower portion on the front face of the housing **12**. The medals thus paid out are stored in a medal tray **40**.

Sound-transmissible portions **42** are provided on the upper side of the medal tray **40** to output sounds emitted from speaks (not shown) mounted in the housing **12** to the outside of the housing **12**.

As described above, a predetermined number of plural kinds of identification pictures (i.e., symbols), for example, twenty one identification pictures (i.e., symbols) are drawn on the outer peripheral surface of each of the reels **26**L, **26**C, **26**R. A predetermined number of medals are paid out and the current game condition is shifted to a more desirable game condition for the game player in accordance with the combination of identification information pictures (i.e., symbols) when each of the reels **26**L, **26**C, **26**R is stopped.

FIG. **3** is a schematic diagram showing the internal construction of the housing of the slot machine **10** when the door **13** of the slot machine **10** is opened.

Various kinds of devices, various kinds of control boards (not shown) are contained in the slot machine **10** as shown in FIG. **3**.

A setting switch **72** is provided in the housing **12**, and specification values such as a big-hit shift probability, a payout, and a payout rate are set initially by the operation of a staff member of an arcade. In the gaming machine according to this embodiment, six levels can be set for each specification value. However, the slot machine according to the present invention is not limited to this particular embodiment, and any number of levels may be set for each specification value.

FIG. **4** is a block diagram showing a control circuit for the slot machine according to this embodiment.

The start level **32** described above is connected to an interface circuit group **102** of a main control circuit **100**, and the interface circuit group **102** is connected to an input-output bus **104**. An actuation start signal generated from the start lever **32** is converted to a predetermined signal in the interface circuit group **102**, and then supplied to the input-output bus **104**. The input-output bus **104** is designed so that a data signal or address signal is input/output into/from a central processing unit **106** (hereinafter referred to as "CPU") therethrough.

To the interface circuit group **102** are connected the reel stop buttons **34**L, **34**C, **34**R, the 1-BET switch **20**, the 2-BET switch **22**, the maximum BET switch **24**, and the payout button **36**. Signals generated from these buttons and the switches are supplied to the interface circuit group **102**, converted to predetermined signals, and supplied to the input-output bus **104**.

Furthermore, a medal counter **52** and a medal pass sensor **54** are also connected to the interface circuit group **102**. Signals generated from the counter and the sensor are also supplied to the interface circuit group **102**, converted to desired signals, and then supplied to the input-output bus **104**.

Furthermore, a touch sensor **56** is provided to the interface circuit group **102**. By touching the display device **30**, a contact signal containing the contact position or the like is supplied from the touch sensor **56**.

A ROM (Read Only Memory) **108** and a RAM (Random Access Memory) **110** are connected to the input-output bus **104**. The ROM **108** stores a control program for controlling the overall flow of the game of the slot machine. Furthermore, the ROM **108** also stores initial data for executing the control program, image data to be displayed on the display device **30** and audio data for sounds to be emitted from the speakers **46**.

The RAM **110** temporarily stores flags and variables used for the control program.

The input-output bus **104** is provided with a random number generator **112** for generating random numbers. The random number generator **112** generates numeric values in a fixed range, for example, random numbers contained in the range from "0" to "65535" (corresponding to the value of $2^{16}$). The random number may be generated through operation processing of the CPU **106**.

In the slot machine **10** of this embodiment, the random numbers are generated by the random number generator **112**. However, the present invention is not limited to this mode, and the random numbers may be generated by the CPU **106** on the basis of a program stored in the ROM **108**.

A communication interface circuit **74** is connected to the input-output bus **104**, and thus the slot machine of this embodiment can communicate with a server **80** or the like through a communication line such as a public phone line network, a local area network (LAN), or the like.

A motor control device **117** for driving the reels **26**L, **26**C, **26**R is connected to the input-output bus **104**.

A motor driving circuit **118** is connected to the motor control device **117**. Furthermore, stepping motors **62**L, **62**C, **62**R for rotating the reels **26**L, **26**C, **26**R respectively are connected to the motor driving circuit **118**. The stepping motors **62**L, **62**C, **62**R are provided in the three reels **26**L, **26**C, **26**R respectively so that the rotating shafts of the stepping motors **62**L, **62**C, **62**R serve as the rotational centers of the reels **26**L, **26**C, **26**R, respectively.

A driving control command generated from the CPU **106** is converted to a driving signal by the motor driving circuit **118** through the motor control device **117**, and the driving signal thus converted is supplied to the stepping motors **62**L, **62**C, **62**R. The driving control command contains a command for the rotational speed, and not only the rotation control and stop control of the stepping motors **62**L, **62**C, **62**R, but also the control of the rotational speeds thereof are performed on the basis of the driving control command.

As described above, the CPU **106** can perform the rotation control and stop control of the reels **26**L, **26**C, **26**R and the rotational speed control thereof by controlling the stepping motors **62**L, **62**C, **62**R.

Each of the reels **26**L, **26**C, **26**R is provided with a rotation angle position sensor (not shown) for detecting the rotation angle position of the corresponding reel, and the rotation angle position sensors are connected to a reel rotation angle position detecting circuit **120**. When a signal indicating the rotation angle position of each of the reels **26**L, **26**C, **26**R is generated from the rotation angle position sensor, the signal is supplied to the reel rotation angle position detecting circuit **120**. The signal supplied to the reel rotation angle position detecting circuit **120** is converted to a predetermined signal, and then supplied to the CPU **106** through the motor control device **117**.

On the basis of the signal indicating the rotation angle position of each of the reels **26**L, **26**C, **26**R, CPU **106** can specify identification information pictures (i.e., symbols) displayed while the game player can visually recognize the pictures (i.e., symbols) through the display window **14**.

A lamp driving circuit **122** for driving an illumination lamp **44** is also connected to the input-output bus **104**. The CPU **106** supplies a driving signal to the illumination lamp **44** through the lamp driving circuit **122**, and turns on the illumination lamp **44** in accordance with the game condition.

Furthermore, a speaker driving circuit **124** for driving the speakers **46** is also connected to the input-output bus **104**. The CPU **106** reads out audio data stored in the ROM **108**, and supplies the audio data thus read to the speaker driving circuit **124**. The speakers **46** supplied with the data through the speaker driving circuit **124** generates predetermined sounds.

Furthermore, a hopper driving circuit **126** for driving a hopper **128** is connected to the input-output bus **104**. The CPU **106** reads out the number of medals to be paid out, and supplies a driving signal to the hopper driving circuit **126**. The hopper driving circuit **126** supplied with the driving signal makes the hopper **128** pay out the medals.

Furthermore, a display control device **114** for controlling the image display operation of the display device **30** is also connected to the input-output bus **104**. The display device **30** is connected to the display control device **114**. The CPU **106** reads out data, etc. stored in the ROM **108**, and supplies the data to the display control device **114** as described later. The display device **30** supplied with the data through the display control device **114** displays images thereon.

FIG. **5** shows an example case where slot machines, each of which serves as a communication terminal, is connected to a server.

A plurality of slot machines **10**A, **10**B, **10**C are connected to a server **80** through a communication line. Although the figure only has three slot machines, it should be understood that more than three slot machines may be employed in the system. The communication line may comprise a public phone line network, a cellular phone line network, a local area network (LAN), or the like.

As described later, the server **80** receives information on game conditions which are output from the slot machines **10**A, **10**B, **10**C. The server **80** determines the setting of the signal processing in the slot machines **10**A, **10**B, **10**C on the basis of the information concerned, and then transmits the set information to the slot machines **10**A, **10**B, **10**C through the communication line.

As described above, the main control circuit **100** of each of the slot machines **10**A, **10**B, **10**C as a communication terminal is provided with an input-output bus **104**. Each communication interface circuit **74** is connected to the input-output bus **104**. The slot machines **10**A, **10**B, **10**C are connected to the server **80** through the communication interface circuits **74**. Information such as control information, etc. is input/output between each of the slot machines **10**A, **10**B, **10**C and the server **80**.

FIG. **6** is a block diagram showing the circuit construction of the server **80** described above.

The server **80** comprises a hard disc drive **88**, a CPU **82**, a ROM **84**, a RAM **86**, a communication interface circuit **90**, and a station number switch **87**. A program, etc. described later are recorded in the hard disc drive **88**. As shown in FIG. **5**, the communication interface circuit **90** is connected to the slot machines **10**A, **10**B, **10**C so that it can communicate with the slot machines **10**A, **10**B, **10**C. The office number switch **87** sets a communication office number. The server **80** serves as a master for the slot machines **10**A, **10**B, **10**C, and the station number switch **87** of the server **80** is set to "0000".

Transmission data between each of the slot machines **10**A, **10**B, **10**C and the server **80** comprises a header portion

and a packet portion. The header portion contains data such as the communication station number of a transmission source, the communication station number of a transmission destination, etc. The packet portion contains data such as a command code, data based on the command code, etc. For example, it is assumed that data are transmitted from a slot machine having a communication station number "0001" to the server **80** having a communication station number "0000". The communication station number of the transmission source is set to "0001", and the communication station number of the transmission destination is set to "0000". Furthermore, the command data and the data are set, and then the transmission data are transmitted. As a result, only the server **80** corresponding to the transmission destination having the communication station number "0000" receives the transmission data.

The programs recorded in the hard disc drive **88** contain a program for carrying out communication with the slot machines **10**A, **10**B, **10**C, and a program for receiving information output from the slot machines **10**A, **10**B, **10**C. The other programs recorded in the hard disc drive **88** contain a program for controlling the slot game, a program for totalizing the game results of plural gaming machines.

Furthermore, various kinds of tables are recorded in the hard disc drive **88** described above. The tables thus recorded contain a type code table in which type codes indicating the types of slot machines are associated with the names of the types, etc.

Furthermore, various kinds of tables are generated in the hard disc drive **88** described above. The tables thus generated contain a table number table in which communication station numbers of communication-possible slot machines are associated with the table numbers of the slot machines, etc.

When powered on, each of the slot machines **10**A, **10**B, **10**C outputs a communication allowance request signal to the server **80** to check whether it can communicate with the server **80**. The sever **80** receiving this signal first checks whether it is connected to the slot machines **10**A, **10**B, **10**C so that the communications can be made therebetween. After this check, a communication allowance signal for notifying that the server **80** and the slot machines **10**A, **10**B, **10**C are allowed to communicate with each other is output from the server **80** to the slot machines **10**A, **10**B, **10**C. Each of the slot machines **10**A, **10**B, **10**C receiving this signal supplies the table number data and the type code. The server **80** receives the table number data and generates a table.

The server **80** achieves the types of the slot machines, the table number data thereof, etc. in the manner as described above. Furthermore, the server **80** totalizes the game results of plural slot machines on the basis of the various kinds of tables described above.

In this embodiment, server-client type communications based on superordinate-subordinate management concept are carried out. However, the preset invention is not limited to this communication mode, and it should be understood that the present invention is also applied to peer-to-peer type communications based on mutually-equal management concept. That is, at least two gaming machines may be connected to each other so that they can communicate with each other.

As described above, a specification value determining table as shown in FIG. **7** is recorded in the ROM **108**. The specification value determining table is a correspondence table for determining specification values containing a big-hit shift probability, a payout, and a payout rate on the basis of a result achieved by totalizing game results, that is, the total result and the setting of the setting switch **72** described above. In the specification value determining table, the specification values are shown by using various kinds of symbols and numeric values in place of actual numeric values.

The initial specification values are determined on the basis of the setting of the setting switch **72** contained in the housing **12**. With respect to the column title, "1" of "PROBABILITY 1" shows that each combination of an alphabet and a numeral in each row of the column ("PROBABILITY 1") refers to the big-hit shift probability when the setting of the setting switch is set to "1". Also, "6" of "PAYOUT 6" shows each combination of an alphabet and a numeral in each row of the column ("PAYOUT 6") refers to the payout when the setting of the setting switch **72** is set to "6". In FIG. **7**, "PROBABILITY" means "big-hit shift probability", and "PAYOUT" means "payout".

The game is carried out with plural gaming machines, and the specification values are renewed by referring to the total of the game results of the plural gaming machines, that is, the total result and the specification value determining table.

For example, if games are carried out with plural gaming machines and if the total result of the gaming machines is in the range from A**1** to A**2** and if the setting of the setting switch **72** is set to "1", the total result becomes in the range from A**1** to A**2** so that the specification values are renewed to the contents in the columns of "PROBABILITY 1," "PAYOUT 1," and "PAYOUT RATE 1." That is, as shown in the second row from the top row for setting **1** of FIG. **7**, the probability, the payout, and the payout rate are renewed to "D1100," "E1100," and "F12".

FIG. **8** is a block diagram showing the electrical circuit of the display control device **114** described above.

The interface circuit **202** is connected to the input-output bus **204**, and an image display command output from the main control circuit **100** is supplied to the input-output bus **204** through the interface circuit **202**. A data signal or address signal is input through the input-output bus **204** to a center processing circuit (hereinafter referred to as CPU) **206**.

A ROM (Read Only Memory) **208** and a RAM (Random Access Memory) **210** are also connected to the input-output bus **204** described above. The ROM **208** stores a display control program for generating a driving signal to be supplied to the display device **30** on the basis of the image display command output from the main control circuit **100**. The RAM **210** stores flags and variable values used for the above program.

Furthermore, an image data processor (hereinafter referred to as VDP) **212** is also connected to the input-output bus **204**. The VDP **212** contains various circuits such as a so-called sprite circuit, a screen circuit, a pallet circuit, etc. The VDP **212** is a processor which can execute various processing to make the display device **30** display images.

A video RAM **214** is connected to the VDP **212** described above. The video RAM **214** stores image data corresponding to the image display command output from the main control circuit **100**. Furthermore, a driving circuit **218** is connected to the VDP **212**. The driving circuit **218** outputs a driving signal for driving the display device **30**.

The CPU **206** described above reads out the display control program stored in the ROM **208**. Subsequently, the CPU **206** executes the display control program thus read out. By executing the display control program, the CPU **206** stores the image data corresponding to the image display command output from the main control circuit **100** into the RAM **214**. The image display command output from the

main control circuit **100** contains various display commands such as a background display command, an operation image display command, a character display command, etc.

The ROM **216** for image data stores various image data such as character image data of characters, e.g., mobiles, moving characters, etc. displayed in a visible-effect scene; background image data constituting the background of the display device **30**; and so on.

The image data for operation described above contain image data for displaying images on the display device **30** in such a display mode that the images take a series of actions.

Next, FIG. **9** is a schematic diagram showing the concept of image data generated in the video RAM **214** described above. Here, the size of the image data generated in the video RAM **214** by the screen display command will be referred to as "screen image area R**1**". In FIG. **9**, the screen image area R**1** is illustrated as an area surrounded by a solid line. The display area displayed on the display device **30** will be referred to as a display area R**2**. In FIG. **9**, the display area R**2** is illustrated as an area surrounded by a broken line.

As shown in FIG. **9**, the screen image area R**1** is set so as to be larger than the display area R**2** displayed on the display device **30**. With this setting, an image to be displayed on the display device **30** can be smoothly scrolled on the screen.

When a character display command is output from the main control circuit **100**, the VDP **212** reads out each image data of character images C**1** to C**3** from the image data ROM **216**. The image data thus read out are recorded at a prescribed area of a prescribed video RAM **214** adapted the display device **30**.

Furthermore, when a background display command is output from the main control circuit **100**, the VDP **212** reads out the image data of an image B**1** of the background from the image data ROM **216**. The image data thus read out are recorded in a prescribed area of the prescribed video RAM **214** adapted to the display device **30**.

After generating image data in the video RAM **214**, the VDP **212** reads out only the image data stored in the display area R**2** from the video RAM **214**, and supplies the image data concerned as a display signal to the driving circuit **218**, whereby the images corresponding to the image data are displayed frame by frame. The images to be displayed on the display device **30** are displayed while smoothly scrolled.

As described above, the image data are recorded on the video RAM **214**, so that the images are displayed on the display device **30** and the game progresses. FIG. **10** shows a display example of images in this game.

The display device **30** is used as a sub screen of the slot game unlike each of the reels **26**L, **26**C, **26**R.

As shown in FIG. **10**, two selection button images are displayed at the lower side of the display device **30**. The selection button images comprise two items of "1. SELECT GAMING MACHINE" and "2. DISPLAY GAME CONDITION". When the game player touches one of the operation button images, the corresponding item is selected, and the images as shown in FIGS. **11** and **12** are displayed. In the following description, a display device of a first gaming machine operated by the game player is referred to as the display device **30**A, and a display device of a second gaming machine selected by another game player is referred to as the display device **30**B.

FIG. **11** is a schematic diagram showing a game machine selection image displayed on the display device **30**A. FIG. **12** is a schematic diagram showing an image after selection of the gaming machine, which is displayed on the display device **30**B. When "1. SELECT GAMING MACHINE" is selected in FIG. **10**, the gaming machine selection image shown in FIG. **11** is displayed. As shown in FIG. **11**, the gaming machine selection image contains a ten-key image and various kinds of operating button images. An image "PLEASE INPUT NUMBER OF GAMING MACHINE YOU WANT TO PLAY WITH" is displayed at the center of the gaming machine selection image.

The game player inputs the number of the gaming machine with which the player wants to play the game utilizing the ten-key image, and the number of the gaming machine thus input is displayed on the display device **30**A. When the game player touches "ENTER" button, the number of the gaming machine is determined. On the other hand, when the game player touches "RETURN" button, the gaming machine selection image is returned to the selection image shown in FIG. **10**.

When the game player pushes "ENTER" button, "PLAY WITH 15-TH GAMING MACHINE!" is displayed on the display device **30**B of the second gaming machine thus selected as shown in FIG. **12**, and the periphery of this display image is illuminated. Furthermore, "START PLAY AFTER 10 SECONDS" is displayed at the center portion of the display device **30**B. After 10 seconds, the image is switched such that the play is started.

When the game is finished, an image indicating the specification values determined on the basis of the total number of payout medals for the respective gaming machines is displayed on the display device **30** as shown in FIGS. **13** and **14**. When the specification values are improved, "CONGRATULATIONS !" is displayed at the upper portion of the display device **30** and the periphery thereof is illuminated as shown in FIG. **13**. The big-hit shift probability, the payout, and the payout rate are displayed with characters in the area extending from the center portion to the lower portion of the display device **30**. On the other hand, when the specification values are reduced, "SORRY" is displayed at the upper portion of the display device **30** and the box is darkened as shown in FIG. **14**.

When the game player selects "2. DISPLAY GAME CONDITION" shown in FIG. **10**, the big-hit shift probability, the payout, and the payout rate are displayed in the area extending from the center portion to the lower portion of the display device **30**.

Sub routines for controlling the slot machine **10** will be described with reference to FIGS. **15** to **20**. A sub routine shown in FIG. **15** is called from the actuating main program of the slot machine **10** and executed in advance.

In the following description, it is assumed that the slot machine **10** is started in advance, the variables used in the CPU **106** are initialized to predetermined values and the CPU **106** operates normally.

First, as shown in FIG. **15**, the CPU **106** executes game player detection processing (step S**11**). In this processing, the CPU **106** determines whether any game player exists as described later. After finishing this processing, the CPU **106** shifts the processing to step S**12**.

Subsequently, the CPU **106** executes game content control processing (step S**12**). In this processing, the CPU **106** executes the control of the game content corresponding to the main object of the game as described later. After finishing this processing, the CPU **106** shifts the processing to step S**13**.

Subsequently, the CPU **106** executes specification value renewal processing (step S**13**). In this processing, the CPU **106** renews the specification values stored in the RAM **110** on the basis of the data received from the server **80**. Immediately after finishing this processing, the CPU **106** finishes this sub routine.

As described above, the processing of FIG. **16** is executed in the sub routine called in step S**11**.

First, the CPU **106** determines whether each of the reels **26**L, **26**C, **26**R is varying (step S**21**). In this processing, the CPU **106** determines whether the CPU **106** itself supplies the driving control command to the motor control device **117**. If the CPU **106** determines to supply the driving control command to the motor control device **117**, the CPU **106** shifts the processing to step S**22**. If the CPU **106** determines that no driving control command is supplied to the motor control device **117**, the CPU **106** shifts the processing to step S**23**.

Subsequently, the CPU **106** executes reset processing of a detection timer (step S**22**). In this processing, the CPU **106** resets the detection timer contained in the CPU **106**. After finishing this processing, the CPU **106** shifts the processing to step S**23**.

Subsequently, the CPU determines whether the detection value of the detection timer is not less than a predetermined value (step S**23**). In this processing, if the CPU **106** determines that the detection value of the detection timer is not less than the predetermined value, the CPU **106** shifts the processing to step S**25**. If the CPU **106** determines that the detection value of the detection timer is not less than the predetermined value, the CPU **106** shifts the processing to step S**24**.

Subsequently, the CPU **106** executes game player detection flag activating processing (step S**24**). In this processing, the CPU **106** records as "ON" the game player detection flag positioned in the RAM **110**. That is, the CPU **106** determines that a game player exists. After finishing this processing, CPU **106** shifts the processing to step S**26**.

In step S**25**, game player detection flag inactivating processing is executed. In this processing, the CPU **106** records as "OFF" the game player detection flag positioned in the RAM **110**. That is, the CPU **106** determines that no game player exists. After finishing this processing, the CPU **106** shifts the processing to step S**26**.

Subsequently, the CPU **106** determines whether the detection flag is changed from "ON" to "OFF" (step S**26**). In this processing, if the CPU **106** determines that the detection flag positioned in the RAM **110** is changed from "ON" to "OFF", the CPU **106** shifts the processing to step S**27**. If the CPU **106** determines that the detection flag is not changed from "ON" to "OFF", CPU **106** shifts the processing to step S**29**.

Subsequently, specification value evacuation processing is executed by the CPU **106** (step S**27**). In this processing, various specification values positioned in the RAM **110** are recorded at positions different from the addresses positioned in the RAM **110** by the CPU **106** (that is, the specification values at predetermined addresses (i.e., original addresses) in the RAM **110** are recorded at addresses different from the original addresses in the RAM **110**). After finishing this processing, the CPU **106** shifts the processing to step S**28**.

Subsequently, the CPU **106** executes specification value initialization processing (step S**28**). In this processing, the CPU **106** initializes various kinds of specification values. Specifically, the CPU **106** records in a predetermined area of the RAM **110** each specification value when the total result of the specification value determining table shown in FIG. **7** is "–". After the processing is finished, the CPU **106** immediately finishes this sub routine.

In step S**29**, the CPU **106** determines whether the detection flag is changed from "OFF" to "ON". In this processing, if the CPU **106** determined that the detection flag positioned in the RAM **110** is changed from "OFF" to "ON", the CPU **106** shifts the processing to step S**30**. On the other hand, if the CPU **106** determines that the detection flag is not changed from "OFF" to "ON", the CPU **106** immediately finishes this sub routine.

Subsequently, the CPU **106** executes notification/selection screen display processing (step S**30**). In this processing, the CPU **106** displays an image as shown in FIG. **22**. After finishing this processing, the CPU **106** shifts the processing to step S**31**.

Subsequently, the CPU **106** determines whether initialization of specification values is selected or not (step S**31**). Here, selection of the initialization of the specification values means that the game player touches "YES" of the operation button image displayed on the screen of the display device shown in FIG. **22**. Non-selection of the initialization of the specification values means that the game player touches "NO" of the operation button image displayed on the screen of the display device **30**. In this processing, if the CPU **106** determines that the initialization is selected, the CPU **106** shifts the processing to step S**32**. If the CPU **106** determines that the initialization is not selected, the CPU **106** shifts the processing to step S**33**.

In step S**32**, the CPU **106** executes specification value setting processing. In this processing, the CPU **106** records in the RAM **110** the various specification values which have been restored in the RAM **110** through the processing of step S**27**, whereby the various specification values set previously can be reset. After finishing this processing, the CPU **106** finishes this sub routine.

In step S**33**, the CPU **106** executes restored specification value deletion processing (step S**33**). In this processing, the CPU **106** resets the various kinds of specifications restored in the RAM **110** through the processing of step S**27**, thereby keeping the initialized state. After finishing this processing, the CPU **106** finishes this sub routine.

As described above, the processing shown in FIG. **17** is carried out in game content control processing called from step S**13** as described above.

First, the CPU **106** determines whether a medal is inserted or not (step S**41**). In this processing, if the CPU **106** determines that a medal is inserted, the CPU **106** shifts the processing to step S**42**. On the other hand, if the CPU **106** determines that no medal is inserted, the CPU **106** immediately finishes this sub routine.

In step S**42**, the CPU **106** determines whether the BET switch is operated or not. In this processing, if the CPU **106** determines that the BET switch is operated, the CPU **106** shifts the processing to step S**43**. On the other hand, if the CPU **106** determines that the BET switch is operated, the CPU **106** immediately finishes this sub routine. The BET switch contains the 1-BET switch **20**, the 2-BET switch **22**, and the maximum BET switch **24**.

In step S**43**, the CPU **106** determines whether the start lever **32** is operated or not. In this processing, if the CPU **106** determines whether the start lever **32** is operated, the CPU **106** shifts the processing to step S**44**. On the other hand, if the CPU **106** determines that the start lever **32** is not operated, the CPU **106** immediately finishes this sub routine.

In step S**44**, the CPU **106** executes gaming machine driving control processing. In this processing, the CPU **106** executes the control for concrete contents of the game. After finishing this processing, the CPU **106** shifts the processing to step S**45**.

Subsequently, the CPU **106** executes stop winning-combination determination processing (step S**45**). In this processing, the reel rotation angle position detecting circuit **120** receives a signal representing a rotation angle position which is output from the rotation angle position sensor. The

reel rotation angle position detecting circuit **120** converts the signal thus received to a predetermined signal. Furthermore, the reel rotation angle position detecting circuit **120** supplies the received signal to the CPU **106** through the bus **104**. The CPU **106** receiving the signal from the reel rotation angle position detecting circuit **120** detects the rotation angle position of each of the reels **26**L, **26**C, **26**R on the basis of the signal. Furthermore, the CPU **106** identifies a winning combination on the basis of the stop positions of the reels **26**L, **26**C, **26**R, that is, symbols (design) stopped and displayed at the display window **14**, the table representing the stop modes of the symbols for which medals are paid out, and the data indicating activated lines for which medals are betted. Furthermore, the CPU **106** records the winning-combination data indicating the identified winning-combination in the RAM **110**. After finishing this processing, the CPU **106** shifts the processing to step S**46**.

Subsequently, the CPU **106** executes payout processing (step S**46**). In this processing, the CPU **106** calculates the number of medals to be paid out (hereinafter referred to as "payout number") on the basis of the kind of the winning-combination determined by the processing in step **45**. The CPU **106** supplies a driving signal to the hopper driving circuit **126** on the basis of the payout number thus calculated. The hopper driving circuit **126** receiving the driving signal drives the hopper **128** to pay out medals. After finishing this processing, the CPU **106** finishes this sub routine.

As described above, the processing shown in FIG. **8** is called in the gaming machine driving control processing routine called in step S**44**.

First, the CPU **106** executes internal lottery processing (step S**51**). In this processing, the CPU **106** outputs a command to the random number generator **112** to generate a random number. Upon receiving this command, the random number generator **112** generates a random number. The CPU **106** records the internal lottery data based on the random number thus achieved at a predetermined position of the RAM **110**. After finishing this processing, the CPU **106** shifts the processing to step S**52**.

Subsequently, the reel rotation control processing is executed (step S**52**). In this processing, the CPU **106** outputs a command to the motor control device **117** to rotate each of the reels **26**L, **26**C, **26**R. Upon receiving the command, the motor control device **117** transmits to the motor driving circuit **118** a signal indicating that each of the reels **26**L, **26**C, **26**R is rotated. With this signal, each of the stepping motors **62**L, **62**C, **62**R is driven, and each of the three reels **26**L, **26**C, **26**R starts to rotate. After finishing this processing, the CPU **106** shifts the processing to step S**53**.

Subsequently, the CPU **106** executes reel position detection processing (step S**53**). In this processing, the CPU **106** receives signals indicating the rotation angle positions output from the rotation angle position sensors. The reel rotation angle position detecting circuit **120** converts the signals to predetermined signals. The signals thus converted are supplied to the CPU **106** through the input-output bus **104**. The CPU **106** receiving the signals described above detects the rotation angle positions of the reels **26**L, **26**C, **26**R on the basis of these signals. After finishing this processing, the CPU **106** shifts the processing to step S**54**.

Subsequently, the CPU **106** executes reel stop control processing (step S**54**). In this processing, the CPU **106** receives stop signals generated from the reel stop buttons **34**L, **34**C, **34**R through the interface circuit group **102** and the input-output bus **104** as described later. The stop signal is generated when the game player pushes each of the reel stop buttons **34**L, **34**C, **34**R. The CPU **106** receiving each stop signal transmits a stop control signal to the motor control device **117** through the input-output bus **104** to stop the reel **26**L, **26**C, **26**R corresponding to the reel stop button **34**L, **34**C, **34**R thus pushed. The motor control device **117** receiving the signal transmits a driving signal to the stepping motor **62**L, **62**C, **62**R. Each stepping motor **62**L, **62**C, **62**R receiving the corresponding stop signal controls the rotation and stop of the corresponding reel **26**L, **26**C, **26**R and also the controls the rotational speed thereof, whereby symbols drawn on the peripheral surface of each of the reels **26**L, **26**C, **26**R are stopped and displayed. The reels **26**L, **26**C, **26**R are stopped at the positions calculated through the internal lottery processing of step S**51**. After finishing this processing, the CPU **106** shifts the processing to step S**55**.

Subsequently, the CPU **106** determines whether all the reels are stopped or not (step S**55**). In this processing, if the CPU **106** determines that all the reels are stopped, the CPU **106** finishes this sub routine. If the CPU **106** determines that al the reels are not stopped, the CPU **106** shifts the processing to step S**53**. Specifically, on the basis of the signal indicating the rotation angle position detected through the processing of step S**53**, the CPU **106** determines whether the stepping motor **62**L, **62**C, **62**R is stopped. If the CPU **106** determines that the stepping motors **62**L, **62**C, **62**R are stopped, the CPU **106** finishes this sub routine. If the CPU **106** determines that all the stepping motors **62**L, **62**C, **62**R are not stopped, the CPU **106** shifts the processing to step S**53**.

As described above, the processing shown in FIG. **19** is carried out in the reel stop control processing routine called in step S**54**.

First, the CPU **106** determines whether the left reel stop button **34**L is operated (step S**61**). In this processing, if the CPU **106** determines that the left reel stop button **34**L is operated, the CPU **106** shifts the processing to step S**62**. If the CPU **106** determines that the left reel stop button **34**L is not operated, the CPU **106** shifts the processing to step S**63**.

Specifically, when the CPU **106** determines that it receives a signal supplied through the operation of the left reel stop button **34**L, the CPU **106** shifts the processing to step S**62**. If the CPU **106** determines that it does not receive the signal supplied through the operation of the left reel stop button **34**L, the CPU **106** shifts the processing to step S**63**.

In step S**62**, the CPU **106** executes left reel stop processing. In this processing, the CPU **106** transmits a stop signal to the motor control device **117**. The CPU **106** stops the stepping motor **62**L through the motor driving circuit **118** to stop the left reel **26**L. The stepping motor **62**L is stopped on the basis of internal lottery data generated through the processing of step S**51** and the signal representing the rotation angle position detected through the processing of the step S**53**. If this processing is finished, the CPU **106** shifts the processing to step S**63**.

In step S**63**, the CPU **106** determines whether the center reel stop button **34**C is operated or not. In this processing, if the CPU **106** determines that the center reel stop button **34**C is operated, the CPU **106** shifts the processing to step S**64**. If the CPU **106** determines that the center reel stop button **34**C is not operated, the CPU **106** shifts the processing to step S**65**.

Specifically, if the CPU **106** determines that it receives a signal supplied through the operation of the center reel stop button **34**C, the CPU **106** shifts the processing to step S**64**. If the CPU **106** determines that it does not receive the signal supplied through the operation of the center reel stop button **34**C, the CPU shifts the processing to step S**65**.

In step S**64**, the CPU **106** executes center reel stop processing. In this processing, the CPU **106** transmits a stop signal to the motor control device **117**. The CPU **106** stops the stepping motor **62**C through the motor driving circuit **118** to stop the center reel **26**C. At this time, the stepping motor **62**C is stopped on the basis of the internal lottery data generated through the processing of step S**51** and the rotation angle position detected through the step S**53**. If this processing is finished, the CPU **106** shifts the processing to step S**65**.

In step **65**, the CPU **106** determines whether the right reel stop button **34**R is operated or not. In this processing, if the CPU **106** determines that the right reel stop button **34**R is operated, the CPU **106** shifts the processing to step S**66**. If the CPU **106** determines that the right reel stop button **34**R is not operated, the CPU **106** finishes this sub routine.

Specifically, if the CPU **106** determines that it receives the signal supplied through the right reel stop button **34**R, the CPU **106** shifts the processing to step S**66**. On the other hand, if the CPU **106** determines that it does not receive the signal supplied through the operation of the right reel stop button **34**R, the CPU **106** finishes this sub routine.

In step S**66**, the CPU **106** executes the right reel stop processing. In this processing, the CPU **106** transmits a stop signal to the motor control device **117**. The CPU **106** stops the stepping motor **62**R through the motor driving circuit **118** to stop the right reel **26**R. At this time, the stepping motor **62**R is stopped on the basis of the internal lottery data generated through the processing of step S**51** and the signal indicating the rotation angle position detected through the processing of the step S**53**. If this processing is finished, the CPU **106** finishes this sub routine.

The processing shown in FIG. **20** is carried out in the specification value renewal processing routine called in step S**13**.

First, the CPU **106** transmits the data of the number of medals to be paid out (step S**71**). In this processing, the CPU **106** transmits the data of the number of medals paid out through the processing of step S**46**, that is, the game result to the server **80** through the interface circuit group **102**. After this processing is finished, the CPU **106** shifts the processing to step S**72**.

Subsequently, the CPU **106** determines whether it receives the data of the total result from the server **80** (step S**72**). As described later, the server **80** totalizes the data of the numbers of payout medals transmitted from two gaming machines to calculate a total result. The data of the total result thus calculated is transmitted to each gaming machine through the communication interface circuit **90**. The CPU **106** determines whether the data of the total result is received. If the CPU **106** determines that the data of the total result is received, the CPU **106** shifts the processing to step S**73**. If the CPU **106** determines that the data of the total result is not received, the CPU **106** determines again whether the data of the total result is received or not.

Subsequently, the CPU **106** executes specification value determining processing (step S**73**). In this processing, the CPU **106** refers to the specification value determining table recorded in the ROM **108** on the basis of the data of the total result received through the processing of step S**72** to determine the big-hit shift probability, the payout, and the payout rate. When this processing is finished, the CPU **106** shifts the processing to step S**74**.

Subsequently, the CPU **106** executes the specification value renewal processing (step S**74**). In this processing, the CPU **106** renews the respective data of the big-hit shift probability, the payout and the payout rate stored in the RAM **110** to the respective data of the big-hit shift probability, the payout, and the payout rate determined through the processing of the step S**73**, and stores the data thus renewed into the RAM **110**. Specifically, if the total of the numbers of payout medals is not less than a predetermined fixed number, the big-hit probability, the payout and the payout rate are increased. On the other hand, if the total of the numbers of payout medals is less than the predetermined fixed number, the big-hit probability, the payout, and the payout rate are reduced so as to be depreciated. After finishing this processing, the CPU **106** finishes this sub routine.

FIG. **21** shows the data communication between each of the two gaming machines **10**A, **10**B and the server **80**. In the following description, the hardware of the gaming machine **10**A is represented by adding the reference numerals with a character "A", and the hardware of the gaming machine **10**B is represented by adding the reference numerals with a character B.

First, the gaming machine **10**A executes gaming machine data transmission processing (step S**81**). In this processing, when the player operates the ten keys displayed on the display device **30** shown in FIG. **11**, the gaming machine **10**B with which the game player wants to play the game jointly is selected. That is, the gaming machine having a payout medal number with which the player wants to add his/her payout medal number is selected. A signal indicating that the gaming machine **10**B is selected is transmitted through the interface circuit group **102**A and the input-output bus **104**A to CPU **106**A. The CPU **106**A transmits the data of the gaming machine **10**A of the player concerned and the gaming machine **10**B selected by the player concerned to the server **80**. After finishing this processing, the CPU **106**A shifts the processing to step S**82**.

The server **80** executes gaming machine data reception processing (step S**91**). In this processing, the CPU **82** receives the data of the gaming machine **10**A of the player and the gaming machine **10**B selected by the player. After finishing this processing, the CPU **82** shifts the processing to step S**82**.

Subsequently, the server **80** transmits a gaming machine selection notifying signal (step S**92**). In this processing, the CPU **82** transmits to the gaming machine **10**B through the communication interface circuit **90** a signal indicating that there is a notification that the player of the gaming machine **10**A wishes to jointly play with the gaming machine **10**B. After finishing this processing, the CPU **82** shifts the processing to step S**93**.

The gaming machine **10**B receives the gaming machine selection notifying signal (step S**101**). In this processing, the CPU **106**B receives from the server **80** the signal indicating that there is a notification that the player of the gaming machine **10**A wishes to jointly play with the gaming machine **10**B. After finishing this processing, the CPU **106**B shifts the processing to step S**102**.

Subsequently, the gaming machine **10**B plays the game (step S**102**). In this processing, the processing shown in FIGS. **16** to **19** described above is carried out in the gaming machine **10**B. After finishing this processing, the CPU **106**B shifts the processing to step S**103**.

Subsequently, the CPU **106**B transmits the data of the game result (step S**103**). In this processing, the CPU **106**B transmits the data of the game result, that is, the data of the number of medals paid out for a predetermined period to the server **80** through the interface circuit group **102**B and the input-output bus **104**B. After finishing this processing, the CPU **106**B shifts the processing to step S**104**.

Like the gaming machine **10**B, the gaming machine **10**A plays the game (step S**82**). In this processing, the processing shown in FIGS. **16** to **19** described above is carried out. After finishing this processing, the CPU **106**A shifts the processing to step S**83**.

Subsequently, the CPU **106**A transmits the data of the game result (step S**83**). In this processing, the CPU **106**A transmits the data of the game result, that is, the data of the number of medals paid out for a predetermined period to the server **80** through the interface circuit group **102**A and the input-output bus **104**A. After finishing this processing, the CPU **106**A shifts the processing to step S**84**.

The server **80** receives the data of the game results (step S**93**). In this processing, the CPU **82** receives from the gaming machines **10**A and **10**B the data of the game results, that is, the data of the payout medal numbers of the gaming machines **10**A and **10**B, and records the data into the RAM **86**. After finishing this processing, the CPU **82** shifts the processing to step S**94**.

Subsequently, the server **80** totalizes the game results (step S**94**). In this processing, the CPU **82** adds the data of the payout medal numbers of the gaming machines **10**A and **10**B which are recorded in the RAM **86**, and records the total result data into the RAM **86**. After finishing this processing, the CPU **82** shifts the processing to step S**95**.

Subsequently, the server **80** transmits the total result data (step S**95**). In this processing, the CPU **82** transmits the total result data calculated in step S**94** to the gaming machines **10**A and **10**B through the communication interface circuits **90**A and **90**B. After finishing this processing, the CPU **82** immediately finishes this sub routine.

The gaming machine **10**A receives the total result data (step S**84**). In this processing, the CPU **106**A receives from the server **80** the total result data transmitted through the processing of the step S**95**, that is, the data of the sum of the numbers of medals paid out to the gaming machines **10**A and **10**B. After finishing this processing, the CPU **106**A shifts the processing to step S**85**.

Subsequently, the gaming machine **10**A determines the specification values (step S**85**). In this processing, on the basis of the total result data received in step S**84**, the CPU **106**A refers to the specification value determining table recorded in the ROM **108**A and determines the specification values to be altered. After finishing this processing, the CPU **106**A shifts the processing to step S**86**.

Subsequently, the gaming machine **10**A renews the specification values (step S**86**). In this processing, the CPU **106**A renews the probability data, the payout data and the payout rate data recorded in the RAM **110**A to the corresponding specification values determined through the processing of the step S**85**. After finishing this processing, the CPU **106**A immediately finishes this sub routine.

Like the gaming machine **10**A, the gaming machine **10**B also receives the total result data (step S**104**). In this processing, the CPU **106**B receives from the server **80** the total result data transmitted through the processing of the step S**95**, that is, the data of the sum of the numbers of medals paid out to the gaming machines **10**A and **10**B. After finishing this processing, the CPU **106**B shifts the processing to step S**105**.

Subsequently, the gaming machine **10**B determines the specification values (step S**105**). In this processing, on the basis of the total result data received in step S**104**, the CPU **106**B refers to the specification value determining table recorded in the ROM **108**B and determines the specification values. After finishing this processing, the CPU **106**B shifts the processing to step S**106**.

Subsequently, the gaming machine **10**B renews the specification (step S**106**). In this processing, the CPU **106**B renews the big-hit shift probability data, the payout data and the payout rate recorded in the RAM **110**B to the corresponding specification values determined through the processing of the step S**105**. After finishing this processing, the CPU **106**B immediately finishes this sub routine.

By carrying out the above-described processing shown in FIG. **21**, the specification value is renewed on the basis of the total of the number of medals paid out to the gaming machines **10**A and **10**B. Specifically, if the total number of the payout medals is not less than a predetermined fixed number, the specification values are increased. On the other hand, if the total number of payout medals is less than the predetermined fixed number, the specification values are reduced. Accordingly, even when the number of medals paid out to one of jointly-played gaming machines is large, the specification values would be reduced (or depreciated) if the number of medals paid out to the other gaming machine is small, so that the next game play must be carried out under a more unfavorable condition than the preceding game play. Conversely, even when the number of medals paid out for one of the jointly-played gaming machines is small, the specification values would be increased (or improved) if the number of medals paid out to the other gaming machine is large, so that the next game play could be carried out under a more favorable condition that the preceding game play.

In the above embodiment, the gaming machines are designed so that the operations are carried out for the detailed setting by using the touch sensors **56**. However, this invention is not limited to this mode, and an operating portion such as a switch or the like may be used in place of the touch sensor.

In the above embodiment, the slot machine with which the player operates the stop buttons so as to stop the reels is described. However, the present invention is not limited to this mode. The present applies to a slot machine for the casino such that the reels may automatically stop after they rotate for a certain period of time. Although the slot machine provided with mechanical reels is described in the above embodiment, it should be understood that the present invention may apply to the video slot machine.

Furthermore, in the above embodiment, a gaming machine which can be selected as a jointly-playing gaming machine (i.e., a partner gaming machine) is limited to only one gaming machine **10**B. However, this invention is not limited to this mode, and plural gaming machines may be selected as partner gaming machines.

Furthermore, in the above embodiment, it is assumed that the player of a gaming machine that is requested to be jointly played necessarily participates in the joint game play irrespective of player's intention. However, this invention is not limited to this mode, and the gaming machine may be designed so that the joint player can reject the offer for playing the game jointly on the player's decision. For example, the gaming machine may be provided with an operating portion such as a switch so that the player may reject the offer.

Furthermore, in the above embodiment, the player is allowed to freely select a gaming machine with which the player wants to totalize the game results (i.e., a partner gaming machine). However, this invention is not limited to this mode, and it may be modified so that a gaming machine with which the game results are totalized (i.e., a partner gaming machine) has been already determined when the player plays the game. For example, a partner gaming

machine(s) is/are predetermined at the manufacturing time thereof, or determined on the manager side of the arcade.

In the above embodiment, slot machines are used as the gaming machines. However, this invention is not limited to the slot machines, but it may be applied to pachinko machines or other types of gaming machines.

Furthermore, in the above embodiment, the server totalizes the game results, and transmits the total result to each gaming machine, however, this invention is not limited to this mode. For example, it may be modified so that the server merely receives the game result of each gaming machine and transmits the game result to the game result to the partner gaming machine(s), and the total of the game results is calculated at each gaming machine.

Furthermore, the specification value determining table shown in FIG. **7** is used, and the total of the payout medal numbers are associated with each other. However, this invention is not limited to this mode, and the specification values may be determined by using tables shown in FIGS. **23**A and **23**B. That is, FIG. **23**A shows a table indicating the total result and the change of the specification values based on the total result, and FIG. **23**B shows a table indicating the set number and the specification values (the big-hit shift probability, the payout, and the payout rate) for each set number. As the set number decreases, the specification values are more advantageous to the player. For example, it is assumed that the set number for the specification values is originally set to "8", and also a total result of "A**5** to A**6**" is achieved when a game play is played jointly. At this time, the change is equal to "+2" as shown in FIG. **23**A, and thus the set number of the specification values is enhanced to "6". The specification values may be determined in the manner as described above.

Furthermore, in the above embodiment, the specification values are determined by totalizing the number of medals paid out for a predetermined time period. However, this invention is not limited to this mode. For example, there may be used a mode for predetermining a score for each combination of symbols, and determining the specification values on the basis of comparison of the scores for combinations of symbols achieved after one game is played. Alternatively, there may be used a mode of determining the specification values on the basis of the total of results of a sub game different from the slot game or on the basis of comparison of game results achieved by other methods.

According to this invention, a game result of one player and a game result of other player may be totalized, and the specification values may be changed on the basis of the total result. Therefore, even when the game result of the one player is bad, the specification values may be increased or improved because the game result of the other player could be good. Accordingly, the player may have a sense of anticipation to the game although the his game result is bad. Furthermore, even when the game result of the player is good, the specification values may be reduced or depreciated because the game result of the other player could be bad. In order to avoid such situation, the players do their best to achieve a good game result. Accordingly, exciting and thrilling games can be provided.

What is claimed is:

**1**. A first gaming machine for transmitting/receiving data to/from a server, comprising:

a specification value setting device for setting at least one specification value as a control condition for game control;

a transmitting device for transmitting data of a game result to the server;

a gaming machine determining device for determining a second gaming machine operated by a co-player;

a total result data receiving device for receiving from the server data of a total game result achieved by the first gaming machine and the second gaming machine based on the data of the game result transmitted by the transmitting device;

a specification value determining device for determining a specification value based on the data of the total game result received by the total result data receiving device; and

a specification value renewing device for renewing to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

**2**. The first gaming machine according to claim **1**, wherein the gaming machine determining device determines a plurality of gaming machines including the second gaming machine.

**3**. The first gaming machine according to claim **2**, wherein the total result data receiving device receives from the server data of a total game result and wherein the total game result is achieved by the plurality of gaming machines including the first and the second gaming machines.

**4**. A first gaming machine for transmitting/receiving data to/from a second gaming machine operated by a co-player, comprising:

a specification value setting device for setting at least one specification value as a control condition for game control;

a gaming machine determining device for determining the second gaming machine;

a receiving device for receiving from the second gaming machine data of a game result achieved by the second gaming machine;

a game result totalizing device for totalizing a game result achieved by the first gaming machine and the game result achieved by the second gaming machine based on the data of the game result of the second gaming machine received by the receiving device so as to calculate a total result;

a specification value determining device for determining a specification value based on the total result calculated by the game result totalizing device; and

a specification value renewing device for renewing to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

**5**. The first gaming machine according to claim **4**, wherein the gaming machine determining device determines a plurality of gaming machines operated by co-players including the second gaming machine and wherein the first gaming machine transmits and receives data to and from the plurality of gaming machines.

**6**. The first gaming machine according to claim **5**, wherein the receiving device receives data of game results achieved by the plurality of gaming machines including the second gaming machine and wherein the game result totalizing device totalizes a game result achieved by the first gaming machine and the game results achieved by the plurality of gaming machines including the second gaming machines based on the data of the game results of the plurality of gaming machines received by the receiving device so as to calculate the total result.

**7**. The first gaming machine according to claim **1**, further comprising a gaming machine selecting device for selecting the second gaming machine based on an operation by a game

player, wherein the gaming machine determining device determines the second gaming machine based on a selection result by the gaming machine selecting device.

**8**. A server for transmitting/receiving data to/from a first gaming machine operated by a game player and a second gaming machine operated by a co-player, comprising:

a specification value setting device for setting at least one specification value as a control condition for game control with the first gaming machine;

a game result data receiving device for receiving data of a game result transmitted from the first gaming machine and data of a game result transmitted from the second gaming machine;

a game result totalizing device for totalizing the game result of the first gaming machine and the game result of the second gaming machine on the basis of the data of the game result transmitted from the first gaming machine and the data of the game result transmitted from the second gaming machine so as to calculate a total result wherein the data of the game results are received by the game result data receiving device;

a specification value determining device for determining a specification value based on the total result calculated by the game result totalizing device; and

a determined specification value transmitting device for transmitting the specification value determined by the specification value determining device to the first gaming machine and the second gaming machine.

**9**. The server according to claim **8**, wherein the server transmits and receives data to and from a plurality of gaming machines including the first and the second gaming machines.

**10**. The server according to claim **9**, wherein the game result data receiving device receives data of game results transmitted from the plurality of gaming machines including the first and the second gaming machines.

**11**. A program stored on media for directing a computer of a first gaming machine for transmitting/receiving data to/from a server to perform:

setting at least one specification value as a control condition for game control with the first gaming machine;

transmitting data of a game result to the server;

determining a second gaming machine operated by a co-player;

receiving from the server data of a total result totalizing the game result achieved by the first gaming machine and a game result achieved by the second gaming machine;

determining a specification value based on the data of the total result; and

renewing to replace the set specification value with the determined specification value.

**12**. The program according to claim **11**, wherein the computer of the first gaming machine performs determining at least one gaming machine operated by another co-player other than the second gaming machine.

**13**. The program according to claim **12**, wherein the computer of the first gaming machine performs receiving from the server data of the total result totalizing a game result achieved by the at least one gaming machine other than the second gaming as well as the game results achieved by the first and the second gaming machines.

**14**. The first gaming machine according to claim **1**, wherein the specification value comprises a big-hit shift probability, a payout, a payout rate, or a combination thereof.

**15**. A method of renewing at least one specification value for a first gaming machine for transmitting/receiving data to/from a server, comprising:

setting a first specification value as a control condition for game control with the first gaming machine;

determining a second gaming machine operated by a co-player;

performing a game;

transmitting data of a game result to the server;

receiving from the server data of a total result totalizing the game result achieved by the first gaming machine and a game result achieved by the second gaming machine;

determining a second specification value based on the data of the total result; and

renewing the specification value from the first specification value to the second specification value.

**16**. A method for setting a value associated with an award obtainable based on a game result from subsequent play of a game on a first gaming machine, comprising:

determining a total game result based on a first game result from prior play of a game on the first gaming machine and a second game result from prior play of a game on a second gaming machine; and

setting the value in accordance with the determined total game result.

**17**. The method according to **16**, wherein:

the value associated with the obtainable award is one of (i) a probability associated with an obtainable big prize payout, (ii) an amount associated with an obtainable regular payout based on a game result from subsequent play of a game on the first gaming machine and a game result from subsequent play of a game on the second gaming machine, and (iii) a rate associated with the obtainable regular payout.

**18**. The method according to **16**, wherein:

the determining of the total game result includes summing the first result and the second result.

**19**. The method according to **16**, wherein:

the prior played game on the first gaming machine and the prior played game on the second gaming machine are a same type game; and

the value is set for subsequent play of the same type game on the first gaming.

**20**. The method according to **16**, wherein:

setting the value includes modifying a prior value associated with the award obtainable based on the game result from the prior play of the game on the first gaming machine.

**21**. The method according to **20**, wherein:

the prior value is modified to be (i) less favorable to a player of the first gaming machine, if an amount of the determined total game result is less than a threshold amount, and (ii) more favorable to the player of the first gaming machine, if the amount of the determined total game result is more than the threshold amount.

**22**. The method according to **21**, wherein:

the threshold amount is a highest amount of a range of amounts extending from a lowest amount of the range to the highest amount; and

the prior value is modified to be less favorable to the player of the first gaming machine, if the amount of the determined total game result is within the range of amounts.

**23**. The method according to **16**, further comprising:

selecting the second gaming machine prior to determining the total game result.

**24**. The method according to **23**, wherein:

the second gaming machine is selected by the first gaming machine in accordance with a predefined selection criteria.

**25**. The method according to **23**, further comprising:

accepting, by a player of the second gaming machine, the selection of the second gaming machine by a player of the first gaming machine, prior to determining the total game result;

wherein the determining is performed based on the player of the second gaming machine accepting the selection of the second gaming machine.

**26**. The method according to **16**, wherein the value is a first value, and further comprising:

setting a second value associated with an award obtainable based on a game result from subsequent play of a game on the second gaming machine, in accordance with the determined total game result.

**27**. The method according to **16**, further comprising:

storing a table including predefined different values associated with the award obtainable based on different game results from play of a game on the first gaming machine, for different total game results;

wherein the value is set also in accordance with the stored table.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 7,338,363 B2
APPLICATION NO. : 10/686567
DATED : March 4, 2008
INVENTOR(S) : Kazuo Okada

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

In Column 23, Line 61 (Claim 1), delete “transmitting/receiving” and insert --transmitting and receiving--;
In Line 62 (Claim 1), delete “to/from” and insert --to and from--;
In Line 63 (Claim 1), delete “for setting” and insert --that sets--; and
In Line 66 (Claim 1), delete “for transmitting” and insert --that transmits--.

In Column 24, Line 1 (Claim 1), delete “for determining” and insert --that determines--;
In Line 3 (Claim 1), delete “for receiving” and insert --that receives--;
In Line 8 (Claim 1), delete “for determining” and insert --that determines--;
In Line 12 (Claim 1), delete “for renewing” and insert --that renews--;
In Line 25 (Claim 4), delete “transmitting/receiving” and insert --transmitting and receiving--;
In Line 26 (Claim 4), delete “to/from” and insert --to and from--;
In Line 28 (Claim 4), delete “for setting” and insert --that sets--;
In Line 31 (Claim 4), delete “for determining” and insert --that determines--;
In Line 33 (Claim 4), delete “for receiving” and insert --that receives--;
In Line 36 (Claim 4), delete “for totalizing” and insert --that totalizes--;
In Line 42 (Claim 4), delete “for determining” and insert --that determines--;
In Line 45 (Claim 4), delete “for renewing” and insert --that renews--; and
In Line 66 (Claim 7), delete “for selecting” and insert --that selects--.

In Column 25, Line 4 (Claim 8), delete “transmitting/receiving” and insert --transmitting and receiving--, then delete “to/from” and insert --to and from--;
In Line 7 (Claim 8), delete “for setting” and insert --that sets--;
In Line 10 (Claim 8), delete “for receiving” and insert --that receives--;
In Line 14 (Claim 8), delete “for totalizing” and insert --that totalizes--;
In Line 22 (Claim 8), delete “for determining” and insert --that determines--;
In Lines 25-26 (Claim 8), delete “for transmitting” and insert --that transmits--;

Signed and Sealed this
Tenth Day of December, 2019

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)** Page 2 of 2
**U.S. Pat. No. 7,338,363 B2**

In Line 38 (Claim 11), delete "for transmitting/receiving" and insert --capable of transmitting and receiving--; and
In Line 39 (Claim 11), delete "to/from" and insert --to and from--.

In Column 26, Line 2 (Claim 15), delete "for transmitting/receiving" and insert --capable of transmitting and receiving--; and
In Line 3 (Claim 15), delete "to/from" and insert --to and from--.

**Appx83**



US007497777B2

(12) **United States Patent**
**Machida**

(10) **Patent No.: US 7,497,777 B2**
(45) **Date of Patent: Mar. 3, 2009**

(54) **GAMING MACHINE AND COMPUTER-READABLE PROGRAM PRODUCT**

(75) Inventor: **Matsuzo Machida**, Tokyo (JP)

(73) Assignee: **Aruze Corp.**, Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 958 days.

(21) Appl. No.: **10/869,875**

(22) Filed: **Jun. 18, 2004**

(65) **Prior Publication Data**

US 2004/0259634 A1 Dec. 23, 2004

(30) **Foreign Application Priority Data**

Jun. 19, 2003 (JP) .......................... P2003-175623

(51) **Int. Cl.**
***G06F 17/00*** (2006.01)

(52) **U.S. Cl.** .......................................................... **463/9**

(58) **Field of Classification Search** ............. 463/40–42, 463/9; 705/1

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,738,451 A * 4/1988 Logg ............................ 463/2
5,390,937 A * 2/1995 Sakaguchi et al. ............. 463/7
6,375,571 B1 4/2002 Ohnuma et al.
6,398,650 B1 * 6/2002 Horigami et al. .............. 463/43
6,585,599 B1 * 7/2003 Horigami et al. .............. 463/43
6,723,822 B2 * 4/2004 Shirai et al. ................. 528/195
6,807,521 B1 * 10/2004 Kurosawa et al. ............. 703/22
6,860,807 B2 * 3/2005 Tsuchida ....................... 463/7
6,884,169 B2 * 4/2005 Tsuchida et al. .............. 463/31
7,001,271 B2 * 2/2006 Nakazawa et al. ............. 463/7
7,033,275 B1 * 4/2006 Endo et al. .................... 463/33
7,223,174 B2 * 5/2007 Machida ....................... 463/43
7,309,288 B2 * 12/2007 Machida ....................... 463/43

(Continued)

FOREIGN PATENT DOCUMENTS

JP 2000-113206 4/2000

(Continued)

OTHER PUBLICATIONS

Chinese Office Action with English language Translation dated Mar. 24, 2006.

(Continued)

*Primary Examiner*—Ronald Laneau
(74) *Attorney, Agent, or Firm*—McGinn IP Law Group, PLLC

(57) **ABSTRACT**

In a machine main unit **1**, the execution order of actions of all characters is calculated and the calculated execution order is displayed on a screen. The execution order of actions of the characters is calculated based on stored skill parameters and possessed item parameters. Further, if the action of an ally character is executed in response to entry operation, when a predetermined coordination condition for a different ally character from the ally character whose action is executed is satisfied, the action of the ally character is executed and the action of the different ally character is executed without following the action execution order.

**22 Claims, 61 Drawing Sheets**



U.S. PATENT DOCUMENTS

2002/0142817 A1* 10/2002 Nakazawa et al. ............. 463/7
2002/0142833 A1* 10/2002 Tsuchida et al. .............. 463/30
2004/0176163 A1* 9/2004 Ishihata et al. ................ 463/30
2004/0259613 A1* 12/2004 Machida ........................ 463/1
2004/0259617 A1* 12/2004 Machida ........................ 463/5
2004/0259636 A1* 12/2004 Machida ...................... 463/30
2005/0014543 A1* 1/2005 Itoi et al. ....................... 463/8

FOREIGN PATENT DOCUMENTS

JP 2001-029655 2/2001
JP 2002-200334 7/2002
JP 2002-292141 10/2002

OTHER PUBLICATIONS

Korean Office Action dated Nov. 18, 2005, with partial English translation.
Chinese Office Action dated Nov. 17, 2006 with Englsih translation.
Japanese Office Action dated Dec. 18, 2007, with English language translation.

* cited by examiner

FIG. 1



FIG. 2

1
21
CPU
24
IMAGE PROCESSING SECTION
25
IMAGE OUTPUT SECTION
16
SCREEN
22
ROM
26
AUDIO PROCESSING SECTION
27
AUDIO OUTPUT SECTION
17L, 17R
SPEAKER
23
RAM
28
DECODER
29
DVD-ROM DRIVE
31
DVD-ROM
30
COMMUNICATION INTERFACE
4
CONTROLLER
32
MEMORY CARD



FIG. 3A

TITLE SCREEN
SHADOW HEARTS
41
NEW GAME
CONTINUE
16

FIG. 3B

WORLD MAP
42e
42c
42d
A COUNTRY
CITY E
CITY D
CITY C
B COUNTRY
CITY A
41
CITY B
16
42a
42b

FIG. 4
MAIN GAME PROCESSING
ST1
NEW GAME SELECTED?
NO
YES
ST2
DISPLAY PROLOG AND GAME CONTENT
ST3
SET PREVIOUS GAME END TIME
DISPLAY WORLD MAP
ST4
3
ST5
SUB-MAP SELECTED?
NO
YES
ST20
MENU DISPLAY REQUEST?
NO
ST21
YES
PERFORM MENU DISPLAY AND PROCESSING
3
ST6
START ACTION ON SUB-MAP
ST7
ENEMY ENCOUNTERED?
NO
YES
ST8
BATTLE PROCESSING
ST9
EVENT OCCURRED?
NO
YES
ST10
ESCAPED FROM ENEMY?
YES
NO
ST11
WIN?
NO
YES
ST12
ADD POINTS OF EXPERIENCE VALUE, ETC., AND GIVE ITEM, MONEY, ETC.
ST13
RAISE LEVEL IN RESPONSE TO EXPERIENCE VALUE
ST14
ALL DIE?
NO
ST15
YES
GAME OVER
1
DISPLAY MOVIE IN RESPONSE TO CONDITION
ST16
ST17
SELECTED SUB-MAP REQUEST CONDITION CLEARED?
NO
YES
ST18
TRANSITION TO ENDING?
NO
YES
ST19
DISPLAY ENDING
1
END



FIG. 5

BATTLE PROCESSING
ST30
SET CHARACTER PARAMETERS AND CALCULATE AND SET TURN INTERVAL VALUE
ST31
DISPLAY BATTLE SCENE START SCREEN
ST32
TURN ORDER PROCESSING
ST33
IS CHARACTER WITH COMMAND SELECTION MADE EFFECTIVE ENEMY CHARACTER?
YES
ST34
PERFORM BATTLE AUTOMATIC PROCESSING
NO
ST35
COMMAND PROCESSING
ST36
UPDATE TURN ORDER EACH TIME CHARACTER TAKES ACTION
ST37
PERFORM TURN ORDER UPDATE DISPLAY PROCESSING
ST38
BATTLE TERMINATION CONDITION SATISFIED?
NO
YES
ST39
PERFORM SOUL POINT ADDITION PROCESSING
RETURN



FIG. 6



FIG. 7A

INDIVIDUAL SKILLS OF ALLY CHARACTER A

| LV (CHARACTER LEVEL) | HP (HIT POINTS) | MP (SPELL POINTS) | SP (SANITY POINTS) | STR (PHYSICAL OFFENSIVE POWER) | VIT (PHYSICAL DEFENSIVE POWER) | AGL (AGILITY) | INT (SPELL OFFENSIVE POWER) | POW (SPELL DEFENSIVE POWER) | LUC (LUCK) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 200 | 10 | 21 | 20 | 18 | 20 | 12 | 16 | 15 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| 20 | 2776 | 176 | 40 | 43 | 40 | 43 | 31 | 35 | 36 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| 50 | 6844 | 437 | 70 | 79 | 74 | 78 | 62 | 65 | 69 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

FIG. 7B

INDIVIDUAL SKILLS OF ALLY CHARACTER B

| LV (CHARACTER LEVEL) | HP (HIT POINTS) | MP (SPELL POINTS) | SP (SANITY POINTS) | STR (PHYSICAL OFFENSIVE POWER) | VIT (PHYSICAL DEFENSIVE POWER) | AGL (AGILITY) | INT (SPELL OFFENSIVE POWER) | POW (SPELL DEFENSIVE POWER) | LUC (LUCK) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 100 | 20 | 4 | 8 | 9 | 16 | 21 | 20 | 16 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| 20 | 1936 | 275 | 9 | 27 | 27 | 35 | 41 | 39 | 37 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| 50 | 4834 | 678 | 16 | 58 | 56 | 65 | 72 | 70 | 71 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

FIG. 8

| ACTION TYPE | EXECUTION COMMAND CORRECTION VALUE |
|---|---|
| DEFAULT | 3 |
| PHYSICAL ATTACK | 3 |
| SPELL (AID) | 2.5 |
| SPELL (RECOVERY) | 3 |
| SPELL (SMALL ATTACK) | 3 |
| SPELL (MEDIUM ATTACK) | 3.5 |
| SPELL (LARGE ATTACK) | 4 |
| PROPER TECHNIQUE | 4.5 |
| ITEM (RECOVERY) | 3 |
| ITEM (AID) | 2.5 |
| DEFENSE (USUAL) | 2 |
| DEFENCE (HOLD ON) | 2.5 |
| ESCAPE | 3 (AT FAILURE TIME) |

FIG. 9

TURN ORDER PROCESSING
ST41
COMBO FORMATION FLAG ON?
NO
YES
ST42
TURN ORDER INTERRUPT PROCESSING
ST43
TURN ORDER DETERMINATION PROCESSING
ST44
DISPLAY TURN ORDER ON SCREEN
ST45
MAKE EFFECTIVE COMMAND SELECTION FOR CHARACTER
RET



FIG. 10

TURN ORDER INTERRUPT PROCESSING
IS NUMBER OF CHARACTERS TO BE COORDINATED MORE THAN ONE?
ST51
NO
YES
PERFORM CHARACTER SELECTION PROCESSING
ST52
PERFORM TURN ORDER FORCIBLE INTERRUPT PROCESSING
ST53
MAKE EFFECTIVE COMMAND SELECTION FOR CHARACTER
ST54
RETURN



FIG. 11

119
118
D
D
a
c
A
B
b
C
116
115
a
b
c
117
CHARA A
CHARA B
CHARA C
45
A
B
D
C
44
111
112
114
113
120
16





FIG. 12
TURN ORDER DETERMINATION PROCESSING
PERFORM TURN INTERVAL VALUE COMPARISON PROCESSING
ST71
PERFORM TURN ELAPSED TIME CALCULATION PROCESSING
ST72
DO SOME CHARACTERS HAVE THE SAME TURN INTERVAL VALUE?
ST73
NO
4
YES
ALLY AND ENEMY CHARACTERS INCLUDED?
ST74
NO
ARE CHARACTERS HAVING THE SAME TURN INTERVAL VALUE ALLY CHARACTERS?
ST77
NO
YES
MORE THAN ONE ALLY CHARACTER INCLUDED?
ST70
YES
YES
JUST AFTER BATTLE STARTS?
ST78
NO
NO
ST75
DETERMINE TURN ORDER SO THAT ALLY CHARACTER TAKES PRECEDENCE OVER ANY OTHER CHARACTER
YES
ST79
DETERMINE TURN ORDER ACCORDING TO LIST ORDER
DETERMINE TURN ORDER BASED ON COMPARISON RESULT OF TURN ELAPSED TIMES
ST80
4
PERFORM TURN ORDER DECISION PROCESSING
ST76
RET

FIG. 13A

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA1 |
| ALLY CHARACTER B | AB1 |
| ALLY CHARACTER C | AC1 |
| ALLY CHARACTER D | AD1 |
| ENEMY CHARACTER A | BA1 |
| ENEMY CHARACTER B | BB1 |
| ENEMY CHARACTER C | BC1 |

FIG. 13B

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA2 |
| ALLY CHARACTER B | AB1 |
| ALLY CHARACTER C | AC1 |
| ALLY CHARACTER D | AD1 |
| ENEMY CHARACTER A | BA1 |
| ENEMY CHARACTER B | BB1 |
| ENEMY CHARACTER C | BC1 |

FIG. 13C

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA2 |
| ALLY CHARACTER B | AB2 |
| ALLY CHARACTER C | AC1 |
| ALLY CHARACTER D | AD1 |
| ENEMY CHARACTER A | BA1 |
| ENEMY CHARACTER B | BB1 |
| ENEMY CHARACTER C | BC1 |

FIG. 14

COMMAND PROCESSING
ST201
ACTION SELECTION COMMAND?
NO
YES
ACTION SELECTION PROCESSING
ST202
ST203
COMBINATION COMMAND?
NO
YES
COMBINATION MOVE PROCESSING
ST204
ST205
ITEM COMMAND?
NO
5
YES
JUDGMENT PROCECSSING
ST206
RET



FIG. 15

5
ST207
DEFEND COMMAND?
NO
YES
ST208
PERFORM DEFENSE PROCESSING
ST209
PERFORM ESCAPE PROCESSING
RET

FIG. 16

119
118
D
D a c A B b C
HP ○○
MP ○○
CHARA D
114
D
ATTACK
HARD HIT, · · ·
SPELL
ITEM
DEFEND
ESCAPE
45
44
16



*FIG. 17*

COMBINATION MOVE PROCESSING
ST281
DISPLAY MOVE TARGET SELECTION SCREEN
ST282
PERFORM MOVE TARGET SELECTION COMMAND ACCEPTANCE PROCESSING
ST283
DISPLAY MOVE METHOD SELECTION SCREEN
ST222
COMMAND ACCEPTANCE PROCESSING
ST285
ENDURE COMMAND?
NO
YES
ST286
ADD 2 TO HOLD-OUT POWER
ST287
SUBTRACT 2 FROM PHYSICAL OFFENSIVE POWER
ST288
UPDATE CHARACTER POSITION INFORMATION
ST289
PERFORM EFFECT DISPLAY CONTROL PROCESSING
RET

FIG. 18

119 118
A A B C b D a c
HP ○○
MP ○○
CHARA A
111
A
ALLY B
ALLY C
ALLY D
44
45
16

FIG. 19

119 118
A A B C b D a c
113 111
HP ○○
MP ○○
CHARA A
C A
INTACT
ENDURE
44
45
16

FIG. 20

| CHARACTER | POSITION INFORMATION | | |
|---|---|---|---|
| | X | Y | Z |
| ALLY CHARACTER A | XA1 | YA1 | ZA1 |
| ALLY CHARACTER B | XA2 | YA2 | ZA2 |
| ALLY CHARACTER C | XA3 | YA3 | ZA3 |
| ALLY CHARACTER D | XA4 | YA4 | ZA4 |
| ENEMY CHARACTER A | XB1 | YB1 | ZB1 |
| ENEMY CHARACTER B | XB2 | YB2 | ZB2 |
| ENEMY CHARACTER C | XB3 | YB3 | ZB3 |

FIG. 21



FIG. 22
119
118
A
A
B
C
b
D
a
c
HP
MP
CHARA A
111
A
ATTACK
COMBINATION
SPELL
ITEM
DEFEND
ESCAPE
45
44
16
FIG. 23
119
118
B
B
C
b
D
a
c
A
HP
MP
CHARA B
113
B
ALLY A
ALLY C
ALLY D
44
45
16

FIG. 24

119
118
C
C b D a c A B
116
117
115
a
b
c
A B D
C
120
111
112
114
113
16

FIG. 25

119
118
C
C b D a c A B
113
C
HP ○○
MP ○○
CHARA C
ALLY A
ALLY B
ALLY D
44
45
16

FIG. 26



FIG. 27

JUDGMENT PROCESSING
ST221
DISPLAY ACTION SELECTION SCREEN
ST222
COMMAND ACCEPTANCE PROCESSING
ST223
DISPLAY ACTION TARGET SELECTION SCREEN
ST224
PERFORM ACTION TARGET SELECTION COMMAND ACCEPTANCE PROCESSING
ST225
JUDGMENT RING DETERMINATION PROCESSING
ST226
JUDGMENT RING DECISION PROCESSING
ST227
CONSECUTIVE ATTACK SET PROCESSING
ST228
UPDATE HP, MP, AND SP
ST229
DOES PARAMETER UPDATE CONDITION BASED ON SPECIAL ITEM OR SPECIAL TECHNIQUE HOLD TRUE?
NO
YES
ST230
UPDATE SKILL PARAMETERS OF AGL, LUC, ETC.
ST231
UPDATE STATUS
ST232
PERFORM EFFECT IMAGE DISPLAY PROCESSING
RETURN



FIG. 28

119
118
D
D
a
c
A
B
b
C
46
a
b
c
D
ENEMY a
ENEMY b
ENEMY c
115
116
117
45
44
114
16



FIG. 29

COMMAND ACCEPTANCE PROCESSING
ST55
IS SP OF SELECTED CHARACTER 0?
YES
NO
ST57
DID ANY CHARACTER TAKE ACTION?
NO
YES
ST58
TEMPORARY TURN ORDER DISPLAY PROCESSING
ST56
PERFORM CHARACTER RUNAWAY PROCESSING
ATTACK TARGET RANGE DISPLAY PROCESSING
ST59
ST60
COMMAND DECISION OPERATION PERFORMED?
NO
YES
RET



FIG. 30

SCREEN AT COMMAND DETERMINATION TIME (JUDGMENT RING DISPLAY)

FIG. 31



FIG. 32

MAIN CHARACTER A
117
116
115
100
104
102
113
Good
112
103
101
114
111
HP MP SP
MAIN CHARACTER A 34/34 19/19 21/22
MAIN CHARACTER B 20/20 33/33 3/4
MAIN CHARACTER C 25/25 30/30 11/12
MAIN CHARACTER D 30/30 30/30 4/5
16

FIG. 33

MAIN CHARACTER A
117
116
101
100
115
104
Perfect
113
102
112
103
114
111
HP MP SP
MAIN CHARACTER A 34/34 19/19 21/22
MAIN CHARACTER B 20/20 33/33 3/4
MAIN CHARACTER C 25/25 30/30 11/12
MAIN CHARACTER D 30/30 30/30 4/5
16



FIG. 34

FIG. 35

SCREEN ON WHICH JUDGMENT RING IS BROKEN TO PIECES



FIG. 36

DISPLAY SCREEN EXAMPLE AT BATTLE TIME ACTION START SCREEN

FIG. 37

DISPLAY SCREEN EXAMPLE AT BATTLE TIME ACTION TERMINATION SCREEN

117
116
115
113
112
114
111
16

FIG. 38

JUDGMENT RING DETERMINATION PROCSESSING
ST91
DETERMINE TIMING AREA RANGES FROM SETUP TABLE
ST92
CORRECT TIMING AREA RANGES, ROTATION SPEED AND NUMBER OF REVOLUTIONS OF ROTATION BAR, AND JUDGMENT RING SIZE IN RESPONSE TO JUDGMENT RING CORRECTION PARAMETERS
ST93
PERFORM JUDGMENT RING VARYING DISPLAY PROCESSING
RETURN

FIG. 39

| CHARACTER | ATTACK | ATTACK SKILL | FIRST TIMING AREA [° ] | | | SECOND TIMING AREA [° ] | | | THIRD TIMING AREA [° ] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | TOP | TERMINATION | 120% | TOP | TERMINATION | 120% | TOP | TERMINATION | 120% |
| ALLY CHARACTER A | SOFT HIT | 6 | 45 | 135 | 30 | 180 | 247 | 23 | 292 | 337 | 15 |
| | NORMAL HIT | 28 | 45 | 115 | 23 | 180 | 231 | 17 | 292 | 325 | 11 |
| | HARD HIT | 50 | 45 | 100 | 18 | 180 | 219 | 13 | 292 | 316 | 8 |
| ALLY CHARACTER B | SOFT HIT | 3 | 50 | 125 | 25 | 157 | 205 | 16 | 247 | 282 | 12 |
| | NORMAL HIT | 20 | 50 | 105 | 18 | 157 | 193 | 12 | 247 | 273 | 9 |
| | HARD HIT | 37 | 50 | 90 | 13 | 157 | 177 | 7 | 247 | 261 | 5 |
| ALLY CHARACTER C | SOFT HIT | 21 | 22 | 90 | 23 | 202 | 260 | 19 | 270 | 310 | 13 |
| | NORMAL HIT | 38 | 22 | 70 | 16 | 202 | 240 | 14 | 270 | 298 | 9 |
| | HARD HIT | 42 | 22 | 55 | 11 | 202 | 233 | 10 | 270 | 289 | 6 |

FIG. 40

(SPECIAL TABLE)

| ALLY CHARACTER | SPECIAL SKILL | SKILL VALUE | FIRST TIMING AREA [° ] | | | SECOND TIMING AREA [° ] | | | THIRD TIMING AREA [° ] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | START ANGLE | END ANGLE | 120% AREA | START ANGLE | END ANGLE | 120% AREA | START ANGLE | END ANGLE | 120% AREA |
| A | ATTACK SPELL 1 | 99 | 45 | 180 | 20 | | | | | | |
| | ATTACK SPELL 2 | 18 | 60 | 165 | 12 | 220 | 265 | 8 | | | |
| | ATTACK SPELL 3 | 34 | 30 | 85 | 10 | 195 | 230 | 13 | 285 | 310 | 3 |
| B | RECOVERY SPELL 1 | 19 | 45 | 315 | 31 | | | | | | |
| | RECOVERY SPELL 2 | 38 | 60 | 180 | 18 | 270 | 350 | 12 | | | |
| | RECOVERY SPELL 3 | 50 | 45 | 120 | 12 | 135 | 186 | 8 | 270 | 310 | 5 |
| C | | | | | | | | | | | |

FIG. 41

(ITEM TABLE)

| ALLY CHARACTER | USED ITEM | USED ITEM INDIVIDUAL SKILL | FIRST TIMING AREA [° ] | | | SECOND TIMING AREA [° ] | | | THIRD TIMING AREA [° ] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | START ANGLE | END ANGLE | 120% AREA | START ANGLE | END ANGLE | 120% AREA | START ANGLE | END ANGLE | 120% AREA |
| COMMON | ITEM A | 100 | 45 | 315 | 34 | | | | | | |
| | ITEM B | 500 | 135 | 225 | 11 | | | | | | |
| | ITEM C | COMPLETE RECOVERY | 45 | 130 | 7 | 215 | 285 | 10 | | | |

FIG. 42

OPPOSITE CHARACTER DAMAGE AMOUNT = ASSIGNMENT VALUE x SP REMAINING AMOUNT CORRECTION VALUE x CHARACTER INDIVIDUAL SKILL x ATTACK SKILL x JUDGMENT RING CORRECTION VALUE

| ATTACK TIME | ASSIGNMENT VALUE |
|---|---|
| FIRST | 0.2 |
| SECOND | 0.3 |
| THIRD | 0.5 |

FIG. 43

AT PHYSICAL ATTACK TIME (AT COMMAND DETERMINATION TIME)

FIG. 44

AT PHYSICAL ATTACK TIME (AFTER COMMAND DETERMINATION)





FIG. 45A

FIG. 45B

FIG. 46A

OPPOSITE CHARACTER DAMAGE AMOUNT WHEN ATTACK SPELL IS USED
= ASSIGNMENT VALUE x CHARACTER INDIVIDUAL SKILL x SKILL VALUE
OF USED SPECIAL SKILL x JUDGMENT RING CORRECTION VALUE

FIG. 46B

RECOVERY VALUE WHEN RECOVERY SPELL IS USED
= ASSIGNMENT VALUE x SKILL VALUE OF USED SPECIAL
SKILL x JUDGMENT RING CORRECTION VALUE

| SPECIAL SKILL USE TIME | ASSIGNMENT VALUE |
|---|---|
| FIRST | 0.2 |
| SECOND | 0.3 |
| THIRD | 0.5 |

FIG. 47

JUDGMENT RING CORRECTION PARAMETER TABLE

| TYPE | COMPONENT | TIMING AREA RANGE | | ROTATION SPEED | | SIZE | | NUMBER OF REVOLUTIONS | |
|---|---|---|---|---|---|---|---|---|---|
| | | INDIVIDUAL | ALL | INDIVIDUAL | ALL | INDIVIDUAL | ALL | INDIVIDUAL | ALL |
| ITEM | ITEM D | DOUBLE | | | | | | | |
| | ITEM E | | DOUBLE | | | | | | |
| | ITEM F | | | 1/2 | | | | | |
| | ITEM G | | | | 1/2 | | | | |
| | ITEM H | DOUBLE | | 1/2 | | | | | |
| | ITEM I | | | IRREGULAR (HOWEVER, OFFENSIVE POWER IS TRIPLED) | | | | | |
| | ITEM J | ALL (ANYWHERE) | | | | | | | |
| | ITEM K | | | | | | | MAXIMUM OF SEVEN REVOLUTIONS AS LONG AS PLAYER SUCCEEDS | |
| | ITEM L | | | | | | | EFFECT OF ITEM + INCREASE IN OFFENSIVE POWER WITH INCREASE IN NUMBER OF REVOLUTIONS | |
| | ITEM M | NO EFFECTIVE AREA. RANDOM NUMBER IS ASSIGNED AT OPERATION TIMING AND THE NUMBER OF ATTACKING CHARACTERS (0 TO 4) AND OFFENSIVE POWER (ONE TO FOUR TIMES) ARE DETERMINED | | | | | | | |
| ENEMY SPELL | ENEMY SPELL A | 1/2 | | | | | | | |
| | ENEMY SPELL B | | | DOUBLE | | | | | |
| | ENEMY SPELL C | | | | | 1/2 | | | |
| | ENEMY SPELL D | | 1/2 | | | | DOUBLE | | |
| | ENEMY SPELL E | | | IRREGULAR | | DOUBLE | | | |
| | ENEMY SPELL F | EFFECTIVE AREA, ROTATION SPEED, AND SIZE ARE DETERMINED AT RANDOM IN THE RANGE OF 0.5 TO 2 (ALL) | | | | | | | |
| EVENT TYPE | CENTER BOSS A | | | | DOUBLE | | | | |
| | CENTER BOSS B | | 1/2 | | | | | | |
| | CENTER BOSS C | | 1/2 | | IRREGULAR | | | | |
| | RUSS BOSS | | 1/2 | | | | | | |

FIG. 48

JUDGMENT RING DECISION PROCESSING
ST101
O BUTTON OPERATION SIGNAL INPUT?
NO
YES
ST102
IS ROTATION BAR ON TIMING AREA?
NO
YES
ST103
IS ROTATION BAR ON 120% AREA?
NO
YES
ST104
SET JUDGMENT RING CORRECTION VALUE TO 1.2
ST105
SET JUDGMENT RING CORRECTION VALUE TO 1.0
ST106
CALCULATE DAMAGE AMOUNT OR RECOVERY VALUE
ST107
TERMINATION CONDITION ACHIEVED?
NO
YES
RETURN



FIG. 49

CONSECUTIVE ATTACK SET PROCESSING
ST241
DOES CONSECUTIVE ATTACK CONDITION HOLD TRUE?
NO
YES
ST242
SET CONSECUTIVE ATTACK PARAMETER AS 1.02 TIMES
ST243
SET CONSECUTIVE ATTACK PARAMETER TO 1.0
ST244
CALCULATE DAMAGE AMOUNT OR THE RECOVERY VALUE BASED ON CALCULATED DAMAGE AMOUNT OR RECOVERY VALUE AND CONSECUTIVE ATTACK PARAMETER
RETURN



FIG. 50

ACTION SELECTION PROCESSING
DID ATTACK OF PRECEDING ALLY CHARACTER HIT ENEMY CHARACTER AS COMBINATION ATTACK TARGET?
ST211
NO
YES
DOES CHARACTER EXIST IN COMBO EFFECTIVE RANGE?
ST212
NO
YES
CHECK ENEMY CHARACTER POSTURE
ST213
CHECK SUCCESS DEGREE OF ACTION TECHNIQUE
ST214
COMBINATION ACTION PROCESSING
ST215
JUDGMENT PROCESSING
ST216
RET



FIG. 51

| CHARACTER | SPECIFIC ATTACK | ATTACK TYPE | ATTACK TARGET RANGE | DAMAGE DISPLAY MODE OF TARGET CHARACTER | DAMAGE DISPLAY MODE AFTER ATTACK | MAXIMUM NUMBER OF HITS |
|---|---|---|---|---|---|---|
| ALLY CHARACTER A | SPECIFIC ATTACK A1 | SPELL | LARGE CIRCLE | ANTIAIRCRAFT MODE | BLOW IN AIR | 8 |
| | SPECIFIC ATTACK A2 | SPELL | MEDIUM CIRCLE | GROUND MODE | FLOAT | 10 |
| | SPECIFIC ATTACK A3 | FUSION | LARGE STRAIGHT LINE | ALL MODES | DOWN | 13 |
| | SPECIFIC ATTACK A4 | FUSION | LARGE THROUGH SHAPE | SCATTER MODE | FLOAT | 16 |
| | SPECIFIC ATTACK A5 | FUSION | WHOLE | ALL MODES | ACTION IMPOSSIBLE | 20 |
| | SPECIFIC ATTACK A6 | FUSION | SINGLE UNIT | ANTIAIRCRAFT MODE | BLOW IN AIR | 12 |

FIG. 52

COMBINATION ACTION PROCESSING
ST221
DISPLAY ACTION SELECTION SCREEN
ST222
COMMAND ACCEPTANCE PROCESSING
ST223
DISPLAY ATTACK TARGET SELECTION SCREEN
ST224
PERFORM ATTACK TARGET SELECTION COMMAND ACCEPTANCE PROCESSING
ST225
JUDGMENT RING DETERMINATION PROCESSING
ST236
COMBINATION ACTION JUDGMENT RING DECISION PROCESSING
ST228
UPDATE HP, MP, AND SP
ST229
DOES PARAMETER UPDATE CONDITION BASED ON SPECIAL ITEM OR SPECIAL TECHNIQUE HOLD TRUE?
NO
YES
ST230
UPDATE SKILL PARAMETERS OF AGL, LUC, ETC.
ST231
UPDATE STATUS
ST232
PERFORM EFFECT IMAGE DISPLAY PROCESSING
RETURN

FIG. 53

COMBINATION ACTION JUDGMENT RING DECISION PROCESSING
JUDGMENT RING DECISION PROCESSING
ST226
DOES COMBO CONDITION HOLD TRUE?
ST251
NO
YES
SET COMBO RING
ST252
SELECTED BUTTON SIGNAL INPUT WITHIN TIME LIMIT?
ST253
NO
YES
SET COMBO FORMATION FLAG TO ON
ST255
SET COMBO FORMATION FLAG TO OFF
ST254
CONSECUTIVE ATTACK SET PROCESSING
ST257
SET DAMAGE AMOUNT TO 0
ST259
RET



FIG. 54

119
118
D
D
a
c
A
B
b
C
116
115
a
b
c
117
105
106
A
B
D
C
120
111
112
114
113
16

FIG. 55

119
118
D
D
a
c
A
B
b
C
116
115
a
b
c
117
100
101
A
B
D
C
120
111
112
114
113
16



FIG. 56

119
118
D
D
a
c
A
B
b
C
COMBO START
COMBO ◯ TH TIME
◯ HIT
◯ ◯ Damage
115
116
117
a
D
b
c
114
A
B
C
120
111
112
113
16

FIG. 57

119
118
A
A
a
c
B
b
C
D
HP ◯ ◯
MP ◯ ◯
CHARA A
111
A
ATTACK
COMBINATION
SPELL
ITEM
DEFEND
ESCAPE
LIGHT☆, · · · · ·
45
44
16



FIG. 58
119
118
A
A
a
c
B
b
C
D
46
115
116
117
a
b
c
A
ENEMY a
ENEMY b
ENEMY c
45
44
111
16
FIG. 59
119
118
A
A
a
c
B
b
C
D
115
116
117
101
a
b
c
100
A
B
D
C
120
111
112
114
113
16



FIG. 60

119
118
A
A
a
c
B
b
C
D
115
116
117
a
b
c
105
106
A
B
D
C
120
111
112
114
113
16

FIG. 61

119
118
A
A
a
c
B
b
C
D
COMBO IS CONTINUING
COMBO SECOND TIME
a
HIT
Damage
115
A
111
16



FIG. 62

119
118
A
A
a
c
B
b
C
D
116
117
115
a
b
c
A
B
D
C
120
111
112
114
113
16

FIG. 63

119
118
C
C
a
c
B
b
D
A
113
C
HP
MP
CHARA C
ATTACK
COMBINATION
SPELL
FUSION
ITEM
DEFEND
ESCAPE
GROUND, · · · · ·
45
44
16



FIG. 64

119
118
C
C
a
c
B
b
D
A
116
117
46
115
b
c
a
C
ENEMY a
ENEMY b
ENEMY c
45
44
113
16

FIG. 65

119
118
C
C
a
c
B
b
D
A
COMBO IS CONTINUING
COMBO SECOND TIME
116
117
b
c
115
a
101
A
B
D
C
100
120
111
112
114
113
16



FIG. 66

119
118
C
C
a
c
B
b
D
A
116
117
105
106
b
c
115
a
A
B
D
C
120
111
112
114
113
16

FIG. 67

119
118
C
C
a
c
B
b
D
A
115
COMBO IS CONTINUING
COMBO THIRD TIME
a
HIT
Damage
D
114
16



FIG. 68

119
118
B
B a c b D A C
116
117
115
b
c
a
A
B
D
C
120
111
112
113
114
16

FIG. 69

119
118
B
B a c b D A C
HP ○○
MP ○○
CHARA B
112
B
ATTACK
SPELL
WIND, · · · · ·
ITEM
DEFEND
ESCAPE
45
44
16



FIG. 70
119
118
B
B a c b D A C
116
117
46
115
b
c
a
B
ENEMY a
ENEMY b
ENEMY c
45
44
112
16
FIG. 71
119
118
B
B a c b D A C
116
117
115
b
c
a
A
B
D
C
100
101
120
111
112
114
113
16



FIG. 72
119
118
B
B
a
c
b
D
A
C
116
117
105
106
115
b
c
a
A
B
D
C
120
111
112
114
113
16
FIG. 73
119
118
B
B
a
c
b
D
A
C
115
a
COMBO IS CONTINUING
COMBO FOURTH TIME
HIT
Damage
B
112
16

FIG. 74

119
118
B
B
a
c
b
D
A
C
116
117
115
b
c
a
A
B
D
C
120
111
112
114
113
16

FIG. 75

47
46
47
48
16



FIG. 76

FIG. 77



*FIG. 78*



FIG. 79A

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA1 |
| ALLY CHARACTER B | AB1 |
| ALLY CHARACTER C | AC1 |
| ALLY CHARACTER D | AD1 |
| ENEMY CHARACTER A | BA1 |
| ENEMY CHARACTER B | BB1 |
| ENEMY CHARACTER C | BC1 |

FIG. 79B

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA2 |
| ALLY CHARACTER B | AB2=AB1-AA1 |
| ALLY CHARACTER C | AC2=AC1-AA1 |
| ALLY CHARACTER D | AD2=AD1-AA1 |
| ENEMY CHARACTER A | BA2=BA1-AA1 |
| ENEMY CHARACTER B | BB2=BB1-AA1 |
| ENEMY CHARACTER C | BC2=BC1-AA1 |

FIG. 79C

| CHARACTER | TURN INTERVAL TIME |
|---|---|
| ALLY CHARACTER A | AA3=AA2-AB2 |
| ALLY CHARACTER B | AB3 |
| ALLY CHARACTER C | AC3=AC2-AB2 |
| ALLY CHARACTER D | AD3=AD2-AB2 |
| ENEMY CHARACTER A | BA3=BA2-AB2 |
| ENEMY CHARACTER B | BB3=BB2-AB2 |
| ENEMY CHARACTER C | BC3=BC2-AB2 |

FIG. 80A

| ATTACK TARGET RANGE | SHAPE INFORMATION |
|---|---|
| | RADIUS |
| LARGE CIRCLE | R11 |
| MEDIUM CIRCLE | R12 |
| SMALL CIRCLE | R13 |

FIG. 80B

| ATTACK TARGET RANGE | SHAPE INFORMATION | |
|---|---|---|
| | RADIUS | ANGLE |
| LARGE SECTOR | R21 | D1 |
| MEDIUM SECTOR | R22 | D2 |
| SMALL SECTOR | R23 | D3 |

FIG. 80C

| ATTACK TARGET RANGE | SHAPE INFORMATION |
|---|---|
| | WIDTH |
| LARGE STRAIGHT LINE | W1 |
| MEDIUM STRAIGHT LINE | W2 |
| SMALL STRAIGHT LINE | W3 |

FIG. 80D

| ATTACK TARGET RANGE | SHAPE INFORMATION | |
|---|---|---|
| | RADIUS | WIDTH |
| LARGE THROUGH SHAPE | R21 | W1 |
| MEDIUM THROUGH SHAPE | R22 | W2 |
| SMALL THROUGH SHAPE | R23 | W3 |

FIG. 81

TEMPORARY TURN ORDER DISPLAY PROCESSING
ST262
SET CORRECTION VALUE CORRESPONDING TO COMMAND IN RESPONSE TO SELECTED COMMAND
ST263
PERFORM TEMPORARY TURN INTERVAL VALUE CALCULATION PROCESSING
ST264
PERFORM TEMPORARY TURN INTERVAL VALUE COMPARISON PROCESSING
ST265
PERFORM TEMPORARY TURN ORDER DETERMINATION PROCESSING
ST266
PERFORM TEMPORARY TURN ORDER DISPLAY PROCESSING
RET

FIG. 82

ATTACK TARGET RANGE DISPLAY PROCESSING
CALCULATE ATTACK TARGET RANGE IN RESPONSE TO SELECTED COMMAND
ST271
PERFORM TARGET CHARACTER SPECIFICATION DISPLAY PROCESSING
ST272
PERFORM TARGET CHARACTER POSITION INFORMATION EXTRACTION PROCESSING
ST273
PERFORM ATTACK TARGET RANGE CALCULATION PROCESSING WITH POSITION INFORMATION AS REFERENCE
ST274
DETECT CHARACTER IN ATTACK TARGET RANGE BASED ON CHARACTER POSITION INFORMATION
ST275
PERFORM SPECIFICATION DISPLAY PROCESSING FOR CHARACTER IN ATTACK TARGET RANGE
ST276
RET

FIG. 83

57A
57B
58
56
INTERNET
60
INFORMATION CENTER
55
51
PDC NETWORK
52A
52B
53A
53B
53C





FIG. 84
119
118
B
B
a
c
B
D
A
C
HP
MP
CHARA B
112
B
ATTACK
SPELL
ITEM
DEFEND
ESCAPE
44
45
16
FIG. 85
119
118
B
a
c
b
D
B
A
C
HP
MP
CHARA B
112
B
ATTACK
HARD HIT, · · ·
SPELL · · ·
ITEM
DEFEND
ESCAPE
44
45
16

FIG. 86

119
118
B
a
c
b
D
A
B
C
HP
MP
CHARA B
112
B
ATTACK
SPELL
WIND, · · · · · ·
ITEM
DEFEND
ESCAPE
45
44
16



# GAMING MACHINE AND COMPUTER-READABLE PROGRAM PRODUCT

## CROSS-REFERENCE TO THE RELATED APPLICATION(S)

This application is based upon and claims a priority from prior Japanese Patent Application No. 2003-175623 filed on Jun. 19, 2003, the entire contents of which are incorporated herein by reference. This application is related to co-pending U.S. applications claiming priorities on JP-2003-175618, JP-2003-175620, JP-2003-175622, JP-2003-175064, JP-2003-175065, JP-2003-175066, JP-2003-175136 and JP-2003-175137, and filed on even date herewith. The co-pending applications are expressly incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a gaming program, a computer-readable record medium recording the gaming program, and a gaming machine, and in particular to a gaming program, a computer-readable record medium recording the gaming program, and a gaming machine for displaying a plurality of characters on a display screen and allowing a player to select the action of the character, thereby advancing a game.

2. Description of the Related Art

Hitherto, various games have been provided for a player to enter commands, etc., through operation unit such as a controller to handle a character in the game in a virtual world in the game on a screen of a computer, a television, etc., and advance a preset story. Such a game is generally called "RPG" (Role Playing Game).

The following RPG is generally known: A battle scene in which a character handled by a player, which will be hereinafter referred to as the ally character, and an enemy character controlled by a computer fight a battle is included and the player beats the enemy character in the battle, thereby acquiring an experiment value or virtual money, and proceeds the story whiling raising the character level.

In the battle scene in this kind of RPG, the attack made by the ally character is uniquely determined by the battle skill responsive to the level of the ally character, the attack power responsive to the possessed items and the like (such as arms and spells). The action of the character after command selection is automatically processed by the computer in accordance with the action control algorithm of the character contained in the game program based on the selected command. (For example, refer to JP-A-2002-200334.) On the other hand, the display mode after attack in the attacked character is also determined in response to the algorithm. It is a common practice to determine the attack order in response to the agility skill responsive to the level and the possessed items (arms, spell, etc.,).

## SUMMARY OF THE INVENTION

However, in the gaming machine described above, the battle scene proceeds without displaying the action execution order containing attacks and thus the real pleasure of devising a stratagem is lost and it is feared that the interest in the game may be unable to be augmented.

It is therefore an object of the invention to provide a gaming program, a computer-readable record medium recording the

gaming program, and a gaming machine for making it possible to display the action execution order, thereby augmenting the interest in a game.

According to a first aspect of the invention, there is provided a gaming machine for allowing a player to enter an action command of an ally character to proceed a game, the gaming machine including: an operation unit that allows the player to enter the action command; a display control section that displays a plurality of characters including at least the one ally character and at least one enemy character on a display for displaying the progress of the game and displaying a battle between the ally character and the enemy character; and an execution order calculation section that calculates the execution order of actions of the plurality of characters in the battle, wherein the display control section displays the execution order calculated by the execution order calculation section on the display.

According to a second aspect of the invention, there is provided a computer-readable program product for storing a gaming program for causing a computer to execute steps including: allowing a player to enter an action command of an ally character to proceed a game; displaying a plurality of characters including at least one ally character and at least one enemy character on a display for displaying the progress of the game and displaying a battle between the ally character and the enemy character; calculating the execution order of actions of the plurality of characters at the battle time; and displaying the calculated execution order on the display.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and advantages of the present invention will be more fully apparent from the following detailed description taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a drawing to show the general configuration of a gaming machine incorporating the invention;

FIG. **2** is a block diagram to show the system configuration of the gaming machine in FIG. **1**;

FIGS. **3**A and **3**B show display examples of a title screen and a world map;

FIG. **4** is a flowchart to show a procedure of ally game processing;

FIG. **5** is a flowchart to show a procedure of battle processing;

FIG. **6** is a drawing to show a battle scene start screen;

FIGS. **7**A and **7**B are drawings to show the character individual skills of ally characters A and B;

FIG. **8** is a drawing to show execution command correction values;

FIG. **9** is a flowchart to show a procedure of turn order processing;

FIG. **10** is a flowchart to show a procedure of turn order interrupt processing;

FIG. **11** is a drawing to show an action selection screen;

FIG. **12** is a flowchart to show a procedure of turn order determination processing;

FIGS. **13**A to **13**C are drawings to show turn interval values;

FIG. **14** is a flowchart to show a procedure of command processing;

FIG. **15** is a flowchart following FIG. **14**;

FIG. **16** is a drawing to show an action selection screen;

FIG. **17** is a flowchart to show a procedure of combination move processing;

FIG. **18** is a drawing to show a move target selection screen;

FIG. **19** is a drawing to show a move method selection screen;

FIG. **20** is a drawing to show move information;

FIG. **21** is a drawing to show an effect image for moving each character;

FIG. **22** is a drawing to show an action selection screen;

FIG. **23** is a drawing to show a move target selection screen;

FIG. **24** is a drawing to show an effect image for moving each character;

FIG. **25** is a drawing to show a move target selection screen;

FIG. **26** is a drawing to show an effect image for moving each character;

FIG. **27** is a flowchart to show a procedure of judgment processing;

FIG. **28** is a drawing to show an action target selection screen;

FIG. **29** is a flowchart to show a procedure of command acceptance processing;

FIG. **30** is a drawing to show a display screen at the command determination time;

FIG. **31** is a drawing to show a screen displayed when an O button is operated when a rotation bar passes through a first timing area;

FIG. **32** is a drawing to show a screen displayed when the O button is operated when the rotation bar passes through a second timing area;

FIG. **33** is a drawing to show a screen displayed when the O button is operated when the rotation bar passes through a third timing area;

FIG. **34** is a drawing to show a screen displayed when a player fails in operating the O button on the timing area;

FIG. **35** is a drawing to show a screen displayed after rotation of the rotation bar stops when a player succeeds in operating the O button on all timing areas;

FIG. **36** is a drawing to show how the ally character A attacks an enemy character A;

FIG. **37** is a drawing to show a screen displayed when the ally character A terminates the attack on the enemy character A and returns to the former position;

FIG. **38** is a flowchart to show a procedure of judgment ring determination processing;

FIG. **39** is a drawing to show an arm table;

FIG. **40** is a drawing to show a special table;

FIG. **41** is a drawing to show an item table;

FIG. **42** is a drawing to show a calculation expression for calculating the damage amount to an enemy character (opposite character damage amount);

FIG. **43** is a drawing to show the display mode of a judgment ring displayed at the command determination time;

FIG. **44** is a drawing to show the display mode of the judgment ring after command determination;

FIGS. **45**A and **45**B are drawings to show different examples of 120% areas;

FIG. **46**A is a drawing to show a calculation expression for calculating the opposite character damage amount when attack spell is used and FIG. **46**B is a drawing to show a calculation expression for calculating the recovery value when recovery spell is used;

FIG. **47** is a drawing to show a judgment ring correction parameter table;

FIG. **48** is a flowchart to show a procedure of judgment ring decision processing;

FIG. **49** is a flowchart to show a procedure of consecutive attack set processing;

FIG. **50** is a flowchart to show a procedure of action selection processing;

FIG. **51** is a drawing to show the types of actions for changing a damage display mode;

FIG. **52** is a flowchart to show a procedure of combination action processing;

FIG. **53** is a flowchart to show a procedure of combination action judgment ring decision processing;

FIG. **54** is a drawing to show the display mode of a combo ring;

FIG. **55** is a drawing to show the display mode of the judgment ring after command determination;

FIG. **56** is a drawing to show the display mode of combo attack;

FIG. **57** is a drawing to show an action selection screen;

FIG. **58** is a drawing to show a move target selection screen;

FIG. **59** is a drawing to show the display mode of the judgment ring after command determination;

FIG. **60** is a drawing to show the display mode of the combo ring;

FIG. **61** is a drawing to show the display mode of combo attack;

FIG. **62** is a drawing to show the display mode of combo attack;

FIG. **63** is a drawing to show an action selection screen;

FIG. **64** is a drawing to show a move target selection screen;

FIG. **65** is a drawing to show the display mode of the judgment ring after command determination;

FIG. **66** is a drawing to show the display mode of the combo ring;

FIG. **67** is a drawing to show the display mode of combo attack;

FIG. **68** is a drawing to show the display mode of combo attack;

FIG. **69** is a drawing to show an action selection screen;

FIG. **70** is a drawing to show a move target selection screen;

FIG. **71** is a drawing to show the display mode of the judgment ring after command determination;

FIG. **72** is a drawing to show the display mode of the combo ring;

FIG. **73** is a drawing to show the display mode of combo attack;

FIG. **74** is a drawing to show the display mode of combo attack;

FIG. **75** is a drawing to show display mode of attack;

FIG. **76** is a drawing to show display mode of attack;

FIG. **77** is a drawing to show display mode of attack;

FIG. **78** is a drawing to show display mode of attack;

FIGS. **79**A through **79**C are drawings to show turn interval values;

FIGS. **80**A through **80**D are drawings to show the shapes of attack target ranges;

FIG. **81** is a flowchart to show a procedure of temporary turn order display processing;

FIG. **82** is a flowchart to show a procedure of attack target range display processing;

FIG. **83** is a drawing to show the configuration of a network game system;

FIG. **84** is a drawing to show an action selection screen; FIG. **85** is a drawing to show an action selection screen; and FIG. **86** is a drawing to show an action selection screen.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the accompanying drawings, there is shown a preferred embodiment of the invention.

### Configuration of gaming machine

FIG. **1** shows the general configuration of a gaming machine incorporating the invention. The gaming machine is made up of a machine main unit **1**, a controller **4** as operation unit that can be operated by a player for outputting a control command to the machine main unit **1** in response to operation of a player, and a display **15** for displaying an image based on an image signal from the machine main unit **1**. In the gaming machine, a game is executed as various images of a plurality of characters including ally characters and enemy characters and the like are displayed on a display surface (screen) **16** of the display **15** such as a CRT.

A game executed in the gaming machine is executed as a gaming program recorded on an external record medium separate from the main unit **1** is read. In addition to a CD-ROM or a DVD-ROM, an FD (flexible disk) or any other record medium can be used as the external record medium recording the gaming program. In the embodiment, a DVD-ROM is used as the external record medium. A cover **2** that can be opened and closed is provided in the top center of the main unit **1**. As the cover **2** is opened, a DVD-ROM **31** (FIG. **2**) can be placed in a DVD-ROM drive **29** (FIG. **2**) as a record medium drive provided inside the main unit **1**.

The controller **4** includes various input parts for outputting a control command to a CPU **21** (FIG. **2**) in the main unit **1** in response to operation of the player. The controller **4** is provided in the left portion with an up button **7**, a down button **8**, a left button **9**, and a right button **10** mainly operated by the player to move a character in a game or move an option of a menu as the input parts. The controller **4** is provided in the right portion with a Δ button **11**, a O button **12**, a X button **13**, and a □ button **14** mainly operated by the player to determine or cancel various items. The controller **4** is provided in the center with a selection button **6** at the top and a start button **5** at the bottom.

The display **15** has input terminals of a video signal and an audio signal, which are connected to a video output terminal and an audio output terminal of the main unit **1** by terminal cables **18** and **19**. Used as the display **15** is an existing television having in one piece the screen **16** that can display image data output from an image output section **25** (FIG. **2**) described later and speakers **17**L and **17**R that can output audio data output from an audio output section **27** (FIG. **2**) described later. The main unit **1** and the controller **4** are connected by a signal cable **20** as shown in FIG. **1**.

The main unit **1** is provided on one side with a memory slot **3** as an insertion slot of a memory card **32** (FIG. **2**). The memory card **32** is a storage medium for temporarily recording game data in a case such as when the player interrupts the game. The data recorded on the memory card **32** is read through a communication interface **30** (FIG. **2**) described later having a card reader function.

### Electric Configuration

FIG. **2** shows the system configuration of the gaming machine. The main unit **1** includes the CPU **21** as control section, ROM **22** and RAM **23** as storage section, an image processing section **24**, the image output section **25**, an audio processing section **26**, the audio output section **27**, a decoder **28**, the DVD-ROM drive **29**, and the communication interface **30**.

The DVD-ROM **31** can be attached to and detached from the DVD-ROM drive **29** and the gaming program in the DVD-ROM **31** placed in the DVD-ROM drive **29** is read by the CPU **21** in accordance with a basic operation program of an OS (operating system), stored in the ROM **22**. The read gaming program is converted into predetermined signals by the decoder **28** for storage in the RAM **23**.

The gaming program stored in the RAM **23** is executed by the CPU **21** in accordance with the basic operation program or an input signal from the controller **4**. Image data and audio data are read from the DVD-ROM **31** in response to the executed gaming program. The image data is sent to the image processing section **24** and the audio data is sent to the audio processing section **26**.

The image processing section **24** converts the received image data into an image signal and supplies the image signal to the screen **16** through the image output section **25**. The audio processing section **26** converts the received audio data into an audio signal and supplies the audio signal to the speakers **17**L and **17**R through the audio output section **27**.

The communication interface **30** enables the controller **4** and the memory card **32** to be connected detachably to the main unit **1**. Through the communication interface **30**, data is read from and written into the memory card **32** and a signal from the controller **4** is sent to the sections including the CPU **21**.

Next, specific examples of processing executed by the CPU **21** based on the gaming program recorded on the DVD-ROM **31** and the game content displayed on the screen **16** as the processing is executed will be discussed.

### Main Game Processing

When power of the machine main unit **1** is on, when the DVD-ROM **31** is placed in the DVD-ROM drive **29**, "opening demonstration" is displayed on the screen **16**. The "opening demonstration" is effect display for telling the player about the start of a game. After the "opening demonstration" is displayed for a predetermined time, a "title screen" drawing a game title large is displayed and "main game processing" shown in FIG. **4** is started.

FIG. **3**A shows an example of the "title screen." Here, the character string of the game title, SHADOW HEARTS, is displayed and two options (NEW GAME and CONTINUE) are displayed below the game title. A cursor **41** is displayed at the left position of the option of either NEW GAME or CONTINUE and as the player operates the up button **7** or the down button **8**, the position of the cursor **41** is changed. When the player operates the O button **12**, the option pointed to by the cursor **41** for selection is selected.

In the "main game processing" shown in FIG. **4**, first, which of the two options is selected on the title screen is determined (ST**1**). If it is determined that NEW GAME is selected (YES at ST**1**), a prolog and the game content are displayed (ST**2**) and then a "world map" shown in FIG. **3**B is displayed (ST**4**). On the other hand, if it is determined that CONTINUE is selected (NO at ST**1**), the situation at the previous game end time is set to restore the state of the game (ST**3**), and then the "world map" is displayed without displaying the prolog or the game content (ST**4**).

As the game according to the embodiment, a main character of an ally character which acts based on operation of the player and an enemy character which acts based on the gaming program appear and a game developed centering on the battle between the characters is realized on the screen **16**. In

the embodiment, four main characters, namely, a main character A **111**, a main character B **112**, a main character C **113** and a main character D **114** appear and the game proceeds in the party unit made up of the four main characters. Various types of status are set for each character. The experience value, money, arms, skill, and the like added by the number of gaming times, the number of times an enemy character has been beaten, etc, are defined as the status.

FIG. **3**B shows an example of "world map." The main cities of "A country" as the stage of the game story are displayed on the "world map" and options indicated by five city names (CITY A **42**_a_, CITY B **42**_b_, CITY C **42**_c_, CITY D **42**_d_, and CITY E **42**_e_) are displayed. They are options to make a transition to a provided "sub-map." As the player operates the up button **7** or the down button **8**, the cursor **41** indicating each option moves and as the player operates the O button **12**, one option is selected. When one "sub-map" is thus selected, the "world map" makes a transition to the screen corresponding to the "sub-map" and the player can play various games set in response to the "sub-map." Specifically, the visual scene in each city is prerender-displayed as a background image conforming to scene development and while the main characters move therein, various events are conquered and the story proceeds.

When the player operates the O button **14** on the "world map," a "menu screen" is displayed, enabling the player to make various settings, etc., on the "menu screen."

Referring again to FIG. **4**, when any of the options displayed on the "world map" is selected (YES at ST**5**), a start screen of the "sub-map" responsive to the selected option is displayed and the party of the ally characters starts action on the "sub-map" (ST**6**). On the other hand, when the determination at ST**5** is NO, whether or not the player operates the □ button **14** on the "world map" for making a "menu screen" display request is determined (ST**20**). When the determination at ST**20** is YES, the "menu screen" is displayed and various types of setting processing are performed in response to operation of the player (ST**21**). On the other hand, when the determination at ST**20** is NO, the process again goes to ST**5**. The action on the "sub-map" is for the ally character to walk, talk to a pedestrian, do shopping, etc. The player can also display the "menu screen" by operating the □ button **14** on the "sub-map" and various types of operation are made possible. For example, as the player selects a TOOL command, TOOL command processing is executed and the skill of an ally character can be recovered; as the player selects a TRADE command, trade processing is executed and it is made possible to sell a possessed item.

Then, when the main character party starting action on the "sub-map" encounters an enemy character (YES at ST**7**), "battle processing" is started (ST**8**). When the "battle processing" is started, a transition is made to a "battle scene" where a battle is fought between the main character party and the enemy character. The "battle processing" is described later. On the other hand, when the main character party does not encounter an enemy character (NO at ST**7**), when some event occurs (YES at ST**9**), the process proceeds to ST**16** and a movie responsive to the event is displayed; when no event occurs (NO at ST**9**), the process returns to ST**6**.

In the "battle scene" executed by performing the "battle processing, " when the main character party succeeds in escaping from the enemy character (YES at ST**10**), the process proceeds to ST**16** and a movie responsive to the situation is displayed. On the other hand, when the main character party fails in escaping from the enemy character or the main character party fights a battle with the enemy character (NO at ST**10**), subsequently whether or not the main character party wins the enemy character in the battle in the "battle scene" is determined (ST**11**). When the determination is YES, namely, when the main character party wins the enemy character, points of the experience value, etc., are added and an item and money are given to each character of the party in response to the type of enemy character and the battle substance (ST**12**). The level of each character is raised in response to the experience value of the character (ST**13**). Then, a movie responsive to the situation is displayed (ST**16**). When the determination at ST**11** is NO, namely, when the main character party cannot win the enemy character, subsequently whether all characters of the main character party die is determined (ST**14**). When the determination is NO, the process proceeds to ST**16**. When the determination at ST**14** is YES, the game is over (ST**15**) and the main game processing is terminated.

After a movie is displayed at ST**16**, if the sub-map request condition has been cleared (YES at ST**17**), subsequently whether or not a transition is to be made to the ending is determined (ST**18**). If the determination at ST**18** is YES, a predetermined ending is displayed (ST**19**) and the "main game processing" is terminated. On the other hand, if the determination at ST**18** is NO, the process again goes to ST**4**.

Battle Processing

The "battle processing" will be discussed with FIG. **5**.

As shown in FIG. **5**, first, parameters concerning characters (character parameters) are set and the turn interval value is calculated and set (ST**30**). At ST**30**, the CPU **21** sets the character parameters in a predetermined area of the RAM **23** from a predetermined area of the DVD-ROM **31**. The characters correspond to a plurality of characters including ally and enemy characters made to appear in a "battle scene" as shown in FIG. **6**.

Character Individual Skills

As a specific example of the character parameters, the character individual skills will be discussed with FIG. **7**. FIG. **7** is a schematic representation to show the character individual skills of the ally characters A **111** and B **112**.

The character individual skills shown in FIG. **7** are stored for each of the characters appearing in the game. The types of character individual skills include physical attack power (STR), physical defence power (VIT), agility (AGL), magic (spell) attack power (INT), spell defence power (POW), and luck (LUC) in addition to HP, MP, and SP described above. Each of them is represented by a numeric value and a different value is set depending on the type of character although the character level is the same.

The character individual skills are set in response to the character level (LV). This character level changes in response to the experience value cumulatively stored in response to the experience of battle, etc., in the game. Particularly for HP, MP, and SP, the maximum HP, the maximum MP, and the maximum SP corresponding to the character individual skills and the actual HP, MP, and SP changing in the game are stored. Of course, AGL and LUC also change with a special item or a special technique, as described later.

The character individual skills are loaded into the RAM **23**. The character individual skills change in response to the arm, protector, item, etc., with which the character is equipped. They also change in response to the worked spell and the used item by the character. The CPU **21** for loading the character individual skill table into the RAM **23** corresponds to character parameter storage section for storing the skill parameters and the possessed item parameters for each character. The DVD-ROM **31** in which the character individual skill table is stored also corresponds to character parameter stor-

age section in which the skill parameters and the possessed item parameters are stored for each character.

Thus, the CPU **21** reads the character parameters such as the character individual skills stored in the RAM **23** from the RAM **23**.

Turn Interval Value

The turn interval value is calculated for each of the characters including ally and enemy characters. The CPU **21** reads the agility (AGL) and the luck (LUC) set for each of the characters and an execution command correction value (described later). The agility (AGL) and the luck (LUC) are set in response to the level of the character and are updated based on spell, special technique, special item, as described above.

The execution command correction value will be discussed with FIG. **8**. FIG. **8** is a schematic representation to show the execution command correction value.

The execution command correction values are set in a one-to-one correspondence with the previously executed action types in "battle scene" as shown in FIG. **8**. The execution command correction values are stored in the DVD-ROM **31** and are loaded by the CPU **21** into a predetermined area of the RAM **23**.

Further, as a specific turn interval value calculation method, turn interval value=[{108.9−AGL+(LUC/10)}×28/108.9+4]×[execution command correction value]. Since the processing is executed when a "battle scene" is started, the default value 3 is used as the execution command correction value. Of course, another calculation method may be adopted and table control may be performed.

The CPU **21** sets the turn interval value calculated for each of the characters made to appear in a "battle scene" in a predetermined area of the RAM **23**. The CPU **21** for executing the processing corresponds to execution order calculation section for calculating the execution order of actions of all characters. The execution order calculation section has a function of calculating the execution order of actions of all characters based on the skill parameters and the possessed item parameters stored by the character parameter storage section. Upon completion of the processing, the process proceeds to ST**31**.

At ST**31**, a "battle scene" start screen as shown in FIG. **6** is displayed. On the start screen, the ally character party (ally character A **111**, ally character B **112**, ally character C **113**, and ally character D **114**) is displayed toward the player. Although described later in detail, the attack order is assigned to the characters on the screen and a battle image among the characters is displayed (the game is advanced on the screen) Three enemy characters (enemy character A **115**, enemy character B **116**, and enemy character C **117**) are displayed facing the ally characters at the positions corresponding to the ally characters. Although not shown in FIG. **6**, information concerning the status of each ally character is displayed in the lower right portion of the start screen. A turn order **118** of executing the actions of the ally and enemy characters is displayed on the top of the start screen. The turn order displayed as in FIG. **6** indicates execution of the action of each character in order from left to right. A hexagon mark **119** is displayed at the right end of the turn order, indicating the character to execute action. Further, when an action command is selected, a temporary turn order is displayed as in FIG. **11**, etc., (for example, the mark indicating the ally character D **114** is displayed at the right end as the temporary turn order after execution of the ally character D **114**).

Specifically, hit points (HP), magic points (MP), and sanity points (SP) are predetermined for each ally character, and the remaining numbers of points (current number of points/initial number of points) are displayed on the start screen.

As HP remains, the ally character can execute various commands of attack, item use, etc., and when HP becomes zero, the corresponding ally character becomes inactive. MP enables the corresponding ally character to use a special skill of spell, etc., and when MP becomes zero, the ally character becomes unable to use the special skill. SP enables the corresponding ally character to hold its sanity. When SP becomes zero, the ally character loses its sanity and enters an abnormal status. When the ally character enters the abnormal status, command manipulation for the ally character becomes ineffective and the ally character runs away so as to take abnormal action in such a manner that it makes an attack on any character regardless of whether the character is an enemy or an ally.

The turn order is displayed based on the turn order set at ST**30**, as described later. In the embodiment, after all characters appearing in the "battle scene" execute actions, again the turn order for all characters to execute actions is determined.

At ST**32**, "turn order processing" is performed to manage the order in which the ally characters and enemy characters can take action of attack, etc. In the processing, the CPU **21** manages the turn order of the character for which command selection is made effective based on the turn interval value calculated from the skills concerning each character, etc. The CPU **21** displays an image indicating the turn order on the screen **16**. The "turn order processing" is described later in detail.

The CPU **21** displays a selection mark **43** above the head of the ally character for which command selection is made effective on the screen **16**, as shown in FIG. **6**. After the display, subsequently the ally character with the selection mark **43** displayed above the head (in this case, the ally character D **114**) is zoomed up, and a "command selection screen" as shown in FIG. **16** is displayed. When the "turn order processing" is exited, the process returns to ST**33**.

At ST**33**, whether or not the character for which command selection is made effective in the "turn order processing" (the character whose turn has come around) is an enemy character is determined. If the determination at ST**33** is YES, automatic processing is performed in accordance with the gaming program so that the enemy character makes an attack on the ally character (ST**34**).

On the other hand, if it is determined at ST**33** that the character for which command selection is made effective is the ally character, subsequently "command processing" of accepting command selection of the player is performed (ST**35**). In the processing, a command is selected in response to player's entry operation through the controller **4**, and the action is determined based on the selected command. This means that the action for any of the characters is determined in response to player's entry operation through the controller **4**. The CPU **21** for executing the processing corresponds to action determination section for determining the action of any of the characters in response to player's entry operation through operation unit.

The CPU **21** displays a command menu **44** containing options of commands to determine the action of the ally character D **114** on the screen **16**, as shown in FIG. **16**. The CPU **21** moves a selection cursor **45** displayed at the left of the command menu **44** as the player operates the up button **7** or the down button **8** of the controller **4**. When the player operates the O button **12**, the command with the selection cursor **45** displayed at the left position is selected and the action of the main character D **114** is determined. Five commands of

attack, spell, ITEM, DEFEND, and ESCAPE are displayed on the command menu **44** in FIG. **16**.

Effect display responsive to the determined action is produced. For example, when the player selects an attack, spell, or special technique command (ACTION command described later), display processing such that action is taken against the target character as the target of the ally character or the enemy character, etc., is executed. When a command for combination (COMBINATION command described later) is selected, display processing of moving the ally character, etc., is executed. In the "command processing," "judgment processing" for making possible technical intervention according to the operation timing of the player is also performed. The "command processing" is described later in detail. When the "command processing" is exited, the process returns to ST**36**.

At ST**36**, the turn order is updated each time the character takes action. In the processing, the CPU **21** stores the character taking action in a predetermined area of the RAM **23** and updates the turn order of the character taking action. Accordingly, when the "turn order processing" is again performed, the turn orders are compared and the characters for which command selection is made effective to cause the characters to take action are determined. When all characters execute action, the characters executing action are stored as if they did not any action. Upon completion of ST**36**, the process proceeds to ST**37**.

At ST**37**, turn order update display processing is executed. In the processing, the CPU **21** updates and displays the turn order for executing action in the next turn based on the turn order updated at ST**37**. Upon completion of ST**37**, the process proceeds to ST**38**.

At ST**38**, whether or not the "battle processing" termination condition is satisfied is determined. When the determination at ST**38** is NO, the process returns to ST**32**; when the determination is YES, "soul point addition processing" is executed (ST**39**) and the "battle processing" is exited. The "battle processing" exit condition is any of the fact that the enemy characters appearing on the battle screen suffer a crushing defeat, the fact that the player selects an "ESCAPE" command and the main character party succeeds in escaping from the enemy characters, the fact that the ally character party suffers a crushing defeat, or the fact that such an event for terminating the battle occurs.

Turn Order Processing

The "turn order processing" will be discussed with FIG. **9**.

As shown in FIG. **9**, first, whether or not a combo formation flag is ON is determined (ST**41**). In the processing, the CPU **21** reads the combo formation flag stored in a predetermined area of the RAM **23** by executing ST**253**, ST**254**, etc., (described later). If the CPU **21** determines that the combo formation flag is ON, the process proceeds to ST**42**. On the other hand, if the CPU **21** does not determine that the combo formation flag is ON, the process proceeds to ST**43**.

At ST**42**, "turn order interrupt processing" is executed. In the processing, the CPU **21** determines the turn order to cause the characters to execute combo action preferentially. The "turn order interrupt processing" is described later in detail. When the processing is exited, the process returns to ST**43**.

At ST**43**, "turn order determination processing" is executed. In the processing, the CPU **21** determines the turn order based on the turn order determined at ST**42** and the turn interval value of each character. The "turn order determination processing" is described later in detail. When the processing is exited, the process returns to ST**44**.

At ST**44**, the turn order is displayed on the screen. In the processing, the CPU **21** displays the turn order determined at ST**43** on the screen **16** as shown in FIG. **6**. The CPU **21** for executing the processing corresponds to order display control section for displaying the execution order calculated by the execution order calculation section on the screen. Upon completion of ST**44**, the process proceeds to ST**45**.

At ST**45**, command selection for the character is made effective. In the processing, the CPU**21** makes effective command selection for the character caused to execute action based on the turn order determined at ST**43**. Upon completion of ST**45**, the subroutine is exited.

Turn Order Interrupt Processing

The "turn order interrupt processing" will be discussed with FIG. **10**.

First, whether or not the number of characters to be coordinated is more than one is determined (ST**51**). Whether or not a character exists in a combination attack effective range **120** (for example, within 1 m in diameter (in the game) with the ally character in collection as the center) is determined by direct measurement each time. In the processing, the CPU **21** reads the data indicating the characters to be coordinated from the RAM **23** and determines whether or not the number of characters to be coordinated is one or more. If the CPU determines that the number of characters to be coordinated is more than one, the process proceeds to ST**52**. On the other hand, if the CPU does not determine that the number of characters to be coordinated is more than one, the process proceeds to ST**53**. The ally character as the reference (center) of the combination attack effective range **120** may be the first ally character or may be the ally character executing combo (action) just before.

At ST**52**, character selection processing is executed. In the processing, the CPU **21** displays a combination character selection image shown in FIG. **11**. The CPU **21** determines the ally characters for making combination attack in response to an entry operation signal in the controller **4**. Upon completion of ST**52**, the process proceeds to ST**53**.

At ST**53**, turn order forcible interrupt processing is executed. In the processing, the CPU **21** determines the turn order of the ally characters for making combination attack so that the turn order is forcibly made preferential. The CPU **21** for executing the processing corresponds to action execution section. When the action of an ally character is executed in response to player's entry operation through the operation unit, when a predetermined combination condition (combo condition) for a different ally character from the ally character whose action is executed is satisfied, the action execution section executes the action of the ally character and executes the action of the different ally character without following the action execution order.

The CPU **21** makes effective command selection for the character determined so as to be forcibly made preferential (ST**54**). Accordingly, command selection for the ally characters for making combination attack is forcibly made effective independently of the turn interval value, so that the player can devise a stratagem of a battle involving combination attack. Upon completion of ST**54**, the subroutine is exited.

Turn Order Determination Processing

The "turn order determination processing" will be discussed with FIG. **12**.

As shown in FIG. **12**, first, turn interval value comparison processing is executed (ST**71**). In the processing, the CPU **21** reads the turn interval values stored in the predetermined area of the RAM **23**, and compares the turn interval values. The characters for which action command selection is made effec-

tive are set in the ascending order of the turn interval values. The CPU **21** for executing the processing corresponds to the execution order calculation section for calculating the execution order of actions of all characters. The execution order calculation section has the function of calculating the execution order of actions of all characters based on the skill parameters and the possessed item parameters stored by the character parameter storage section. Upon completion of the processing, the process proceeds to ST**72**.

At ST**72**, turn elapsed time calculation processing is executed. In the processing, the CPU **21** calculates the turn elapsed time, the elapsed time from execution of action in the preceding turn to the next turn coming around, for each character based on the comparison result at ST**71**. Upon completion of the processing, the process proceeds to ST**73**.

At ST**73**, whether or not some characters have the same turn interval value is determined. In the processing, the CPU **21** determines whether or not some characters have the same turn interval value based on the comparison result at ST**71**. At the determination time, the character type (ally or enemy character) does not matter. If the CPU **21** determines that some characters have the same turn interval value, the process proceeds to ST**74**. On the other hand, if the CPU **21** does not determine that some characters have the same turn interval value, the process proceeds to ST**76**.

At ST**74**, whether or not the characters having the same turn interval value include ally and enemy characters is determined. In the processing, the CPU **21** determines whether or not the characters determined to have the same turn interval value at ST**73** include ally and enemy characters. If the CPU **21** determines that the characters include ally and enemy characters, the process proceeds to ST**70**. At ST**70**, whether or not the more than one ally characters have the same turn interval value is determined. If it is determined that more than one ally characters having the same turn interval value is included, the process proceeds to ST**78**; if it is not determined that more than one ally characters having the same turn interval value is included, the turn order is determined so that the ally character takes precedence over any other character (ST**75**), and the process proceeds to ST**76**. On the other hand, if the CPU **21** does not determine at ST**74** that the characters include ally and enemy characters, the process proceeds to ST**77**.

At ST**77**, whether or not the characters having the same turn interval value are ally characters is determined. In the processing, the CPU **21** determines whether or not the characters determined to have the same turn interval value at ST**73** are ally characters. If the CPU **21** determines that the characters having the same turn interval value are ally characters, the process proceeds to ST**78**. On the other hand, if the CPU **21** does not determine that the characters having the same turn interval value are ally characters, the CPU **21** compares the turn elapsed times calculated at ST**72** and determines the turn order so that the character having the longer turn elapsed time takes precedence over any other character based on the comparison result (ST**80**), and the process proceeds to ST**76**.

At ST**78**, whether or not the timing is just after the battle starts is determined. In the processing, if the CPU **21** determines that the timing is just after the battle starts, the CPU **21** determines the turn order according to the list order (ST**79**), and the process proceeds to ST**76**. On the other hand, if the CPU **21** does not determine that the timing is just after the battle starts, the CPU **21** compares the turn elapsed times calculated at ST**72** and determines the turn order so that the character having the longer turn elapsed time takes precedence over any other character based on the comparison result (ST**80**), and the process proceeds to ST**76**.

At ST**76**, turn order decision processing is executed. In the processing, the CPU **21** decides the turn order so that the characters take action in the ascending order of the turn interval values based on the comparison result at ST**71**, and stores the turn order in a predetermined area of the RAM **23**. The CPU **21** selects the character for executing action based on the turn order and makes effective action command selection in the selected character.

A specific example will be discussed with FIGS. **13**A to **13**C. FIGS. **13**A to **13**C are schematic representations to show the turn interval values set for each character. FIGS. **13**A to **13**C show the turn interval values in a battle scene wherein the ally character A **111**, the ally character B **112**, the ally character C **113**, and the ally character D **114** appear as the ally characters and the enemy character A **115**, the enemy character B **116**, and the enemy character C **117** appear as the enemy characters.

As described above, the turn interval value is calculated for each of the characters and is stored in the predetermined area of the RAM **23** as shown in FIGS. **13**A. AA**1** is stored as the first turn interval value in the ally character A **111**. AB**1** is stored as the first turn interval value in the ally character B **112**. AC**1** is stored as the first turn interval value in the ally character C **113**. AD**1** is stored as the first turn interval value in the ally character D **114**. BA**1**, is stored as the first turn interval value in the enemy character A **115**. BB**1**, is stored as the first turn interval value in the enemy character B **116**. BC**1**, is stored as the first turn interval value in the enemy character C **117**. AA**2** is stored as the second turn interval value in the ally character A **111**, as described above.

When the turn interval values set for the characters have the relation that AA**1**<AB**1**<BC**1**<BA**1**=AD**1**<BB**1**<AC**1**, action is executed in the following order: The ally character A **111** with the turn interval value AA**1**, the ally character B **112** with the turn interval value AB**1**, the enemy character C **117** with the turn interval value BC**1**, the ally character D **114** with the turn interval value AD**1**, the enemy character A **115** with the turn interval value BA**1**, the enemy character B **116** with the turn interval value BB**1**, and the ally character C **113** with the turn interval value AC**1**. An order image to execute action in this order is displayed on the screen **16**.

When the action of the ally character A **111** is executed according to the order, the turn interval value is calculated based on the action type (execution command correction value) and is stored as shown in FIGS. **13**B. AA**2** is stored as the second turn interval value in the ally character A **111**.

Subsequently, to determine the second character for executing action, the turn interval value AA**2** is recognized as the second turn interval value and thus the turn interval values of the ally character B **112**, the ally character C **113**, the ally character D **114**, the enemy character A **115**, the enemy character B **116**, and the enemy character C **117** are compared. Since AB**1** is the minimum, the ally character B **112** is selected. Accordingly, the second action in the ally character A **111** is not executed before all other characters execute action. When the action of the ally character B **112** is executed, the turn interval value is calculated based on the action type and is stored as shown in FIGS. **13**A. AB**2** is stored as the second turn interval value in the ally character B **112**. A comparison is also made between AA**2** and AB**2**, the next action execution order is determined, and the turn order responsive to the order is displayed.

As such processing is repeated, after action of the ally character C **113** with the maximum turn interval value is executed, it is recognized that action of all characters terminates, and all turn interval values indicating the second action are compared.

When the characters having the same turn interval value exist, the CPU **21** decides the turn order based on the turn order determined at any of ST**75**, ST**79**, or ST**80** and stores the turn order in the predetermined area of the RAM **23**. Since the turn order is stored in the predetermined area of the RAM **23** at ST**36**, action command selection is not made effective for any character already executing action until all other characters execute action. Upon completion of the processing, the subroutine is exited.

Command Processing

The "command processing" will be discussed with FIG. **14**.

As shown in FIG. **14**, first, whether or not the command is an ACTION SELECTION command is determined (ST**201**). In the processing, the CPU **21** determines whether or not the command is an ACTION SELECTION command in response to an input signal, etc., from the controller **4**. The ACTION SELECTION command mentioned here includes the above-described ATTACK command and a spell command and also contains a SPECIAL TECHNIQUE command such as a FUSION command. If the CPU **21** determines that the command is an ACTION SELECTION command, the CPU **21** executes "action selection processing" of physical attack, spell, specific technique, etc., (ST**202**) and exits the subroutine. The "action selection processing" is described later in detail. On the other hand, if the CPU **21** does not determine that the command is an ACTION SELECTION command, the process proceeds to ST**203**.

At ST**203**, whether or not the command is a COMBINATION SELECTION command is determined. In the processing, the CPU **21** determines whether or not the command is a COMBINATION SELECTION command in response to an input signal, etc., from the controller **4**. If the CPU **21** determines that the command is a COMBINATION SELECTION command, the CPU **21** executes "combination move processing" of moving a character to make combination attack (ST**204**) and exits the subroutine. The "combination move processing" is described later in detail. On the other hand, if the CPU **21** does not determine that the command is a COMBINATION SELECTION command, the process proceeds to ST**205**.

At ST**205**, whether or not the command is an ITEM command is determined. In the processing, the CPU **21** determines whether or not the command is an ITEM command in response to an input signal, etc., from the controller **4**. If the CPU **21** determines that the command is an ITEM command, the process proceeds to ST**206**. On the other hand, if the CPU **21** does not determine that the command is an ITEM command, the process proceeds to ST**207** in FIG. **15**.

At ST**206**, "judgment processing" is executed. In the processing, the CPU **21** determines the action type and executes action responsive to the determined action type. The "judgment processing" is described later in detail. Upon completion of the processing, the subroutine is exited.

Subsequently, at ST**207** in FIG. **15**, the CPU **21** determines whether or not the command is a DEFEND command. If the CPU **21** determines that the command is a DEFEND command, the CPU **21** executes defense processing (ST**208**) and exits the subroutine. On the other hand, if the CPU **21** does not determine that the command is a DEFEND command, the CPU **21** executes escape processing (ST**209**). Upon completion of the processing, the subroutine is exited.

Combination Move Processing

The "combination move processing" will be discussed with FIG. **17**.

The "combination move" is action to make the later combination attack. As shown in FIG. **17**, first, move target selection screen display processing is executed (ST**281**). In the processing, the CPU **21** displays a move target selection screen as shown in FIG. **18**. Upon completion of the processing, the process proceeds to ST**282**.

At ST**282**, move target selection command acceptance processing is executed. In the processing, the CPU **21** determines the move target in response to an entry operation signal supplied from the controller **4**. For example, when an entry operation signal for selecting the ally character D is supplied from the controller **4** as shown in FIG. **18**, the CPU **21** determines action for moving to the proximity of the ally character D **114**, specifically the combination attack effective range **120** (within 1 m in diameter with the ally character D as the center), and stores the action in a predetermined area of the RAM **23**. Upon completion of the processing, the process proceeds to ST**283**.

At ST**283**, move method selection screen display processing is executed (ST**283**). In the processing, the CPU **21** displays a move method selection screen as shown in FIG. **19**. Upon completion of the processing, the process proceeds to ST**222**.

At ST**222**, "command acceptance processing" is executed. In the processing, the CPU **21** determines the move method in response to an entry operation signal supplied from the controller **4**. For example, when an entry operation signal for selecting ENDURE is supplied from the controller **4** as shown in FIG. **19**, the CPU **21** determines action as ENDURE move method after move, and stores the action in a predetermined area of the RAM **23**. The "command acceptance processing" is described later in detail. Upon completion of the processing, the process is returned to ST**285**.

At ST**285**, whether or not the command is an ENDURE command is determined. In the processing, if the CPU **21** determines at ST**285** that the command is an ENDURE command, the process proceeds to ST**286**. On the other hand, if the CPU **21** does not determine at ST**285** that the command is an ENDURE command, the process proceeds to ST**288**.

At ST**286**, value "2" is added to hold-out power. In the processing, the CPU **21** reads the hold-out power stored in a predetermined area of the RAM **23** and then adds 2 to the read hold-out power and stores the result as the hold-out power, thereby incrementing the hold-out power by 2 for update. Upon completion of ST**286**, the process proceeds to ST**287**.

At ST**287**, value "2" is subtracted from the physical attack power. In the processing, the CPU **21** reads the physical attack power stored in a predetermined area of the RAM **23** and then subtracts 2 from the read physical attack power and stores the result as the physical attack power, thereby decrementing the physical attack power by 2 for update. Upon completion of ST**287**, the process proceeds to ST**288**.

At ST**288**, character position information is updated. In the processing, the CPU **21** updates and stores position information set for each character as shown in FIG. **20** in response to the move target determined at ST**282**. The position information in FIG. **20** is indicated by the three position coordinates of X, Y, and Z. This means that the position information is stored as three-dimensional information. Upon completion of ST**288**, the process proceeds to ST**289**.

At ST**289**, effect image display processing is executed. In the processing, the CPU **21** displays an effect image for moving the characters on the screen **16** as shown in FIG. **21** in

response to the move target and the move method determined at ST**282** and ST**222**. Upon completion of the processing, the subroutine is exited.

In the embodiment, the position information of only the ally character for which the move action command is selected is updated and stored, thereby producing display so as to move only the ally character for which the move action command is selected, but another action may be adopted. For example, the position information of all ally characters may be updated and stored so as to move to the proximity of the move target character, thereby producing display so as to move all ally characters.

Screen Display Description in Combination Move Processing

The screens provided on the screen **16** as the "combination move processing" is thus executed will be discussed with FIGS. **18**, **19**, and **21** to **26**. A description is given by taking a "battle scene" wherein the four ally characters (**111** to **114**) and the three enemy characters (**115** to **117**) appear as an example.

As shown in FIG. **22**, an action command selection screen for the ally character A **111** is displayed. When the player selects a COMBINATION command by the controller **4**, the move method is determined and the move target selection screen shown in FIG. **18** is displayed. Subsequently, when the player selects a CHARACTER D command by the controller **4** on the move target selection screen, the move target is determined and the move method selection screen shown in FIG. **19** is displayed. When the player selects an ENDURE command by the controller **4** on the move method selection screen, the ally character A **111** is displayed so as to move to the proximity of the ally character D **114**, specifically the combination attack effective range **120** (within 1 m in diameter with the ally character D as the center), as shown in FIG. **21**. The ally character B **112** is also displayed so as to move to the inside of the combination attack effective range **120** with the ally character D **114** as the center as shown in FIG. **24** based on command operation in COMBINATION shown in FIG. **23**. Further, the ally character C **113** is also displayed so as to move to the inside of the combination attack effective range **120** with the ally character D **114** as the center as shown in FIG. **26** based on command operation in COMBINATION shown in FIG. **25**. Thus, the ally character A **111**, the ally character B **112**, and the ally character C **113** are displayed so as to move to the inside of the combination attack effective range **120** with the ally character D **114** as the center.

Judgment Processing

The "judgment processing" will be discussed with FIG. **27**.

To begin with, the CPU **21** displays an action selection screen as shown in FIG. **16** on the screen **16** (ST**221**) and executes "command acceptance processing" (ST**222**). In the processing, the CPU **21** determines the action to be executed in response to an entry operation signal supplied from the controller **4**. Specifically, the type of attack, spell, or specific technique is determined. For example, when the player selects an ACTION SELECTION command, the type of hit is determined. The type of hit is soft hit, normal hit, hard hit, etc. The CPU **21** also displays the temporary turn order corresponding to the selected command. That is, the turn order when the selected command is executed is forecasted and is displayed. The "command acceptance processing" is described later in detail. Upon completion of the processing, the process proceeds to ST**223**.

At ST**223**, the CPU **21** displays an action target selection screen as shown in FIG. **28** on the screen **16** (ST**223**), and executes action target selection command acceptance processing (ST**224**). In the processing, the CPU **21** determines the character (target character) to which the action taken based on the selected command at ST**222** (attack, use of attack spell, use of recovery spell, use of specific technique, use of item, etc.,) is applied in response to an entry operation signal supplied from the controller **4**, and stores the target character in a predetermined area of the RAM **23**.

In the processing, "attack target range display processing" described later is called, and the attack target range and the attack target character are displayed. The target character is selected as follows: A selection mark **46** displayed on the action target selection screen is moved as the player operates the up button **7** or the down button **8** of the controller. When the player operates the O button **12**, the character with the selection mark **46** displayed above the head is determined to be the target character. The above-described character position information indicates the center of the character and is also used for control concerning the attack target range. The position information indicating the center of the character may be used, but may be formed so as to indicate the occupation range of the character. For example, when the occupation range of the character is within the attack target range, the character may be adopted as the attack target character. FIG. **28** shows the case where the selection mark **46** is displayed above the head of the enemy character A **115** and the enemy character A **115** is determined to be the target character. The CPU **21** for executing the processing corresponds to reference character determination section for determining the reference character used as the attack range reference to the attack selected in response to player's entry operation through the operation unit. Upon completion of the processing, the process proceeds to ST**225**.

At ST**225**, "judgment ring determination processing" is executed. In the processing, the CPU **21** determines the display mode of a judgment ring **100** (FIG. **30**) and a rotation bar **101** in response to the skills concerning the character for taking action. The "judgment ring determination processing" is described later in detail. When the processing is exited, the process is returned to ST**226**.

At ST**226**, "judgment ring decision processing" is executed. In the processing, the CPU **21** determines the action of attack, etc., in response to player's entry operation through the controller **4**. The "judgment ring decision processing" is described later in detail. When the processing is exited, the process is returned to ST**227**.

At ST**227**, "consecutive attack set processing" is executed. In the processing, the CPU **21** increases the effect on the action of the attack, etc., if a consecutive attack condition is satisfied. The "consecutive attack set processing" is described later in detail. When the processing is exited, the process is returned to ST**228**.

At ST**228**, HP, MP, and SP are updated. In the processing, the CPU **21** updates the values of HP, MP, and SP based on the damage amount or the recovery value calculated in the "judgment ring decision processing," "consecutive attack set processing." Here, HP and MP are incremented or decremented and SP is decremented in response to the damage amount, the recovery value, etc. SP is decremented by one each time ST**228** is executed. That is, it is decremented by one every turn of the character. Upon completion of the processing, the process proceeds to ST**229**.

The SP decrement value may be determined in response to the damage amount, the recovery value, etc. For example, a value proportional to the damage amount, the recovery value, etc., (for example, the value of one-tenth of the damage amount, the recovery value, etc.,) is determined to be the SP decrement value.

The time interval between the instant at which command selection becomes effective and the instant at which the judgment ring **100** (FIG. **30**) is displayed (the number of seconds) may be determined to be the SP decrement value. In this case, the time required for command selection of the player is set as the SP decrement value. Thus, if command selection of the player is rapid, the SP decrement value may be small, but it takes time in selecting a command, the value as much as the taken time is subtracted from the SP.

At ST**229**, whether or not a parameter update condition based on a special item or a special technique is satisfied is determined. In the processing, when a special item was used or a special technique was executed at ST**222**, ST**224**, ST**225**, ST**226**, the CPU **21** determines whether or not the parameter update condition based on the special item or the special technique is satisfied. When a special item was used or a special technique was executed at ST**222**, ST**224**, ST**225**, ST**226**, when the effect of the used special item or the executed special technique becomes ineffective, the CPU **21** also determines whether or not the parameter update condition based on the special item or the special technique is satisfied. If the CPU **21** determines that the parameter update condition based on the special item or the special technique is satisfied, the process proceeds to ST**230**. On the other hand, if the CPU **21** does not determine that the parameter update condition based on the special item or the special technique is satisfied, the process proceeds to ST**231**.

At ST**230**, the individual skill parameters of AGL, LUC, etc., are updated. In the processing, the CPU **21** updates and stores the individual skill parameters of AGL, LUC, etc., based on the used special item or the executed special technique at ST**222**, ST**224**, ST**225**, ST**226**. When a special item was used or a special technique was executed at ST**222**, ST**224**, ST**225**, ST**226**, when the effect of the used special item or the executed special technique becomes ineffective, the CPU **21** also updates and stores the individual skill parameters of AGL, LUC, etc., based on the special item or the special technique. Upon completion of the processing, the process proceeds to ST**231**.

At ST**231**, the status is updated. In the processing, the CPU **21** updates the status of the character in response to the action executed according to the "judgment ring decision processing." In the update processing, when the status of the character is updated to the "abnormal status," the character enters the abnormal status different from a normal status. The "abnormal status" varies depending on the type of attack item, spell, etc. For example, "poison" abnormal status is an abnormal status in which the physical strength of the character is automatically decreased every turn for the main character to take action upon reception of spell from the enemy or upon reception of attack of a predetermined item. "petrifaction" abnormal status is an abnormal status in which the character is fixed like a stone and it becomes impossible to enter a command upon reception of spell from the enemy or upon reception of attack of a predetermined item. Upon completion of the processing, the process proceeds to ST**232**.

At ST**232**, effect image display processing is executed. In the processing, the CPU **21** displays an effect image to take predetermined action (attack, working spell, executing a special technique, using an item, etc.,) in characters in response to the action executed according to the "judgment ring decision processing." The CPU **21** also displays a parameter image of HP, MP, SP, etc., on the screen **16** based on the updated parameters. Upon completion of the processing, the subroutine is exited.

Command Acceptance Processing

The "command acceptance processing" will be discussed with FIG. **29**.

As shown in FIG. **29**, first, whether or not the SP of the selected character is 0 is determined (ST**55**). In the processing, when the character for which command selection is made effective is an ally character in the "turn order processing," the CPU **21** determines whether or not the SP of the ally character is 0. If the CPU **21** determines that the SP of the selected character is 0, the process proceeds to ST**56**. On the other hand, if the CPU **21** does not determine that the SP of the selected character is 0, the process proceeds to ST**57**.

At ST**56**, character runaway processing is executed. In the processing, the CPU **21** selects the type of command for determining the type of action (attack, use of attack spell, use of recovery spell, etc.,) at random. The CPU **21** selects a character to which the action is applied at random regardless of whether the character is an enemy or an ally. That is, the command operation for the selected ally character becomes ineffective and action is selected at random regardless of whether the character is an enemy or an ally. Upon completion of the processing, the subroutine is exited.

In the embodiment, once the runaway state is entered, no commands are accepted; however, only some commands may be accepted on a predetermined condition. For example, although only the ITEM command is accepted, which character the selected "item" is to be used for is unknown or one FIGHT command is accepted every three turns. The main character runs away when SP=0 and the character may be restored to the normal state after the expiration of a time interval rather than continuing to run away.

At ST**57**, whether or not any character took action is determined. In the processing, if the CPU **21** determines that any character took action, the process proceeds to ST**58**. On the other hand, if the CPU **21** does not determine that any character took action, the process proceeds to ST**59**.

At ST**58**, "temporary turn order display processing" is executed. In the processing, the CPU **21** displays the temporary turn order responsive to the selected command on the screen **16**. The "temporary turn order display processing" is described later in detail. When the processing is exited, the process is returned to ST**59**.

At ST**59**, "attack target range display processing" is executed. In the processing, the CPU **21** displays the attack target range responsive to the selected command on the screen **16**. The "attack target range display processing" is described later in detail. When the processing is exited, the process is returned to ST**60**.

At ST**60**, whether or not command decision operation is performed is determined. In the processing, if the CPU **21** determines that the player performs command decision operation in response to an entry operation signal supplied from the controller **4**, the subroutine is exited. On the other hand, if the CPU **21** does not determine that the player performs command decision operation in response to an entry operation signal supplied from the controller **4**, the process again goes to ST**57**.

Temporary Turn Order Display Processing

The "temporary turn order display processing" will be discussed with FIG. **81**.

As shown in FIG. **81**, first, the execution command correction value is set in response to the selected command (ST**262**). In the processing, the CPU **21** reads the execution command correction value in execution of the selected command is executed from the DVD-ROM **31** or the predetermined area of the RAM **23** into which the execution command correction

value is loaded from the DVD-ROM **31** for storage. Upon completion of the processing, the process proceeds to ST**263**.

At ST**263**, temporary turn interval value calculation processing is executed. In the processing, the CPU **21** calculates the turn interval value in execution of the selected command as the temporary turn interval value based on the execution command correction value, etc., read at ST**262**. Upon completion of the processing, the process proceeds to ST**264**.

At ST**264**, temporary turn interval value comparison processing is executed. In the processing, the CPU **21** compares the turn interval values in execution of the selected command based on the temporary turn interval value calculated at ST**263**. The turn interval values are compared between the characters already taking action in the same turn. Upon completion of the processing, the process proceeds to ST**265**.

At ST**265**, temporary turn order determination processing is executed. In the processing, the CPU **21** stores the turn order in execution of the selected command in a predetermined area of the RAM **23** as the temporary turn order based on the comparison result at ST**264**. The CPU **21** for executing ST**264** and ST**265** corresponds to execution order temporary calculation section for temporarily calculating the action execution order in all characters in response to the selected (specified) command. Upon completion of the processing, the process proceeds to ST**266**.

At ST**266**, temporary turn order display processing is executed. In the processing, the CPU **21** displays an image based on the turn order stored in the predetermined area of the RAM **23** at ST**265** on the screen **16** as the temporary turn order image in execution of the selected command. A specific example will be discussed with FIGS. **84** to **86**. Command selection display for the ally character B **112** is produced on the display **16** shown in FIG. **84**. The current turn of the ally character A **111**, the ally character C **113**, and the ally character D **114** already terminates. The selection cursor **45** points to ITEM and the player does not yet select specific action. In this case, the present turn order **118** is displayed on the top of the screen **16**. When HARD HIT of ATTACK command is selected as shown in FIG. **85** in response to player's entry operation through the controller **4**, the temporary turn order after action is executed is displayed. For example, the turn order in which the action turn of the ally character B **112** comes around following the ally character D **114** and preceding the ally character A **111** is displayed. In this case, the current turn of the ally character A **111**, the ally character C **113**, and the ally character D **114** already terminates and thus the turn order **118** in the next turn is displayed in response to action selection of the ally character B **112**, so that the player can forecast the turn order and can devise a stratagem. When WIND of SPELL command is selected as shown in FIG. **86** in response to player's entry operation through the controller **4**, the temporary turn order after action is executed is also displayed. For example, the turn order in which the action turn of the ally character B **112** comes around following the ally character A **111** and preceding the ally character C **113** is displayed. Thus, the turn order in execution of the selected command (temporary turn order) is displayed on the screen **16**; in other words, for each selected command, the turn order corresponding to the command is displayed, so that the player can devise a stratagem in the "battle scene". The CPU **21** for executing the processing corresponds to temporary order display control section for displaying the action execution order temporarily calculated by the execution order temporary calculation section on the screen. The temporary order display is produced until the command is decided. Upon completion of the processing, the subroutine is exited.

Accordingly, the CPU **21** repeatedly executes ST**262** to ST**266**, and displays the temporary turn order for the selected command successively on the screen **16**. When a different command is selected in response to an entry operation signal from the controller **4**, the CPU **21** displays the temporary turn order corresponding to the different command. Thus, a different turn order may be displayed depending on the selected command and the player can be given an occasion to devise a stratagem.

Attack Target Range Display Processing

The "attack target range display processing" will be discussed with FIG. **82**.

As shown in FIG. **82**, first, the attack target range is calculated in response to the selected command (ST**271**). In the processing, the CPU **21** calculates the attack target range based on the selected command. Specifically, the CPU **21** reads the attack target range based on the command from the DVD-ROM **31** or the predetermined area of the RAM **23** into which the attack target range is loaded from the DVD-ROM **31** for storage, as shown in FIG. **51**. The CPU **21** reads the data indicating the shape of the attack target range based on the read attack target range and a table shown in FIGS. **80**A through **80**D. Accordingly, the CPU **21** calculates the attack target range based on the selected command. Upon completion of the processing, the process proceeds to ST**272**.

Different types of attack ranges are set in the tables shown in FIG. **80**, which are stored in the DVD-ROM **31** or are loaded by the CPU **21** into the predetermined area of the RAM **23** from the DVD-ROM **31**. The attack range is used as two-dimensional data, but may be formed as three-dimensional data.

At ST**272**, target character specification display processing is executed. In the processing, the CPU **21** displays the selection mark **46** indicating that the character is the attack reference for the selected attack target character as shown in FIGS. **75** to **78**. Upon completion of the processing, the process proceeds to ST**273**.

At ST**273**, target character position information extraction processing is executed. In the processing, the CPU **21** reads position information as shown in FIG. **20** from the predetermined area of the RAM **23**. The CPU **21** reads the position information of not only the character as the attack reference, but also all ally and enemy characters appearing in the "battle scene." The CPU **21** for executing the processing corresponds to attack range extraction section for extracting the attack range corresponding to the attack selected in response to player's entry operation through the operation unit from different types of attack ranges. Upon completion of the processing, the process proceeds to ST**274**.

At ST**274**, attack target range-calculation processing is executed with the position information as the reference. In the processing, the CPU **21** calculates the attack target range calculated at ST**271** with the character pointed to by the selection mark **46** as the reference. Specifically, when the attack target range based on the command is small circle, the CPU **21** adopts as the attack target range, the range having a radius of R**1** with the position information of the character pointed to by the selection mark **46** as the reference. The CPU **21** displays each attack target range **48** on the screen **16** as shown in FIGS. **75** to **78** based on the calculated attack target range and the target character selected as the attack reference (reference character) The CPU **21** for executing the processing corresponds to attack range display control section for displaying the attack range corresponding to the attack extracted by the attack range extraction section on the screen based on the reference character determined by reference

character determination section. Upon completion of the processing, the process proceeds to ST275.

At ST275, a character in the attack target range is detected based on the character position information. In the processing, the CPU 21 detects whether or not a character exists in the attack target range calculated at ST274. Specifically, the CPU 21 compares the attack target range calculated at ST274 with the position information of all characters appearing in the "battle scene." The character position information indicates the center of the character and is indicated by the three position coordinates of X, Y, and Z as shown in FIG. 20. That is, the CPU 21 compares the position information stored for each character with the attack target range and determines whether or not a character exists in the attack target range. The CPU 21 detects the character in the attack target range based on the comparison result. Upon completion of the processing, the process proceeds to ST276.

At ST276, specification display processing is executed for the character in the attack target range. In the processing, the CPU 21 displays an attack target mark 47 indicating that the character is the attack target for each character detected being in the attack target range at ST275, as shown in FIGS. 75 to 78.

The attack target range indicates the attack target range with the enemy character to be attacked as the reference. There are different types of specific attack target range shapes. For example, a circle shown in FIG. 75, a sector shown in FIG. 76, a straight line shown in FIG. 78, and a through shape shown in FIG. 77 are set. The circular attack target range is shaped like a circle with the reference character as the center. There are different types of circular attack target ranges (for example, large circle, medium circle, small circle) different in radius (for example, R11, R12, R13), as shown in FIG. 80A. The sector attack target range is shaped like a sector with the reference character as the center. There are different types of sector attack target ranges (for example, large sector, medium sector, small sector) different in radius and angle (for example, radius of R21, R22, R23 and angle of D1, D2, D3), as shown in FIG. 80B. Further, the linear attack target range is along the straight line connecting the character to be attacked and the reference character. There are different types of linear attack target ranges (for example, large straight line, medium straight line, small straight line) different in width (for example, W1, W2, W3), as shown in FIG. 80C. Further, the through-shape attack target range is a combination of a circle with the reference character as the center and a shape along the straight line connecting the character to be attacked and the reference character. That is, the through-shape attack target range is provided by combining the circular attack target range and the linear attack target range. There are different types of through-shape attack target ranges (for example, large through shape, medium through shape, small through shape) different in radius and width (for example, R21, R22, R23 and W1, W2, W3), as shown in FIG. 80D. The CPU 21 for executing the processing corresponds to target character display control section for displaying an image for enabling the player to distinguish between the reference character determined by the reference character determination section and the target character as the attack target contained in the attack range. Upon completion of the processing, the subroutine is exited.

Description of Judgment Ring

Just before the ally character takes action against the target character based on the selected command, a judgment ring 100 as a variable display area is displayed as shown in FIG. 30 and the necessary parameters for determining the effect are determined using the judgment ring 100. The CPU 21 for thus displaying the variable display area corresponds to variable display control section for displaying a variable display area with the display mode changing with the passage of the time on the screen.

As shown in FIG. 30, the judgment ring 100 as the reference area is displayed in a state in which it is inclined in a slanting direction. Displayed on the judgment ring 100 is a rotation bar 101 as a varying area for clockwise rotating like a clock hand with the center point of the judgment ring 100 as a support. This means that the rotation bar 101 as a varying area varies relatively to the reference area. The variable display area with the display mode changing with the passage of the time is made up of the reference area and the varying area varying relatively to the reference area.

Also displayed on the judgment ring 100 are timing areas colored in predetermined angle ranges, which will be hereinafter referred to as timing areas. The timing areas are "effective areas" relatively advantageous to the player. The areas except the "effective areas" in the judgment ring 100 become "non-effective areas" relatively disadvantageous to the player. Each of the timing areas contains a 120% area as a "special effective area" described later.

That is, the reference area is made up of the effective areas relatively advantageous to the player and the non-effective areas relatively disadvantageous to the player, and each of the effective areas contains the special effective area furthermore advantageous to the player. Accordingly, the action effect is determined to be any of the first effect relatively advantageous to the player, the second effect relatively disadvantageous to the player, or the third effect furthermore relatively advantageous to the player.

Then, the settings of the parameters are changed depending on whether or not the player can operate the O button 12 when rotation of the rotation bar 101 is started and the rotation bar 101 passes through any of the timing areas. The timing areas include three timing areas as shown in FIG. 30. The timing area through which the rotation bar 101 first passes is a "first timing area" 102, the timing area through which the rotation bar 101 next passes is a "second timing area" 103, and the timing area through which the rotation bar 101 last passes is a "third timing area" 104.

For example, when the player can well operate the O button 12 on any of the three timing areas, namely, the player can operate the O button 12 with the rotation bar 101 on any of the three timing areas, then the action taken by the main character against the enemy character becomes effective. When the FIGHT command is selected, three attacks are made on the enemy character to cause damage thereto by predetermined attack power. When the SPECIAL command is selected and recovery spell is used, spell having predetermined recovery power can be worked on an ally character three times for giving recovery power to the ally character.

In contrast, when the player upsets the operation timing of the O button 12 on one timing area, the advantage assigned to the timing area becomes ineffective. Particularly, when the player fails three times, the advantage becomes zero. In the embodiment, the player visually recognizes the effective areas of the judgment ring 100; the point is that the five senses of the player may be influenced to enable the player to recognize the operation timing. For example, it is also possible to adopt an auditory configuration wherein specific voice (sound) is generated for a predetermined time and the player is requested to operate in the generation section or a tactile configuration wherein the controller 4 or a portable terminal is vibrated and the player is requested to operate in the vibration generation section.

FIG. **31** shows a screen displayed when the O button **12** is operated when the rotation bar **101** passes through the first timing area **102**. As shown in FIG. **31**, when the player can well operate the O button **12** on the first timing area **102**, a character string of COOL is displayed, for example.

FIG. **32** shows a screen displayed when the O button **12** is operated when the rotation bar **101** passes through the second timing area **103**. As shown in FIG. **32**, if the player can well operate the O button **12** on the second timing area **103**, a character string of GOOD is displayed, for example.

FIG. **33** shows a screen displayed when the O button **12** is operated when the rotation bar **101** passes through the third timing area **104**. As shown in FIG. **33**, if the player can well operate the O button **12** on the third timing area **104**, a character string of PERFECT is displayed, for example.

FIG. **34** shows a screen displayed when the O button **12** is operated before the rotation bar **101** enters the first timing area **102**, namely, when the player fails in operating the O button **12** on the timing area. As shown in FIG. **34**, if the player fails in operating the O button **12** on the timing area, a character string of MISS is displayed, for example.

FIG. **35** shows a screen displayed after rotation of the rotation bar **101** stops when the player can well operate the O button **12** on the three timing areas, namely, when the player can operate the O button **12** when the rotation bar **101** exists on the three timing areas. As shown in FIG. **35**, the judgment ring **100** is broken to pieces and the pieces scatter at the same time as rotation of the rotation bar **101** stops. Then, the ally character A **111** with the FIGHT command selected in FIG. **22** moves to the enemy character A **115** selected as the target character and attacks the enemy character. The attack power at this time (damage amount to enemy character) varies depending on the operation timing of the O button **12** in the judgment ring **100**. That is, the matching between the timing of player's entry operation through the operation unit performed when the display mode of the variable display area changes and the display mode of the variable display area is determined and the action effect of the attack power, etc., changes with the determination result.

FIG. **36** shows how the ally character A **111** takes action against the enemy character A **115** based on the selected command and the operation result during display of the judgment ring **100**. Here, the FIGHT command is selected and the ally character A **111** attacks the enemy character A **115**. When the player can well operate the O button **12** on the three timing areas during display of the judgment ring **100**, the ally character A **111** makes three attacks on the enemy character A **115** by predetermined attack power on the screen, as described above.

In the embodiment, if the player fails the first operation, he or she can give a challenge to the second operation, but when the player fails the first operation, operation acceptance may be terminated.

FIG. **37** shows a screen displayed when the ally character A **111** terminates the attack on the enemy character A **115** and returns to the former position. Here, the time period from the start of action of the character or an enemy character against the target character (the state shown in FIG. **36**) to the termination of the action (the state shown in FIG. **37**) is referred to as "a (one) turn" and display processing for the one turn is performed in the "effect image display processing" at ST**232** (FIG. **27**).

Judgment Ring Determination Processing

FIG. **38** shows a procedure of the "judgment ring determination processing" at ST**225** (FIG. **27**). Here, first any of the "attack table" (FIGS. **39**), the "special table" (FIG. **40**), or the "item table" (FIG. **41**) set in the RAM **23** is referenced and the timing area ranges are determined (ST**91**). Subsequently, the timing area ranges determined at ST**91**, predetermined rotation speed and the predetermined number of revolutions of the rotation bar, and the size of the judgment ring are corrected based on judgment ring correction parameters described later (ST**92**). The rotation speed of the rotation bar is set to 1.5 seconds per round (revolution) as the basic speed, and the number of revolutions of the rotation bar is set to one as the basic number of revolutions. The judgment ring **100** is displayed in the timing area ranges finally determined at ST**92** and rotation display of the rotation bar **101** is produced based on the determined rotation speed and the determined number of revolutions of the rotation bar **101** as judgment ring varying display processing (ST**93**). The timing areas and the judgment ring correction parameters are as follows:

FIG. **39** shows the "attack table." The "attack table" is a table set when the player selects the FIGHT command. As shown in FIG. **39**, the attacks that can be used are defined according to the type of ally character, and the attack skill and the range of each timing area are set in response to the type of attack (for example, soft hit, normal hit, or hard hit).

The attack skill is used to calculate the damage amount to an enemy character (opposite character damage amount). The greater the numeric value of the attack skill, the larger the damage amount to the enemy character.

The range of each timing area is indicated by the angle range surrounded by the "start angle" and "end angle" with rotation start position of the rotation bar **101**, **100***a*, as 0 degrees, as shown in FIG. **39**. The "start angle" and "end angle" are set to different values in response to the type of used arm, as shown in FIG. **39**. For example, when the main character is the main character A **111** and the used arm is an arm A**1**, the range of the first timing area **102** is set to the 90-degree angle range of the start angle 45 degrees to the end angle 135 degrees. The range of the second timing area **103** is set to the 67-degree angle range of the start angle 180 degrees to the end angle 247 degrees. The range of the third timing area **104** is set to the 45-degree angle range of the start angle 292 degrees to the end angle 337 degrees.

In the judgment ring **100**, a "120% area" is set as a special effective area in the predetermined range of each timing area; when the rotation bar passes through the area, if the player can operate the O button **12**, the damage amount to the enemy character increases 20%, namely, becomes 1.2 times. The "120% area" is formed in the range of the angle position resulting from subtracting the angle of the "120% area" from the end angle to the end angle.

FIG. **42** shows a calculation expression for calculating the damage amount to the enemy character (opposite character damage amount).

"Assignment value" is set to 0.2 at the first attack time, 0.3 at the second attack time, and 0.5 at the third attack time, as shown in FIG. **42**.

"SP remaining amount correction value" is 1 until the current SP falls below 25% of the maximum SP, namely, while "25−current SP/maximum SP×100≦0" is satisfied. When the current SP falls below 25% of the maximum SP, namely, when "25−current SP/maximum SP×100>0" is satisfied, 0.01 is added to the "SP remaining amount correction value" and the "SP remaining amount correction value" becomes 1.01. Then, whenever SP is decremented by one, 0.01 is added to the "SP remaining amount correction value." That is, whenever SP is decremented by one, the opposite character damage amount is increased 1%.

"Character individual skill" means the STR (physical attack power) shown in FIGS. **7**, and "used item individual skill" is a value set in response to the types of main character and arm shown in FIG. **39**.

"Judgment ring correction value" is 1.2 if the player operates the O button **12** when the rotation bar **101** is on the 120% area of any timing area; 1 if the player operates the O button **12** when the rotation bar **101** is on any other area than the 120% area of any timing area; or 0 if the player does not operate the O button **12** when the rotation bar **101** is on any timing area.

For example, when the FIGHT command is selected, when the player can well operate the O button **12** on the three timing areas, namely, when the player can operate the O button **12** when the rotation bar **101** is on the three timing areas, then the main character repeats an attack on the enemy character three times to give predetermined damage to the enemy character. For example, when the main character A **111** uses the arm Al to attack the enemy character, the opposite character damage amount at the first attack becomes "0.2×SP remaining amount correction value×STR×6×1 (1.2)" and as many points as the opposite character damage amount are subtracted from the HP of the enemy character. Likewise, the opposite character damage amount at the second attack becomes "0.3×SP remaining amount correction value×STR×6×1 (1.2)" and that at the third attack becomes "0.5×SP remaining amount correction value×STR×6×1 (1.2)." As many points as the opposite character damage amount are subtracted from the HP of the enemy character.

On the other hand, when the player upsets the operation timing of the O button **12** on one timing area, the later "judgment ring correction value" in the timing area becomes 0. For example, when the main character uses the arm Al to attack the enemy character, when the player can operate the O button **12** when the rotation bar **101** is on the first timing area, the opposite character damage amount at the first attack becomes "0.2×SP remaining amount correction value×STR×6×1 (1.2)." However, when the player upsets the operation timing of the O button **12** on the second timing area, the "judgment ring correction value" at the second attack and that at the third attack become 0 and the opposite character damage amount also becomes 0.

When the HP of the enemy character becomes 0, it means that the main character beats the enemy character.

FIG. **43** shows the display mode of the judgment ring **100** displayed at the command determination time. It shows the judgment ring **100** displayed at the command determination time when the ally character is the main character A **111**, and the SOFT HIT command is selected. The judgment ring **100** is formed according to the angle ranges of the timing areas set in the "attack table" shown in FIG. **39**. When the main character is the ally character A **111**, and the ATTACK command is selected, the start angle and the end angle of the first timing area **102** are 45 degrees and 135 degrees; those of the second timing area **103** are 180 degrees and 247 degrees; and those of the third timing area **104** are 292 degrees and 337 degrees. As shown in FIG. **43**, the "120% area" in the first timing area **102** is a range **102***a* of 105 degrees resulting from subtracting 30 degrees from the end angle 135 degrees to the end angle 135 degrees; the "120% area" in the second timing area **103** is a range **103***a* of 224 degrees resulting from subtracting 23 degrees from the end angle 247 degrees to the end angle 247 degrees; and the "120% area" in the third timing area **104** is a range **104***a* of 322 degrees resulting from subtracting 15 degrees from the end angle 337 degrees to the end angle 337 degrees.

FIG. **44** shows the display mode of the judgment ring **100** after the command determination. It shows a state in which the rotation bar **101** starts to rotate and passes through the first timing area **102**.

The "120% areas" are not limited to those described above. For example, the "120% area" may be provided in the range of the start angle to a predetermined angle as shown in FIG. **45**A or two "120% areas" may be provided in one timing area as shown in FIG. **45**B. FIG. **45**A shows the case where the range **102***a* of the start angle 45 degrees to the angle 65 degrees (45 degrees+20 degrees) is set as the "120% area". FIG. **45**B shows the case where the range **102***a* of the start angle 45 degrees to the angle 65 degrees (45 degrees+20 degrees) and the range of the angle 105 degrees resulting from subtracting 30 degrees from the end angle 135 degrees to the end angle 135 degrees are set as the "120% areas".

FIG. **40** shows the "special table." The "special table" is a table set when the player selects the SPECIAL command. The SPECIAL command is a command using a special skill set for each character. For example, for the character A **111**, the character is transformed into a fusion monster described later and it is made possible to use attack spell although attack spell cannot be used in the usual status. As shown in FIG. **40**, the special skills that can be used are defined according to the type of main character, and the skill value and the range of each timing area are set for each special skill.

As shown in FIG. **40**, when the ally character is the ally character A **111**, attack spell **1** to attack spell **3** can be used as the special skills. The skill values set for them are used to calculate the opposite character damage amount to give damage to the enemy character using the attack spell **1** to the attack spell **3**. In this case, the greater the skill value of the used special skill, the larger the damage amount to the enemy character, namely, the number of points to decrease the HP of the enemy character. It is made possible to use the attack spell **1** to the attack spell **3** when the character is transformed into a fusion monster described later.

On the other hand, when the ally character is the ally character B **112**, recovery spell **1** to recovery spell **3** can be used as the special skills. The skill values set for them are used to calculate the recovery value to recover an ally character using the recovery spell **1** to the recovery spell **3**. In this case, the greater the skill value of the used special skill, the larger the recovery value of the ally character, namely, the number of points to recover the decreased HP of the ally character receiving damage from the enemy character.

The range of each timing area is indicated by the angle range surrounded by the "start angle" and "end angle" with rotation start position of the rotation bar **101**, **100***a*, as 0 degrees, as with the "arm table" (FIG. **39**). The "start angle" and "end angle" are set to different values in response to the type of used special skill. In addition, in the "special table," only the first timing area **102** is set or only the first timing area **102** and the second timing area **103** are set depending on the type of used special skill. The main character C **113** is not provided with such special skills and neither the skill value nor the timing area range is set in the "special table."

FIG. **46**A shows a calculation expression for calculating the opposite character damage amount when each of the attack spell **1** to the attack spell **3** is used as the special skill and FIG. **46**B shows a calculation expression for calculating the recovery value when each of the recovery spell **1** to the recovery spell **3** is used as the special skill.

"Assignment value" is set to 0.2 at the first special skill use time, 0.3 at the second special skill use time, and 0.5 at the third special skill use time, as shown in FIG. **46**.

"Character individual skill" used with the calculation expression for calculating the opposite character damage amount when each of the attack spell **1** to the attack spell **3** in FIG. **46**A means the INT (spell attack power) shown in FIG. **7**. "Skill value of used special skill" is a skill value set in response to the types of main character and used special skill shown in FIG. **40**.

"Judgment ring correction value" is 1.2 if the player operates the O button **12** when the rotation bar **101** is on the 120% area of any timing area; 1 if the player operates the O button **12** when the rotation bar **101** is on any other area than the 120% area of any timing area; or 0 if the player does not operate the O button **12** when the rotation bar **101** is on any timing area.

For example, when the SPECIAL command is selected for the main character A **111** and attack spell is selected as the used special skill, when the player can well operate the O button **12** on all displayed timing areas, then the main character A attacks the enemy character using the selected attack spell to give predetermined damage to the enemy character. For example, when the main character A uses the attack spell **1** to attack the enemy character, the main character A attacks the enemy character using the attack spell only once because only one timing area is set. The opposite character damage amount at this time becomes "0.2×INT×99×1 (1.2)" from FIG. **46**A and as many points as the opposite character damage amount are subtracted from the HP of the enemy character.

When the SPECIAL command is selected and recovery spell is selected as the used special skill, when the player can well operate the O button **12** on all displayed timing areas, then the main character works the selected recovery spell on an ally character for recovery. For example, when the main character B uses the recovery spell **1**, the main character B **112** uses the recovery spell on the ally character only once because only one timing area is set. The recovery value of the ally character at this time becomes "0.2×19×1 (1.2)" from FIG. **46**B and as many points as the recovery value are added to the HP of the ally character.

Comparing the timing area ranges in the tables by character, in the "attack table" in FIG. **39**, the timing area ranges set for the ally character A **111** generally are wide as compared with those set for the ally character B **112**. For example, the sum total of the timing area ranges with soft hit selected is the angle range of (135−45 degrees)+(247−180 degrees)+(337−292 degrees)=202 degrees, and the sum total of the timing area ranges set to normal hit is the angle range of (125−50 degrees)+(205−157 degrees)+(282−247 degrees)=185 degrees.

The reason why the difference exists is that the ally character A **111** is a male character set to great physical strength and high physical attack power on the story and accordingly excels in a physical attack. Therefore, the timing area ranges when the "attack table" is selected are set wide, and the degree of difficulty in operating the judgment ring **100** is low.

On the other hand, in the "special table" in FIG. **40**, the timing area ranges set for the ally character B **112** are wider than those set for the ally character A **111**.

The reason why the difference exists is that the ally character B **112** is a female character set to a sorcerer on the story; the timing area ranges when recovery spell is used, namely, when the special table is selected are set wide, and the degree of difficulty in operating the judgment ring **100** is low.

Thus, the features of the characters because of setting the story are involved in the execution condition of the judgment ring **100**, so that not only the simple technical intervention element, but also the amusement of finding out commands matching the characteristics of the characters occur, and the interest in the game is furthermore increased.

FIG. **41** shows the "item table." The "item table" is a table set when the player selects the ITEM command. The used item individual skill and the range of each timing area are set in response to the type of used item. As shown in the "item table," items A to C can be used common to all main characters. Each of the items A to C is an item to recover the decreased HP of an ally character receiving damage from an enemy character. Therefore, the used item individual skill is used to calculate the recovery value to recover the ally character using each of the items A to C.

The calculation expression for calculating the recovery value when the main character uses each of the items A to C is the same as that in FIG. **46**B, and "assignment value" is set to 0.2 at the first item use time and 0.3 at the second item use time.

FIG. **47** shows a "judgment ring correction parameter table." The "judgment ring correction parameter table" lists parameters for changing the display mode of the judgment ring **100** (ranges of timing areas, rotation speed and number of revolutions of rotation bar, and size of judgment ring), which will be hereinafter referred to as judgment ring correction parameters, and change in the display mode.

ITEM, ENEMY SPELL, and EVENT TYPE are included as the types of judgment ring correction parameters listed in the "judgment ring correction parameter table."

As listed in the "judgment ring correction parameter table," 10 types of items (item D to item M) are set in the judgment ring correction parameter ITEM, and it is made possible to obtain the items as the main character party clears a predetermined condition on each "sub-map." To use the items at a battle scene, a store, etc., the display mode of the judgment ring **100** differs from the usual state and the judgment ring **100** is displayed in a very advantageous state to the player.

The advantages produced when the items are used are as follows:

(1) When the item D or the item E is used, the range of each timing area is widened twice. That is, the O button **12** becomes easy to operate.

(2) When the item F or the item G is used, the rotation speed of the rotation bar **101** is halved. That is, the O button **12** becomes easy to operate.

(3) When the item H is used, the range of each timing area is doubled and the rotation speed is halved.

(4) When the item I is used, the rotation speed of the rotation bar **101** changes irregularly as it is increased or decreased. However, if the player can well operate the O button **12**, the attack power, namely, the opposite character damage amount is tripled as a very advantageous state.

(5) When the item J is used, the whole range on the judgment ring **100** becomes the timing area. That is, the player achieves success regardless of where the player operates the O button **12** on the judgment ring **100**.

(6) When the item K is used, the number of revolutions of the rotation bar **101**, which usually is one, becomes a maximum of seven. In this case, the player can operate the O button **12** with care.

(7) When the item L is used, the advantage of the item I works, the number of revolutions increases, and the opposite character damage amount increases in response to the consumption number of the number of revolutions when the player succeeds in operating the O button **12**.

(8) When the item M is used, no timing areas are displayed on the judgment ring **100**, but the number of main characters for attacking and the attack power are determined at random in response to the operation timing of the O button **12**.

In blanks in the "judgment ring correction parameter table," the same mode as at the usual time is applied.

As the player acquired the item D to the item M as the judgment ring correction parameters, it is made possible for the player to develop the game very advantageously and thus the items are set as rare items comparatively hard to acquire.

The ENEMY SPELL set as the judgment ring correction parameter means specific enemy spell of spell that the enemy character has (enemy spell). When the main character receives the enemy spell, the display mode of the judgment ring **100** becomes a disadvantageous state to the player. In the "judgment ring correction parameter table," six types of enemy spell (enemy spell A to enemy spell F) are set in the judgment ring correction parameter ENEMY SPELL.

The disadvantages produced when the main character receives the enemy spell are as follows:

(1) When the main character receives the enemy spell A, the range of each timing area on the judgment ring **100** is halved.

(2) When the main character receives the enemy spell B, the rotation speed of the rotation bar **101** is doubled.

(3) When the main character receives the enemy spell C, the size of the judgment ring **100** is halved.

(4) When the main character receives the enemy spell D, the size of the judgment ring **100** is doubled, but the range of each timing area on the judgment ring **100** is halved.

(5) When the main character receives the enemy spell E, the size of the judgment ring **100** is doubled, but the rotation speed of the rotation bar **101** changes irregularly as it is increased or decreased. In this case, if the player can well operate the O button **12**, the attack power remains the usual attack power although it is tripled with the item I.

(6) When the main character receives the enemy spell F, the range of each timing area, the rotation speed of the rotation bar **101**, and the size of the judgment ring **100** are determined at random in the range of half to double.

The EVENT TYPE set as the judgment ring correction parameter is an event that the main character party fights a battle with a specific enemy character. When the event occurs, the display mode of the judgment ring **100** becomes a disadvantageous state to the player. In the "judgment ring correction parameter table," four event types (intermediate bosses A to C and wrath boss) are set in the judgment ring correction parameter EVENT TYPE.

The advantages produced when the event types occur are as follows:

(1) The event type INTERMEDIATE BOSS A is an event that the main character party encounters INTERMEDIATE BOSS A, one type of enemy boss character, and fights a battle therewith. When the event occurs, the rotation speed of the rotation bar **101** is doubled.

(2) The event type INTERMEDIATE BOSS B is an event that the main character party encounters INTERMEDIATE BOSS B, one type of enemy boss character, and fights a battle therewith. When the event occurs, the range of each timing area is halved.

(3) The event type INTERMEDIATE BOSS C is an event that the main character party encounters INTERMEDIATE BOSS C, one type of enemy boss character, and fights a battle therewith. When the event occurs, the range of each timing area is halved and further the rotation speed of the rotation bar **101** changes irregularly as it is increased or decreased.

(4) The event type WRATH BOSS is an event that the main character party encounters WRATH BOSS, one type of enemy boss character, and fights a battle therewith. When the event occurs, the range of each timing area is halved.

The boss character is an enemy character for enabling the player to acquire a very large number of experience points as the player beats the boss character, as compared with the normal enemy character and therefore the display mode of the judgment ring **100** becomes a state in which the player is hard to operate the O button **12**, as described above.

Judgment Decision Processing

The judgment decision processing will be discussed with FIG. **48**.

First, the CPU **21** displays the judgment ring **100** determined at ST**225** and the rotation bar **101** on the screen **16** as variable display area. The CPU **21** displays the rotation bar **101** so that the rotation bar **101** rotates (varies).

The CPU **21** determines whether or not a O button operation signal is input (ST**101**). In the processing, if the player operates the O button **12**, the CPU **21** receives an entry operation signal of the O button **12** from the controller **4** and determines that the O button operation signal is input. If the CPU **21** determines that the O button operation signal is input, the process proceeds to ST**102**. On the other hand, if the CPU **21** does not determine that the O button operation signal is input, the process proceeds to ST**107**.

AT ST**102**, the CPU **21** determines whether or not the rotation bar **101** is on any of the timing areas. In the processing, the CPU **21** determines whether or not the display mode is a mode in which the rotation bar **101** is on any of the timing areas upon reception of the entry operation signal from the controller **4** at ST**101**. This means that the CPU **21** determines whether or not the timing at which the player operated the O button **12** is a specific timing. The CPU **21** for determining the processing corresponds to matching determination section for determining the matching between the timing of player's entry operation through the controller **4** performed when the display mode of the variable display area changes and the display mode.

If the CPU **21** determines that the rotation bar **101** is on any of the timing areas, the process proceeds to ST**103**. On the other hand, if the CPU **21** does not determine that the rotation bar **101** is on any of the timing areas, the process proceeds to ST**107**.

At ST**103**, the rotation bar **101** is on a 120% area is determined. In the processing, the CPU **21** determines whether or not the display mode is a mode in which the rotation bar **101** is on any of the 120% areas of the judgment ring **100** upon reception of the entry operation signal from the controller **4** at ST**101**. This means that the CPU **21** determines whether or not the timing at which the player operated the O button **12** is a specific timing.

If the CPU **21** determines that the rotation bar **101** is on any of the 120% areas, the CPU **21** sets the judgment correction value 1.2 in the predetermined area of the RAM **23** (ST**104**) and the process proceeds to ST**106**. On the other hand, if the CPU **21** does not determine that the rotation bar **101** is on any of the 120% areas, the CPU **21** sets the judgment correction value 1 in the predetermined area of the RAM **23** (ST**105**) and the process proceeds to ST**106**.

At ST**106**, the damage amount or the recovery value is calculated. In the processing, the CPU **21** calculates the damage amount or the recovery value according to the predetermined calculation expression based on the selected command, the type of ally character, and the used item, and sets the calculation result in a predetermined area of the RAM **23**. The CPU **21** for executing the processing corresponds to attack effect calculation section, when consecutive attack hit determination section determines that attack hits the enemy

character at consecutive times, for calculating the effect of damage from each of the attacks hitting the enemy character at consecutive times.

At ST**107**, whether or not the display termination condition of the judgment ring **100** is achieved is determined. The termination condition is (1) consumption of the specified number of revolutions (which is usually one; may increase in response to the judgment ring correction parameter) or (2) consumption of the specified number of observation push times (which is usually three; may change in response to various parameters). The CPU **21** detects and determines whether or not the termination condition is satisfied. If the CPU **21** determines that the termination condition is satisfied, the subroutine is exited. On the other hand, if the CPU **21** does not determine that the termination condition is satisfied, the process returns to ST**101**.

Consecutive Attack Set Processing

The "consecutive attack set processing" will be discussed with FIG. **49**.

First, a consecutive attack condition is satisfied is determined (ST**241**). In the processing, the CPU **21** determines whether or not the action executed according to the "judgment ring decision processing" becomes consecutive attack. If the attack at this time is executed consecutively with the preceding action ("combo attack"), the CPU **21** also determines that the consecutive attack condition (which is also combination condition) is satisfied. If the CPU **21** determines that the consecutive attack condition is satisfied, the process proceeds to ST**242**. On the other hand, if the CPU **21** does not determine that the consecutive attack condition is satisfied, the process proceeds to ST**243**.

At ST**242**, a consecutive attack parameter is set as 1.02 times. In the processing, the CPU **21** reads the consecutive attack parameter stored in a predetermined area of the RAM **23**. The CPU **21** multiplies the read consecutive attack parameter by 1.02 for each of the consecutive attacks executed according to the "judgment ring decision processing" and stores the result in the predetermined area of the RAM **23**.

Specifically, when a determination is made so as to make three consecutive attacks in combination attack of enemy characters, the CPU **21** reads the consecutive attack parameter before consecutive attack. When the read consecutive attack parameter is "1.0404" (the result of making two consecutive attacks by the enemy characters taking the preceding action), the CPU **21** calculates "1.0404"×"1.02"="1.061208" and stores the result in the predetermined area of the RAM **23** as the consecutive attack parameter for the first consecutive attack. Then, the CPU **21** calculates "1.061208"×"1.02"="1.08243216" and stores the result in the predetermined area of the RAM **23** as the consecutive attack parameter for the second consecutive attack. Subsequently, the CPU **21** calculates "1.08243216"×"1.02"="1.1040808032" and stores the result in the predetermined area of the RAM **23** as the consecutive attack parameter for the third consecutive attack. Upon completion of the processing, the process proceeds to ST**244**.

The multiplication result of multiplying the parameter by 1.02 is stored, but another mode may be adopted if increment operation is performed. For example, the multiplication result of multiplying the parameter by a predetermined value (greater than 1.0) rather than 1.02 may be stored or the addition result rather than the multiplication result may be stored.

At ST**243**, the consecutive attack parameter is set as 1.0. In the processing, the CPU **21** stores the consecutive attack parameter 1.0. That is, if the CPU does not determine at ST**241** that the consecutive attack condition is satisfied, the CPU **21** stores the reference value 1.0 as the consecutive attack parameter. Upon completion of the processing, the process proceeds to ST**244**.

At ST**244**, the damage amount or the recovery value is calculated based on the calculated damage amount or recovery value and the consecutive attack parameter. In the processing, the CPU **21** reads the damage amount or the recovery value stored in the predetermined area of the RAM **23** at ST**106**. The CPU **21** reads the consecutive attack parameter stored at ST**242** or ST**243**. The CPU **21** stores the multiplication result of multiplying the damage amount or the recovery value by the consecutive attack parameter in a predetermined area of the RAM **23** for each action. Accordingly, the effect of damage from the attack calculated can be increased. The CPU **21** for executing the processing corresponds to consecutive hit effect increase section for increasing the effect of damage from the attack calculated by the attack effect calculation section if the consecutive attack hit determination section determines that attack hits the enemy character at consecutive times. Upon completion of the processing, the subroutine is exited.

Action Selection Processing

The "action selection processing" will be discussed with FIG. **50**.

As shown in FIG. **50**, first, whether or not attack hit the enemy character as the combination attack target is determined (ST**211**). To make attack consecutively with the ally character making the preceding attack, the CPU **21** determines whether or not the attack of the ally character hit the enemy character as the combination attack target. If the CPU **21** determines that the attack hit the enemy character as the combination attack target, the process proceeds to ST**212**. On the other hand, if the CPU **21** does not determine that the attack hit the enemy character as the combination attack target, the process proceeds to ST**216**.

At ST**212**, whether or not an ally character exists in the combination attack effective range **120** is determined. In the processing, the CPU **21** reads the position information of the ally character from the predetermined area of the RAM **23**. To make attack consecutively with the ally character making the preceding attack, the CPU **21** compares the position information of the ally character making the preceding attack with the position information of another ally character, thereby determining whether or not an ally character exists in the combination attack effective range **120**. Predetermined combination condition may be satisfied according to the fact that an ally character is positioned in the combination attack effective range **120**. If the CPU **21** determines that an ally character exists in the combination attack effective range **120**, the process proceeds to ST**213**. On the other hand, if the CPU **21** does not determine that an ally character exists in the combination attack effective range **120**, the process proceeds to ST**216**.

At ST**213**, the enemy character posture is checked. The posture check is the damage display mode responsive to the action of attack, etc., previously executed ("beaten posture"). The damage display mode is determined in response to the type of attack or the skill, the weight, etc., of the enemy character. Predetermined combination condition may be satisfied according to the fact that the damage display mode of the enemy character to be attacked is a predetermined damage display mode.

Description of Action for Changing Damage Display Mode

The types of actions for changing the damage display mode will be discussed with FIG. **51**. FIG. **51** is a schematic representation to show actions set for the ally character A **111**.

As shown in FIG. **51**, specific attacks are set for the ally character A **111**. The specific attacks include various attack types of physical attack, spell, fusion, etc. The attack target range, the damage display mode of target character, the damage display mode after attack, and the maximum number of hits are set for each specific attack.

The attack target range indicates the attack range with the enemy character of the attack target as the reference. The shapes of the attack target ranges include, for example, large circle (see FIG. **75**), medium circle, small circle, large straight line (see FIG. **78**), medium straight line, small straight line, large through shape (see FIG. **77**), medium through shape, small through shape, large sector (see FIG. **76**), medium sector, small sector, single unit, whole. Specifically, medium circle, large circle having larger radius than medium circle, small circle having smaller radius than medium circle, medium sector, large sector having larger radius and angle than medium sector, small sector having smaller radius and angle than medium sector, medium straight line, large straight line winder than medium straight line, small straight line narrower than medium straight line, medium through shape provided by combining medium circle and medium straight line, large through shape provided by combining large circle and large straight line, small through shape provided by combining small circle and small straight line, and the like are set as described above. That is, any of the different types of attack ranges is set for each of the different types of attacks and is stored. In FIGS. **75** to **78**, the turn order and the ally character are not shown. The table is stored in the DVD-ROM **31** and is stored in the predetermined area of the RAM **23** by the CPU **21**. That is, the CPU **21** for loading the table corresponds to attack range storage section for storing any of the different types of attack ranges for each of the different types of attacks.

The damage display mode of target character indicates the damage display mode of the enemy character to be attacked, and the execution possibility of attack varies depending on the damage display mode and the setting of the enemy character as the actual attack target.

The damage display mode after attack indicates the possible damage display mode of the attacked enemy character after execution of attack. As the damage display mode after attack, the attacked enemy character may become the damage display mode in response to the skill of the ally character executing attack and the skill, the weight, etc., of the enemy character.

The maximum number of hits means the maximum number of times a specific attack can hit in execution of the specific attack. Thus, the number of the timing areas of the judgment ring **100** is determined in response to the maximum number of hits. All attacks responsive to the maximum number of hits do not necessarily hit depending on the time during combo attack described later.

Thus, specific attack is set for the ally character A **111** and as the specific attack is executed, the damage display mode is determined in response to the position information of the ally character and combo attack can be developed advantageously.

Thus, to make attack consecutively with the previously attacking ally character, the CPU **21** reads the damage display mode of the enemy character subjected to the combination attack by the ally character ("beaten posture"). Upon completion of the processing, the process proceeds to ST**214**.

At ST**214**, the success degree of action technique is checked. In the processing, the CPU **21** reads the success degree of action technique. Specifically, the possibility of hit (execution) of each attack is represented in response to the damage display mode. Upon completion of the processing, the process proceeds to ST**215**.

At ST**215**, "combination action processing" is executed. In the processing, the CPU **21** selects combination attack and executes consecutive attack. The "combination action processing" is described later in detail. When the "combination action processing" is exited, the subroutine of the "action selection processing" is exited.

At ST**216**, "judgment processing" is executed. In the processing, the CPU **21** executes the "judgment processing." Accordingly, the CPU **21** selects action when combination attack is not applied, and executes the selected action. When the "judgment processing" is exited, the subroutine of the "action selection processing" is exited.

Combination Action Processing

The "combination action processing" will be discussed with FIG. **52**. Steps similar to those of the "judgment processing" previously described with reference to FIG. **27** are denoted by the same step numbers in FIG. **52** to simplify the description of the "combination action processing."

As shown in FIG. **52**, first, the CPU **21** displays an action selection on the screen **16** (ST**221**) and executes "command acceptance processing" (ST**222**). The CPU **21** displays an action target selection screen as shown in FIG. **28** on the screen **16** (ST**223**), and executes action target selection command acceptance processing (ST**224**). Subsequently, the CPU **21** executes "judgment ring determination processing" (ST**225**). When the processing is exited, the process is returned to ST**236**.

At ST**236**, "combination action judgment ring decision processing" is executed. In the processing, the CPU **21** determines the action of attack, etc., in response to player's entry operation through the controller **4**. The "combination action judgment ring decision processing" is described later in detail. When the processing is exited, the process is returned to ST**228**.

At ST**228**, the CPU **21** updates HP, MP, and SP. Then, the CPU **21** determines whether or not a parameter update condition based on a special item or a special technique is satisfied (ST**229**). If the CPU **21** determines that the parameter update condition based on the special item or the special technique is satisfied, the CPU **21** updates the individual skill parameters of AGL, LUC, etc., (ST**230**), and the process proceeds to ST**231**. On the other hand, if the CPU **21** does not determine that the parameter update condition based on the special item or the special technique is satisfied, the process proceeds to ST**231**. At ST**231**, the CPU **21** updates the status. Then, the CPU **21** displays an effect image (ST**213**). Upon completion of the processing, the subroutine is exited.

Combination Action Judgment Ring Decision Processing

The "combination action judgment ring decision processing" will be discussed with FIG. **53**.

First, "judgment ring decision processing" is executed (ST**226**). In the processing, the CPU **21** executes the above-described "judgment ring decision processing." The CPU **21** for executing the processing corresponds to consecutive attack execution section for another ally character to attack the enemy character. When the processing is exited, the process is returned to ST**251**.

At ST**251**, whether or not a combo condition (consecutive and combination action execution condition, namely, consecutive condition and combination condition) is satisfied is determined. In the processing, the CPU **21** determines that the combo condition is satisfied if the rotation bar **101** is displayed in every timing area (effective area) in the judgment ring **100** in response to an entry operation signal of the con-

troller **4** based on the result of the "judgment ring decision processing" executed at ST**226**. That is, the CPU **21** determines whether or not the timing of player's entry operation through the operation unit performed while the display mode of the variable display area for consecutive attack changes is a predetermined timing. The CPU **21** for executing the processing corresponds to the consecutive attack hit determination section for determining whether or not attack hits the enemy character at consecutive times based on the determination result of the matching determination section. The consecutive attack hit determination section has a function of determining whether or not attack executed by one or more characters hits the enemy character at consecutive times based on the determination result of the matching determination section. If the CPU **21** determines that the combo condition is satisfied, the process proceeds to ST**252**. On the other hand, if the CPU **21** does not determine that the combo condition is satisfied, the process proceeds to ST**254**.

At ST**252**, a combo ring is set. In the processing, the CPU **21** sets a combo ring in response to the type of selected action (combo). Specifically, the CPU **21** sets the display mode of displaying the combo ring, such as the display time for displaying the combo ring and a button image displayed in the combo ring, in response to the type of selected action. Upon completion of the processing, the process proceeds to ST**253**.

At ST**253**, whether or not a selected button signal has been input within the time limit is determined. In the processing, the CPU **21** displays the combo ring set at ST**252**, as shown in FIG. **54**. If the CPU **21** determines that a selected button signal has been input within the time limit, the process proceeds to ST**255**. On the other hand, if the CPU **21** does not determine that a selected button signal has been input within the time limit, the process proceeds to ST**254**. That is, the CPU **21** for executing the processing corresponds to combination condition determination section for determining whether or not player's entry operation through the operation unit has been performed as predetermined entry operation displayed on the screen within the time limit. When the combination condition determination section determines that player's entry operation through the operation unit has been performed as predetermined entry operation displayed on the screen within the time limit, it means that predetermined combination condition is satisfied. That is, determining that player's entry operation through the operation unit has been performed as predetermined entry operation displayed on the screen within the time limit is an example of the predetermined combination condition.

At ST**254**, the combo formation flag is set to OFF. In the processing, the CPU **21** sets the combo formation flag stored in the predetermined area of the RAM **23** to OFF and stores the combo formation flag set to OFF. Then, the CPU **21** sets the damage amount calculated and stored in the predetermined area of the RAM **23** to 0 (ST**259**). Upon completion of the processing, the subroutine is exited.

At ST**255**, the combo formation flag is set to ON. In the processing, the CPU **21** sets the combo formation flag stored in the predetermined area of the RAM **23** to ON and stores the combo formation flag set to ON. The CPU **21** for executing the processing corresponds to section for setting so that another ally character attacks the enemy character. Upon completion of the processing, the process proceeds to ST**257**.

At ST**257**, "consecutive attack set processing" is executed. In the processing, the CPU **21** increases the damage amount according to the above-described "consecutive attack set processing." When the "consecutive attack set processing" is exited, the subroutine of the "combination action judgment ring decision processing" is exited.

Screen Display Description of Combination Action Processing

The screens displayed on the screen **16** when the "combination action processing" is thus executed will be discussed with FIGS. **11**, **16**, **28**, and **54** to **74**. In the description, a battle scene wherein the four ally characters (**111** to **114**) and the three enemy character (**115** to **117**) appear is taken as an example. The description is started at the battle state in which the three ally characters (**111** to **114**) gather in the combination attack effective range **120** as in FIG. **26**.

An action command selection screen for the ally character D **114** is displayed as shown in FIG. **16**. Action command selection is executed as the player operates the controller **4** (for example, a SPELL command is selected and then SPELL A is selected). An action target selection screen is displayed as shown in FIG. **28** and the target character as the action target is selected as the player operates the controller **4** (for example, ENEMY CHARACTER A is selected). Subsequently, as shown in FIG. **55**, the judgment ring **100** and the rotation bar **101** are displayed in the variable display area of the screen **16**, varying display of the rotation bar **101** is started, and action details (action success or failure, the number of action times, etc.,) are determined as the player operates the controller **4**, as described above. A combo ring **105** for determining whether or not the combo is satisfied (is formed) is displayed so as to rotate in the variable display area of the screen **16**, as shown in FIG. **54**. A combo mark **106** to indicate the type of button provided on the controller **4** is displayed in the combo ring **105**. When the player operates the button indicating the combo mark **106** within the time limit, the combo condition is satisfied and combo attack is executed as shown in FIG. **56**. Next, when a plurality of ally characters exist in the proximity of the ally character D **114** executing the action, a screen for selecting the character to execute the next action from among the characters existing in the combination attack effective range **120** is displayed as shown in FIG. **11**. The character to execute the next action is selected as the player operates the controller **4** (for example, ALLY CHARACTER A **111** is selected). As the attack is made, the damage display mode (a so-called "beaten posture", when attacked) of the enemy character A **115** is to be "float."

An action command selection screen for the ally character A **111** is displayed as shown in FIG. **57**. Action command selection is executed as the player operates the controller **4** (for example, a SPELL command is selected and then SPELL B is selected). Since the damage display mode of the enemy character A **115** is "float," the action corresponding to "antiaircraft mode" becomes effective action. An action target selection screen is displayed as shown in FIG. **58** and the target character as the action target is selected as the player operates the controller **4** (for example, ENEMY CHARACTER A is selected). During combo attack, it is made possible to execute combo attack provided that action is applied to the enemy character A **115** previously attacked by the ally character D **114**. Subsequently, as shown in FIG. **59**, the judgment ring **100** and the rotation bar **101** are displayed in the variable display area of the screen **16**, varying display of the rotation bar **101** is started, and action details (action success or failure, the number of action times, etc.,) are determined as the player operates the controller **4**, as described above. The combo ring **105** for determining whether or not the combo is satisfied (is formed) is displayed so as to rotate in the variable display area of the screen **16**, as shown in FIG. **60**. When the player operates the button indicating the combo mark **106** within the time limit, the combo condition is satisfied and combo attack is executed as shown in FIG. **61**. Next, when a plurality of ally characters exist in the proximity of the ally character A **111**

executing the action, a screen for selecting the character to execute the next action from among the characters existing in the proximity of the ally character A **111** is displayed as shown in FIG. **62**. The character to execute the next action is selected as the player operates the controller **4** (for example, ALLY CHARACTER C **113** is selected). As the attack is made, the damage display mode of the enemy character A **115** ("beaten posture") is "down."

An action command selection screen for the ally character C **113** is displayed as shown in FIG. **63**. Action command selection is executed as the player operates the controller **4** (for example, a SPELL command is selected and then SPELL C is selected). Since the damage display mode of the enemy character A **115** is "down," the action corresponding to "ground mode" becomes effective action. An action target selection screen is displayed as shown in FIG. **64** and the target character as the action target is selected as the player operates the controller **4** (for example, ENEMY CHARACTER A is selected). During combo attack, it is made possible to execute combo attack provided that action is applied to the enemy character A **115** previously attacked by the ally character A **111**. Subsequently, as shown in FIG. **65**, the judgment ring **100** and the rotation bar **101** are displayed in the variable display area of the screen **16**, varying display of the rotation bar **101** is started, and action details (action success or failure, the number of action times, etc.,) are determined as the player operates the controller **4**, as described above. The combo ring **105** for determining whether or not the combo is satisfied (is formed) is displayed so as to rotate in the variable display area of the screen **16**, as shown in FIG. **66**. When the player operates the button indicating the combo mark **106** within the time limit, the combo condition is satisfied and combo attack is executed as shown in FIG. **67**. Next, only the ally character B **112** exists in the proximity of the ally character C **113** executing the action, and is forcibly selected as the character to execute the next action. As the attack is made, the damage display mode of the enemy character A **115** ("beaten posture") is "down," as shown in FIG. **68**.

An action command selection screen for the ally character B **112** is displayed as shown in FIG. **69**. Action command selection is executed as the player operates the controller **4** (for example, a SPELL command is selected and then SPELL D is selected). Since the damage display mode of the enemy character A **115** is "down," the action corresponding to "ground mode" becomes effective action. An action target selection screen is displayed as shown in FIG. **70** and the target character as the action target is selected as the player operates the controller **4** (for example, ENEMY CHARACTER A is selected). During combo attack, it is made possible to execute combo attack provided that action is applied to the enemy character A **115** previously attacked by the ally character B **112**. Subsequently, as shown in FIG. **71**, the judgment ring **100** and the rotation bar **101** are displayed in the variable display area of the screen **16**, varying display of the rotation bar **101** is started, and action details (action success or failure, the number of action times, etc.,) are determined as the player operates the controller **4**, as described above. The combo ring **105** for determining whether or not the combo is satisfied (is formed) is displayed so as to rotate in the variable display area of the screen **16**, as shown in FIG. **72**. When the player operates the button indicating the combo mark **106** within the time limit, the combo condition is satisfied and combo attack is executed as shown in FIG. **73**. As the attack is made, the damage display mode of the enemy character A **115** ("beaten posture") is "down," as shown in FIG. **72**. Thus, the combo attack is executed and is displayed.

Program

The gaming program described above will be discussed in detail. The gaming program specifically causes at least a computer to execute the following steps. In other words, the gaming program causes a computer to function as various means for the following steps. The gaming program causes a computer to implement functions for the following steps.

(A) Step of determining the action for any of the ally characters in response to player's entry operation through the operation unit.

(B) Step of assigning the attack order to the characters on the screen and displaying a battle image among the characters.

(C) Step of advancing a game on the screen based on the determined action.

(D) Variable display control step of displaying the variable display area with the display mode changing with the passage of the time on the screen.

(E) Matching determination step of determining the matching between the timing of player's entry operation through the operation unit performed when the display mode of the variable display area changes and the display mode.

(F) Consecutive attack hit determination step of determining whether or not attack hits the enemy character at consecutive times based on the determination result in the matching determination step.

(G) Attack effect calculation step, when it is determined in the consecutive attack hit determination step that attack hits the enemy character at consecutive times, of calculating the effect of damage from each of the attacks hitting the enemy character at consecutive times.

(H) Consecutive hit effect increase step of increasing the effect of damage from the attack calculated in the attack effect calculation step when it is determined in the consecutive attack hit determination step that attack hits the enemy character at consecutive times.

(I) Step of determining whether or not attack executed by a plurality of characters hits the enemy character at consecutive times based on the determination result in the matching determination step.

(J) Attack range storage step of storing any of the different types of attack ranges for each of the different types of attacks.

(K) Attack range extraction step of extracting the attack range corresponding to the attack selected in response to player's entry operation through the operation unit from different types of attack ranges stored in the attack range storage step.

(L) Reference character determination step of determining the reference character used as the attack range reference to the attack selected in response to player's entry operation through the operation step.

(M) Attack range display control step of displaying the attack range corresponding to the attack extracted in the attack range extraction step on the screen based on the reference character determined in the reference character determination step.

(N) Target character display control step of displaying an image for enabling the player to distinguish between the reference character determined in the reference character determination step and the target character as the attack target contained in the attack range.

(O) Execution order calculation step of calculating the execution order of actions of all characters.

(P) Order display control step of displaying the execution order calculated in the execution order calculation step on the screen.

(Q) Character parameter storage step of storing the skill parameters and the possessed item parameters for each character.

(R) The above-mentioned execution order calculation step of calculating the execution order of actions of all characters based on the skill parameters and the possessed item parameters stored in the character parameter storage step.

(S) Action execution step, when the action of an ally character is executed in response to player's entry operation through the operation unit, when a predetermined combination condition for a different ally character from the ally character whose action is executed is satisfied, the action execution step of executing the action of the ally character and executing the action of the different ally character without following the action execution order.

(T) Variable display control step of displaying a variable display area for consecutive attack with the display mode changing with the passage of the time on the screen when another ally character attacks the same enemy character following one ally character attacking the enemy character.

(U) Consecutive attack execution step in which another ally character attacks the enemy character when the timing of player's entry operation through the operation unit performed while the display mode of the variable display area for consecutive attack changes is a predetermined timing.

Storage Medium

A computer-readable record medium recording the gaming program may store the skill parameters and the possessed item parameters for each of the characters in addition to the gaming program described above.

In the embodiment, after all characters appearing in a "battle scene" execute action, the turn order for executing actions of all characters is again determined, but the invention is not limited to the mode and another mode may be adopted. For example, the character completing execution of action may execute the next action in response to the turn interval values before all characters execute action.

Another Embodiment

The turn interval values to adopt the mode will be discussed with FIG. **79**.

The turn interval value is calculated as turn interval value=[{108.9−AGL+(LUC/10)}×28/108.9+4]×[execution command correction value], as described above.

When the turn interval values set for the characters have the relation that AA**1**<AB**1**<BC**1**<BA**1**=AD**1**<BB**1**<AC**1**, action is executed in the following order: The ally character A **111** with the turn interval value AA**1**, the ally character B **112** with the turn interval value AB**1**, the enemy character C **117** with the turn interval value BC**1**, the ally character D **114** with the turn interval value AD**1**, the enemy character A **115** with the turn interval value BA**1**, the enemy character B **116** with the turn interval value BB**1**, and the ally character C **113** with the turn interval value AC**1**. An order image to execute action in this order is displayed on the screen **16**.

When the action of the ally character A **111** is executed according to the order, the turn interval value corresponding to the ally character A **111** is calculated as AA**2** based on the action type and AA**2** is stored as shown in FIG. **79**B.

The turn interval value corresponding to each of the characters except the ally character A **111** is decremented by the turn interval value AA**1** corresponding to the ally character A **111**. For example, the turn interval value corresponding to the ally character B **112** results from subtracting the turn interval value AA**1** corresponding to the ally character A **111** from the turn interval value AB**1** (AB**2**).

Subsequently, to determine the second character for executing action, the turn interval values of the ally character B **112**, the ally character C **113**, the ally character D **114**, the enemy character A **115**, the enemy character B **116**, and the enemy character C **117** containing the turn interval value AA**2** corresponding to the ally character A **111** are all compared. Accordingly, the turn order is determined based on the turn interval values independently of the number of times each character has executed action.

When AB**2** becomes the minimum, the ally character B **112** is selected. When the action of the ally character B **112** is executed, the turn interval value corresponding to the ally character B **112** is calculated as AA**3** based on the action type and AA**3** is stored as shown in FIG. **79***c*.

The turn interval value corresponding to each of the characters except the ally character B **112** is decremented by the turn interval value AB**2** corresponding to the ally character B **112**. For example, the turn interval value corresponding to the ally character C **113** results from subtracting the turn interval value AB**2** corresponding to the ally character B **112** from the turn interval value AC**2** (AC**3**).

As such processing is repeated, it is made possible to allow the character completing execution of action to execute the next action in response to the turn interval values before all characters execute action.

The above-described steps ST**36**, ST**37**, and ST**71** are modified as described below for making it possible to allow the character completing execution of action to execute the next action in response to the turn interval values before all characters execute action: (It is made possible to skip ST**57**.)

At ST**36**, the turn order is updated each time action is taken. In the processing, the CPU **21** updates the turn interval value corresponding to the character taking action and also updates the turn order. The CPU **21** subtracts the turn interval value corresponding to the character before taking action from each of the turn interval values not taking action, and stores the result in the predetermined area of the RAM **23**. Accordingly, the "turn order processing" is again performed, the turn orders are compared and the characters for which command selection is made effective to cause the characters to take action are determined. The CPU **21** updates the turn interval values for all characters, so that it is made possible to allow the character completing execution of action to execute the next action in response to the turn interval values before all characters execute action. For example, when the ally character C **113** executes action three times and the ally character B **112** executes action twice, the ally character C **113** may execute the fourth action. Upon completion of ST**36**, the process proceeds to ST**37**.

At ST**37**, turn order update display processing is executed. In the processing, the CPU **21** updates and displays the turn order for executing action in the next turn based on the turn order updated at ST**37**. Upon completion of ST**37**, the process proceeds to ST**38**.

At ST**71**, turn interval value comparison processing is executed. In the processing, the CPU **21** reads the turn interval values corresponding to all characters from the predetermined area of the RAM **23**. Then, the CPU **21** compares the read turn interval values. The characters for which action command selection is made effective are set in the ascending order of the turn interval values. Upon completion of the processing, the process proceeds to ST**72**.

The embodiment of the invention has been described, but the invention is not limited to the specific embodiment. For example, the controller **4** operated by the player may be made integral with the machine main unit **1**.

Further, the invention can also be applied to a portable gaming machine or a desk-top gaming machine including in one piece an operation unit that can be operated by a player, a display section for displaying an image and audio (sound), a storage section for storing a gaming program, and a control section for executing control processing following the gaming program.

Further, the invention can also be applied to a network game of the type wherein the above-mentioned gaming program is stored in a server connected to a network such as Internet **56** and a player can play a game by connecting to the server from a personal computer, a mobile telephone, a portable information terminal (PDA), etc.

A network game system will be discussed with FIG. **83** by way of example. In the network game system, mobile telephones **53**A, **53**B, and **53**C as terminals for playing a game are connected to a PDC network **51** capable of conducting packet communications, for example, through base stations **52**A and **52**B, and an information center **55** is accessed through the PDC network **51** in response to player's operation and the game state. The information center **55** acquires various pieces of information through a network such as Internet **56** from servers **57**A and **57**B storing data required for games and the like as well as game programs in response to requests from the mobile telephones **53**A, **53**B, and **53**C, and transmits information required for games to the mobile telephones **53**A, **53**B, and **53**C. Like a server **58** in FIG. **83**, the server storing the game data, etc., may be connected to the information center **55** by a private or leased communication line **60** not via the network such the Internet **56**.

To play a game, the player previously downloads a game program from the server **57**A, **57**B into the mobile telephone **53**A, **53**B, **53**C and executes the game program on the mobile telephone **53**A, **53**B, **53**C. In addition, various systems are possible, such as a system wherein the mobile telephone **53**A, **53**B, **53**C is assigned a role like a browser in such a manner that the game program is executed on the server **57**A, **57**B in accordance with an instruction from the mobile telephone **53**A, **53**B, **53**C and the player views the game on the mobile telephone **53**A, **53**B, **53**C. The players may share the network game system or may be able to fight a battle with each other by connecting the mobile telephones using the PDC network **51**.

In the embodiment, the judgment ring **100** containing the reference areas and the rotation bar **101** as the varying area are provided, but the invention is not limited to the mode and another mode may be adopted. For example, the judgment ring may be made a varying area and the rotation bar may be made a reference area. That is, the reference area or the varying area is formed containing a plurality of effective areas relatively advantageous to the player and a non-effective area relatively disadvantageous to the player.

Further, the advantages described in the specification are only enumeration of the most favorable advantages produced from the invention, and the advantages of the invention are not limited to those described in the specification.

According to the invention, the execution order of actions of all characters is calculated and is displayed on the screen, so that it is made possible to visually recognize the action execution order, it is easy to devise a stratagem of action of attack, etc., and the interest in the game can be augmented.

As described above, according to one aspect of the invention, there are provided a gaming program, a computer-readable record medium recording the gaming program, and a gaming machine, characterized in that the execution order of actions of all characters is calculated and the calculated execution order is displayed on the screen.

More particularly, according to a number of aspects of the invention, the following are provided:

(1) A gaming program executed by operation unit that can be operated by a player and a computer for displaying a plurality of characters including an ally character and an enemy character on a screen of an existing display or a separate display, determining an action for any of the plurality of characters in response to entry operation through the operation unit, and advancing a game on the screen, the gaming program for causing the computer to function as execution order calculation section for calculating the execution order of actions of all the characters and order display control section for displaying the execution order calculated by the execution order calculation section on the screen.

(2) The gaming program as described in (1) for causing the computer to function as character parameter storage section for storing skill parameters and possessed item parameters for each of the plurality of characters and the execution order calculation section for calculating the execution order of actions of all the characters based on the skill parameters and the possessed item parameters stored by the character parameter storage section.

(3) The gaming program as described in (1) or (2) for causing the computer to function as action execution section, when the action of an ally character is executed in response to entry operation through the operation unit, when a predetermined combination condition for a different ally character from the ally character whose action is executed is satisfied, the action execution section for executing the action of the ally character and executing the action of the different ally character without following the action execution order.

(4) A computer-readable record medium recording a gaming program executed by operation unit that can be operated by a player and a computer for displaying a plurality of characters including an ally character and an enemy character on a screen of an existing display or a separate display, determining an action for any of the plurality of characters in response to entry operation through the operation unit, and advancing a game on the screen, the gaming program for causing the computer to function as execution order calculation section for calculating the execution order of actions of all the characters and order display control section for displaying the execution order calculated by the execution order calculation section on the screen.

(5) A gaming machine including operation unit that can be operated by a player and a machine main unit for displaying a plurality of characters including an ally character and an enemy character on a screen of an existing display or a separate display, determining an action for any of the plurality of characters in response to entry operation through the operation unit, and advancing a game on the screen, characterized in that the machine main unit has execution order calculation section for calculating the execution order of actions of all the characters and order display control section for displaying the execution order calculated by the execution order calculation section on the screen.

According to the aspects in (1), (4), or (5), the execution order of actions of all characters is calculated and is displayed on the screen, so that it is made possible to visually recognize the action execution order, it becomes easy to devise a stratagem of action of attack, etc., the interest in a battle scene can be increased, and the interest in the game can be augmented.

According to the aspect in (2), the action execution order of the characters is calculated based on the skill parameters and the possessed item parameters stored corresponding to the characters, so that it is made possible to devise a stratagem of

action of attack, etc., varying from one character to another and the interest in a battle scene can be increased.

According to the aspect in (3), when a predetermined combination condition is satisfied, the action of the ally character is executed and the action of the different ally character is executed without following the calculated action execution order, so that it is made possible to devise a stratagem of action so that the predetermined combination condition is satisfied, and the interest in a battle scene can be still more increased.

The foregoing description of the preferred embodiment of the invention has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed, and modifications and variations are possible in light of the above teachings or may be acquired from practice of the invention. The embodiments were chosen and described in order to explain the principles of the invention and its practical application to enable those skilled in the art to utilize the invention in various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto, and their equivalents.

What is claimed is:

**1**. A gaming machine for allowing a player to enter an action command of an ally character to proceed in a game, the gaming machine comprising:

an operation unit that allows the player to enter the action command;

a display control section that displays a plurality of characters including at least the one ally character and at least one enemy character on a display for displaying a progress of the game and displaying a battle between the ally character and the enemy character;

an execution order calculation section that calculates an execution order of actions of a plurality of characters in the battle; and

an action execution section that executes the actions of the plurality of characters based on the execution order calculated by the execution order calculation section,

wherein the display control section displays the execution order calculated by the execution order calculation section on the display, and

wherein, when a predetermined combination condition for a predetermined ally character and a different ally character from the predetermined ally character to take combination action is satisfied, when executing an action of the predetermined ally character, the action execution section also executes an action of the different ally character without following the execution order calculated by the execution order calculation section.

**2**. The gaming machine as claimed in claim **1**, further comprising:

an action determination section that determines an action of the ally character based on the action command entered by the player to the operation unit.

**3**. The gaming machine as claimed in claim **2**, wherein the action determination section determines an action of the enemy character based on a predetermined algorithm.

**4**. The gaming machine as claimed in claim **1**, further comprising:

a character parameter storage section that stores character parameters including skill parameters indicating skills of the plurality of characters and possessed item parameters indicating items possessed by the plurality of characters,

wherein the execution order calculation section calculates the execution order of actions of the plurality of characters based on the character parameters stored in the character parameter storage section.

**5**. The gaming machine as claimed in claim **1**, wherein the execution order calculation section calculates the execution order of actions of the plurality of characters based on turn interval values set for the plurality of characters.

**6**. The gaming machine as claimed in claim **5**, further comprising;

a character parameter storage section that stores character parameters including skill parameters indicating skills of the plurality of characters and possessed item parameters indicating items possessed by the plurality of characters,

wherein the execution order calculation section calculates the execution order of actions of the plurality of characters by correcting the turn interval values based on the character parameters stored in the character parameter storage section.

**7**. The gaming machine as claimed in claim **5**, wherein, when a plurality of the plurality of characters have a same turn interval value, the execution order calculation section calculates the execution order of actions of the plurality of characters such that the ally character takes precedence over any other character.

**8**. The gaming machine as claimed in claim **5**, wherein, when a plurality of the ally characters have a same turn interval value, the execution order calculation section calculates the execution order of actions of the plurality of characters according to a list order of the ally characters.

**9**. The gaming machine as claimed in claim **5**, wherein, when one of the plurality of characters completes execution of action, the execution order calculation section updates a turn interval value set for the one of the plurality of characters completing execution of action.

**10**. The gaming machine as claimed in claim **9**, wherein, when the one of the plurality of characters completes execution of action, the execution order calculation section updates the turn interval value set for the one of the plurality of characters completing execution of action based on an execution command correction value provided in response to an action type.

**11**. The gaming machine as claimed in claim **5**, wherein the execution order calculation section excludes a character completing execution of action in each turn in the battle to calculate the execution order of actions of the plurality of characters.

**12**. A computer-readable program product for storing a gaming program for causing a computer to execute the steps of:

allowing a player to enter an action command of an ally character to proceed in a game;

displaying a plurality of characters including at least one ally character and at least one enemy character on a display for displaying the progress of the game and displaying a battle between the ally character and the enemy character;

calculating an execution order of actions of the plurality of characters at a time of the battle; and

displaying the execution order on the display;

executing the actions of the plurality of characters based on the execution order; and

wherein, when a predetermined combination condition for a predetermined ally character and a different ally character from the predetermined ally character to take combination action is satisfied, in executing an action of the

predetermined ally character, an action of the different ally character is also executed without following the execution order.

**13**. The program product as claimed in claim **12**, further causing the computer to execute a step of determining the an action of the ally character based on an operation command entered by the player.

**14**. The program product as claimed in claim **12**, further causing the computer to execute a step of determining an action of the enemy character based on a predetermined algorithm.

**15**. The program product as claimed in claim **12**, further causing the computer to execute a step of storing character parameters including skill parameters indicating skills of the plurality of characters and possessed item parameters indicating items possessed by the plurality of characters,

wherein, in calculating the execution order, the execution order of actions of the plurality of characters is calculated based on the character parameters.

**16**. The program product as claimed in claim **12**, wherein, in calculating the execution order, the execution order of actions of the plurality of characters is calculated based on turn interval values set for the plurality of characters.

**17**. The program product as claimed in claim **16**, further causing the computer to execute a step of storing character parameters including skill parameters indicating skills of the plurality of characters and possessed item parameters indicating items possessed by the plurality of characters,

wherein, in calculating the execution order, the turn interval values are corrected based on the character parameters.

**18**. The program product as claimed in claim **16**, wherein, in calculating the execution order, when more than one of the plurality of characters possesses a specific turn interval value, the execution order of actions of the plurality of characters is calculated so that the ally character takes precedence over any other character.

**19**. The program product as claimed in claim **16**, wherein, in calculating the execution order, when more than one of the ally characters possesses a specific turn interval value, the execution order of actions of the plurality of characters is calculated according to a list order of the ally characters.

**20**. The program product as claimed in claim **16**, wherein, in calculating the execution order, when one of the plurality of characters completes execution of action, a turn interval value set for the one of the plurality of characters completing execution of action is updated.

**21**. The program product as claimed in claim **20**, wherein, in calculating the execution order, when the one of the plurality of characters completes execution of action, the turn interval value set for the one of the plurality of characters completing execution of action is updated based on an execution command correction value provided in response to an action type.

**22**. The program product as claimed in claim **16**, wherein, in calculating the execution order, a character completing execution of action in each turn in the battle is excluded to calculate the execution order of actions of the plurality of characters.

* * * * *



(12) **United States Patent**
**Haishima**

(10) **Patent No.: US 7,664,988 B2**
(45) **Date of Patent: Feb. 16, 2010**

(54) **GAMING APPARATUS HAVING MEMORY FAULT DETECTION**

(75) Inventor: **Jun Haishima**, Tokyo (JP)

(73) Assignee: **Universal Entertainment Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 439 days.

(21) Appl. No.: **11/205,121**

(22) Filed: **Aug. 17, 2005**

(65) **Prior Publication Data**

US 2006/0048008 A1 Mar. 2, 2006

(30) **Foreign Application Priority Data**

Aug. 25, 2004 (JP) ............................ 2004-245337

(51) **Int. Cl.**
***G06F 11/00*** (2006.01)

(52) **U.S. Cl.** ............................................ **714/36**; 713/2

(58) **Field of Classification Search** .................. 714/36, 714/27, 3, 5, 47; 710/104; 713/2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,701,478 A * 12/1997 Chen ............................ 713/2
5,732,268 A * 3/1998 Bizzarri ......................... 713/2
5,860,122 A * 1/1999 Owada et al. ............... 711/162
5,864,698 A * 1/1999 Krau et al. ..................... 713/2
5,971,851 A * 10/1999 Pascal et al. .................. 463/24
6,011,564 A * 1/2000 Furuhashi et al. ........... 345/501
6,115,036 A * 9/2000 Yamato et al. .............. 715/723
6,393,559 B1 * 5/2002 Alexander ..................... 713/2
6,449,735 B1 * 9/2002 Edwards et al. ............... 714/25
2004/0078697 A1 * 4/2004 Duncan ....................... 714/42
2005/0246586 A1 * 11/2005 Chang ......................... 714/36
2007/0168738 A1 * 7/2007 Wang .......................... 714/36

FOREIGN PATENT DOCUMENTS

EP 0 774 716 A1 5/1997
EP 0 801 387 A2 10/1997
JP 9-319445 12/1997
JP 2000-35888 2/2000
JP 2003-330793 11/2003
JP 2003-331236 11/2003

* cited by examiner

*Primary Examiner*—Dieu-Minh Le
(74) *Attorney, Agent, or Firm*—Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.

(57) **ABSTRACT**

An information processing device and associated methodology are provided for inspecting a program fault. A first memory stores a boot program executed when the information processing device is initiated for operation. A second memory device is provided for storing an application program. A control device executes a fault inspection program to inspect whether or not a fault has occurred in the second memory device. The fault inspection program is stored in the first memory device and is initiated upon initialization of the information processing device.

**10 Claims, 3 Drawing Sheets**





FIG.1
1
11
12
CPU
13
ROM
13a
BOOT PROGRAM STORING AREA
13b
FAULT INSPECTION PROGRAM STORING AREA
13c
START PROGRAM STORING AREA
14
RAM
15
16
17
18
19
20
21
OUTPUT DEVICE
22
INPUT DEVICE
23
24
HARD DISK
24a
OS STORING AREA
24b
EXTENDED BIOS STORING AREA
24c
APPLICATION PROGRAM STORING AREA
25
VIDEO BOARD
26
SOUND BOARD

FIG.2

START PROGRAM
EXECUTION OF BOOT PROGRAM
S11
EXECUTION OF FAULT INSPECTION PROGRAM
S12
S13
FAULT ?
YES
NO
S14
START OF EXECUTION OF APPLICATION PROGRAM
S15
ERROR DISPLAY



FIG.3



# GAMING APPARATUS HAVING MEMORY FAULT DETECTION

## CROSS-REFERENCE TO THE RELATED APPLICATION(S)

This application is based upon and claims a priority from the prior Japanese Patent Application No. 2004-245337 filed on Aug. 25, 2004, the entire contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to an information process device in which a fault in hardware or software is inspected.

2. Description of Related Art

In a conventional information process device, data and programs required in calculation or control are stored in one memory area of a memory device such as a hard disk and a program for inspecting whether or not a fault such as damage, change or falsification occurs in the programs or data (hereinafter, abbreviated as "fault inspection program") is stored in the other memory area in the same memory device, as disclosed in Unexamined Japanese Publication No. 2003-331236.

Therefore, in a case that the damage occurs in the memory device, there is fear that the fault inspection program is also damaged. At that time, it cannot be guaranteed that the fault inspection program properly operates.

## SUMMARY OF THE INVENTION

In order to dissolve the above problems, the present invention has been done and has an object to provide an information process device in which it can be guaranteed that a fault inspection program properly operates even if a fault occurs in a memory device which is inspected through the fault inspection program.

In order to accomplish the above object, according to one aspect of the present invention, it is provided an information process device comprising:

a first memory device for storing a boot program executed when the information process device is started to operate;

a mother board on which the first memory device is provided;

a second memory device for storing an application program, the second memory device being connected to the mother board;

a control device for executing a fault inspection program to inspect whether or not a fault occurs in the second memory device;

wherein the fault inspection program is stored in the first memory device; and

wherein the control device executes the fault inspection program when the information process device is started to operate.

According to the information process device of the present invention, the fault inspection program is stored in the first memory device on the mother board which is independent from the second memory device, thereby even if the fault occurs in the second memory device, it can be guaranteed that the fault inspection program properly operates.

The above and further objects and novel features of the invention will more fully appear from the following detailed description when the same is read in connection with the accompanying drawings. It is to be expressly understood, however, that the drawings are for purpose of illustration only and not intended as a definition of the limits of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification illustrate embodiments of the invention and, together with the description, serve to explain the objects, advantages and principles of the invention.

In the drawings,

FIG. **1** is a block diagram of an information process device according to the embodiment,

FIG. **2** is a flowchart of a start program executed when the information process device is started to operate, and

FIG. **3** is a perspective view of the information process device according to the embodiment.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Hereinafter, the embodiment according to the present invention will be described with reference to the drawings.

FIG. **1** is a block diagram of the embodiment according to the present invention. FIG. **3** is a perspective view of an information process device of the embodiment. As shown in FIG. **3**, although the information process device **1** is a gaming machine for business use, such gaming machine utilizes an operating system (OS) which is generally used in a personal computer on sale. And under an operation circumstances thereof, a game soft program stored in a hard disk mentioned later is operated.

And as shown in FIG. **1**, in the information process device **1** according to the embodiment, a CPU **12**, a ROM **13**, a RAM **14**, a bus **15**, connectors **16**, **17**, a port **18**, extended slots **19**, **20** are provided on a mother board **11**.

The CPU **12** controls the information process device **1** of the embodiment and executes various programs. Therefore, the CPU **12** corresponds to a control device.

And the ROM **13** is a nonvolatile memory in which various control programs are stored, such control programs being required when the information process device **1** of the embodiment is started to operate. The ROM **13** corresponds to a first memory device. And in the ROM **13**, as shown in FIG. **1**, a boot program storing area **13*a*** for storing a boot program, a fault inspection program storing area **13*b*** for storing a fault inspection program and a start program storing area **13*c*** for storing a start program are formed.

Here, the boot program stored in the boot program storing area **13*a***, the fault inspection program stored in the fault inspection program storing area **13*b*** and the start program stored in the start program storing area **13*c*** will be described hereinafter.

Further, the RAM **14** is a memory for temporarily storing various data calculated when the CPU **12** executes programs.

The bus **15** is constructed from a PCI bus in which a bridge circuit for frequency change is formed, and becomes a common signal bus through which transmission and receipt of signals are conducted among the CPU **12**, the ROM **13**, the RAM **14**, the connectors **16**, **17**, the port **18** and the extended slots **19**, **20**.

The connector **16** is a device to connect an output device **21** required when the game soft program is operated, to the mother board **11**.

Here, the output device **21** connected to the connector **16** is constructed from a liquid crystal display (see the reference number **21** in FIG. **3**) and a sound output device (not shown)

such as a speaker. Instead of the liquid crystal display (see the reference number **21** in FIG. **3**), a CRT display and the like may be used.

The connector **17** is a device to connect an input device required when the game soft program is operated, to the mother board **11**. Here, the input device **22** is constructed from a control panel **22** (see FIG. **3**) provided with a plurality of button switches (not shown). The input device **22** may include the other devices such as a keyboard, a mouse and the like, and according to contents of the game soft program, a joystick and the like may be connected to the connector **17**. And in FIG. **1**, although only one connector **17** is shown, if a plurality of input devices **22** are used, plural connectors **17** are provided respectively corresponding to each of the input devices **22**.

And a hard disk **24** (HDD) is connected to the port **18** through a flat cable **23**.

And in the hard disk **24** connected to the port **18**, there are formed an operating system (OS) storing area **24***a* for storing the OS, an extended BIOS (Basic Input Output System) storing area **24***b* for storing an extended BIOS and an application storing area **24***c* for storing an application program which is the game soft program. Therefore, the hard disk **24** corresponds to a second memory device.

And the extended slot **19** is an insertion slot to connect a video board **25** to the mother board **11**.

Here, the video board **25** connected to the mother board **11** through the extended slot **19** is a board having a graphics-accelerator to display figures and characters on the liquid crystal display (see the reference number **21** in FIG. **3**) which is one of the output devices **21**. The video board **25** can conduct performance with a resolution level and a graphics describing speed so that the operation of the game soft program in the information process device **1** of the embodiment can be properly executed.

And the extended slot **20** is an insertion slot to connect a sound board **26** to the mother board **11**.

Here, the sound board **26** connected to the mother board **11** through the extended slot **20** is a board having a chip such as FM sound source and PCM sound source to output sounds from the speaker (not shown) which is one of the output devices **21**. The sound board **26** can conduct performance so that the operation of the game soft program in the information process device **1** of the embodiment can be properly executed.

Next, with reference to a flowchart shown in FIG. **2**, it will be described an operation executed when the information process device **1** according to the embodiment is started to operate. FIG. **2** is a flowchart of a start program executed when the information process device **1** is started to operate.

In the information process device **1** of the embodiment, when the device **1** is started to operate, the start program stored in the start program storing area **13***c* of the ROM **13** is executed by the CPU **12**.

That is to say, as shown in FIG. **2**, when the start program is executed, at first in S**11**, a boot program is executed.

Here, the boot program is a program stored in the boot program storing area **13***a* of the ROM **13**, and based on the boot program, initialization of various devices including the extended BIOS (Basic Input Output System) in the hard disk **24** and the OS (Operating System) in the hard disk **24** is executed.

At that time, since the OS (Operating System) in the hard disk **24** is loaded in the RAM **14** and started to operate, the ROM **13** may be called as a boot ROM at this point of view.

Next, when procedure of the start program shifts to S**12**, the fault inspection program is executed.

Here, the fault inspection program is a program stored in the fault inspection program storing area **13***b* and through which a fault inspection in the hard disk **24** is executed. Concretely, according to the fault inspection program, it is inspected whether or not a damage occurs in the hard disk **24** or whether or not change or falsification of the program stored in the hard disk **24** is conducted.

Next, when procedure of the start program shifts to S**13**, it is determined whether or not a fault occurs in the hard disk **24**. This determination is conducted based on an execution result of the fault inspection program obtained in S**12**.

At that time, if it is determined that the fault does not occur in the hard disk **24** (S**13**: NO), procedure shifts to S**14**, thereafter the application program stored in the hard disk **24** is loaded in the RAM **14** and execution of the application program is started. On the other hand, if it is determined that the fault occurs in the hard disk **24** (S**13**: YES), procedure shifts to S**15** and error display is conducted on the liquid crystal display (see the reference number **21** in FIG. **3**) which is one of the output devices **21**.

As mentioned, in the information process device **1** according to the embodiment, as shown in FIG. **1**, the fault inspection program is stored in the fault inspection program storing area **13***b* of the ROM **13** on the mother board **11** independently from the hard disk **24**, thereby even if a fault occurs in the hard disk **24** which is inspected by the fault inspection program, it can be guaranteed that the fault inspection program properly operates.

And as shown in FIG. **3**, the information process device **1** of the embodiment is used as the gaming machine for business use, and as shown in FIG. **2**, the fault inspection program stored in the ROM **13** is executed at the time that the information process device **1** is started to operate and the fault inspection in the hard disk **24** is executed before games are started. Therefore, measures to avoid troubles during gaming can be taken beforehand, without giving displeasure to a player of the gaming machine for business use.

Here, the present invention is not limited to the embodiment mentioned in the above and various modifications can be conducted within the scope of the present invention.

For example, as shown in FIG. **3**, although the information process device **1** of the embodiment is used as the gaming machine for business use, the information process device **1** may be adopted for a personal computer on sale. In this case, the keyboard, the mouse or the joystick may be utilized as the input device, instead of the control panel **22**.

And in the information process device **1** of the embodiment, although the hard disk **24** is used as the second memory device, a flash memory in which contents can be changed and stored may be used. In this case, the fault inspection program inspects whether or not a fault occurs in the flash memory.

The present invention can be adopted for the fault inspection in the information process device.

What is claimed is:

**1**. A gaming device configured to execute a game, the gaming device comprising:

a first memory device for storing a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device for storing a game application program for the game, the second memory device being connected to the mother board; and

a control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein,

wherein the fault inspection program is stored in the first memory device, and the control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started.

**2**. The gaming device according to claim **1**, wherein the first memory device is a ROM provided on the mother board,

wherein the second memory device is a hard disk which is independent from the mother board, and

wherein the control device executes the fault inspection program stored in the ROM to inspect whether or not the fault occurs in the hard disk.

**3**. The gaming device according to claim **1**, wherein the gaming device is configured for business use.

**4**. The gaming device according to claim **1**, wherein the first memory device and the mother board are located in the gaming device.

**5**. The gaming device according to claim **1**, wherein the second memory device is a flash memory.

**6**. A gaming device configured to execute a game, the gaming device comprising:

a first memory device configured to store a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device configured to store a game application program, the second memory device being connected to the mother board and electrically rewritable;

a control device configured to execute a fault inspection program to inspect whether or not a fault occurs in the second memory device and the game application program stored therein;

wherein the fault inspection program is stored in the first memory device, and the control device executes the fault inspection program every time the gaming device is started to operate and completes the execution of the fault inspection program before the game is started, and

wherein when the fault does not occur in the second memory device the game application program is started to execute and when the fault occurs in the second memory device an error is displayed on a display device located on an exterior of the gaming device.

**7**. The gaming device according to claim **6**,

wherein the first memory device is a ROM provided on the mother board,

wherein the second memory device is a hard disk which is independent from the mother board, and

wherein the control device executes the fault inspection program stored in the ROM to inspect whether or not the fault occurs in the hard disk.

**8**. The gaming device according to claim **7**, further comprising:

a RAM provided on the mother board;

wherein the game application program is loaded from the hard disk to the RAM and executed by the control device when the fault does not occur in the hard disk.

**9**. The gaming device according to claim **6**, wherein the display device is a liquid crystal display.

**10**. A gaming device configured to execute a game, the gaming device comprising:

a first memory device for storing a boot program executed when the gaming device is started to operate;

a mother board on which the first memory device is provided;

a second memory device for storing a game application program for the game and a BIOS, the second memory device being connected to the mother board; and

a control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein;

wherein the fault inspection program is stored in the first memory device, and the control device executes the boot program to initialize the BIOS stored in the second memory device before executing the fault inspection program when the gaming device is started to operate, and completes the execution of the fault inspection program before the game is started.

* * * * *



US008078540B2

(12) **United States Patent**
**Tanimura**

(10) **Patent No.: US 8,078,540 B2**
(45) **Date of Patent: *Dec. 13, 2011**

(54) **GAMING MACHINE, GAMING INFORMATION AUTHENTICATION AND ACQUISITION DEVICE, AND GAMING INFORMATION ACQUISITION DEVICE**

(75) Inventor: **Tatsuhiko Tanimura**, Tokyo (JP)

(73) Assignee: **Universal Entertainment Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/656,779**

(22) Filed: **Feb. 16, 2010**

(65) **Prior Publication Data**

US 2010/0151939 A1 Jun. 17, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/404,892, filed on Apr. 17, 2006, now Pat. No. 7,693,282.

(30) **Foreign Application Priority Data**

Apr. 19, 2005 (JP) ................................. 2005-121397

(51) **Int. Cl.**
***G06Q 99/00*** (2006.01)

(52) **U.S. Cl.** ................ **705/51**; 705/52; 705/56; 705/59; 726/29

(58) **Field of Classification Search** .............. 705/50–79; 713/150
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,149,522 A 11/2000 Alcorn et al.
2002/0144115 A1 10/2002 LeMay et al.
2003/0195033 A1 10/2003 Gazdic et al.
2003/0216172 A1 11/2003 LeMay et al.
2006/0046819 A1* 3/2006 Nguyen et al. .................. 463/16
2006/0100010 A1* 5/2006 Gatto et al. ..................... 463/29
2006/0247005 A1 11/2006 Tanimura
2008/0318657 A2* 12/2008 Okada ............................ 463/20

FOREIGN PATENT DOCUMENTS

EP 1 352 677 10/2003
JP A-08-241194 9/1996
JP A-2001-344096 12/2001
JP A-2002-341957 11/2002

OTHER PUBLICATIONS

Saha et al., "A Service Platform for On-Line Games", May 22-23, 2003, ACM.*

* cited by examiner

*Primary Examiner* — Jalatee Worjloh
(74) *Attorney, Agent, or Firm* — Oliff & Berridge, PLC

(57) **ABSTRACT**

A gaming machine includes a gaming operation execution device, a loading device and a processing device. The gaming operation execution device executes gaming operations. The loading device includes a connector for connecting a storage medium, a first program memory part for storing a first authentication program, a second program memory part for storing a second authentication program, and a first processor for authenticating the first authentication program with the second authentication program. The processing device includes a memory, a reading unit for reading out the gaming information from the storage medium and for reading out the first authentication program authenticated by the first processor, a second processor for authenticating the gaming information with the authenticated first authentication program, a writing unit for writing the authenticated gaming information to the memory, and an operation control unit for controlling the gaming operation execution device.

**6 Claims, 7 Drawing Sheets**





Fig.1
POWER SUPPLY UNIT
39
39a
MEMORY CARD
30
GAME PROGRAM
30a
GAME SYSTEM PROGRAM
30b
17
11
11a
11b
12
CPU
BOOT ROM
AUTHENTICATION PROGRAM
PRELIMINARY AUTHENTICATION PROGRAM
GAMING BOARD 10
1
GAMING INFORMATION AUTHENTICATING AND LOADING DEVICE
31
18
32
24
I/O PORT
MAIN CPU
21
ROM
BIOS
22
22a
RAM
23
MOTHERBOARD20

*Fig.2*



*Fig.3*

MOTHERBOARD 20
SAMPLING CIRCUIT
CLOCK PULSE GENERATION CIRCUIT
RANDOM NUMBER GENERATOR
FREQUENCY DIVIDER
RAM
ROM
MAIN CPU
36
37
35
38
23
22
21
CPU
BOOT ROM
GAMING BOARD 10
17
11
12
18
31
32
MEMORY CARD
30
BANKNOTE INPUT SENSOR
48a
CONTROL PANEL
45
POWER SUPPLY UNIT
39
39a
24
I/O PORT
LAMP DRIVE CIRCUIT
59
LAMP
60
LED DRIVE CIRCUIT
61
LED
62
HOPPER DRIVE CIRCUIT
63
HOPPER
64
COIN DETECTOR UNIT
66
PAY-OUT COMPLETION SIGNAL CIRCUIT
65
IMAGE CONTROL CIRCUIT
71
UPPER-SIDE IMAGE DISPLAY PANEL
43
LOWER-SIDE IMAGE DISPLAY PANEL
44
AUDIO CONTROL CIRCUIT
72
SPEAKER
49L,49R
SLOT MACHINE 41



*Fig.4*

MOTHERBOARD 20
MAIN CPU
21
BIOS
22a
ROM
22
RAM
23
AUTHENTICATION PROGRAM
11a
GAME SYSTEM PROGRAM
30b
GAME PROGRAM
30a
GAMING BOARD 10
CPU
17
f4
f1
r1
AUTHENTICATION PROGRAM
11a
PRELIMINARY AUTHENTICATION PROGRAM
11b
BOOT ROM 11
f2
f3
r2
r3
30b
12
30
30a
30
MEMORY CARD
GAME SYSTEM PROGRAM
GAME PROGRAM
30b
30a
GAMING INFORMATION AUTHENTICATING AND LOADING DEVICE 1



*Fig.5*

MOTHERBOARD
20
GAMING BOARD
10
S1-1
SWITCH ON POWER SUPPLY
SWITCH ON POWER SUPPLY
S2-1
CPU 17 CARRIES OUT AUTHENTICATION OF AUTHENTICATION PROGRAM 11a USING PRELIMINARY AUTHENTICATION PROGRAM
S2-2
S1-2
DEVELOP COMPRESSED DATA IN BIOS INTO RAM 23
S1-3
MAIN CPU 21 EXECUTES PROGRAM DEVELOPED INTO RAM 23
S1-4
MAIN CPU 21 READS IN AUTHENTICATION PROGRAM FROM BOOT ROM 11 AND STORES AUTHENTICATION PROGRAM IN RAM 23
PCI BUS
AUTHENTICATION PROGRAM
11a
S1-5
AUTHENTICATION OF GAMING INFORMATION USING AUTHENTICATION PROGRAM 11a STORED IN RAM 23
IDE BUS
MEMORY CARD
30
S1-6
READ OUT AUTHENTICATED GAMING INFORMATION FROM MEMORY CARD, AND WRITE GAMING INFORMATION TO RAM 23
IDE BUS
MEMORY CARD
30
S1-7
EXECUTE GAMING INFORMATION



*Fig.6*

MOTHERBOARD 20
MAIN CPU
BIOS
ROM
RAM
AUTHENTICATION PROGRAM
GAME SYSTEM PROGRAM
GAME PROGRAM
GAMING BOARD 10
CPU
P1,P2
f4
f1
r1
f2
r2
f3
r3
AUTHENTICATION PROGRAM
PRELIMINARY AUTHENTICATION PROGRAM
BOOT ROM 11
MEMORY CARD
GAME SYSTEM PROGRAM
GAME PROGRAM
GAMING INFORMATION AUTHENTICATING AND LOADING DEVICE 1
21
22a
22
23
11a
30b
30a
17
11b
12
30



*Fig.7*

MOTHERBOARD
20
GAMING BOARD
10
S1-1
SWITCH ON POWER SUPPLY
SWITCH ON POWER SUPPLY
S2-1
S1-10
MOTHERBOARD (MAIN CPU 21)
PCI BUS
CPU 17 INSTRUCTS MAIN CPU 21 TO REMAIN IN RESET STATE
S2-10
CPU 17 PERFORMS AUTHENTICATION OF AUTHENTICATION PROGRAM 11a USING PRELIMINARY AUTHENTICATION PROGRAM
S2-2
S1-11
MOTHERBOARD (MAIN CPU 21)
PCI BUS
CPU 17 INSTRUCTS MAIN CPU 21 TO RELEASE RESET STATE
S2-11
S1-2
DEVELOP COMPRESSED DATA IN BIOS INTO RAM 23
S1-3
MAIN CPU 21 EXECUTES PROGRAM DEVELOPED INTO RAM 23
S1-4
MAIN CPU 21 READS AUTHENTICATION PROGRAM FROM BOOT ROM 11, AND STORES AUTHENTICATION PROGRAM IN RAM 23
PCI BUS
AUTHENTICATION PROGRAM
11a
S1-5
AUTHENTICATION OF GAMING INFORMATION USING AUTHENTICATION PROGRAM 11a STORED IN RAM 23
IDE BUS
MEMORY CARD
30
S1-6
READ IN AUTHENTICATED GAMING INFORMATION FROM MEMORY CARD, AND WRITE GAMING INFORMATION TO RAM 23
IDE BUS
MEMORY CARD
30
S1-7
EXECUTE GAMING INFORMATION



# GAMING MACHINE, GAMING INFORMATION AUTHENTICATION AND ACQUISITION DEVICE, AND GAMING INFORMATION ACQUISITION DEVICE

## CROSS REFERENCE TO RELATED APPLICATIONS

This is a Continuation of application Ser. No. 11/404,892 filed Apr. 17, 2006, which claims the benefit of priority from the prior Japanese Patent Application No. 2005-121397, filed on Apr. 19, 2005. The disclosure of the prior applications are hereby incorporated herein by reference in their entirety.

## BACKGROUND

1. Field of the Invention

The present invention relates to a gaming machine, a gaming information authenticating and loading device, and a loading device for loading gaming information, whereby gaming information recorded on a portable storage medium can be authenticated.

2. Related Background of the Invention

In the prior art, various types of gaming machines are known, such as gaming machines known as video game machines, slot machines, Pachislo machines, Pachinko machines, or the like, which provide image-based gaming by using images displayed on image display means. In recent years, in this type of gaming machine, it has become possible to supply a program (hereinafter, called a "gaming program") used to control the operations required for playing the game, such as controlling the progress of the game, controlling the display of images, and judging whether or not a prize has been won (a hit or miss judgment), and various types of game used for playing the game (hereinafter, collectively referred to as "gaming information"), by means of a storage medium. For example, gaming information is stored in a small, portable storage medium, such as a compact flash memory (registered trademark; also called "CF card"), and the gaming machine has a component which allows attachment and detachment of the storage medium, gaming information being supplied to the gaming machine by means of this storage medium.

Nevertheless, since the storage medium which stores the gaming information is detachable with respect to the gaming machine, then there is a risk that the medium could be removed from the gaming machine and used to perform illegal actions, such as duplicating or manipulating the gaming information stored on the medium. Therefore, in cases where gaming information is supplied by means of a storage medium, it is necessary to prevent illegal actions relating to the storage medium which stores the gaming information.

With regard to this point, for example, Japanese Patent Application Publication No. 2001-344096 discloses a method in which, when a storage medium is attached to a game device, storing identification information that is unique to the game device is stored on the storage medium from the game device, and identification information that is unique to the gaming information is also stored on the game device from the storage medium. Then, according to the method, the software stored on the storage medium is executed if the two sets of the identification information are the same in the game device and the storage medium.

Moreover, Japanese Patent Application Publication No. 2002-341957 discloses technology relating to the startup of a computer when a removable unit is attached to a computer main body, whereby the content of a user code stored in the removable unit is compared with the content of a unit code stored in the computer main body, and permission to start up the system is decided according to whether or not the respective contents are matching.

Furthermore, Japanese Patent Application Publication No. Hei. 8-241194 discloses a video game system in which a security check is performed repeatedly during the progress of a game, in order to compare a security code set in an information processing device, with an accumulation device (storage medium) which stores a game program and a security code.

## SUMMARY

However, in the conventional examples described in the aforementioned publications, there is a problem in that only the storage medium itself is authenticated, whereas authentication of the actual gaming information is not performed, in other words, it is not checked and verified that the gaming information stored on the storage medium has not been manipulated in some way.

In other words, the technology described in Japanese Patent Application Publication No. 2001-344096 simply makes it possible to prevent illegal actions of duplicating the gaming information stored on the storage medium, but it does not make it possible to prevent manipulation of the actual gaming information. Furthermore, in the technology described in Japanese Patent Application Publication No. 2002-341957, although authentication is carried out in respect of the removable unit itself, the data stored in the unit is not authenticated, and therefore, this technology does not make it possible to prevent manipulation of the data stored in the unit. Moreover, in the video game system described in Japanese Patent Application Publication No. Hei. 8-241194, although transfer to and execution of illegal software after the security check is prevented, it is not possible to prevent manipulation of the data stored on the recording medium.

Therefore, the present invention is devised in order to resolve the aforementioned problems, an object thereof being to provide a gaming machine, a gaming information authenticating and loading device, and a loading device for loading gaming information, whereby the gaming information stored on a storage medium can be authenticated.

According to the present invention, a gaming machine comprising: a gaming operation execution device executing gaming operations for playing a game; a loading device including a connector for connecting a storage medium which stores gaming information to be used in playing the game, a first program memory part for storing a first authentication program for authenticating the gaming information stored in the storage medium connected to the connector, a second program memory part for storing a second authentication program for authenticating the first authentication program stored in the first program memory part, and a first processor for authenticating the first authentication program with the second authentication program stored in the second program memory part; and a processing device connected to the loading device, including a readable and writable memory, a reading unit for reading out the gaming information from the storage medium connected to the connector of the loading device and for reading out the first authentication program authenticated by the first processor from the first program memory part, a second processor for authenticating the gaming information read out by the reading unit with the first authentication program read out by the reading unit, a writing unit for writing the gaming information authenticated by the second processor to the readable and writable memory, and an operation control unit for controlling the gaming operation

execution device in accordance with the gaming information written to the readable and writable memory by the writing unit.

In this gaming machine, since the loading device is connected to the processing device, by connecting a storage medium storing gaming information to the connector of the loading device, it is possible to load the gaming information stored in the storage medium and to store the information in the memory of the processing device. Furthermore, since the first authentication program for authenticating the gaming information is stored in the program memory part of the loading device, this loading process is carried out after the second processor has performed authentication processing with the first authentication program. Moreover, since the first authentication program can be authenticated by the first processor with the second authentication program, it is possible to authenticate the gaming information stored on the storage medium to a higher degree of reliability.

Moreover, the first processor of the loading device may send an authentication completion signal to the reading unit of the processing device when completing authentication of the first authentication program, and the reading unit may suspend readout of the first authentication program until receiving the authentication completion signal from the first processor. In this case, it is possible reliably to avoid a situation where the reading unit reads out the first authentication program before the authentication processing of the first authentication program by the first processor has been completed.

Furthermore, the reading unit may perform readout of the first authentication program after detecting completion of authentication of the first authentication program by the first processor. In this case, it is possible reliably to avoid situations in which the reading unit reads out the first authentication program before the authentication processing of the first authentication program by the first processor has been completed.

According to the present invention, a gaming information authenticating and loading device comprising: a loading device including a connector for connecting a storage medium which stores gaming information to be used in playing the game, a first program memory part for storing a first authentication program for authenticating the gaming information stored in the storage medium connected to the connector, a second program memory part for storing a second authentication program for authenticating the first authentication program stored in the first program memory part, and a first processor for authenticating the first authentication program with the second authentication program stored in the second program memory part; and a processing device connected to the loading device, including a readable and writable memory, a reading unit for reading out the gaming information from the storage medium connected to the connector of the loading device and for reading out the first authentication program authenticated by the first processor from the first program memory part, a second processor for authenticating the gaming information read out by the reading unit with the first authentication program read out by the reading unit, a writing unit for writing the gaming information authenticated by the second processor to the readable and writable memory.

In this gaming information authenticating and loading device, since the loading device is connected to the processing device, by connecting a storage medium storing gaming information to the connector of the loading device, it is possible to load the gaming information stored on the storage medium and to store that information in the memory of the processing device. Furthermore, since the first authentication program for authenticating the gaming information is stored in the program memory part of the loading device, this loading process is carried out after the second processor has performed authentication processing in accordance with the first authentication program. Moreover, since the first authentication program is subjected to authentication processing in accordance with the second authentication program, by the first processor, it is possible to authenticate the gaming information stored on the storage medium to a higher degree of reliability.

Moreover, the first processor of the loading device may send an authentication completion signal to the reading unit of the processing device when completing authentication of the first authentication program, and the reading unit may suspend readout of the first authentication program until receiving the authentication completion signal from the first processor. In this case, it is possible reliably to avoid a situation where the reading unit reads out the first authentication program before the authentication processing of the first authentication program by the first processor has been completed.

Furthermore, the reading unit may perform readout of the first authentication program after detecting completion of authentication of the first authentication program by the first processor. In this case, it is possible reliably to avoid situations where the reading unit reads out the first authentication program before the authentication processing of the first authentication program by the first processor has completed.

According to the present invention, a gaming information loading device for loading stored gaming information to be used in playing a game from a storage medium and for sending the gaming information into a connected motherboard, the gaming information loading device comprising: a connector for connecting a storage medium which stores gaming information to be used in playing the game; a first program memory part for storing a first authentication program for authenticating the gaming information stored in the storage medium connected to the connector; a second program memory part for storing a second authentication program for authenticating the first authentication program stored in the first program memory part; and a first processor for authenticating the first authentication program with the second authentication program stored in the second program memory part.

When this gaming information loading device is connected to the motherboard, if the gaming information stored in a storage medium connected to the connector is read out by the motherboard, it is possible to carry out authentication processing for the gaming information with the first authentication program. Moreover, since authentication processing can be carried for the first authentication program by the first processor with the second authentication program, it is possible to authenticate the gaming information stored on the storage medium, with a higher degree of reliability.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram showing the general constitution of a gaming information authenticating and loading device according to an embodiment of the present invention;

FIG. **2** is a perspective diagram showing the general constitution of a slot machine, which is a gaming machine relating to an embodiment of the invention;

FIG. **3** is a block diagram of the slot machine shown in FIG. **2**, describing the internal constitution of same;

FIG. **4** is a block diagram showing the procedure of an authenticating and loading process for gaming information relating to the gaming information authenticating and loading device shown in FIG. **1**;

FIG. **5** is a chart showing the procedure of an authenticating and loading process for gaming information performed by the gaming board and motherboard shown in FIG. **1**;

FIG. **6** is a block diagram showing the procedure of an authenticating and loading process for gaming information according to an embodiment different from the procedure shown in FIG. **4**; and

FIG. **7** is a chart showing the procedure of an authenticating and loading process for gaming information performed by the gaming board and motherboard, which is different from the procedure shown in FIG. **5**.

## DETAILED DESCRIPTION OF EMBODIMENTS

Below, an embodiment of the present invention will be described. The same reference numeral is used for the same constituent elements, and duplicated description thereof is omitted.

(General Constitution of Gaming Information Authenticating and Loading Device)

FIG. **1** is a block diagram showing the general constitution of a gaming information authenticating and loading device **1**. The gaming information authenticating and loading device **1** has a gaming board **10** constituting a loading device according to the present invention, and a motherboard **20** constituting a processing device according to the present invention. The gaming information authenticating and loading device **1** is constituted by connecting the gaming board **10** with the motherboard **20** by means of a PCI bus **31** and an IDE bus **32** constituting a signal transmission unit. This gaming information authenticating and loading device **1** carries out an authenticating and loading process for authenticating and loading a game program **30***a* and game system program **30***b*, which form the gaming information of the present invention and are stored on the memory card **30**.

The gaming board **10** comprises a CPU **17** and boot ROM **11** which are mutually connected by means of an internal bus **18**, and a card slot **12** corresponding to the memory **30**. The gaming board **10** is a device which loads a game program **30***a* and a game system program **30***b*, described hereinafter, in the motherboard **20** from a memory card **30** constituting a storage medium according to the present invention.

The CPU **17** and the boot ROM **11** which are mutually connected by the internal bus **18** are connected to the motherboard **20** by means of a PCI bus **31**. The PCI bus **31** transmits signals between the motherboard **20** and the gaming board **10**, and the PCI bus **31** also supplies power from the motherboard **20** to the gaming board **10**. The boot ROM **11** stores an authentication program (first authentication program) **11***a*, a preliminary authentication program (second authentication program) **11***b*, which are described below, and a program (boot code), or the like, (not illustrated) for booting (starting up) the CPU **17** and the preliminary authentication program **11***b*. This boot ROM **11** has the function of the first program memory part and the second program memory part of the present invention.

The authentication program **11***a* states a procedure (authentication procedure) for authenticating the gaming information, in other words, checking and verifying that the gaming information, which is the object of the authenticating and loading process, has not been manipulated. This authentication program **11***a* forms a program for authenticating the game program **30***a* and the game system program **30***b* supplied to a slot machine **41** via the memory card **30**. This authentication program **11***a* may also be called a "manipulation checking program", since the authentication program **11***a* checks whether the game program **30***a* and the game system program **30***b* have not been manipulated.

On the other hand, the object of the authentication processing performed by the preliminary authentication program **11***b* is the authentication program **11***a* itself. This preliminary authentication program **11***b* states a procedure (authentication procedure) for authenticating the authentication program **11***a*. In other words, the preliminary authentication program **11***b* checks and verifies that the authentication program **11***a* has not been manipulated. Accordingly, the preliminary authentication program **11***b* is a program for authenticating the authentication program **11***a*, which performs authentication of the game program **30***a* and the game system program **30***b*.

The card slot **12** is connected to the motherboard **20** by means of an IDE bus **32**. This card slot **12** is a slot (physical connection section) which allows the memory card **30** to be connected in such a manner that that the game program **30***a* and the game system program **30***b* stored thereon can be read out. The card slot **12** constitutes the connector of the present invention, into which the memory card **30** can be inserted.

The motherboard **20** is constituted by means of a commercially available, generic motherboard (a printed circuit board mounted with the basic components of a personal computer). The motherboard **20** has, at least, a CPU (Central Processing Unit) **21**, a ROM (Read Only Memory) **22**, a RAM (Random Access Memory) **23**, and an I/O port **24**, as shown in FIG. **1**. The PCI bus **31** and IDE bus **32** described above are connected to this I/O port **24**.

The ROM **22** stores programs, such as the BIOS (Basic Input/Output System) **22***a* (standard BIOS on the motherboard **20**) which is executed by the main CPU **21**, and permanent data. When this BIOS **22***a* is executed by the main CPU **21**, then prescribed initialization processing of the peripheral device is carried out, and a process for reading the game program **30***a* and the game system program **30***b* stored in the memory card **30** via the gaming board **10** is started. A memory device, such as a flash memory, is used for this ROM **22**, and it is possible to use a memory whose contents are either rewritable or non-rewritable.

The data and the program used when the main CPU **21** is operating are stored in the RAM **23**. The RAM **23** can store, at the least, an authentication program **11***a* read out via the gaming board **10**, and the game program **30***a* and the game system program **30***b*. Thus, the RAM **23** constitutes the readable and writable memory of the present invention.

The memory card **30** is the storage medium according to the present invention which stores gaming information used in playing a game, and in the present embodiment, a CF card is used. The game program **30***a* and the game system program **30***b* forming the gaming information according to the present invention are stored in this memory card **30** (see FIG. **4**). The game program **30***a* and the game system program **30***b* respectively form slot game programs in the present embodiment.

A power supply unit **39** is connected via a power supply cable **39***a* to the motherboard **20** of the gaming information authenticating and loading device **1**. When this power supply unit **39** supplies power to the motherboard **20**, then the main CPU **21** of the motherboard **20** is started up, and substantially simultaneously with this, power is supplied to the gaming board **10** via the PCI bus **31**, and the CPU **17** is started up.

(General Constitution of Slot Machine)

FIG. **2** is an oblique diagram showing the general constitution of the slot machine **41**. The slot machine **41** is a gaming

machine relating to the present embodiment of the invention. This slot machine **41** incorporates the gaming information authenticating and loading device **1** having the aforementioned constitution, and executes a gaming operation for playing a game, on the basis of a game program **30***a* and a game system program **30***b* incorporated into this authenticating and loading device **1**.

This slot machine **41** has display which displays gaming images used for gaming. The display shows a state where a plurality of (five) reels having a plurality of pictures are aligned, and the display shows a variable display image (reel image) exactly as if the respective reels are scrolling. This slot machine **41** is a video slot machine that executes a slot game in which pay-out is decided in accordance with the combination of pictures at the time that the respective reels shown by the display come to a halt (the reels shown by the image may also be called "game reels").

The slot machine **41** has a frame **42**, and an upper side image display panel **43** and a lower side image display panel **44** are provided on the front side of this frame **42**. The upper side image display panel **43** is constituted by a liquid crystal display device, and displays an image which does not relate directly to the game (a description of the game, for example), in such a manner that the image displayed thereon changes in accordance with the operational contents. The lower side image display panel **44** is located in a substantially central position in the vertical direction of the frame **42**, and is constituted by a liquid crystal display device (not illustrated), in such a manner that a game image comprising reel images is displayed.

The slot machine **41** also comprises a control panel **45** comprising an arrangement of a plurality of operating buttons whereby the player can perform prescribed operations, on the lower part of the lower side image display panel **44**, and a coin inlet **47** for introducing gaming media (hereinafter, called "coins") used in playing a game, such as medals, money coins, or the like, and a banknote inlet **48** having a banknote input sensor **48***a* (see FIG. **3**) which outputs a signal indicating input of a banknote, provided in order that a player can introduce banknotes, are disposed on the right-hand side of the control panel **45**. Furthermore, the slot machine **41** has at the base of the frame **42** a coin pay-out opening **50**, and a coin receiving section **51** which collects coins that have been paid out, and furthermore, speakers **49**L and **49**R are provided respectively on the left and right-hand sides of the pay-out opening **50**.

FIG. **3** is a block diagram of a slot machine **41** focusing on the internal constitution of same. The slot machine **41** incorporates the motherboard **20** and the gaming board **10** constituting the gaming information authenticating and loading device **1** described above. The slot machine **41** also has a plurality of constituent elements constituting the gaming operation execution device of the present invention which executes gaming operations. The motherboard **20** comprises, in addition to the main CPU **21**, ROM **22**, RAM **23** and I/O port **24** described above, a random number generator **35**, a sampling circuit **36**, a clock pulse generator circuit **37**, and a frequency divider **38**. The random number generator **35** operates in accordance with instructions from the main CPU **21**, and generates a random number within a prescribed range. The sampling circuit **36** samples a random number from the group of random numbers generated by the random number generator **35**, in accordance with an instruction from the main CPU **21**, and the random number generator **35** inputs the sampled random number to the main CPU **21**. The clock pulse generator circuit **37** generates a reference clock for operating the main CPU **21**, and the frequency divider **38** inputs a signal obtained by dividing the reference clock at a prescribed frequency, to the main CPU **21**.

Moreover, the slot machine **41** comprises, as the aforementioned gaming operation execution devices, a lamp drive circuit **59**, a lamp **60**, an LED drive circuit **61**, an LED **62**, a hopper drive circuit **63**, a hopper **64**, a pay-out completion signal circuit **65**, a coin detector unit **66**, an image control circuit **71** and an audio control circuit **72**. The elements from the lamp drive circuit **59** until the audio control circuit **72** constitute a group of gaming operation execution devices.

The lamp drive circuit **59** outputs a signal to the lamp **60** for causing the lamp **60** to light up and switching the lamp **60** on and off during the game. By means of this switching on and off, a game performance is created. The LED drive circuit **61** controls the on and off display of the LED **62**. The LED **62** creates a number of credits display, a winning display, and the like. The hopper drive circuit **63** drives the hopper **64** in accordance with control implemented by the main CPU **21**. The hopper **64** performs an operation for paying out coins that have been won as a prize, and pays out coins from the pay-out opening **50** into the coin receiving section **51**. The coin detector unit **66** counts up the number of coins that have been paid out by the hopper **64**, and data on the number thus counted is sent to the pay-out completion signal circuit **65**. The pay-out completion signal circuit **65** inputs the number-of-coins data from the coin detector unit **66**, and when this number of coins reaches a specified number of coins data, then the circuit **65** inputs a signal reporting the completion of coin pay-out to the main CPU **21**.

The image control circuit **71** controls the respective image displays on the upper side image display panel **43** and the lower side image display panel **44**. The image control circuit **71** displays various images, such as variable display images of a plurality of pictures, or the like.

The audio control circuit **72** inputs a sound signal from a sound source IC, amplifies the input sound signal and outputs sound from the speakers **49**L and **49**R. Thereby, sounds for raising the atmosphere of the game at suitable moments after the start of the game, for example, are output from the speakers **49**L and **49**R.

The image control circuit **71** and the audio control circuit **72** store an image control program and an audio control program in the ROM **22**, and they can be incorporated into the motherboard **20** by executing the processing according to the respective programs, by means of the CPU **21**.

Furthermore, the power supply unit **39** is connected to the other constituent elements, as well as the motherboard **20**, but in FIG. **3**, in order to simplify the diagram, the connections between the power source unit **39** and the constituent elements other than the motherboard **20** are omitted.

(Operation of Gaming Information Authenticating and Loading Device and Slot Machine)

Next, the details of the operation of the gaming information authenticating and loading device **1**, and the slot machine **41**, having the constitution described above, are explained with reference to FIG. **1**, and FIG. **4** and FIG. **5**.

Here, FIG. **4** is a block diagram showing the procedure of a gaming information authenticating and loading process in the gaming information authenticating and loading device **1**. FIG. **5** is a chart showing the procedure of an authenticating and loading process for gaming information performed by the gaming board **10** and the motherboard **20**. In FIG. **5**, "step" is abbreviated to "S".

In the gaming information authenticating and loading device **1** and the slot machine **41**, during the authenticating and loading processing for gaming information, firstly, the

power supply switch in the power source unit **39** is switched on (the power source is switched on), as shown in FIG. **5**, and the motherboard **20** and the gaming board **10** are started up (Step **1-1**, Step **2-1**). In a substantially simultaneous fashion with the switching on of the power supply switch, the memory card **30** is inserted into the card slot **12** in the gaming board **10**.

When the motherboard **20** and the gaming board **10** are started up, their independent processes are carried out respectively, in parallel fashion. Specifically, in the gaming board **10**, the CPU **17** reads out the preliminary authentication program **11***b* stored in the boot ROM **11**. In accordance with the preliminary authentication program **11***b* thus read out, the CPU **17** operates as the first processor, and performs preliminary authentication f**4** (see FIG. **4**) for checking and verifying in advance that the authentication program **11***a* has not been manipulated, before the authentication program **11***a* is read into the motherboard **20** (Step **2-2**).

On the other hand, in the motherboard **20**, the main CPU **21** executes the BIOS **22***a* and develops the compressed data included in the BIOS **22***a* into the RAM **23** (Step **1-2**). When the main CPU **21** advances to Step **1-3**, the main CPU **21** executes the BIOS **22***a* developed into the RAM **23** and then carries out diagnosis and initialization of the various peripheral devices. In this case, the main CPU **21** carries out a check to see what devices are connected to the PCI bus **31**. Here, since the boot ROM **11** of the gaming board **10** is connected to the PCI bus **31**, the main CPU **21** advances to step S**1-4** and operates as the reading unit of the present invention, by reading out the authentication program **11***a* stored in the boot ROM **11**.

Furthermore, when the authentication program **11***a* is read out, the main CPU **21** carries out a loading process r**1** for storing the authentication program **11***a* into the RAM **23**. In this loading process r**1**, in accordance with the functions of the standard BIOS in the BIOS **22***a*, the main CPU **21** takes the check sum acquired by an ADDSUM method (standard check function), and the main CPU **21** stores the authentication program **11***a* in the RAM **23**, while carrying out a confirmation process f**1** (see FIG. **4**) to see whether or not storage has been completed without any errors.

Next, the main CPU **21** advances to Step **1-5**, where the main CPU **21** confirms what devices are connected to the IDE bus **32**, and then accesses the memory card **30** inserted into the card slot **12**, by means of the IDE bus **32**. The main CPU **21** then operates as the reading unit of the present invention, and reads out gaming information (in other words, a game program **30***a* and a game system program **30***b*) from the memory card **30**. In this case, the main CPU **21** reads out 4 bytes of data constituting the gaming information at a time. Continuously, the main CPU **21** operates as the second processor of the present invention, in accordance with the authentication program **11***a* stored in the RAM **23**. Then, the main CPU **21** performs an authentication process f**2** with respect to the read-out game system program **30***b*, and an authentication process f**3** with respect to the game program **30***a*. Thereby, the CPU **21** checks and verifies that the game program **30***a* and the game system program **30***b* have not been manipulated. When these authentication processes f**2** and f**3** complete normally, the main CPU **21** advances to Step **1-6**, where the main CPU **21** operates as the writing unit of the present invention, and carries out a loading process r**2** for the game system program **30***b* which was the object of the authentication process (namely, which has been authenticated), and a loading process r**3** for the game program **30***a*. Thereby, the game program **30***a* and the game system program **30***b* are written to and stored on the RAM **23**.

Although not shown in the drawings, if an abnormality occurs during the authentication process for some reasons, for instance, if the game system program **30***b* has been manipulated, and the authentication process has not been completed normally, then the main CPU **21** reports the occurrence of an abnormality, for instance, by issuing an error display on the upper-side image display panel **43**, whereupon the authentication process is halted. In this case, the loading process is not carried out. In other words, the game program **30***a* and the game system program **30***b* are introduced into the motherboard **20** only when they have been authenticated.

In this way, the authenticating and loading process is completed by the processing in Steps **2-1** to **2-2** performed by the CPU **17**, and Steps **1-1** to **1-6** performed by the main CPU **21**, and the processing by the gaming information authenticating and loading device **1** is also completed.

Continuously, in the slot machine **41**, the main CPU **21** advances to Step **1-7**, where the main CPU **21** operates as the operation control unit and implements control in such a manner that the respective gaming operation execution devices carry out gaming operations, in accordance with the game program **30***a* and the game system program **30***b* stored in the RAM **23**. Thereby, the plurality of constituent elements for gaming operation execution devices which constitute a group of gaming operation execution devices perform respective gaming operations. For example, the image control circuit **71** displays gaming information used in playing a game, such as simulated reels, on the lower-side image display panel **44**, and furthermore, the lamp drive circuit **59** lights up the lamp **60**, or the like, principally in order to create a game effect, in accordance with the progress of the game. Moreover, the hopper drive circuit **63** operates the hopper **64** in accordance with the game winnings result, and thus pays out coins. The player is able to play a slot game by observing the simulated reels.

In this way, in a slot machine **41**, the gaming operation execution devices carry out gaming operations in accordance with the game program **30***a* and the game system program **30***b* supplied by means of the memory card **30** and stored in the RAM **23** after the programs **30***a* and **30***b* are authenticated. Thereby, the player is able to play a slot game.

As described above, in the gaming information authenticating and loading device **1** and the slot machine **41**, since the gaming board **10** is connected to a generic motherboard **20**, then by inserting the memory card **30** storing gaming information into the card slot **12** of the gaming board **10**, the stored gaming information can be read out and stored in the RAM **23** of the motherboard **20**.

Moreover, since the authentication program **11***a* which states a procedure for authenticating the gaming information is stored in the boot ROM **11** of the gaming board **10**, then when the gaming information is loaded, an authentication process is performed in accordance with the authentication program **11***a*, and it is checked and verified that the gaming information has not been manipulated. Consequently, in the authenticating and loading device **1** and the slot machine **41**, even if gaming information **30***a* and **30***b* is supplied from a source that is external to the slot machine **41**, it is certain that the gaming information **30***a* and **30***b* thus loaded is legitimate gaming information which has not been manipulated. Therefore, illegal actions relating to the actual gaming information are reliably prevented.

Moreover, preliminary authentication f**4** is carried out with respect to the authentication program **11***a* used to perform authentication of the game program **30***a* and the game system program **30***b*, before it is read in to the motherboard **20**. That is, before the motherboard **20** loads the authentication pro-

gram **11***a*, the preliminary authentication f**4** is carried out in addition to a check sum by means of a standard BIOS. Therefore, it is confirmed that the authentication program **11***a* is a legitimate program which has not been manipulated, and the reliability of this authentication program **11***a* is improved. As a result, it is possible to authenticate the gaming information **30***a* and **30***b* stored on the memory card **30** with a greater degree of reliability. Furthermore, the preliminary authentication program **11***b*, which carries out preliminary authentication f**4**, is stored in a non-rewritable fashion, in the boot ROM **11**.

Moreover, in the gaming information authenticating and loading device **1** and the slot machine **41**, since the motherboard **20** is constituted by a commercially available generic motherboard, the motherboard **20** has highly generic characteristics and, consequently, it is possible to reduce manufacturing costs.

In the foregoing description, a game program **30***a* and a game system program **30***b* for a slot game are loaded, but instead of this, it is also possible to load a separate game program **30***a* and a game system program **30***b* for another game. In this case, the slot machine **41** becomes a game machine (for instance, a card game machine) which implements another game (for example, a card game which displays card images of trump cards).

Instead of the procedure of the gaming information authenticating and loading process performed by the gaming board **10** and the motherboard **20** described above, it is also possible to adopt a procedure such as that shown in FIG. **6** and FIG. **7**. Specifically, the procedure of the gaming information authenticating and loading process shown in FIG. **6** and FIG. **7** is different from the aforementioned procedure in that reset control of the main CPU **21** is carried out, when the CPU **17** performs authentication of the authentication program **11***a*.

More specifically, similarly to the procedure of the authenticating and loading process for gaming information described above, the power supply switch on the power source unit **39** is switched on (the power supply is switched on), and the motherboard **20** and the gaming board **10** are started up (Step **1-1**, Step **2-1**). Thereby, in the gaming board **10**, the CPU **17** advances to Step **2-10**, and a reset signal output process P**1** (see FIG. **6**) is performed by the main CPU **21**, via the PCI bus **31**. By carrying out the reset control output process P**1**, the main CPU **21** is held in a reset state and the readout process of the authentication program **11***a* and the gaming information **30***a* and **30***b* is not executed, until there is an output process P**2** of the reset release signal (authentication completion signal) at the subsequent step, Step **2-11**. Thereupon, the CPU **17** advances to Step **2-2** to perform readout of the preliminary authentication program **11***b* stored in the boot ROM **11**, and carries out preliminary authentication f**4** in accordance with the preliminary authentication program **11***b*. When the preliminary authentication f**4** is completed normally, the procedure advances to Step **2-11**, and the CPU **17** performs a reset release signal output process P**2** (see FIG. **6**), thereby releasing the reset state of the main CPU **21**.

As described above, by adopting reset control using a reset signal and a reset release signal, the readout of the authentication program **11***a* by the main CPU **21** in the motherboard **20** is suspended, until the preliminary authentication f**4** by the CPU **17** on the gaming board **10** has been completed. Therefore, it is possible reliably to avoid a situation where the main CPU **21** reads out the authentication program **11***a* before the preliminary authentication f**4** by the CPU **17** has been completed. Furthermore, by adopting reset control of this kind, it is possible to avoid a situation in which the CPU **17** and the main CPU **21** access the PCI bus **31** at the same timing, thus causing a conflict of signals, without using separate means, such as a bus switching device.

However, in general, the execution time of the BIOS **22***a* by the main CPU **21** (the sequence of processing from Step **1-2** to Step **1-3**) is significantly longer than the processing time of the preliminary authentication f**4** (Step **2-2**) by the CPU **17**. Therefore, it is desirable that the CPU **17** and the main CPU **21** should be carried out in parallel without adopting reset control, as shown in FIG. **5**, from the viewpoint of being able to shorten the time period until the gaming information is executed at Step **1-7**.

In an embodiment where the CPU **17** and the main CPU **21** carry out processing in parallel, it is also possible to avoid situations where the main CPU **21** reads out an authentication program **11***a* before the preliminary authentication f**4** by the CPU **17** has been completed, by a method other than reset control. Specifically, a prescribed storage region (for example, a register or memory) for confirming the completion of the preliminary authentication f**4** is provided previously in either the gaming board **10** or the motherboard **20**. When the preliminary authentication f**4** has completed, the CPU **17** rewrites the contents of the prescribed storage region, and by means of the main CPU **21** monitoring this rewriting process, the main CPU **21** is able to determine the completion of the preliminary authentication f**4** by the CPU **17**. After determining that the preliminary authentication f**4** has been completed, the main CPU **21** performs readout of the authentication program **11***a*, thereby preventing situations in which the main CPU **21** reads out the authentication program **11***a* before the preliminary authentication f**4** by the CPU **17** has been completed. At the same time, it is also possible to avoid situations in which the CPU **17** and the main CPU **21** access the PCI bus **31** simultaneously, thus producing signal conflicts, without having to use separate means, such as a bus switching device.

In the aforementioned embodiments, a slot machine **41** which performs a slot game is described as an example of a gaming machine, but the present invention may also be applied to gaming machines which implement other types of games. For example, the present invention may also be applied to a card game machine which implements a card game using card images showing trump cards, a Mahjong game machine which implements a Mahjong game, or a Pachinko game machine which uses game balls. Furthermore, in the case of a slot machine, the machine is not limited to being a video slot machine such as the slot machine **41**, but may also be a rotating cylinder type of slot machine which has mechanical reels. In this case, the mechanical reels constitute the gaming operation execution device of the present invention.

In the embodiments described above, the gaming information is constituted by two types of programs, namely, a game program and a game system program, but the gaming information may also be modified appropriately to gaming information constituted by one type of program, or three or more types of program. Furthermore, a state is shown in which both the authentication program **11***a* and the preliminary authentication program **11***b* are stored in the boot ROM **11**; however, it is also possible to provide a plurality of ROMs and RAMs in the gaming board **10**, and to store the authentication program **11***a* and the preliminary authentication program **11***b* in separate ROMs and RAMs.

What is claimed is:

**1**. A gaming machine, comprising:

(i) a board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored;

(ii) a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory configured to read out and store the game program stored in the memory; and

(iii) a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory,

the CPU being configured to:

(a) read out the authentication program from the memory of the board, and then, store the read out authentication program in said another memory of the motherboard;

(b) execute the authentication program stored in said another memory in the process (a), and then, authenticate the game program in the memory of the board, based upon the executed authentication program;

(c) write the game program in the memory of the board, to said another memory of the motherboard, in a case where the game program in the memory of the board is authenticated as a result of the authentication process (b); and

(d) execute the game based upon the game program written to said another memory of the motherboard in the process (c).

**2**. The gaming machine according to claim **1**, wherein:

a preliminary authentication program for authenticating the authentication program is further stored in the memory of the board and another CPU which is different from the CPU, said another CPU configured to execute the preliminary authentication program, is provided on the board, said another CPU being configured to, prior to performing the process (a):

(e) execute the preliminary authentication program stored in the memory of the board, and then, authenticate the authentication program stored in the memory of the board, based upon the preliminary authentication program.

**3**. The gaming machine according to clam **2**, further comprising a power unit which is provided in a casing of the gaming machine and connects to the board and the motherboard, wherein:

in a case where the board and the motherboard are activated based upon power supply from the power unit, the CPU and said another CPU execute the processes (a) to (e) as triggered by the activation.

**4**. A method of controlling a gaming machine having

a board including a memory in which a game program for executing a game and an authentication program from authenticating the game program are stored,

a motherboard which is different from the board and connects to the board, the motherboard including another memory which is different from the memory, said another memory reading out and storing the game program stored in the memory, and

a CPU which is provided on the motherboard, for executing the game based upon the game program stored in said another memory, the method comprising:

(a) reading the authentication program from the memory of the board, and then, storing the read out authentication program in said another memory of the motherboard;

(b) executing the authentication program stored in said another memory at the step (a), and then, authenticating the game program in the memory of the board, based upon the executed authentication program;

(c) writing the game program stored in the memory of the board, to said another memory of the motherboard, in a case where the game program in the memory of the board is authenticated as a result of the authentication step (b); and

(d) executing the game based upon the game program written to said another memory of the motherboard at the step (c).

**5**. The method method of the controlling the gaming machine according to claim **4**, wherein the gaming machine having:

a preliminary authentication program for authenticating the authentication program stored in the memory of the board and another CPU which is different from the CPU provided on the board, said another CPU configured to execute the preliminary authentication program, the method further comprising:

(e) executing by said another CPU the preliminary authentication program stored in the memory of the board, and then, authenticating the authentication program stored in the memory of the board, based upon the preliminary authentication program prior to performing the step (a).

**6**. The method of the controlling the gaming machine according to claim **5**, wherein

The gaming machine further having a power unit provided in a casing provided in a casing of the gaming machine and connected to the board and the motherboard, the method further comprising:

executing the steps (a) to (e) by the CPU and said another CPU of the gaming machine as triggered by an activation of the board and motherboard based upon power supply from the power unit.

* * * * *



US008095990B2

(12) **United States Patent**
**Tanimura**

(10) **Patent No.: US 8,095,990 B2**
(45) **Date of Patent: Jan. 10, 2012**

(54) **GAMING MACHINE, GAMING INFORMATION AUTHENTICATION LOADING DEVICE AND GAMING INFORMATION LOADING DEVICE**

(75) Inventor: **Tatsuhiko Tanimura**, Tokyo (JP)

(73) Assignee: **Universal Entertainment Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1181 days.

(21) Appl. No.: **11/406,404**

(22) Filed: **Apr. 19, 2006**

(65) **Prior Publication Data**

US 2006/0240888 A1 Oct. 26, 2006

(30) **Foreign Application Priority Data**

Apr. 25, 2005 (JP) ................................ 2005-126990
Apr. 25, 2005 (JP) ................................ 2005-126999

(51) **Int. Cl.**
***G06F 7/04*** (2006.01)
***G06F 17/30*** (2006.01)
***A63F 9/24*** (2006.01)
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** .......... **726/30**; 713/165; 713/169; 713/176; 713/192; 713/193; 713/194; 380/251; 463/20; 463/29

(58) **Field of Classification Search** .................. 380/251; 713/165, 169, 176, 192, 193, 194; 726/30; 463/20, 29
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,149,522 A 11/2000 Alcorn et al.
6,722,986 B1 * 4/2004 Lyons et al. .................... 463/29
7,188,255 B1 * 3/2007 Toh et al. ...................... 713/191
7,454,169 B2 * 11/2008 Soerensen et al. ........... 455/26.1
2003/0037239 A1 * 2/2003 Leung et al. .................. 713/169
2003/0045351 A1 3/2003 Gauselmann
2003/0216172 A1 11/2003 LeMay et al.

FOREIGN PATENT DOCUMENTS

JP 08-241194 9/1996
JP 2001-344096 12/2001
JP 2002-341957 11/2002
WO WO 99/65579 12/1999

* cited by examiner

*Primary Examiner* — Michael Simitoski
(74) *Attorney, Agent, or Firm* — Oliff & Berridge, PLC

(57) **ABSTRACT**

A gaming machine comprises a gaming board and a mother board. The gaming board comprises a boot ROM and a card slot. The boot ROM stores therein an authentication program for authenticating a gaming program and a gaming system program stored in a memory card. The card slot receives the memory card therein. The mother board comprises a main CPU and a RAM. The main CPU reads the authentication program from the boot ROM and the gaming program and gaming system program from the memory card received in the card slot. The main CPU executes an authentication process for the read gaming program and gaming system program according to the read authentication program. The main CPU writes the authenticated gaming program and gaming system program to the RAM. The main CPU controls a game proceeding according to the written gaming program and gaming system program.

**10 Claims, 13 Drawing Sheets**



FIG. 1

MEMORY CARD
GAMING PROGRAM
GAMING SYSTEM PROGRAM
30
30a
30b
11a
12
BOOT ROM
AUTHENTICATION PROGRAM
GAMING BOARD
11
10
1
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
31
32
24
I/O PORT
MAIN CPU
21
ROM
BIOS
22
22a
RAM
23
MOTHER BOARD
20

FIG. 2



FIG. 3

36
37
20
MOTHER BOARD
SAMPLING CIRCUIT
CLOCK PULSE GENERATING CIRCUIT
38
23
22
35
RANDOM NUMBER GENERATING CIRCUIT
FREQUENCY DIVIDING CIRCUIT
RAM
ROM
21
MAIN CPU
11
BOOT ROM
31
12
MEMORY CARD
32
59
LAMP DRIVING CIRCUIT
60
LAMP
62
10
GAMING BOARD
LED DRIVING CIRCUIT
LED
30
48a
BILL INSERTION SENSOR
61
63
47a
COIN INSERTION SENSOR
64
HOPPER DRIVING CIRCUIT
HOPPER
COIN DETECTING PORTION
I/O PORT
PAYOUT COMPLETE SIGNAL CIRCUIT
45
CONTROL PANEL
66
71
65
UPPER IMAGE DISPLAY PANEL
43
IMAGE CONTROL CIRCUIT
39
LOWER IMAGE DISPLAY PANEL
44
POWER SOURCE UNIT
72
SOUND CONTROL CIRCUIT
SPEAKERS
39a
24
49L, 49R
41
SLOT MACHINE



FIG. 4

MOTHER BOARD
20
MAIN CPU
21
22a
BIOS
22
ROM
RAM
11a
AUTHENTICATION PROGRAM
f1
r1
23
30b
GAMING SYSTEM PROGRAM
f2
r2
f3
r3
GAMING PROGRAM
30a
10
GAMING BOARD
AUTHENTICATION PROGRAM
11a
BOOT ROM
11
30b
12
30
30a
30
MEMORY CARD
GAMING SYSTEM PROGRAM
GAMING PROGRAM
30b
30a
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
1



FIG. 5

20
MOTHER BOARD
GAMING BOARD
10
S1
TURNING ON POWER SOURCE SWITCH OF POWER SOURCE UNIT
S2
EXTRACTING COMPRESSED PROGRAM INCORPORATED INTO BIOS ON RAM 23
S3
EXECUTING EXTRACTED PROGRAM
S4
READING AUTHENTICATION PROGRAM 11a FROM BOOT ROM 11 AND STORING AUTHENTICATION PROGRAM 11a IN RAM 23
PCI BUS
AUTHENTICATION PROGRAM
11a
S5
READING GAMING INFORMATION FROM MEMORY CARD 30 AND AUTHENTICATING GAMING INFORMATION ACCORDING TO AUTHENTICATION PROGRAM 11a
IDE BUS
MEMORY CARD
30
S6
READING GAMING INFORMATION FROM MEMORY CARD 30 AND WRITING GAMING INFORMATION TO RAM 23
IDE BUS
MEMORY CARD
30
S7
EXECUTING GAMING INFORMATION



FIG. 6

MEMORY CARD
30
GAMING PROGRAM
30a
GAMING SYSTEM PROGRAM
30b
12
GAMING BOARD
15
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
2
32
24
I/O PORT
MAIN CPU
21
ROM
11a
26
RAM
23
MOTHER BOARD
25

FIG. 7

36
37
25
MOTHER BOARD
SAMPLING CIRCUIT
CLOCK PULSE GENERATING CIRCUIT
38
23
26
35
RANDOM NUMBER GENERATING CIRCUIT
FREQUENCY DIVIDING CIRCUIT
RAM
ROM
21
MAIN CPU
59
60
LAMP DRIVING CIRCUIT
LAMP
12
32
MEMORY CARD
62
LED DRIVING CIRCUIT
LED
15
GAMING BOARD
30
61
63
48a
BILL INSERTION SENSOR
47a
COIN INSERTION SENSOR
64
HOPPER DRIVING CIRCUIT
HOPPER
I/O PORT
COIN DETECTING PORTION
PAYOUT COMPLETE SIGNAL CIRCUIT
45
CONTROL PANEL
66
71
65
UPPER IMAGE DISPLAY PANEL
43
IMAGE CONTROL CIRCUIT
39
LOWER IMAGE DISPLAY PANEL
44
POWER SOURCE UNIT
72
SOUND CONTROL CIRCUIT
SPEAKERS
39a
24
49L, 49R
91
SLOT MACHINE

FIG. 8

25
MOTHER BOARD
GAMING BOARD
15
S1
TURNING ON POWER SOURCE SWITCH OF POWER SOURCE UNIT
S2
EXTRACTING COMPRESSED PROGRAM INCORPORATED INTO BIOS ON RAM 23
S3
EXECUTING EXTRACTED PROGRAM
S8
READING GAMING INFORMATION FROM MEMORY CARD 30 AND AUTHENTICATING GAMING INFORMATION ACCORDING TO AUTHENTICATION PROGRAM 11a STORED IN ROM 26
IDE BUS
MEMORY CARD
30
S6
READING GAMING INFORMATION FROM MEMORY CARD 30 AND WRITING GAMING INFORMATION TO RAM 23
IDE BUS
MEMORY CARD
30
S7
EXECUTING GAMING INFORMATION



FIG. 9
MEMORY CARD
30
GAMING PROGRAM
30a
GAMING SYSTEM PROGRAM
30b
17
11
11a
22
CPU
BOOT ROM
AUTHENTICATION PROGRAM
GAMING BOARD
16
18
31
32
24
I/O PORT
MAIN CPU
21
ROM
22
RAM
23
MOTHER BOARD
20
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
3

FIG. 10

36
37
20
MOTHER BOARD
SAMPLING CIRCUIT
CLOCK PULSE GENERATING CIRCUIT
35
38
23
22
RANDOM NUMBER GENERATING CIRCUIT
FREQUENCY DIVIDING CIRCUIT
RAM
ROM
21
MAIN CPU
17
CPU
31
11
BOOT ROM
12
32
MEMORY CARD
30
16
GAMING BOARD
59
LAMP DRIVING CIRCUIT
60
LAMP
62
LED DRIVING CIRCUIT
LED
61
63
64
48a
BILL INSERTION SENSOR
47a
COIN INSERTION SENSOR
HOPPER DRIVING CIRCUIT
HOPPER
COIN DETECTING PORTION
I/O PORT
PAYOUT COMPLETE SIGNAL CIRCUIT
45
CONTROL PANEL
66
71
65
UPPER IMAGE DISPLAY PANEL
43
IMAGE CONTROL CIRCUIT
LOWER IMAGE DISPLAY PANEL
44
39
POWER SOURCE UNIT
72
SOUND CONTROL CIRCUIT
SPEAKERS
39a
24
49L, 49R
101
SLOT MACHINE



FIG. 11

MOTHER BOARD
20
MAIN CPU
21
P1, P2
BIOS
22a
ROM
22
RAM
11a
AUTHENTICATION PROGRAM
f1
r1
23
f5
30c
30b
GAMING SYSTEM PROGRAM
f2
r2
f3
r3
GAMING PROGRAM
30a
GAMING BOARD
16
CPU
17
PRELIMINARY AUTHENTICATION PROGRAM
11b
f4
AUTHENTICATION PROGRAM
11a
BOOT ROM
11
30b
12
30c
30
30a
30
MEMORY CARD
GAMING SYSTEM PROGRAM
GAMING PROGRAM
30b
30a
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
3

FIG. 12

20
MOTHER BOARD
GAMING BOARD
16
S1
TURNING ON POWER SOURCE SWITCH OF POWER SOURCE UNIT
OUTPUTTING RESET SIGNAL
S21
S9
RECEIVING RESET SIGNAL TO BECOME RESET STATE
PCI BUS
AUTHENTICATING AUTHENTICATION PROGRAM 11a ACCORDING TO PRELIMINARY AUTHENTICATION PROGRAM 11b
S22
PCI BUS
S10
RECEIVING RELEASE ORDER TO RELEASE RESET STATE
OUTPUTTING RELEASE ORDER
S23
S2
EXTRACTING COMPRESSED PROGRAM INCORPORATED INTO BIOS ON RAM 23
S3
EXECUTING EXTRACTED PROGRAM
S4
READING AUTHENTICATION PROGRAM 11a FROM BOOT ROM 11 AND STORING AUTHENTICATION PROGRAM 11a IN RAM 23
PCI BUS
AUTHENTICATION PROGRAM
11a
S11
READING GAMING INFORMATION FROM MEMORY CARD 30 AND AUTHENTICATING GAMING SYSTEM PROGRAM 30b ACCORDING TO AUTHENTICATION PROGRAM 11a
IDE BUS
MEMORY CARD
30
S12
AUTHENTICATING GAMING PROGRAM 30a ACCORDING TO AUTHENTICATION PROGRAM 11a
IDE BUS
MEMORY CARD
30
S13
GENERATING AUTHENTICATION LOG INFORMATION
S14
READING GAMING INFORMATION FROM MEMORY CARD 30 AND WRITING GAMING INFORMATION TO RAM 23
IDE BUS
MEMORY CARD
30
S15
CHECKING AUTHENTICATION LOG INFORMATION
S16
READING AUTHENTICATION PROGRAM 11a FROM BOOT ROM 11 AND AUTHENTICATING AUTHENTICATION PROGRAM 11a ACCORDING TO GAMING SYSTEM PROGRAM 30b
S17
EXECUTING GAMING INFORMATION



FIG. 13

MOTHER BOARD
20
MAIN CPU
21
P1, P2
BIOS
22a
ROM
22
RAM
f1
11a
AUTHENTICATION PROGRAM
r1
f1
30b
GAMING SYSTEM PROGRAM
r2
f1
GAMING PROGRAM
r3
30a
23
GAMING BOARD
16
CPU
17
f4
AUTHENTICATION PROGRAM
11a
BOOT ROM
11
f7
f6
f8
12
30a
30
MEMORY CARD
GAMING SYSTEM PROGRAM
GAMING PROGRAM
30b
30a
GAMING INFORMATION AUTHENTICATION LOADING DEVICE
3



# GAMING MACHINE, GAMING INFORMATION AUTHENTICATION LOADING DEVICE AND GAMING INFORMATION LOADING DEVICE

## CROSS REFERENCE TO RELATED APPLICATION

This application claims benefit of priority under 35 U.S.C. §119 to Japanese Patent Application No. 2005-126990, filed on Apr. 25, 2005, and Japanese Patent Application No. 2005-126999, filed on Apr. 25, 2005, the entire contents of which are incorporated by reference herein.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a gaming machine and a gaming information authentication loading device configured to authenticate and load gaming information stored in a portable storage medium, and a gaming information loading device configured to load the gaming information stored in the portable storage medium.

2. Description of the Related Art

There have been conventionally various gaming machines such as a video gaming machine, a slot machine, a pachi-slot machine and a pachinko gaming machine. Recently, a portable storage medium such as a compact flash memory card (a registered trade name of "CF card") is employed to feed a gaming program and gaming information into each of these gaming machines. The gaming program is used to control a gaming procedure, a gaming image display, a gaming action and the like to be executed in the gaming machine. The gaming information is used in a game to be played in the gaming machine.

In a case where the portable storage medium is employed in the gaming machine, the portable storage medium stores the gaming information therein and then is attached to the gaming machine to feed the gaming information into the gaming machine. In this configuration, a malicious third party can carry out a fraud act such as making a copy or a falsification of the stored gaming information because the portable storage medium is not incorporated into the gaming machine and is easily detached from the gaming machine. Therefore, it is very important to prevent the malicious third party from carrying out the fraud act when the gaming information is fed into the gaming machine by means of the portable storage medium.

Conventional prevention methods for the fraud act are disclosed in Japanese Patent Laid-open Publications No. 2001-344096, No. 2002-341957 and No. H08-241194.

In the first reference, when a storage medium is attached to a gaming machine, the gaming machine stores unique identification information for the gaming machine in the storage medium, and the storage medium stores unique identification information for the storage medium in the gaming machine. If the unique identification information for the gaming machine matches the unique identification information for the storage medium, software stored in the storage medium is executed.

In the second reference, when a removal unit is attached to a computer main body, a user code stored in the removal unit is compared with a unit code stored in the computer main body. If the user code matches the unit code, the computer main body boots up a system.

In the third reference, a security code stored in a storage means (storage medium) is compared with a security code stored in a gaming machine. If both security codes match each other, the gaming machine reads a gaming program stored in the storage means. This security check is repeatedly conducted during a gaming procedure.

However, these prevention methods for the fraud act have the problem that the stored gaming information is not authenticated. More specifically, none of these prevention methods certifies that a falsification of the stored gaming information is not made.

The prevention method disclosed in the first reference can prevent a malicious third party from making a copy of the stored gaming information and using it on the gaming machine by means of another storage medium, however, can not prevent the malicious third party from making a falsification of the stored gaming information. The prevention method disclosed in the second reference can authenticate the removal unit, however can not prevent a malicious third party from making a falsification of the stored gaming information because data stored in the removal unit are not authenticated. The prevention method disclosed in the third reference can prevent a malicious third party from replacing the gaming program stored in one storage medium by a fraudulent gaming program stored in another storage medium and using it on the gaming machine after the security check is started, however, can not prevent the malicious third party from making a falsification of the gaming program stored in the one storage medium.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a gaming machine and a gaming information authentication loading device capable of authenticating and loading gaming information stored in a storage medium, and a gaming information loading device capable of loading the gaming information stored in the storage medium.

In order to achieve the object, the present invention provides a gaming machine comprising: a game action executing device configured to execute a game action; a loading device comprising: a program storage unit configured to store therein an authentication program for authenticating gaming information stored in a storage medium; and a connection unit configured to be connected to the storage medium, and a process device comprising: a readable and rewritable storage unit; a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit; and an action controlling unit configured to control the game action executing device according to the written gaming information so that the game action executing device executes the game action.

According to the present invention, in the gaming machine, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit of the loading device stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program.

In order to achieve the object, the present invention provides a gaming machine comprising: a game action executing device configured to execute a game action; a loading device comprising: a connection unit configured to be connected to a storage medium, and a process device comprising: a readable and rewritable storage unit; a program storage unit configured to store therein an authentication program for authenticating gaming information stored in the storage medium; a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit; and an action controlling unit configured to control the game action executing device according to the written gaming information so that the game action executing device executes the game action.

According to the present invention, in the gaming machine, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit of the process device stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program. Furthermore, the authentication program is stored in the program storage unit of the process device, which can omit a loading process for loading the authentication program to the process device side.

In order to achieve the object, the present invention provides a gaming information authentication loading device comprising: a loading device comprising: a connection unit configured to be connected to a storage medium storing gaming information therein; and a program storage unit configured to store therein an authentication program for authenticating the gaming information, and a process device comprising: a readable and rewritable storage unit; a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit.

According to the present invention, in the gaming information authentication loading device, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit of the loading device stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program.

In order to achieve the object, the present invention provides a gaming information authentication loading device comprising: a loading device comprising: a connection unit configured to be connected to a storage medium storing gaming information therein, and a process device comprising: a readable and rewritable storage unit; a program storage unit configured to store therein an authentication program for authenticating the gaming information; a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit.

According to the present invention, in the gaming information authentication loading device, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit of the process device stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program. Furthermore, the authentication program is stored in the program storage unit of the process device, which can omit a loading process for loading the authentication program to the process device side.

In order to achieve the object, the present invention provides a gaming information loading device configured to load gaming information stored in a storage medium from the storage medium to a mother board connected to the gaming information loading device, comprising: a connection unit configured to be connected to the storage medium; and a program storage unit confiuged to store therein an authentication program for authenticating the gaming information.

According to the present invention, the gaming information loading device is capable of being connected to the mother board, which realize to read the gaming information from the storage medium connected to the connection unit and then authenticate and load the read gaming information in the mother board side.

In order to achieve the object, the present invention provides a gaming machine comprising: a game action executing device configured to execute a game action; a loading device including a connection unit configured to be connected to a storage medium; and a process device including a readable and rewritable storage unit, wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device: the program storage unit configured to store therein an authentication program for authenticating gaming information stored in the storage medium; the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and the mutual authentication unit configured to execute a mutual authentication process for the authentication program according to the gaming information authenticated by the authentication unit, the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit, and the process device includes an action controlling unit configured to control the game action executing device according to the written

gaming information so that the game action executing device executes the game action, when the mutual authentication unit has executed the mutual authentication process.

According to the present invention, in the gaming machine, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program. Furthermore, the gaming information and the authentication program can maintain consistency each other by executing the mutual authentication process for the authentication program according to the authenticated gaming information.

In order to achieve the object, the present invention provides a gaming information authentication loading device comprising: a loading device including therein a connection unit configured to be connected to a storage medium storing gaming information therein; and a process device including a readable and rewritable storage unit, wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device: the program storage unit configured to store therein an authentication program for authenticating the gaming information; the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and the mutual authentication unit configured to execute a mutual authentication process for the authentication program according to the gaming information authenticated by the authentication unit, and the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit.

According to the present invention, in the gaming information authentication loading device, the loading device is connected to the process device, which can easily load and store the gaming information stored in the storage medium to the readable and rewritable storage unit by only connecting the storage medium to the connection unit of the loading device. Further, the program storage unit stores therein the authentication program for authenticating the gaming information, which can load the gaming information that is not falsified by a malicious third party to the readable and rewritable storage unit by executing the authentication process for the gaming information according to the authentication program. Furthermore, the gaming information and the authentication program can maintain consistency each other by executing the mutual authentication process for the authentication program according to the authenticated gaming information.

In order to achieve the object, the present invention provides a gaming information loading device configured to load gaming information stored in a storage medium from the storage medium to a mother board connected to the gaming information loading device, comprising: a connection unit configured to be connected to the storage medium; a program storage unit confiuged to store therein an authentication program for authenticating the gaming information; a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit; and an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program.

According to the present invention, the gaming information loading device is capable of being connected to the mother board, which realize to read the gaming information from the storage medium connected to the connection unit and the authentication program from the program storage unit. Further, the mother board can authenticate and load the read gaming information according to the read authentication program.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a geming information authentication loading device according to a first exemplary embodiment of the present invention.

FIG. **2** is a perspective view of a slot machine according to the first exemplary embodiment of the present invention.

FIG. **3** is a block diagram of the slot machine according to the first exemplary embodiment of the present invention.

FIG. **4** is a block diagram which shows a gaming information authentication loading procedure in the gaming information authentication loading device according to the first exemplary embodiment of the present invention.

FIG. **5** is a chart which shows the gaming information authentication loading procedure executed between a mother board and a gaming board in the gaming information authentication loading device according to the first exemplary embodiment of the present invention.

FIG. **6** is a block diagram of a geming information authentication loading device according to a second exemplary embodiment of the present invention.

FIG. **7** is a block diagram of a slot machine according to the second exemplary embodiment of the present invention.

FIG. **8** is a chart which shows a gaming information authentication loading procedure executed between a mother board and a gaming board in the gaming information authentication loading device according to the second exemplary embodiment of the present invention.

FIG. **9** is a block diagram of a geming information authentication loading device according to a third exemplary embodiment of the present invention.

FIG. **10** is a block diagram of a slot machine according to the third exemplary embodiment of the present invention.

FIG. **11** is is a block diagram which shows a gaming information authentication loading procedure in the gaming information authentication loading device according to the third exemplary embodiment of the present invention.

FIG. **12** is a chart which shows a gaming information authentication loading procedure executed between a mother board and a gaming board in the gaming information authentication loading device according to the third exemplary embodiment of the present invention.

FIG. **13** is a block diagram which shows a gaming information authentication loading procedure in a gaming information authentication loading device according to the modified third exemplary embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Hereinafter, first to third exemplary embodiments of the present invention will be described with reference to FIGS. **1** to **13**.

First Exemplary Embodiment

(Configuration of Gaming Information Authentication Loading Device)

The gaming information authentication loading device **1** comprises a gaming board **10**, a mother board **20**, a PCI (Peripheral Component Interconnect) bus **31** and an IDE (Integrated Device Electronics) bus **32**. The gaming board **10** is employed as a gaming information loading device or a loading device in the present invention. The mother board **20** is employed as a process device in the present invention. The mother board **20** is connected to the gaming board **10** via the PCI bus **31** and the IDE bus **32**. The PCI bus **31** and the IDE bus **32** are employed as a signaling portion in the present invention.

A memory card **30** stores a gaming program **30***a* and a gaming system program **30***b* therein. The memory card **30** is employed as a portable storage medium such as a CF card in the present invention. The gaming program **30***a* and the gaming system program **30***b* are employed as gaming information such as a slot game program in the present invention. The gaming information authentication loading device **1** carries out a gaming information authentication loading procedure for authenticating and then loading the gaming program **30***a* and the gaming system program **30***b*.

The gaming board **10** comprises a boot ROM **11** and a card slot **12** for the memory card **30**. The gaming board **10** loads the gaming program **30***a* and the gaming system program **30***b* from the memory card **30** and then transfers the loaded programs to the mother board **20**.

The boot ROM **11** is connected to the mother board **20** via the PCI bus **31**. The boot ROM **11** stores therein an authentication program (falsification check program) **11***a* and a boot code program (not shown) for allowing a main CPU **21** of the mother board **20** to boot the authentication program **11***a* via the PCI bus **31**. The boot ROM **11** functions as a program storage means in the present invention. The authentication program **11***a* is a program for authenticating the gaming program **30***a* and the gaming system program **30***b* to be transferred to a slot machine **41** by means of the memory card **30**. In the authentication program **11***a*, an authentication procedure for checking that the gaming program **30***a* and the gaming system program **30***b* are not falsified is written.

The card slot **12** is connected to the mother board **20** via the IDE bus **32**. The card slot **12** functions as a connection means (physical connection portion) capable of receiving the memory card **30** therein in the present invention. The memory card **30** is received in the card slot **12** in a readable situation for the gaming program **30***a* and the gaming system program **30***b*.

The mother board **20** is composed of a commercial general mother board (print circuit board on which basic parts of a personal computer are mounted). The mother board **20** comprises the main CPU (Central Pocessing Unit) **21**, a ROM (Read Only Memory) **22**, a RAM (Random Access Memory) **23** and I/O port **24**. The PCI bus **31** and the IDE bus **32** are connected to the I/O port **24**. In the mother board **20**, the main CPU **21** executes a BIOS (Basic Input/Output System) **22***a* stored in the ROM **22** to initialize peripheral devices including the gaming board **10** when a power source unit **39** (see FIG. **3**) connected to the mother board **20** is powered on. Then, the main CPU **21** reads the gaming program **30***a* and the gaming system program **30***b* stored in the memory card **30** via the gaming board **10** to carry out the authentication loading process. It is noted that the main CPU **21** is run to supply an electric power to the gaming board **10** via the PCI bus **31** when the electric power is supplied from the power source unit **39** into the mother board **20**.

The ROM **22** stores therein permanent programs such as the BIOS **22***a* to be executed by the main CPU **21** and permanent data. A memory device such as a flash memory is employed as the ROM **22**. It is noted that the memory device may use a rewritable or non-rewritable memory. The RAM **23** is employed as a readable and rewritable storage means in the present invention. The RAM **23** stores therein temporal programs and/or temporal data employed by the main CPU **21**. The authentication program **11***a*, the gaming program **30***a* and the gaming system program **30***b* are temporally stored in the RAM **23**.

(Configuration of Slot Machine)

The slot machine **41** is employed as a gaming machine in the present invention. The gaming information authentication loading device **1** is incorporated into the slot machine **41**. The slot machine **41** executes the slot game program on the basis of the gaming program **30***a* and the gaming system program **30***b* loaded into the gaming information authentication loading device **1**.

As shown in FIG. **2**, the slot machine **41** comprises a cabinet **42**, an upper image display panel **43**, a lower image display panel **44**, a control panel **45**, a coin insertion slot **47**, a bill insertion slot **48**, speakers **49**L, **49**R, a payout slot **50** and a coin receiving portion **51**.

The cabinet **42** forms the entirety of the slot machine **41**. The upper image display panel **43** is mounted on a front upper portion of the cabinet **42**. The upper image display panel **43** includes therein a liquid crystal display device configured to display an image (e.g. an explanation image for the slot game) which does not directly relate to a game image such as a video reel image. The displayed image is changed according to contents of action.

The lower image display panel **44** is mounted on a front center portion of the cabinet **42**. The lower image display panel **44** includes therein a liquid crystal display device which is employed as a display means in the present invention. The liquid crystal display device displays the game image. More specifically, the liquid crystal display device variably displays the video reel image formed by five quasi-reels on which a plurality of symbols is mounted. The slot machine **41** determines a dividend according to a symbol combination displayed on the liquid crystal display device at a time of stopping the five quasi-reels.

The control panel **45** is mounted on the front center portion of the cabinet **42** and below the lower image display panel **44**. A plurality of operation buttons is arranged on the control panel **45**. A player uses the operation buttons to operate a predetermined operation. The coin insertion slot **47** is mounted on the control panel **45**. A player uses the coin insertion slot **47** to insert one or more gaming media such as coins or medals into the slot machine **41**. The bill insertion slot **48** is mounted on the control panel **45**. A player uses the bill insertion slot **48** to insert one or more bills into the slot machine **41**.

The speakers **49**L, **49**R are mounted on the front lower portion of the cabinet **42**. The payout slot **50** is mounted on the front lower portion of the cabinet **42** and between the speakers **49**L, **49**R. The coin receiving portion **51** forward extends from the front lower portion of the cabinet **42**.

As shown in FIG. **3**, the slot machine **41** further comprises the gaming board **10**, the mother board **20**, the power source unit **39**, a power source cable **39***a*, a coin insertion sensor **47***a*, a bill insertion sensor **48***a*, a lamp driving circuit **59**, a lamp **60**, an LED driving circuit **61**, an LED **62**, a hopper driving circuit **63**, a hopper **64**, a payout complete signal circuit **65**, a

coin detecting portion **66**, an image control circuit **71** and a sound control circuit **72**. The lamp driving circuit **59**, the lamp **60**, the LED driving circuit **61**, the LED **62**, the hopper driving circuit **63**, the hopper **64**, the payout complete signal circuit **65**, the coin detecting portion **66**, the image control circuit **71** and the sound control circuit **72** operate as a game action executing device in the present invention.

The moter borad **20** comprises the main CPU **21**, the ROM **22**, the RAM **23**, the I/O port **24**, a random number generating circuit **35**, a sampling circuit **36**, a clock pulse generating circuit **37** and a frequency dividing circuit **38**. The random number generating circuit **35** generates random numbers within a constant range according to an order of the main CPU **21**. The sampling circuit **36** samples one random number among the generated random numbers and then inputs the sampled random number into the main CPU **21** according to an order of the main CPU **21**. The clock pulse generating circuit **37** generates a reference pulse to be employed at a time of operating the main CPU **21**. The frequency dividing circuit **38** inputs into the main CPU **21** a signal which is generated by dividing the reference pulse by a constant frequency.

The power source unit **39** is connected to the mother borad **20** via the power source cable **39***a*. The lamp driving circuit **59** outputs into the lamp **60** a signal for lighting the lamp **60**, which causes the lamp **60** to blink during the slot game. If the lamp **60** blinks, a game effect is executed. The LED driving circuit **61** controls a blink of the LED **62**. The LED **62** functions as a credit number display, an obtained number display or the like. The hopper driving circuit **63** drives the hopper **64** according to a control of the main CPU **21**. The hopper **64** pays out one or more winning coins from the payout slot **50** to the coin receiving portion **51**. The coin detecting portion **66** counts the number of winning coins paid out by the hopper **64** and then notifies the counted number of winning coins of the payout complete signal circuit **65**. The payout complete signal circuit **65** inputs into the main CPU **21** a signal for notifying a payout complete when the counted number of winning coins attaines the predetermined number of winning coins.

The image control circuit **71** controls image displays to display various images such as the variable display image of symbols on the upper image display panel **43** and the lower image display panel **44**. The sound control circuit **72** amplifies a sound signal input from a sound source IC (not shown) and then outputs the amplified sound signal into the speakers **49**L, **49**R. Thereby, the sound control circuit **72** outputs from the speakers **49**L, **49**R a sound for bringing a lot of excitement to the slot game at an appropriate time. It is noted that the image control circuit **71** and the sound control circuit **72** may be incorporated into the mother board **20** by storing an image control program and a sound control program into the ROM **22**. Thereby, the main CPU **21** may execute the above processes according to the image control program and the sound control program. It is further noted that the power source unit **39** is connected to other elements in addition to the mother board **20**.

(Gaming Information Authentication Loading Procedure)

A gaming information authentication loading procedure will be described with reference to FIGS. **4** and **5**.

In step S**1**, a power source switch of the power source unit **39** connected to the mother board **20** is turned on. The memory card **30** is inserted into the card slot **12** of the gaming board **10** before or after the power source switch is turned on.

In step S**2**, the main CPU **21** executes the BIOS **22***a* to extract a compressed program incorporated into the BIOS **22***a* and causes the extracted program to be temporarily stored in the RAM **23**. In step S**3**, the main CPU **21** executes the extracted program temporarily stored in the RAM **23** to check and initialize various peripheral devices. At this time, the main CPU **21** checks what peripheral device is connected to the PCI bus **31**. In step S**4**, the main CPU **21** operates as a reading means to read the authentication program **11***a* stored in the boot ROM **11** because the boot ROM **11** of the gaming board **10** is connected to the PCI bus **31**.

When the main CPU **21** has read the authentication program **11***a*, a loading process **r1** for causing the read authentication program **11***a* to be temporarily stored in the RAM **23** is executed. In the loading process **r1**, the main CPU **21** causes the read authentication program **11***a* to be temporarily stored in the RAM **23**, while carrying out a checksum in an ADDSUM type (standard check function) according to a standard BIOS function of the BIOS **22***a* to check whether or not the read authentication program **11***a* is correctly stored in the RAM **23** (see an authentication process f**1** in FIG. **4**).

In the step S**5**, the main CPU **21** checks what peripheral device is connected to the IDE bus **32** and then accesses the memory card **30** inserted into the card slot **12** via the IDE bus **32**. Then, the main CPU **21** operates as the reading means to read the gaming program **30***a* and the gaming system program **30***b* from the memory card **30**. At this time, the main CPU **21** reads data composed of the gaming program **30***a* and the gaming system program **30***b* every four bits. Next, the main CPU **21** operates as an authentication means to execute an authentication process f**2** for the read gaming system program **30***b* and an authentication process f**3** for the read gaming program **30***a* according to the stored aunthentication program **11***a*, in order to check that the gaming program **30***a* and the gaming system program **30***b* are not falsified and authenticate them. In step S**6**, the main CPU **21** operates as a writing means to execute a loading process r**2** for the authenticated gaming system program **30***b* and a loading process r**3** for the authenticated gaming program **30***a* to write them to the RAM **23**, after the authentication processes f**2**, f**3** normally finish.

If abnormality in each authentication process occurs, the gaming information authentication loading procedure does not normally finish. At this time, the main CPU **21** notifies the abnormality and then stops the gaming information authentication loading procedure. For example, if the gaming system program **30***b* is falsified, the main CPU **21** carries out an error display and then stops the gaming information authentication loading procedure. In this case, the loading processes are not executed. Therefore, the gaming program **30***a* and the gaming system program **30***b* are loaded in the mother board **20** only when they are authenticated. It is noted that the gaming information authentication loading device **1** operates in the steps S**1** to S**6**.

In step S**7**, the main CPU **21** operates as an action controlling means to control a game proceeding (game action) according to the written gaming program **30***a* and the written gaming system program **30***b*. For example, the main CPU **21** controls the following operation: the image control circuit **71** displays a gaming image such as the video reel image on the lower image display panel **44**; the lamp driving circuit **59** lights the lamp **60** according to the game proceeding; and the hopper driving circuit **63** operates the hopper **64** to pay out one or more coins, according to an obtained gaming winning combination. A player can play the slot game with reference to the video reel image.

The slot machine **41** carries out the gaming proceeding according to the authenticated gaming program **30***a* and the authenticated gaming system program **30***b* transferred from the memory card **30**.

(Advantageous Features of Gaming Information Authentication Loading Procedure)

In the gaming information authentication loading device **1**, the gaming board **10** is connected to the mother borad **20**. Therefore, the gaming information such as the gaming program **30***a* and the gaming system program **30***b* can be easily loaded from the memory card **30** to the RAM **23** of the mother borad **20** when the memory card **30** storing the gaming information therein is only inserted into the card slot **12** of the gaming board **10**.

The authentication program **11***a* described along the authentication process is stored in the boot ROM **11** of the gaming board **10**. Therefore, the authentication process can be executed according to the authentication program **11***a* to check whether or not the gaming information is not falsified and then authenticate it when the gaming information is loaded. As a result, in the gaming information authentication loading device **1**, even if the gaming information is supplied from an outside device of the slot machine **41**, the authenticated gaming information that is not falsified can be loaded, which certinaly prevents a malicious third party from making a falsification for the gaming information.

The mother borad **20** is composed of a commercial general mother board. Therefore, versatility of the mother board **20** is increased to reduce a production cost.

Although the gaming program **30***a* and the gaming system program **30***b* for the slot game are loaded in the exemplary embodiment, a gaming program **30***a* and a gaming system program **30***b* for a game other than the slot game may be loaded. This realize that the slot machine **41** becomes another gaming machine such as a card gaming machine, which is capable of carrying out another game such as a card game for displaying a card image.

Second Examplary Embodiment

As shown in FIG. **6**, the gaming information authentication loading device **2** is different from the gaming information authentication loading device **1** regarding the following matters: the gaming information authentication loading device **2** has a gaming board **15** and a mother board **25** instead of the gaming board **10** and the mother board **20**; and the gaming board **15** is connected to the mother board **25** only via the IDE **32**.

The gaming board **15** is different from the gaming board **10** regarding the following matter: the gaming board **15** does not have the boot ROM **11**. The mother board **25** is different from the mother board **20** regarding the following matter: the mother board **25** has a ROM **26** instead of the ROM **22**. The ROM **26** stores the programs and the data stored in the ROM **22** and the authentication program **11***a* therein. It is noted that the ROM **26** may be incorporated into the main CPU **21**.

The ROM **26** stores the authentication program **11***a* for executing the authentication procedure for the gaming program **30***a* and the gaming system program **30***b* therein. Therefore, the mother board **25** is composed of a dedicated mother board corresponding to the gaming program **30***a* and the gaming system program **30***b*.

As shown in FIG. **7**, a slot machine **91** is different from the slot machine **41** regarding the following matter: the gaming information authentication loading device **2** instead of the gaming information authentication loading device **1** is incorporated into the slot machine.

As shown in FIG. **8**, a gaming information authentication loading procedure is different from the gaming information authentication loading procedure of the first examplary embodiment regarding the following matter: the gaming information authentication loading device **2** executes step S**8** instead of the steps S**4**, S**5**. In the gaming information authentication loading device **1**, the authentication program **11***a* is stored in the boot ROM **11** of the gaming board **10**. Thereby, the gaming information authentication loading device **1** executes the step S**4** to load the authentication program **11***a* to the mother board **20** while carrying out the checksum. On the other hand, in the gaming information authentication loading device **2**, the authentication program **11***a* is stored in the ROM **26** of the mother board **10**. Thereby, the gaming information authentication loading device **2** does not execute to load the authentication program **11***a* from the gaming board **10** to the mother board **20**, which allows it to execute the step S**8** instead of the steps S**4**, S**5**.

In the step S**8**, the main CPU **21** accesses the memory card **30** inserted into the card slot **12** via the IDE bus **32**. Then, the main CPU **21** operates as the reading means to read the gaming program **30***a* and the gaming system program **30***b* from the memory card **30** as well as the step S**5**. Next, the main CPU **21** operates as the authentication means to execute the authentication process f**2** for the read gaming system program **30***b* and the authentication process f**3** for the read gaming program **30***a* according to the aunthentication program **11***a* stored in the ROM **26**, in order to check that the gaming program **30***a* and the gaming system program **30***b* are not falsified ant then authenticate them. In the step S**6**, the main CPU **21** operates as the writing means to execute the loading process r**2** for the authenticated gaming system program **30***b* and the loading process r**3** for the authenticated gaming program **30***a* to write them to the RAM **23**, after the authentication processes f**2**, f**3** normally finish. In the step S**7**, the main CPU **21** operates as the action controlling means to control a game proceeding (game action) according to the written gaming program **30***a* and the written gaming system program **30***b*.

Next, advantageous features of the gaming information authentication loading procedure will be described.

The gaming information such as the gaming program **30***a* and the gaming system program **30***b* can be easily loaded from the memory card **30** to the RAM **23** of the mother board **25** when the memory card **30** storing the gaming information therein is only inserted into the card slot **12** of the gaming board **15**.

The authentication program **11***a* described along the authentication process is stored in the ROM **26** of the mother board **25**. Therefore, the authentication process can be executed according to the authentication program **11***a* to check whether or not the gaming information is not falsified and then authenticate it when the gaming information is loaded. As a result, in the gaming information authentication loading device **2**, even if the gaming information is supplied from an outside device of the slot machine **91**, the authenticated gaming information that is not falsified can be loaded, which certinaly prevents a malicious third party from making a falsification for the gaming information.

The authentication program **11***a* is stored in the ROM **26** of the mother board **25**. Therefore, loading the authentication program **11***a* from the gaming board **15** to the mother board **25** and carrying out the checksum can be omitted. As a result, the gaming information authentication loading procedure is easily executed in comparison with that of the first exemplary embodiment.

Third Examplary Embodiment

As shown in FIG. **9**, a gaming information authentication loading device **3** is different from the gaming information

authentication loading device **1** regarding the following matter: the gaming information authentication loading device **3** has a gaming board **16** instead of the gaming board **10**.

The gaming board **16** is different from the gaming board **10** regarding the following matter: the gaming board **16** has a CPU **17** and an inner bus **18**. The CPU **17** is connected to the boot ROM **11** via the inner bus **18**.

As shown in FIG. **10**, a slot machine **101** is different from the slot machine **41** regarding the following matter: the gaming information authentication loading device **3** instead of the gaming information authentication loading device **1** is incorporated into the slot machine.

As shown in FIG. **11**, the gaming system program **30***b* stored in the memory card **30** includes a mutual authentication program **30***c* for executing an authentication process (mutual authentication process) f**5** for the authentication program **11***a*. It is noted that the mutual authentication program **30***c* may be independent from the gaming system program **30***b*. A ROM (not shown) incorporated into the CPU **17** includes a preliminary authentication program **11***b* for executing an authentication process (preliminary authentication process) f**4** for the authentication program **11***a*. It is noted that the preliminary authentication program **11***b* may be stored in the boot ROM **11**.

As shown in FIG. **12**, a gaming information authentication loading procedure is different from the gaming information authentication loading procedure of the first examplary embodiment regarding the following matter: the gaming information authentication loading device **3** executes steps S**9**, S**10** between the step S**1** and the step S**2**; the gaming information authentication loading device **3** executes steps S**11** to S**17** instead of the steps S**5** to S**7**; and the CPU **17** of the gaming board **16** executes steps **21** to **23**.

The gaming information authentication loading procedure will be described with reference to FIGS. **11** and **12**.

In the step S**1**, the power source switch of the power source unit **39** is turned on. Processes on the gaming board **16** side are started when the power source switch has been turned on. In step S**21**, the CPU **17** executes an output process P1 to output a reset control (reset signal) to the main CPU **21** via the PCI bus **31**. The reset control causes the main CPU **21** to hold a reset state without carrying out any process until the CPU **17** executes an output process P**2** to output a release order to the main CPU **21**. In step S**22**, the CPU **17** reads the preliminary authentication program **11***b* stored in the ROM and then operates as a preliminary authentication means to execute the authentication process f**4** for checking that the authentication program **11***a* is not falsified and then authenticating it according to the read preliminary authentication program **11***b*. In step S**23**, after the authentication process f**4** has normally finished, the CPU **17** executes the output process P**2** to output the release order to the main CPU **21**, which releases the reset state of the main CPU **21**.

On the other hand, in step S**9**, the main CPU **21** receives the reset control to become the reset state where the main CPU **21** stops any process. In step S**10**, the main CPU **21** receives the release order to release the reset state thereof. In the steps S**2** to S**4**, the main CPU **21** operates as the reading means to read from the boot ROM **11** the authentication program **11***a* authenticated in the authentication process f**4**, and then causes the read authentication program **11***a* to be temporarily stored in the RAM **23**.

The steps S**9**, S**10** on the mother board **20** side and the steps S**21** to S**23** on the gaming board **16** may be replaced by the following steps: (1) a prescribed storage such as register or memory for checking completion of the authentication process f**4** is previously reserved on the gaming board **16** or the mother board **20**; (2) the CPU **17** rewrites contents of the prescribed storage by holding up an ending flag when the authentication process f4 finishes; (3) the main CPU **21** detects the completion of the authentication process f**4** by monitoring the rewritten contents of the prescribed storage; and (4) the main CPU **21** reads the authentication program **11***a* after detecting the completion of the authentication process f**4**. This can prevent the main CPU **21** from reading the authentication program **11***a* before the authentication process f**4** finishes. At this time, this can prevents occurrence of a signal collision due to the CPU **17** and the main CPU **21** accessing simultaneously the PCI bus **31**, without using another means such as a bus switching means.

In step S**11**, the main CPU **21** operates as the reading means to read the gaming program **30***a* and the gaming system program **30***b* from the memory card **30**, as well as the step S**5**. Next, the main CPU **21** operates as the authentication means to execute the authentication process f**2** for the read gaming system program **30***b* according to the stored authentication program **11***a*. In step S**12**, the main CPU **21** operates as the authentication means to execute the authentication process f**3** for the read gaming program **30***a* according to the stored authentication program **11***a*, when the authentication process f**2** has normally finished.

In step S**13**, the main CPU **21** operates as an authentication log information generating means to execute an authentication logging process for generating authentication log information which shows that the gaming program **30***a* and the gaming system program **30***b* are authenticated and then causing the generated authentication log information to be stored in the RAM **23**, when the authentication process f**3** has normally finished. In step S**14**, the main CPU **21** operates as the writing means to execute the loading process r**2** for the authenticated gaming system program **30***b* and the loading process r**3** for the authenticated gaming program **30***a* to write them to the RAM **23**.

In step S**15**, the main CPU **21** accesses an address of the RAM **23** storing the authentication log information therein, and then checks that the authentication processes f**2** and f**3** have normally finished with reference to the authentication log information. In step S**16**, the main CPU **21** operates as the mutual authentication means to read the authentication program **11***a* from the boot ROM **11** to the RAM **23**, and then execute the authentication process f**5** for the authentication program **11***a* to check ex post facto that the authentication program **11***a* is a legitimate program according to the mutual authentication program **30***c* included in the gaming system program **30***b* written to the RAM **23**, when having checked that the authentication processes f**2** and f**3** normally finished. The authentication process f**5** is called the mutual authentication process because the authentication program **11***a* is authenticated according to the authenticated gaming system program **30***b* including the mutual authentication program **30***c* therein.

In step S**17**, the main CPU **21** operates as the action controlling means to check whether or not the authentication process f**5** has normally finished, and then control a game proceeding (game action) according to the written gaming program **30***a* and the written gaming system program **30***b* when the authentication process f**5** has normally finished.

Next, advantageous features of the gaming information authentication loading procedure will be described.

The gaming information such as the gaming program **30***a* and the gaming system program **30***b* can be easily loaded from the memory card **30** to the RAM **23** of the mother board

**20** when the memory card **30** storing the gaming information therein is only inserted into the card slot **12** of the gaming board **16**.

The authentication program **11***a* described along the authentication procedure is stored in the boot ROM **11** of the gaming board **16**. Therefore, the authentication procedure can be executed according to the authentication program **11***a* to check whether or not the gaming information is not falsified and then authenticate it when the gaming information is loaded. As a result, in the gaming information authentication loading device **3**, even if the gaming information is supplied from an outside device of the slot machine **101**, the authenticated gaming information that is not falsified can be loaded, which certinaly prevents a malicious third party from making a falsification for the gaming information.

The preliminary authentication process f**4** is carried out to check that the authentication program **11***a* is not falsified and then authenticate it before the authentication program **11***a* is stored in the RAM **23**. Therefore, reliability for the authentication program **11***a* increases because the checkum and the preliminary authentication process f4 are carried out with respect to the authentication program **11***a* so as to authenticate that the authentication program **11***a* is not falsified and is a legitimate program. It is noted that the preliminary authentication program **11***b* is not rewritten because it is stored in the ROM in corporated into the CPU **17**. It is further noted that the ROM may be the boot ROM **11**.

The mutual authentication process f**5** is carried out to check that the authentication program **11***a* is a legitimate program according to the mutual authentication program **30***c* included in the gaming system program **30***b*. Therefore, the authentication processes are carried out bi-directionally between the gaming information and the authentication program **11***a*. As a result, the gaming information and the authentication program **11***a* are consistent each other, which increases reliability for them.

It is considered that the authentication program **11***a*, the gaming program **30***a* and the gaming system program **30***b* are falsified after being stored in the RAM **23**. However, the mutual authentication process f**5** is carried out after the authentication log information which shows that the gaming program **30***a* and the gaming system program **30***b* are authenticated is stored in the RAM **23**. Therefore, even if the gaming information is supplied from an outside device of the slot machine **101** and stored in the RAM **23**, the stored gaming information can be not falsified because the mutual authentication process f**5** is carried out after the gaming information is stored in the RAM **23**, which more certinaly prevents a malicious third party from making a falsification for the gaming information.

### Modified Third Exemplary Embodiment

The gaming information authentication loading device **3** and the slot machine **101** may carries out a gaming information authentication loading procedure shown in FIG. **13**.

In the third exemplary embodiment, the main CPU **21** of the mother board **20** carries out the authentication process f**2** for the gaming system program **30***b* and the authentication process f**3** for the gaming program **30***a* according to the authentication program **11***a* stored in the RAM **23**, and then carries out the authentication process (mutual authentication process) f**5** for the authentication program **11***a* according to the gaming system program **30***b*. On the other hand, in the modified third exemplary embodiment, the CPU **17** of the gaming board **10** carries out an authentication process f**6** for the gaming program **30***a* and an authentication process f**7** for the gaming system program **30***b* according to the authentication program **11***a* stored in the boot ROM **11**, and then carries out an authentication process (mutual authentication process) f**8** for the authentication program **11***a* according to the gaming system program **30***b*.

In the modified embodiment, the CPU **17** operates as the reading means, the authentication means and the mutual authentication means. The CPU **17** carries out the output process P**2** to output the release order to the main CPU **21** after the authentication process f**8** has been carried out, and then carries out the loading process r**1** for the authentication program **11***a*, the loading process r**2** for the gaming system program **30***b* and the loading process r**3** for the gaming program **30***a*. In the loading processes r**1**, r**2**, r**3**, the main CPU **21** causes the read authentication program **11***a*, the read gaming program **30***a* and the read gaming system program **30***b* to be temporarily stored in the RAM **23**, while carrying out the checksum in the ADDSUM type according to the standard BIOS function of the BIOS **22***a* to check whether or not the read authentication program **11***a*, the read gaming program **30***a* and the read gaming system program **30***b* are correctly stored in the RAM **23** (see the authentication processes f**1** in FIG. **13**).

The authentication processes are carried out bi-directionally between the gaming information and the authentication program **11***a*. Therefore, the gaming information and the authentication program **11***a* are consistent each other, which increases reliability for them.

### Other Modified Exemplary Embodiments

The mutual authentication process may be carried out by the gaming information authentication loading device **2** and the slot machine **91** in the second exemplary embodiment. In this case, the steps S**13** to S**17** are carried out instead of the steps S**6**, S**7**, following the step S**8** as shown in FIG. **8**.

Although the slot machine configured to allow a player to play the slot game is cited as the gaming machine in the first to third exemplary embodiments, the slot machine may be replaced by another gaming machine such as a card gaming machine configured to allow a player to play a card game by using card images, a mah-jongg gaming machine configured to allow a player to play a mah-jongg game, or a pachinko gaming machine configured to allow a player to play a pachinko game by using a gaming boll. Further, in the slot machine, the quasi-reels may be replaced by mechanical reels. When the mechanical reels are employed in the slot machine.

Although the gaming information is composed of the gaming program **30***a* and the gaming system program **30***b*, the gaming information may be composed of one program or three or more programs.

In a case where the abnormality in each authentication process occurs, the main CPU **21** may stop the gaming information authentication loading procedure while notifying a game arcade staffs of the abnormality by using the speakers **49** R, **49**L and/or the lamp **60**.

It is also noted that, besides those already mentioned above, many modifications and variations of the above exemplary embodiments may be made without departing from the novel and advantageous features of the present invention. Accordingly, all such modifications and variations are intended to be included within the scope of the appended claims.

What is claimed is:

1. A gaming machine comprising:

a game action executing device configured to execute a game action;

a loading device including a connection unit configured to be connected to a removable storage medium storing therein gaming information including a mutual authentication program; and

a process device including a readable and rewritable storage unit,

wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device:

the program storage unit configured to store therein an authentication program for authenticating the gaming information stored in the storage medium;

the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

the mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to the mutual authentication program included in the gaming information authenticated by the authentication unit,

the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit, and

the process device includes an action controlling unit configured to control the game action executing device according to the written gaming information so that the game action executing device executes the game action, when the mutual authentication unit has executed the mutual authentication process.

2. The gaming machine according to claim **1**, wherein an authentication log information generating unit is included in at least one of the loading device and the process device, the authentication log information generating unit configured to generate authentication log information regarding the authentication process for the read gaming information.

3. The gaming machine according to claim **2**, wherein a preliminary authentication unit is included in at least one of the loading device and the process device, the preliminary authentication unit configured to execute a preliminary authentication process for the authentication program before the reading unit reads the authentication program from the program storage unit.

4. The gaming machine according to claim **1**, wherein a preliminary authentication unit is included in at least one of the loading device and the process device, the preliminary authentication unit configured to execute a preliminary authentication process for the authentication program before the reading unit reads the authentication program from the program storage unit.

5. A gaming information authentication loading device comprising:

a loading device including therein a connection unit configured to be connected to a removable storage medium storing therein gaming information including a mutual authentication program; and

a process device including a readable and rewritable storage unit,

wherein each of a program storage unit, a reading unit, an authentication unit and a mutual authentication unit is included in at least one of the loading device and the process device:

the program storage unit configured to store therein an authentication program for authenticating the gaming information;

the reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

the authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

the mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate program according to a mutual authentication program included in the gaming information authenticated by the authentication unit, and

the process device includes a writing unit configured to write the gaming information authenticated by the authentication unit to the readable and rewritable storage unit.

6. The gaming information authentication loading device according to claim **5**, wherein an authentication log information generating unit is included in at least one of the loading device and the process device, the authentication log information generating unit configured to generate authentication log information regarding the authentication process for the read gaming information.

7. The gaming information authentication loading device according to claim **6**, wherein a preliminary authentication unit is included in at least one of the loading device and the process device, the preliminary authentication unit configured to execute a preliminary authentication process for the authentication program before the reading unit reads the authentication program from the program storage unit.

8. The gaming information authentication loading device according to claim **5**, wherein a preliminary authentication unit is included in at least one of the loading device and the process device, the preliminary authentication unit configured to execute a preliminary authentication process for the authentication program before the reading unit reads the authentication program from the program storage unit.

9. A gaming information loading device configured to load gaming information including a mutual authentication program stored in a removable storage medium from the storage medium to a mother board connected to the gaming information loading device, comprising:

a connection unit configured to be connected to the storage medium;

a program storage unit configured to store therein an authentication program for authenticating the gaming information;

a reading unit configured to read the authentication program from the program storage unit and the gaming information from the storage medium connected to the connection unit;

an authentication unit configured to execute an authentication process for the read gaming information according to the read authentication program; and

a mutual authentication unit configured to execute a mutual authentication process for the authentication program to check that the authentication program is a legitimate

program according to a mutual authentication program included in the gaming information authenticated by the authentication unit.

**10**. The gaming information loading device according to claim **9**, further comprising a preliminary authentication unit configured to execute a preliminary authentication process for the authentication program before the reading unit reads the authentication program from the program storage unit.

* * * * *



(12) **United States Patent**
**Haishima**

(10) **Patent No.: US 8,112,670 B2**
(45) **Date of Patent: *Feb. 7, 2012**

(54) **GAMING APPARATUS HAVING MEMORY FAULT DETECTION**

(75) Inventor: **Jun Haishima**, Tokyo (JP)

(73) Assignee: **Universal Entertainment Corporation**, Tokyo (JP)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 181 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/630,135**

(22) Filed: **Dec. 3, 2009**

(65) **Prior Publication Data**

US 2010/0083051 A1 Apr. 1, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/205,121, filed on Aug. 17, 2005, now Pat. No. 7,664,988.

(30) **Foreign Application Priority Data**

Aug. 25, 2004 (JP) ................................ 2004-245337

(51) **Int. Cl.**
***G06F 11/00*** (2006.01)

(52) **U.S. Cl.** .............................................. **714/36**; 713/2

(58) **Field of Classification Search** ............... 714/3, 5.1, 714/5.11, 6.1, 6.32, 36; 713/2; 710/104
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,701,478 | A | 12/1997 | Chen | |
| 5,732,268 | A | 3/1998 | Bizzarri | |
| 5,860,122 | A | 1/1999 | Owada et al. | |
| 5,864,698 | A | 1/1999 | Krau et al. | |
| 5,971,851 | A | 10/1999 | Pascal et al. | |
| 6,011,564 | A | 1/2000 | Furuhashi et al. | |
| 6,115,036 | A | 9/2000 | Yamoto et al. | |
| 6,393,559 | B1 | 5/2002 | Alexander | |
| 6,449,735 | B1 | 9/2002 | Edwards et al. | |
| 7,664,988 | B2 * | 2/2010 | Haishima | 714/36 |
| 2004/0078697 | A1 | 4/2004 | Duncan | |
| 2005/0246586 | A1 | 11/2005 | Chang | |
| 2007/0168738 | A1 | 7/2007 | Wang | |
| 2010/0083051 | A1 * | 4/2010 | Haishima | 714/42 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 774 716 | A1 | 5/1997 |
| EP | 0 801 387 | A2 | 10/1997 |
| JP | 9-319445 | | 12/1997 |
| JP | 2000-35888 | | 2/2000 |
| JP | 2003-330793 | | 11/2003 |
| JP | 2003-331236 | | 11/2003 |

* cited by examiner

*Primary Examiner* — Dieu-Minh Le
(74) *Attorney, Agent, or Firm* — Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.

(57) **ABSTRACT**

In the information process device **1**, the fault inspection program is stored in the fault inspection program area **13***b* of the ROM **13** provided on the mother board **11** which is independently arranged from the hard disk **24**, thereby even if a fault occurs in the hard disk **24** which is inspected by the fault inspection program, it can be guaranteed that the fault inspection program properly operates.

**5 Claims, 3 Drawing Sheets**





FIG.1
1
11
12
CPU
13
ROM
13a
BOOT PROGRAM STORING AREA
13b
FAULT INSPECTION PROGRAM STORING AREA
13c
START PROGRAM STORING AREA
14
RAM
15
16
17
18
19
20
21
OUTPUT DEVICE
22
INPUT DEVICE
23
24
HARD DISK
24a
OS STORING AREA
24b
EXTENDED BIOS STORING AREA
24c
APPLICATION PROGRAM STORING AREA
25
VIDEO BOARD
26
SOUND BOARD

FIG.2

START PROGRAM
EXECUTION OF BOOT PROGRAM
S11
EXECUTION OF FAULT INSPECTION PROGRAM
S12
S13
FAULT ?
YES
NO
S14
START OF EXECUTION OF APPLICATION PROGRAM
S15
ERROR DISPLAY



FIG.3



# GAMING APPARATUS HAVING MEMORY FAULT DETECTION

## CROSS-REFERENCE TO THE RELATED APPLICATIONS

This application is a Continuation of and claims the benefit priority from U.S. Ser. No. 11/205,121, filed Aug. 17, 2005, which claims the benefit of priority from Japanese Patent Application No. 2004-245377, filed Aug. 25, 2004, the entire contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to an information process device in which a fault in hardware or software is inspected.

2. Description of Related Art

In a conventional information process device, data and programs required in calculation or control are stored in one memory area of a memory device such as a hard disk and a program for inspecting whether or not a fault such as damage, change or falsification occurs in the programs or data (hereinafter, abbreviated as "fault inspection program") is stored in the other memory in the same memory device, as disclosed in Unexamined Japanese Publication No. 2003-331236.

Therefore, in a case that the damage occurs in the memory device, there is fear that the fault inspection program is also damaged. At that time, it cannot be guaranteed that the fault inspection program properly operates.

## SUMMARY OF THE INVENTION

In order to dissolve the above problems, the data invention has been done and has an object to provide an information process device in which it can be guaranteed that a fault inspection program properly operates even if a fault occurs in a memory device which is inspected through the fault inspection program.

In order to accomplish the above object, according to one aspect of the present invention, it is provided an information process device comprising:

- a first memory device for storing a boot program executed when the information process device is started to operate;
- a mother board on which the first memory device is provided:
- a second memory device for storing an application program, the second memory device being connected to the mother board;
- a control device for executing a fault inspection program to inspect whether or not a fault occurs in the second memory device;
- wherein the fault inspection program is stored in the first memory device; and
- wherein the control device executes the fault inspection program when the information process device is started to operate.

According to the information process device of the present invention, the fault inspection program is stored in the first memory device on the mother board which is independent from the second memory device, thereby even if the fault occurs in the second memory device, it can be guaranteed that the fault inspection program properly operates.

The above and further objects and novel features of the invention will more fully appear from the following detailed description when the same is read in connection with the accompanying drawings. It is to be expressly understood, however, that the drawings are for purpose of illustration only and not intended as a definition of the limits of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification illustrate embodiments of the invention and, together with the description, serve to explain the objects, advantages and principles of the invention.

In the drawings,

FIG. **1** is a block diagram of an information process device according to the embodiment,

FIG. **2** is a flowchart of a start program executed when the information process device is started to operate, and

FIG. **3** is a perspective view of the information process device according to the embodiment.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Hereinafter, the embodiment according to the present invention will be described with reference to the drawings.

FIG. **1** is a block diagram of the embodiment according to the present invention. FIG. **3** is a perspective view of an information process device of the embodiment. As shown in FIG. **3**, although the information process device **1** is a gaming machine for business use, such gaming machine utilizes an operating system (OS) which is generally used in a personal computer on sale. And under an operation circumstances thereof, a game soft program stored in a hard disk mentioned later is operated.

And as shown in FIG. **1**, in the information process device **1** according to the embodiment, a CPU **12**, a ROM **13**, a RAM **14**, a bus **15**, connectors **16**, **17**, a port **18**, extended slots **19**, **20** are provided on a mother board **11**.

The CPU **12** controls the information process device **1** of the embodiment and executes various programs. Therefore, the CPU **12** corresponds to a control device.

And the ROM **13** is a nonvolatile memory in which various control programs are stored, such control programs being required when the information process device **1** of the embodiment is started to operate. The ROM **13** corresponds to a first memory device. And in the ROM **13**, as shown in FIG. **1**, a boot program storing area **13***a* for storing a boot program, a fault inspection program storing area **13***b* for storing a fault inspection program and a start program storing area **13***c* for storing a start program are formed.

Here, the boot program stored in the boot program storing area **13***a*, the fault inspection program stored in the fault inspection program storing area **13***b* and the start program stored in the start program storing area **13***c* will be described hereinafter.

Further, the RAM **14** is a memory for temporarily storing various data calculated when the CPU **12** executes programs.

The bus **15** is constructed from a PCI bus in which a bridge circuit for frequency change is formed, and becomes a common signal bus through which transmission and receipt of signals are conducted among the CPU **12**, the ROM **13**, the RAM **14**, the connectors **16**, **17**, the port **18** and the extended slots **19**, **20**.

The connector **16** is a device to connect an output device **21** required when the game soft program is operated, to the mother board **11**.

Here, the output device **21** connected to the connector **16** is constructed from a liquid crystal display (see the reference number **21** in FIG. **3**) and a sound output device (not shown) such as a speaker. Instead of the liquid crystal display (see the reference number **21** in FIG. **3**), a CRT display and the like may be used.

The connector **17** is a device to connect an input device required when the game soft program is operated, to the mother board **11**. Here, the input device **22** is constructed from a control panel **22** (see FIG. **3**) provided with a plurality of button switches (not shown). The input device **22** may include the other devices such as a keyboard, a mouse and the like, and according to contents of the game soft program, a joystick and the like may be connected to the connector **17**. And in FIG. **1**, although only one connector **17** is shown, if a plurality of input devices **22** are used, plural connectors **17** are provided respectively corresponding to each of the input devices **22**.

And a hard disk **24** (HDD) is connected to the port **18** through a flat cable **23**.

And in the hard disk **24** connected to the port **18**, there are formed an operating system (OS) storing area **24***a* for storing the OS, an extended BIOS (Basic Input Output System) storing area **24***b* for storing an extended BIOS and an application storing area **24***c* for storing an application program which is the game soft program. Therefore, the hard disk **24** corresponds to a second memory device.

And the extended slot **19** is an insertion slot to connect a video board **25** to the mother board **11**.

Here, the video board **25** connected to the mother board **11** through the extended slot **19** is a board having a graphics-accelerator to display figures and characters on the liquid crystal display (see the reference number **21** in FIG. **3**) which is one of the output devices **21**. The video board **25** can conduct performance with a resolution level and a graphics describing speed so that the operation of the game soft program in the information process device **1** of the embodiment can be properly executed.

And the extended slot **20** is an insertion slot to connect a sound board **26** to the mother board **11**.

Here, the sound board **26** connected to the mother board **11** through the extended slot **20** is a board having a chip such as FM sound source and PCM sound source to output sounds from the speaker (not shown) which is one of the output devices **21**. The sound board **26** can conduct performance so that the operation of the game soft program in the information process device **1** of the embodiment can be properly executed.

Next, with reference to a flowchart shown in FIG. **2**, it will be described an operation executed when the information process device **1** according to the embodiment is started to operate. FIG. **2** is a flowchart of a start program executed when the information process device **1** is started to operate.

In the information process device **1** of the embodiment, when the device **1** is started to operate, the start program stored in the start program storing area **13***c* of the ROM **13** is executed by the CPU **12**.

That is to say, as shown in FIG. **2**, when the start program is executed, at first in S**11**, a boot program is executed.

Here, the boot program is a program stored in the boot program storing area **13***a* of the ROM **13**, and based on the boot program, initialization of various devices including the extended BIOS (Basic Input Output System) in the hard disk **24** and the OS (Operating System) in the hard disk **24** is executed.

At that time, since the OS (Operating System) in the hard disk **24** is loaded in the RAM **14** and started to operate, the ROM **13** may be called as a boot ROM at this point of view.

Next, when procedure of the start program shifts to S**12**, the fault inspection program is executed.

Here, the fault inspection program is a program stored in the fault inspection program storing area **13***b* and through which a fault inspection in the hard disk **24** is executed. Concretely, according to the fault inspection program, it is inspected whether or not a damage occurs in the hard disk **24** or whether or not change or falsification of the program stored in the hard disk **24** is conducted.

Next, when procedure of the start program shifts to S**13**, it is determined whether or not a fault occurs in the hard disk **24**. This determination is conducted based on an execution result of the fault inspection program obtained in S**12**.

At that time, if it is determined that the fault does not occur in the hard disk **24** (S**13**: NO), procedure shifts to S**14**, thereafter the application program stored in the hard disk **24** is loaded in the RAM **14** and execution of the application program is started. On the other hand, if it is determined that the fault occurs in the hard disk **24** (S**13**: YES), procedure shifts to S**15** and error display is conducted on the liquid crystal display (see the reference number **21** in FIG. **3**) which is one of the output devices **21**.

As mentioned, in the information process device **1** according to the embodiment, as shown in FIG. **1**, the fault inspection program is stored in the fault inspection program storing area **13***b* of the ROM **13** on the mother board **11** independently from the hard disk **24**, thereby even if a fault occurs in the hard disk **24** which is inspected by the fault inspection program, it can be guaranteed that the fault inspection program properly operates.

And as shown in FIG. **3**, the information process device **1** of the embodiment is used as the gaming machine for business use, and as shown in FIG. **2**, the fault inspection program stored in the ROM **13** is executed at the time that the information process device **1** is started to operate and the fault inspection in the hard disk **24** is executed before games are started. Therefore, measures to avoid troubles during gaming can be taken beforehand, without giving displeasure to a player of the gaming machine for business use.

Here, the present invention is not limited to the embodiment mentioned in the above and various modifications can be conducted within the scope of the present invention.

For example, as shown in FIG. **3**, although the information process device **1** of the embodiment is used as the gaming machine for business use, the information process device **1** may be adopted for a personal computer on sale. In this case, the keyboard, the mouse or the joystick may be utilized as the input device, instead of the control panel **22**.

And in the information process device **1** of the embodiment, although the hard disk **24** is used as the second memory device, a flash memory in which contents can be changed and stored may be used. In this case, the fault inspection program inspects whether or not a fault occurs in the flash memory.

The present invention can be adopted for the fault inspection in the information process device.

The invention claimed is:

**1**. A gaming device configured to execute a game, the gaming device comprising:

a mother board on which a first memory device is provided;

a second memory device configured to store a game application program, the second memory device being connected to the mother board; and

a control device for executing a fault inspection program for the second memory device to inspect whether or not a fault occurs in the second memory device;

wherein the fault inspection program is stored in the first memory device, and the control device completes the execution of the fault inspection program before the game is started.

**2**. The gaming device according to claim **1**, wherein the first memory device stores a boot program executed when the gaming device is started to operate, and

wherein the control device executes the fault inspection program after the boot program is executed.

**3**. The gaming device according claim **1**, wherein the second memory device is electrically rewritable.

**4**. A gaming device configured to execute a game, the gaming device comprising:

a ROM configured to store a fault inspection program;

a memory device which is electrically rewritable a game application program stored therein;

a control device configured to execute the fault inspection program to inspect whether or not a fault occurs in the game application program stored in the memory device;

wherein the control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started.

**5**. The gaming device according to claim **4**, wherein the ROM is provided on a mother board having a connector, and the memory device is connectable to the mother board through the connector of the mother board.

* * * * *

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 2, 2020, a copy of the foregoing document:

**OPENING BRIEF FOR PLAINTIFF-APPELLANT BOT M8 LLC.**

was filed electronically with the Clerk of the Court using the CM/ECF System, which will send a Notice of Docket Activity via electronic mail to all counsel of record.

Dated: November 2, 2020 By: */s/ Paul J. Andre*
Paul Andre

**CERTIFICATE OF COMPLIANCE WITH RULE 32(B)**

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b) because this brief contains 13,983 words, exclusive of the certificate of interest, table of contents, table of citations, statement of related cases, addendum and this certificate of compliance as exempted by Fed. R. App. 32(f) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Respectfully submitted,

Dated: November 2, 2020

*/s/ Paul J. Andre*

Paul J. Andre
Lisa Kobialka
James Hannah
Kramer Levin Naftalis & Frankel LLP
990 Marsh Road
Menlo Park, California 94025
Tel: (650) 752-1700 | Fax: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Aaron M. Frankel
Cristina Martinez
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

New York, NY 10036
Tel: 212.715.7502 | Fax: 212.715.8302
afrankel@kramerlevin.com
cmartinez@kramerlevin.com
*Attorneys for Plaintiff-Appellant*
Bot M8 LLC.